# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **ARIEL EBAUGH** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | **Civil Action No.:** |
| **v.** | ) | |
| | ) | |
| **THE SUPERIOR COURT OF** | ) | |
| **DEKALB COUNTY &** | ) | |
| **THE STATE OF GEORGIA** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## PETITION FOR WRIT OF MANDAMUS

Plaintiff Ariel Ebaugh seeks an order of this court pursuant to 28 U.S.C. § 1651 striking down Georgia Statute OCGA § 16–11–220(2)(B)(2022) the Georgia State Domestic terrorism statute is a per se infringement upon and violation of the First Amendment to the United States Constitution.

## PARTIES

1. Ariel Ebaugh
2. The State of Georgia
3. DeKalb County, Georgia
4. The Superior Court of DeKalb County
5. The DeKalb County Sheriff's Department

## JURISDICTION AND VENUE

Original jurisdiction is vested in this Court pursuant to 28 USC 133 as the claim arises under the Constitution and laws of the United States.

Venue is vested in this Court as the Constitutional violation of the First Amendment aggrieved of herein is taking place within the United States District Court for the Northern District of Georgia.

## ARGUMENT

1. For the reasons fully discussed in the appended Memorandum of Law, the prosecution of petitioner Ariel Ebaugh's pursuant to the Georgia State Domestic Terrorism statute (OCGA § 16–11–220(2)(B)(2022) arising from the so-called "Cop City" protests is both facially and as applied in clear violation of the First Amendment. To be sure, the domestic terrorism statute suffers from a dramatic undeniable merger of unconstitutional vagueness and overbreadth.

2. To be sure it is clear that 16-11-220's terms violate the fair notice element of the void-for-vagueness doctrine, whose "purpose is to enable the ordinary citizen to conform his or her conduct to the law." *City of Chicago v. Morales*, 527 U.S. 41, 58 (1999). No less true the statute 16-11-220 represents a palpable attempt to apply the force of the state against words and deeds protected by the First Amendment, tying criminal culpability to mere statements or acts that "intimidate or coerce."

That the statute's scope is impermissibly broad with outer limits of its reach impossible to discern is beyond dispute. Such statutes have often been declared unconstitutional on its face under the First Amendment overbreadth doctrine, even though it may have some legitimate uses. *See* e.g., *United States v. Stevens*, 559 U.S. 460, 473 (2010).

3. In addition, the conditions of release imposed upon Ms. Ebaugh following her arrest on this charge unconstitutionally infringe upon her First Amendment rights to speech, association and assembly.

4. For these reasons these interconnected First Amendment challenges to OCGA § 16–11–220(2)(B)(2022) present a multilayered federal issue of first impression to this Court: A state criminal charge for domestic terrorism arising under a statute that is unconstitutional and which subsequently forms the basis for additional unconstitutional terms and conditions of a defendant's release.

5. In addition, because Ms. Ebaugh meets and satisfies the requisite threshold pleading requirements of *Cheney v. U.S. Dist. Court for Dist. Of Columbia*, 542 U.S. 367 (2004),[1] it is respectfully submitted that this Court should issue and must issue a Writ of Mandamus.

6. As set forth more fully in the appended Memorandum of Law, to date, Ms. Ebaugh has been denied any and all adequate, let alone meaningful vehicles within the state court process by which to pursue the relief she desires and is clearly entitled to. Thus, having appropriately moved some three months ago to challenge

---

[1] "Three conditions must be satisfied before a writ of mandamus may issue: first, the party seeking issuance of the writ must have no other adequate means to attain the relief he desires; second, the petitioner must satisfy the burden of showing that his right to issuance of the writ is clear and indisputable; third, even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Cheney v. U.S. Dist. Court for Dist. Of Columbia*, 542 U.S. 367 (2004).

the constitutionality of the state domestic terrorism statute under a local habeas corpus procedure, to date petitioner's effort remains little more than a state court procedural tease.

7. Thus, although Petitioner sought judicial intervention in DeKalb County Superior Court on or about May 30,2023 on the grounds that the extremely serious domestic terrorism law under which she stands charged[2] is unconstitutional[3] to date no action has been taken by any court other than to recuse itself[4] with not so much as a motion schedule set for reply briefs by named and properly served respondents. In addition, not long after the motion was filed the DeKalb County District Attorney announced that because of policy disagreements with the Attorney General she would no longer handle any prosecutions relating to "Cop City" protests including defendants such as Ariele Ebaugh charged with domestic terrorism. In addition, as of the filing of this application the Georgia State Attorney General's Office has ignored the filing of Ariel Ebaugh in its entirety submitting no response to her application whatsoever. And while the DeKalb County Attorney acting on behalf of the DeKalb County Sheriff did file a reply it ignored in its

_____

[2] Under OCGA § 16–11–220(2)(B)(2022), upon a conviction, a defendant can be sentenced up to 35 years in state prison.

[3] Because the State has not indicted Ms. Ebaugh, nor is it apparent when or if within the applicable limitations period it will do so, without an indictment, there is no criminal proceeding to challenge. *See* OCGA § 16– 1–3(4). In this light and because the law disallows preindictment challenges to criminal prosecutions [*Davis v. State*, 307 Ga. 784, 786–88, 838 S.E.2d 233, 234–35 (2020)], Ms. Ebaugh sought the relief she did in state court by her habeas petition.

[4] On May 5th, 2023, Chief Judge LaTisha Dear Jackson of the DeKalb County Superior Court recused herself without as permitted under state law setting forth grounds for her refusal. Assigned next to DeKalb County Superior Court Judge Courtney L. Johnson on June 7th, 2023 she also recused herself on June 26th, 2023, also without setting forth a basis for her recusal. The case was then assigned on the same day to Judge Asha F. Jackson, who recused herself on July 20th, 2023. As of the time of this submission no DeKalb County Superior Court Judge has been assigned the matter, as it languishes without judicial action of any sort by the Court Clerk, with regard to a fourth assignment.

entirety petitioners' constitutional claims and arguments resting instead on a rote denial rooted in insufficient information about the claims to reply.[5]

**8. On or about August 29, 2023 an indictment was handed down in Fulton County Superior Court accusing 61 persons or entities mostly of violations of the Georgia Racketeering law.[6] Brought by the Office of the Attorney General, under act number 124, it is alleged that " on December 14, 2022, ARIEL EBAUGH [sic] did approach DeKalb law enforcement with a rifle, knives, and a pistol in a threatening manner in an attempt to intimidate officers, thus committing an Aggravated Assault against DeKalb law enforcement. This is an overt act in furtherance of the conspiracy."[7]**

**9. The overt act attributed to Ms. Ebaugh under this indictment is the identical conduct at the very time and place which served and continues to serve as the basis for her arrest and the ensuing charge of Domestic Terrorism in DeKalb County.**

**10. As of the time of this application, although indicted in Fulton County for identical conduct under the RICO charge, the Domestic Terrorism charge remains pending and active against Ms. Ebaugh in DeKalb County.**

**11. Given the indictment of Ms. Ebaugh in Fulton County, on September 12, 2023 a request was made by counsel to the Office of the Attorney General to end the charging contradiction whereby Ms. Ebaugh stands charged under**

---

[5] A plain read of the County Attorney's reply is very much the kind of respondent denial of sufficient knowledge and facts typically submitted in a classic tort claim arising from, for example, a traffic accident.

[6] Copy of which appended hereto as Exhibit A.

[7] Of the 225 overt acts set forth in the indictment, this is the sole activity attributed to Ms. Ebaugh. For purposes of the underlying RICO conspiracy itself, there is no evidence delineated in the indictment which connects Ms. Ebaugh to knowing participation in the agreed-to illegal end.

two different statutes, for identical conduct, at the same time and place, but with on-going prosecution in two separate counties.[8]

12. **To date, Deputy Attorney General Fowler has not responded to the writ of habeas corpus filed on behalf of Ariel Ebaugh some six months ago in state court. So, too he has ignored our most recent request to dismiss the domestic terrorism charge in DeKalb County now that the RICO charge has been returned against Ms. Ebaugh alleging the identical conduct. Likewise, to date, other than two judicial recusals, there has been no action undertaken by the Superior Court in DeKalb County concerning the pending application by Ms. Ebaugh for judicial relief from ongoing prosecution under an unconstitutional statute.**

13. Under these circumstances it is abundantly clear that the entirety of the DeKalb County Superior Court and its criminal justice system not only holds a preconceived prejudice against granting habeas consideration to Ms. Ebaugh, but is the very kind of indifference that triggers the **doctrine of futility**, which constitutes a well-settled exception to the need to exhaust local remedies.[9]

---

[8] In relevant part, the request to Deputy Attorney General Fowler states "Inasmuch as we still have pending an unresolve writ of habeas corpus in Superior Court challenging the constitutionality of that statute, and were preparing to seek a writ of mandamus in federal court against it as well, I write now to clarify whether the indictment identified as Fulton County case # 23SC189192 is in full satisfaction of those charges. If so, upon an application by your Office to dismiss the DeKalb County charges we will move to withdraw our writ in Superior Court and forgo, at this time, seeking any federal relief. On the other hand, absent such an application we will ask the Superior Court to proceed with our writ and consider seeking such other and further relief as is necessary to challenge the still pending Domestic Terrorism charge against our client." See, Letter to Deputy Attorney General Fowler, appended hereto as Exhibit B at para. 3.

[9] See, *Alabama Dept. of Rehabilitation Services v. U.S. Dept. of Veterans Affairs*, 165 F.Supp.2d 1262, 1271-72 (M.D. Al. 2001). *See, also*, Petitioners Memorandum of Law, *infra*, fn. 18 (and related arguments therein) setting forth myriad Eleventh Circuit Cases which-- in considering the Doctrine of Futility-- would, given the predicate circumstances of this matter, find it entirely applicable to the petition before this court.

14. Moreover as set forth more fully in petitioner's Memorandum of Law the domestic terrorism statute is "flagrantly and patently violative of express constitutional prohibitions"[10] and of such magnitude as to result "irreparable injury." *Id*. Under these circumstances it is respectfully submitted that this court should exercise its clear and necessary discretion and grant the Writ of Mandamus. *Cheney v. U.S. Dist. Court for Dist. Of Columbia*, 542 U.S. 367 (2004).

15. Finally to the degree respondent argue that the *Younger* abstention doctrine[11] requires this court to abstain from entertaining this claim as it arises from an "on-going" state court proceeding to do so here would be a safety valve with nothing to escape, but state court inaction. As set forth fully in Petitioner's Memorandum of Law here Ms. Ebaugh presents this court multiple but connected reasons why *Younger* is entirely inapposite to the matter at hand- because: the state proceedings against Ms. Ebaugh are motivated by bad faith; the Domestic Terrorism state law being challenged is patently unconstitutional; there is no alternative forum where constitutional issues can be raised; or a federal injunction against enforcement of the Domestic Terrorism statute is necessary to precent great and immediate irreparable injury to Ms. Ebaugh.

## RELIEF SOUGHT

---

[10] *See, generally, Kugler v. Helfant*, 421 U.S. 117, 123-25 (1979).
[11] *Younger v. Harris*, 401 U.S. 37, 45, 53-54 (1971)(explaining the exceptions to the *Younger* doctrine where abstention is not required). For Younger abstention to apply, certain factors must be met: (1) the state judicial proceeding must be ongoing; (2) the proceedings must implicate important state interests; and (3) the federal plaintiff must have had an ample opportunity to raise constitutional challenges in state proceedings. *Sundy v. Friendship Pavilion Acquisition Co., LLC*, 807 Fed. Appx. 977 (11th Cir. 2020) (citing *Foster Children v. Bush*, 329 F.3d 1255,1274–75 (11th Cir. 2003).

In issuing a Writ of Mandamus, Ms. Ebaugh requests the following:

First, and concurrently, to issue a preliminary injunction against enforcement of the Domestic Terrorism statute while this matter proceeds; and

**Second** upon full briefing, argument and consideration issuing an Order striking down OCGA § 16–11–220(2)(B)(2022) as in violation of the First Amendment and thus unconstitutional.

# MEMORANDUM OF LAW

## Introduction

Ariel Ebaugh is twenty-two years old. Every bit a daughter of Georgia, she was born, raised and resided much of her life in the suburbs of Atlanta, save for the years when she resided in the Persian Gulf with her parents[12] and then for a year when she attended Cambridge University in the UK as an exchange student studying poetry. A graduate of Georgia College and State University where she earned a 3.9 GPA and high honors in the study of English with a concentration in creative writing, she is currently working in several different jobs[13] while pursuing a license as an EMT.[14]

Following graduation from College, Ariel learned of the so-called "Cop-City" protests in the South River Forest and upon returning home to Stockbridge, some twenty minutes away, she went to the forest on several occasions to learn more about the protest. While there she participated in a community dinner, on another occasion helped prepare food and attended a concert. In addition, she befriended a young man with whom she participated in a twenty-hour first-aid training session in Atlanta. That friendship, and nothing else, lead to the event

---

[12] The daughter of a U.S. army career veteran and a mother who is an attorney, Ariel grew up in a career-Army/military-contractor family, and during her critical adolescent years lived in the Persian Gulf during war-time, traveling extensively as a teen throughout the Middle East, Europe and western Asia with her parents. Raised as an evangelical Christian Ariel was home schooled from age five until eleventh grade as her parents saw the local public school system as too permissive. *See*, appended hereto as Exhibit C, full biography of Ariel provided to prosecutors with the Dekalb County District Attorney's Office when it still exercised jurisdiction over Cop City prosecutions to provide insight into her life and accomplishments.

[13] Among other employment, Ariel is tutoring elementary students, driving for Doordash (a food delivery service) and cleaning Airbnb's on a per diem basis.

[14] The license process involves a year of study and practical experience with classes meeting up to eight hours a week after which, and upon passing a rigorous examination, Ariel can obtain a state issued license to work as an EMT for a government or private entity.

which culminated in Ariels arrest, her first and only brush with law enforcement at any time or any place.

On December 14, 2022, the day of her arrest, Ariel heard from her friend that police were getting ready to enter and to clear the forest and he asked her to cause a "distraction" so that he could avoid arrest. In what can only be described as utter foolhardiness, Ariel drove to the police staging ground, removed a lawfully owned and possessed long rifle from the trunk of her vehicle and approached officers with the rifle draped over her shoulder. At no time did she fire or aim the weapon at officers or remove it from her shoulder. Ordered by police to drop to the ground, Ariel immediately complied and was placed under arrest without further incident. Later that day, she was charged with, *inter alia*, a count of domestic terrorism in violation of OCGA § 16–11–220(2)(B) which upon conviction carries a potential sentence of up to thirty-five years.[15] Eventually released on bond among the conditions of her release, were court-imposed limits on Ariels speech, association and assembly.[16]

With almost six months having passed since Ariel's arrest and not having heard from either the Dekalb County District Attorney or the Office of the Attorney General of Georgia[17] about whether or when they were proceeding to grand jury presentation with regard to Ms. Ebaugh's, on May 31, 2023 petitioner filed a Writ

---

[15] There are no allegations that Ariel engaged in any other criminal conduct with regard to the protests before her arrest. *See*, appended hereto as Exhibit D, minutes of bond proceeding on December 27, 2022 as a result of which Ms. Ebaugh was released two days later on ten-thousand dollars cash bail.

[16] *See*, Exhibit D, p. 50, Lines 6-8.

[17] Initially, both law enforcement agencies were prosecuting Ms. Ebaugh and the others charged with like offenses in DeKalb County.

of Habeas Corpus[18] in Superior Court[19] seeking dismissal of the Domestic terrorism charge as in violation of Art. I, § I, ¶ V of the Georgia Constitution of 1983, as well as the First and Fourteenth Amendments to the United States Constitution.[20]

What has followed in the months since petitioner sought relief through the state court process against the overbearing reach of a clearly unconstitutional statute and arrest has proven to be very much a dystopian voyage for Ms. Ebaugh. Thus, not long after the writ was filed, citing policy disagreements with the Attorney General's Office, the DeKalb District Attorney ceased any and all prosecutions of those arrested in DeKalb County for charges arising from the protests, including for domestic terrorism. With this unprecedented move the prosecution of Ariel and all DeKalb demonstrators was left solely in the hands of the Attorney General. Not long thereafter the Superior Court Judge assigned the writ recused herself without setting forth a basis for the recusal.[21] Several weeks thereafter a second judge was assigned the writ and, in short order, also recused themself without setting forth the basis for the recusal. As of the submission of this

---

[18] *See*, appended hereto as Exhibit E, Writ of Habeas Corpus filed in Superior Court, filed May 27, 2023.

[19] Under Georgia law one need not be in custody in order to seek relief through a writ of habeas corpus where limiting conditions of bond have been imposed, in particular where a claim can be raised that the underlying basis for one's arrest was in violation of Georgia law or the state constitution. *See*, *generally*, OCGA § 9–14–1(a) which empowered Petitioner to inquire into the legality of the restraint in state court. Further, that the restraint on Ms. Ebaugh's liberty flows from an arrest for an alleged criminal offense did not in this case strip her of standing because she was properly released on bail. OCGA § 9–14–16(1); *see Britt v. Conway,* 281 Ga. 189, 190, 637 S.E.2d 43, 44 (2006).

[20] Service of the writ upon respondents was effected by electronic service on the Office of the Attorney General, on the Office of the DeKalb District Attorney and the DeKalb Sheriff's Department, the arresting agency, via the online filing system for DeKalb County. Summons for an answer to writ was dated May 30, 2023, requesting answer within the statutory 30 days.

[21] Under Georgia Superior Court Rule 25.7, a judge may voluntarily recusing themself from overseeing a matter – be it criminal or civil – without setting forth basis for that recusal.

petition Ms. Ebaugh's writ is frozen in time and place without the appointment of a Superior Court Judge to oversee the application.[22] Most shocking, although being served with the writ, the Office of the Attorney General has not responded to the application in any way.[23] While the Dekalb County Attorney did file a response to the writ, it did not address in any way, shape or form the constitutional challenges or relief sought within it. Very much a perfunctory rote response to the "classic' civil tort claim, the County Attorney's response is simply a compendium of denials essentially based upon a lack of information.[24]

**Against this backdrop, recent events have evolved which strengthen the claims of Ms. Ebaugh before this court. On or about August 29, 2023 an indictment was handed down in Fulton County Superior Court against 61 persons charging, *inter alia*, Racketeering. Brought by the Attorney General, it includes 250 overt acts in furtherance of the conspiracy with but one attributed to Ariel Ebaugh- the identical act at the identical time and place set forth in her still pending [25] charges in DeKalb County for Domestic Terrorism.[26] As set forth in our introduction, to date all efforts to have the Attorney General proceed with the Domestic Terrorism charge in DeKalb County against Ms. Ebaugh have failed as have our efforts to move the Superior Court to proceed on her writ of habeas corpus challenging the**

---

[22] As of September 25th 2023, counsel learned from the DeKalb County Superior Court Clerk that no reassignment has been accomplished.

[23] The failure to respond mirrors the inaction of the Dekalb District Attorney which likewise did not respond to the writ prior to withdrawing from all local prosecutions.

[24] *See* response of DeKalb County Attorney appended hereto as Exhibit F.

[25] As of the time of this submission a check with the court clerk of Dekalb County shows the Domestic terrorism charge still pending against Ms. Ebaugh.

[26] The only violation of law returned against Ms. Ebaugh in the Fulton County indictment is for Racketeering.

**constitutionality of that statute under the constitutions of Georgia and the United States.**

If ever the doctrine of futility[27] has surfaced as palpable evidence that state court redress for well rooted claims of constitutional injury is unavailable to its victim, it is the matter now before this court. Since the time of her illegal arrest months ago under a constitutionally void state statute, and conditions of release which, likewise, raise significant constitutional alarms over petitioner's protected rights to speech, association and assembly, Ariel Ebaugh has sought but repeatedly been denied relief through the Georgia state court process. In sum, to date Ms. Ebaugh's meritorious claims have been ignored by prosecutors and county attorneys in total, and passed from judge to judge with no state court judicial intervention underway, or apparently contemplated.

Under these circumstances nothing stops this court from intervening in a state court proceeding that is remarkable here for little more than palpable and punishing avoidance. And while the doctrine of federal court abstention from pending state court proceedings is well recognized, it is not absolute. Indeed, given the facts of this matter the petition of Ariel Ebaugh is the precise kind of

---

[27] *See, generally, Foster Children v. Bush*, 329 F.3d 1255, 1279 (11th Cir. 2003)(holding that while "[a] federal court should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary … The relevant question is not whether the state courts can do all that Plaintiffs wish they could, but whether the available remedies are … adequate.")(internal quotation omitted). Given the record of the proceedings below, it is clear that the available remedies in state court for petitioner have to date proven entirely inadequate. *See, also, Leonard v. Ala. State Bd. of Pharm.*, 61 F.4th 902, 909 (11th Cir. 2023)(holding the burden is on petitioner, as here, to establish that their claims have been procedurally prevented in a state tribunal in such a way as to "allow a district court to evaluate whether the plaintiff's federal claims will effectively be shut out from the judicial system and cut off from effective review in the courts."); *Pettway v. Marshall,* 2022 U.S. App. LEXIS 29612 (11th Cir. 2022) (holding *Younger* abstention not required where state court proceedings did not provide an adequate forum for the petitioner to pursue his constitutional claims).

claim that climbs well above and beyond the abstention doctrine, and one which calls out for justice from the federal courts.

This Court Has Jurisdiction

In *Younger v. Harris*, 401 U.S. 37 (1971) "the Supreme Court held that a federal district court may not enjoin a pending criminal state-court proceeding except under extraordinary circumstances."[28] *Sundy v. Friendship Pavilion Acquisition Co., LLC*, 807 Fed. Appx. 977, 979 (11th Cir. 2020)(internal citation omitted). Under *Younger*, abstention is generally triggered out of "a proper respect for state functions and the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *Green v. Jefferson County Comm'n*, 563 F.3d 1243,1250 (11th Cir. 2009) (internal citation and quotation omitted). Yet *Younger* is not absolute. Nor is its long-settled doctrine an amorphous teach left to the rudderless chase of criminal defendants or civil litigants.[29]

---

[28] Although examples of extraordinary circumstances are necessarily decided on a case-by-case basis, the *Younger* Court specifically adopted as a linchpin inquiry the question of whether "irreparable injury" to a petitioner would result by virtue of abstention. "The precise reasons for this longstanding public policy against federal court interference with state court proceedings have never been specifically identified but the primary sources of the policy are plain. One is the basic doctrine of equity jurisprudence that courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Younger* 401 U.S. at 43. *See, Hughes v. AG of Fla.*, 377 F.3d 1258,1263 (11th Cir. 2004)("Federal courts have consistently recognized [a] limitation on enjoining state criminal prosecutions unless one of a few narrow exceptions is met… [a] pertinent exception is the exception for irreparable injury."); *Turner v. Bradshaw*, 2022 U.S. App. LEXIS 2594 (11th Cir. 2022)(applying *Younger* certificate of appealability denied for pre-trial detainee where there is no claim that his criminal proceedings were motivated by bad faith or that he suffered an irreparable injury).

[29] Subsequently the *Younger* abstention doctrine was extended to civil proceedings as well where "important state interests" were implicated. *See, generally Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975); *Juidice v. Vail*, 430 U.S. 327 (1977); *Trainor v. Hernandez*, 431 U.S. 434 (1977); *Moore v. Sims*, 442 U.S. 415 (1979). *But see Sprint Communications v. Jacobs*, 571 U.S. 69,73 (2013) where, in holding the district court should not have abstained from considering a

To the contrary, in case after case the Supreme Court as well as the Eleventh Circuit has affirmed and reaffirmed that for *Younger* to preclude federal relief "certain factors must be met— (1) the state judicial proceedings must be ongoing, (2) the proceedings must implicate important state interests, and (3) the federal plaintiff must have had an adequate opportunity to raise constitutional challenges in the state proceedings." *Sunday* 807 Fed. Appx. 977 at 981. This rule was further expounded upon in *Kugler v. Helfant*, 421 U.S. 117, 123-25 (1979) where the Supreme Court held that federal equitable intervention is permitted "in a state criminal trial where there is a showing of bad faith or harassment by state officials responsible for the prosecution, where the state law to be applied in the criminal proceeding is flagrantly and patently violative of express constitutional prohibitions, or where there exist other extraordinary circumstances in which the necessary irreparable injury can be shown even in the absence of the usual prerequisites of bad faith and harassment."(internal citations and quotations omitted.).

Irreparable injury is an extraordinary circumstance permitting intervention where, as here, a "challenged statute is flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph." *Huffman v. Pursue, Ltd.,* 420 U.S. 592,611 (1975). *Accord Moore v. Sims,* 442 U.S. 415, 2377-78 (1979)("Younger, and its civil counterpart which we apply today, do of course allow intervention in those cases where the District Court properly finds that the state proceeding is … flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it.")(internal citation and

---

claim against a state entity, the Supreme Court "cautioned federal courts not to extend *Younger* beyond [its intended] breadth."

quotations omitted). *See, also, Henry v. Harkness*, 701 Fed. Appx. 878,882 (11th Cir. 2017)("A state statute may cause irreparable injury, justifying an exception to *Younger* abstention, when it flagrantly and patently violates express constitutional prohibitions); *Hughes v. AG of Fla.*, 377 F.3d 1258,1263n.7 (11th Cir. 2004)(Irreparable injury is an extraordinary circumstance where a petitioner is being prosecuted by a statute that "flagrantly and patently violates express constitutional prohibitions."); *Redner v. Citrus County,* 919 F2d. 646 649 (11th Cir. 1990)(affirming exceptions to *Younger* abstention include application of a patently invalid state statute.).

Moreover, under the facts presented by this matter Ariel Ebaugh has, to date, been denied "an adequate opportunity to raise [her] constitutional challenges in the state proceedings." *Sundy v. Friendship Pavilion Acquisition Co., LLC*, 807 Fed. Appx. 977 (11th Cir. 2020).[30] Although a federal court "should assume that state procedures will afford an adequate remedy" [*Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1,5(1987)][31] this is not an irrebuttable presumption. And, where, as here, the state court process has failed to consider, let alone resolve, the petitioner's constitutional claims,[32] and where, as here, Ariel Ebaugh is faced with on-going extraordinary

---

[30] **To the extent the Attorney General argues that with the return of an indictment, Ms. Ebaugh now has an adequate means to raise whatever constitutional challenges she believes she has before the trial judge, any such claim proves to be a relief without remedy as there exists no basis for any such challenge under the single Racketeering charge returned against the defendant. Obviously, absent a count of domestic terrorism, the Fulton County Judge has no jurisdiction to entertain Ms. Ebaugh's constitutional challenge to it.**

[31] "[W]hen a litigant has not attempted to present his federal claims in related state-court proceedings, a federal court should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary." *Pennzoil* 481 U.S. at 15.

[32] *Cf. Butler v. Ala. Judicial Inquiry Comm'n*, 261 F.3d 1154,1160 (11th Cir. 2001)(holding "[a]bstention is appropriate here, in part, because the Alabama Supreme Court's speedy and competent response dispels some of the district court's concerns about not abstaining."); *Leonard v. Ala. State Bd. of Pharm.*, 61 F.4th 902,908 (11th Cir. 2023)("[w]hen the plaintiff has not attempted to present their federal claims in related state-court proceedings, a

circumstances, this Court is duty bound to intervene and to resolve the tension between the Georgia State domestic terrorism statute and petitioner's First Amendment rights.

In sum, the factors presented by this matter are the precise kind of "extraordinary circumstances" contemplated under *Younger* which permit, indeed, compel this Court to exercise its discretion and to accept jurisdiction over petitioner's claims. To do otherwise would be to sentence petitioner to "irreparable injury" in the absence of any constitutional conviction.

For all the reasons to follow, it is respectfully submitted that upon consideration, the state domestic terrorism statute under which Ms. Ebaugh stands charged must be struck down as "flagrantly and patently" violative of express constitutional prohibitions under the First Amendment to the United States Constitution.

<u>The Factual Backdrop</u>

For over a year, activists have exercised their First Amendment rights to protest the construction of the Atlanta Public Safety Training Center, "Cop City." Since then, a "draconian crackdown" began against those protestors, and against anti-Cop-City advocates and journalists more broadly.[33] The crackdown reached

---

federal court should assume that the state proceedings are adequate, except upon unambiguous authority to the contrary.").

[33] The author, Spencer Reynolds, who is counsel at the Brennan Center for Justice Liberty and National Security Program was previously senior intelligence counsel at the Office of the General Counsel of the U.S. Department of Homeland Security. *See* DHS's Newest Target: Atlanta "Cop City" Activists, JUST SECURITY (June 13, 2023), https://www.justsecurity.org/86876/dhss-newest-target-atlanta-cop-city-activists/

unprecedented levels when state and local authorities began arresting dozens of "forest defenders who had been camping on public park land near where the training center is planned in protest against the project."[34]

As of today, 42 activists, including an attorney-legal-observer, have been charged under state law with domestic terrorism;[35] one protestor named Tortuguita has been killed during a raid by local and state authorities; a journalist detained and arrested for documenting Cop City protests;[36] three people who work at a bail-fund charged with charity fraud; [37] and three activists arrested for felony intimidation of an officer for merely distributing pamphlets on mailboxes that identified the officers who likely killed Tortuguita.[38] And while community organizations have launched a referendum ballot initiative to ensure Atlanta voters decide whether Cop City is built, the City of Atlanta has repeatedly refused to recognize this effort

---

[34] Timothy Pratt, 'Cop City': civil rights groups urge US to investigate surveillance of protestors, GUARDIAN (Aug 3, 2023), https://www.theguardian.com/us-news/2023/aug/03/cop-city-protesters-homeland-security-letter.

[35] *Id.* Among those detained for domestic terrorism charges were those who's overt acts apparently included attending a music festival protesting 'Cop City' in the forest on March 5; those who had phone number for a bail fund written on their body or on their clothes; and those who wore muddy, black, or camouflage clothing. *See* https://time.com/6276994/georgia-domestic-terrorism-law-cop-city/. *See*, *also*, https://www.justsecurity.org/86944/how-dhs-is-fueling-georgias-terrorism-crackdown-on-cop-city-protests/ reporting domestic terrorism charges had been filed where "the accused affirmed their cooperation with DTAF (Defend the Atlanta Forest) by occupying a tree house while wearing a gas mask and camouflage clothing."

[36] Zane McNeill, Detained "Cop City" Journalist Sues Atlanta Police, Alleges Intimidation: The lawsuit alleges that the arrest is part of a pattern of retaliation against journalists by Atlanta police, TRUTHOUT (May 17, 2023), https://truthout.org/articles/detained-cop-city-journalist-sues-atlanta-police-alleges-intimidation/.

[37] LDF Raises Serious Concerns About Recent Arrest of Atlanta Solidarity Fund Members in Cop City Advocacy and Calls for DOJ Investigation, NAACP LDF (June 6, 2023), https://www.naacpldf.org/press-release/ldf-raises-serious-concerns-about-recent-arrest-of-atlanta-solidarity-fund-members-in-cop-city-advocacy-and-calls-for-doj-investigation/.

[38] Natasha Lennard &amp; Akela Lacy, ACTIVISTS FACE FELONIES FOR DISTRIBUTING FLYERS ON "COP CITY" PROTESTER KILLING: The activists face 20 years in prison for handing out flyers that identified a cop they said was linked to the killing of a protester in the Atlanta Forest, THE INTERCEPT (May 2, 2023) https://theintercept.com/ 2023/05/02/cop-city-activists-arrest-flyers/.

even as this Court has deemed provisions of the City banning ordinance likely unconstitutional under the First Amendment.[39]

That there has been a coordinated effort this past year by state and local officials to tamp down on constitutionally protected political protest against Cop City is beyond debate. That this effort has been framed and fueled by a variety of unconstitutional strategies which seek to chill speech, association and assembly is no less true. Though the constitutionality of partisan political efforts to interfere with the referendum desires of thousands of Atlantans who oppose Cop City [40] remains a question to be resolved another day, here and now this court is presented a clear case of the application of an unconstitutional criminal statute used to unlawfully arrest, prosecute and victimize demonstrators. Ariel Ebaugh is one such victim. For the reasons advanced below, it is respectfully submitted that the Georgia domestic terrorism statute is unconstitutional as violative of the First Amendment.[41]

OCGA § 16–11–220(2)(B) violates the First Amendment

---

[39] Jozsef Papp & Jeremy Redmon, Judge issues order in favor of Atlanta public safety training center opponents People living outside of city allowed to collect referendum signatures; 60-day clock restarted, ATLANTA JOURNAL CONSTITUTION (July 27, 2023), https://www.ajc.com/news/crime/dekalb- residents-allowed-to-collect-referendum-signatures-60-day-clock-restarted/ KNZEJPCPXBGG3PARQKLP47QQDI/#:~:text=A%20federal%20court%20judge%20 has, training%20center%20on%20the%20ballot.

[40] R.J. RICO, Atlanta Cop City activists say they are confident of getting 70K signatures. But big hurdles remain. Hundreds of canvassers have spread out across Atlanta in hopes of convincing more than 70,000 residents to sign onto a petition that activists believe is their best chance to halt the planned construction of a huge police and firefighter training center, OPELIKA-AUBURN NEWS (July 29, 2023), https://oanow.com/ap/national/atlanta-cop-city-activists-say-theyre-confident-of-getting- 70k-signatures-but-big-hurdles-remain/article_ece290d4-1018-5916-a91f-7f9344c09069.html. *See, also* https://roughdraftatlanta.com/2023/09/01/11th-circuit-court-issues-stay-in-favor-of-atlanta-in-cop-city-referendum-case/.

[41] As noted in the original habeas corpus application in state court, the domestic terrorism statute also violates procedurally and substantively Art. I, § I, ¶ V of the Georgia Constitution.

The government has the authority, some would reasonably argue the responsibility, to protect itself and its institutions from those who would tear it down by force or violence. But, when, in seeking to secure itself, the government undertakes to limit or to criminalize the speech of its citizenry, it is entering into a constitutionally fraught arena where to survive judicial scrutiny it must act cautiously and with precision. That is not the case at bar. To be sure, the line between constitutionally protected political persuasion and felonious coercion is razor thin. Therefore, that line must be crystal clear. The line drawn in OCGA § 16–11–220 between protected speech and criminal conduct is not at all clear; indeed, it is barely drawn at all. Instead, the Georgia Legislature has shirked its constitutional responsibility by announcing pure indiscriminate intentions, but leaving the line drawing ultimately to the unchecked pleasure of prosecutors and the final say to courts- while accused sit in jail or see their fundamental rights of speech, association and assembly reduced to but mere aspiration. This failure of precision gives far too little notice of proscribed conduct to engaged citizenry and leaves far too much vague, often political, judgement in the hands of a given prosecutor.

## 16-11-220 is Substantially Overbroad

By seeking to enforce 16-11-220 against Ariel Ebaugh, the government is attempting to level the force of the State against words and deeds protected by the First Amendment. Georgia's Domestic Terrorism's terms have sweeping broad application, tying criminal culpability to statements or acts that "intimidate or coerce" private citizens or government actors. The statute's scope is impermissibly ill-defined; the outer limits of its reach impossible to discern.

The United States Supreme Court has many times declared a law such as this unconstitutional on its face under the First Amendment overbreadth doctrine, even

though it may, on occasion, have some legitimate use. *See* e.g., *United States v. Stevens*, 559 U.S. 460, 473 (2010); *Sabri v. United States*, 541 U.S. 600, 609-10 (2004); NAACP *v. Button*, 371 U.S. 415 (1963)(in order to preserve the First Amendment's requisite "breathing space to survive, government may regulate in the area only with narrow specificity").[42]

If, as is commonly accepted, Justice Holmes was correct when he stated in his famous *Gitlow* dissent "every idea is an incitement,"[43] then every attempt to persuade is necessarily coercive. Coercion is a rhetorical device that fits comfortably within the pathos leg of the Aristotelian rhetorical triangle.[44] Pathos, the appeal to emotions of the audience, is sometimes passion, sometimes love, often fear. But, of course, not all appeals to the decision makers discomfort, even fear, can or should be criminalized. As with incitement, there is constitutionally protected coercion and coercion that falls outside the zone of protection.[45] The

_____

[42] Georgia's Constitution has been interpreted to provide equally broad protection to expression. *State v. Miller*, 260 Ga. 669 (1990). Communicative conduct may only be limited by the government if the regulation furthers a substantial governmental interest that is unrelated to the suppression of free expression; and where the incidental restriction on First Amendment freedom is no greater than necessary to further the governmental interest. *Id.* As a statute that criminalizes expressive conduct and speech, "a careful examination [of 16-11-220] is critical." *State v. Miller*, 260 Ga. 669, (1990). First, does the statute "reach a substantial amount of constitutionally protected conduct?" *Johnson v. State*, 264 Ga. 590, 593 (1994) (citing *Miller v. State,* 260 Ga. 669, (1990). Stated differently, does the statute "stifle expression or conduct otherwise protected?" *Id*, at 591. If so, is the statute narrowly tailored to protect a vital government interest? *Cunningham v. State*, 260 Ga. 827 (1991).

[43] "Every idea is an incitement. It offers itself for belief, and, if believed, it is acted on unless some other belief outweighs it or some failure of energy stifles the movement at its birth. The only difference between the expression of an opinion and an incitement in the narrower sense is the speaker's enthusiasm for the result. Eloquence may set fire to reason." *Gitlow v. New York*, 268 U.S. 652 at 673 (1925).

[44] Aristotle, *The Rhetoric of Aristotle: A Translation*. Cambridge [Cambridgeshire]: The University Press (1909) (three elements of rhetoric are logos, ethos, and pathos).

[45] The Supreme Court's seminal decision in *Brandenburg v. Ohio* is instructive on this point. In Brandenburg the Court struck down an Ohio statute, stating "the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to

Georgia Domestic Terrorism statute makes no attempt to distinguish between the two and therefore, is substantially overbroad.

Several examples illuminate the folly of seeking to criminalize all coercion whose aim is to alter government policy. When he penned our Declaration of Independence wherein he asserted a person's right to throw off the yoke of an oppressive government through violence, if necessary, was Thomas Jefferson a domestic terrorist? Threatening rebellion is coercive indeed. Or, what of the Salt March and Mahatma Gandhi's famous letter to Lord Viceroy Irwin? Was it not coercive to suggest that if the salt tax were not repealed the march would "shake the foundations of the British Empire"? From Dr. King to Nelson Mandela to Bobby Sands to the unnamed student who stood against Chinese tanks in Tiananmen Square came marches, demonstrations, boycotts and fasts. All were attempts to coerce changes to established law and policy. Are they to be celebrated as courageous forms of protest or are they to be criminalized by an ill-conceived and poorly drawn statute such as OCGA 16-11-220?

Far less dramatic or historically noteworthy, but perhaps just as important, is the speech of ordinary citizens seeking redress from their government. Implicit in every entreaty made to an elected official to alter government policy is the negative threat. The simple petition to a local mayor to fill the potholes in the street carries with it; sometimes directly, sometimes not, the threat that if she does not fill the potholes, she will lose political support or may even face a challenger in the next election. The simple fact is, virtually all elected officials live in fear of being voted out of office and are duly motivated by that fear. That type of coercion is the

_____

inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444 at 447 (1969). The First Amendment requires no less of the Georgia Domestic Terrorism law.

lifeblood of political communication between our citizenry and their elected representatives. It cannot be constitutionally proscribed. Yet, other than codifying their pure abstract intentions, the Georgia Legislature did nothing to distinguish constitutionally protected coercion from credible threats of significant, imminent harm. The failure to do so has yielded a statute that is substantially overbroad and infringes on fundamental rights protected by the First Amendment. See, *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)(First Amendment scrutiny *must* be applied to: statutes regulating conduct which has the incidental effect of *burdening* speech; and statutes which, although directed at activities with no *expressive* component, impose a disproportionate burden upon those engaged in *protected* First Amendment activities.")(emphasis in original).[46]

---

[46] *See, also, United States v. Robel* 389 U.S. 258, 262, 268 (1967)(Indictment dismissed where the charge "sweeps indiscriminately across all types of association with Communist-action groups, without regard to the quality and degree of membership… [W]hen legitimate legislative concerns are expressed in a statute which imposes a substantial burden on protected First Amendment activities, Congress must achieve its goal by means which have a "less drastic" impact on the continued vitality of First Amendment freedoms.")(internal citations and quotation marks omitted); *Moore v. City of E. Cleveland*, 431 U.S. 494, 499 (1977) ("[W]hen the government intrudes [on a fundamental right], this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation."); *United States v. Grace*, 461 U.S. 171, 177(1983)("the government's ability to permissibly restrict expressive conduct is very limited: the government may enforce reasonable time, place, and manner regulations as long as the restrictions … are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."); *Boos v. Barry*, 485 U.S. 312, 321 (1988)(holding that content-based speech restrictions must be "necessary to serve a compelling state interest and … narrowly drawn to achieve that end")(internal citations and quotation marks omitted); *Ward v. Rock Against Racism*, 491 U.S. 781,791(1989)(internal citations and quotations omitted)(consistent with the First Amendment "the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions … are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."); *June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2179 (2020)(Gorsuch, J., dissenting)("A court must determine whether protected speech is at issue, whether the restriction is content based or content neutral, whether the State's asserted interest is compelling or substantial, and whether the State might rely on less restrictive alternatives to achieve the same goals."); *Bourgeois v. Peters*, 387 F.3d 1303,1322 (11th Cir. 2004)(weighed against First

**16-11-220 is Unconstitutionally Vague.**

In addition to infringing upon recognized First Amendment protections in violation of the overbreadth doctrine, 16-11-220 also violates "a faithful expression of ancient due process" principles, the void-for-vagueness doctrine.[47] *Sessions v. Dimaya*, 138 S. Ct. 1204, 1224 (2018)(Gorsuch, J., concurring).

Although the concepts underlying overbreadth and vagueness are often "logically related," *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983), the void-for- vagueness doctrine entails a separate inquiry deserving of independent judicial attention given the severe uncertainty and the risk of arbitrary enforcement that 16-11- 220 creates. The statute under which Ariel Ebaugh was charged cannot and does not withstand constitutional scrutiny where, in addition to violating the First Amendment, it also offends basic principles of due process guaranteed her by the Fifth Amendment.

Georgia Code 16-11-220 violates the Fifth and Fourteenth Amendment's prohibition of vague criminal laws. "No person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V, XIV. A

---

Amendment freedoms of association, speech, and assembly, magnetometer searches of all participants at a demonstration in the name of public safety deemed unconstitutional as "magnetometer searches do not seem narrowly tailored at all to the City's professed interest in maintaining safety [and where] there are other ways of ensuring public safety at this event, and the availability of alternatives casts serious doubt on any narrow tailoring analysis.").

[47] In addition to being substantively unconstitutional under the First Amendment of the United States Constitution and Art. I, § I, ¶ V of the Georgia Constitution of 1983, as noted in petitioner's Writ of Habeas Corpus (appended hereto as Exhibit E) 16-11-220 is procedurally unconstitutional under the state constitution as having been passed in violation of the mandate of GA Const. Art III, § 5 ¶ 12. Under this section "[n]o bill or resolution intended to have the effect of law which shall have been rejected by either house shall again be proposed during the same regular or special session under the same or any other title without the consent of two-thirds of the house by which the same was rejected." *Id.* at pp 27-30. A plain read of the legislative history of 16-11-220 establishes that in passing the Domestic Terrorism statute the Legislature ignored the strict procedural passage rules of Art III, § 5 ¶ 12 of the Georgia Constitution. *Id.*

criminal statute is unconstitutionally vague in violation of due process for either of two reasons: first, if "it fails to give ordinary people fair notice" of what is proscribed; and second, if as here it is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015).[48]

Section 16-11-220's terms violate the fair notice element of the void-for-vagueness doctrine, whose "purpose is to enable the ordinary citizen to conform his or her conduct to the law." *City of Chicago v. Morales*, 527 U.S. 41, 58 (1999); *see also Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939)("No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes."). A criminal law provides inadequate notice where the meaning of its terms depends on "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *United States v. Williams*, 553 U.S. 285, 306 (2008).[49] *See, also United States v. Hansen,* 143 S. Ct. 1932,1935 (2023)("A court will hold a statute facially invalid under the overbreadth doctrine if the law "prohibits a substantial amount of protected speech" relative to its plainly legitimate sweep… In such a circumstance, society's interest in free expression outweighs its interest in the statute's lawful applications.")(internal citations and quotations omitted.)

Section 16-11-220's expansive terms are undefined; creating ambiguity about what the law intends to criminalize. The statute's expansiveness and imprecision is particularly dangerous and cannot comply with due process.

---

[48] *Johnson v. State*, 264 Ga. 590, 591 (1994).
[49] The Georgia Constitution is no less exacting. *See, Slakman v. Continental Cas. Co.*, 277 Ga. 189, 191 (2003)(in order to determine whether a statute is unconstitutionally vague, "we apply the fundamental rules of statutory construction that require us to construe [the] statute according to its terms, to give words their plain and ordinary meaning, and to avoid a construction that makes some language mere surplusage.").

Taking the statutory terms at face value, it is unclear where the Georgia Legislature has drawn the line between confrontational speech protected by the First Amendment and criminal coercion. The United States Supreme Court instructs, difficulty in "determin[ing] whether the incriminating fact . . . has been proved" is not what renders a statute vague. Instead, vagueness results when it is impossible to determine "precisely what that [incriminating] fact is." *Williams*, 553 U.S. at 306. The endless array of prosecutable cases illustrates its expanse and ambiguity about what conduct is covered and what is not. The fatal flaw in 16-11-220 is that the line between persuasion protected by the First Amendment and a prosecutable felony depends not on the objective intent of the speaker, but the subjective reaction of the audience. Whether one criminally intends to intimidate or coerce is incapable of objective meaning: what coerces one person may have no effect on, or may even discourage, another. *Coates v. Cincinnati*, 402 U.S. 611,614 (finding unconstitutionally vague an ordinance criminalizing conduct "annoying to persons passing by" because "[c]onduct that annoys some people does not annoy others"); *Baggett v. Bullitt*, 377 U.S. 360, 368 (1964)(invalidating on vagueness and overbreadth grounds an oath requiring teachers to forswear an "undefined variety" of behavior considered "subversive" to the government). Liability under 16-11-220 hinges on the subjective reactions of others and therefore fails to give the ordinary person notice of what the state permits and what it forbids.

The constitutional concern caused by the statute's rank subjectivity is compounded by the risk that charging decisions will be based on the political needs of elected officials and the whims of law enforcement. Section 16-11-220's imprecision in defining the explicit *mens rea* standard for "intimidation or coercion" highlights the lack of notice and risks extending criminal liability to

speech protected by the First Amendment. *United States v. Ragen*, 314 U.S. 513, 524 (1942) ("Because of the absence of a scienter requirement in the provision . . . the statute is little more than a trap for those who act in good faith."). Unlike other criminal statutes that the Supreme Court has upheld against vagueness challenges, 16-11-220 contains no "narrowing definitions" for the operative words "intimidation and coercion". *Compare, Holder v. Humanitarian Law Project*, 561 U.S. 1, 20–21 (2010) (noting that "Congress also took care to add narrowing definitions to the material-support statute over time [which]increased the clarity of the statute's terms"). On their face, "intimidation' and "coercion" are broad and ambiguous terms so we must look to the rest of the statute for context and meaning. Applying the familiar canon of statutory construction, *noscitur a sociis*, we search for words to limit the imprecision and expanse. Alas, here our search is in vain, for there are no definitions or qualifiers to be found.

"Vague laws invite arbitrary power." *Dimaya*, 138 S. Ct. at 1223 (Gorsuch, J., concurring). By predicating liability on such imprecise terms, section 16-11-220 authorizes arbitrary and discriminatory enforcement. Criminal laws must "establish minimal guidelines to govern law enforcement." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983). The indeterminate nature of what behavior might rise to the level of "intimidation or coercion" grants prosecutors unrestrained discretion, creating risk of unguided enforcement under the statute. There lies the denial of due process. *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("a vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis").

The so-called savings clause of Section 16-11-224 with its last minute effort to sway fence-sitting Representatives by incantation alone that "This article

shall not be construed to infringe upon constitutionally protected speech or assembly[50] with assurances by the government of fair enforcement of 16-11-220, even if "well-intentioned" simply "d[id] not neutralize the vice of a vague law." *Baggett,* 377 U.S. at 373. "It is the statute, not the accusation under it, that prescribes the rule to govern conduct and warns against transgression." *Lanzetta,* 306 U.S. at 453. Allowing prosecutors to "shap[e] a vague statute's contours through their enforcement decisions" would transfer to them a job that belongs to Congress. *Dimaya,* 138 S. Ct. at 1228 (Gorsuch, J., concurring). "[T]he [vagueness] doctrine is a corollary of the separation of powers—requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not … It is for the people, through their elected representatives, to choose the rules that will govern their future conduct." *Dimaya,* 138 S. Ct. at 1212, 1227 (Gorsuch, J., concurring).

Indeed, Section 16-11-224 is probably the most damning evidence that the Domestic Terrorism Law is overbroad and vague enough to be sensibly interpreted to infringe on constitutionally protected speech and assembly. Why else would the Legislature have added such an absurdly redundant provision? Of course, the Legislature did not intend for the Domestic Terrorism Statute to be applied in an unconstitutional manner, that goes without saying and usually does. But here, rather than pass a narrow, precise law to achieve its ends, the Georgia Legislature punted. It passed an ill-defined, expansive law which left it entirely to others to make the critical constitutional judgment calls. This is precisely the impermissible delegation of authority and responsibility Justice Gorsuch wrote of in *Dimaya.*

---

[50] *See* § 16-11-224 "Construction; Constitutional Protections" (2022).

Section 16-11-220's vagueness chills protected speech in violation of the First Amendment, compounding the statute's constitutional infirmities. A statute deserves even more exacting scrutiny when it interferes with First Amendment freedoms. While the vagueness doctrine is "an outgrowth not of the First Amendment, but of the Due Process Clause," *Williams*, 553 U.S. at 304, the Supreme Court applies "a more stringent vagueness test," requiring greater statutory precision, where "the law interferes with the right of free speech or of association." *Hoffman Estates v. Flipside*, 455 U.S. 489, 499(1982). The reason why the test is stricter in the First Amendment context is "to ensure that ambiguity does not chill protected speech." *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2309–10 (2012); *Hoffman Estates* 455 U.S. at 499 ("[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights."). 16-11-220 (4)—by its plain terms and scope—criminalizes protected speech. The very threat of prosecution under the Domestic Terrorism law deters people from exercising their free speech rights. Due to its ambiguity, the surest way to avoid prosecution under the statute is self-censorship. Those citizens who might otherwise seek to persuade the government to alter a policy will "'steer far wide of the unlawful zone." As a result, "the free dissemination of ideas may be the loser." *Baggett*, 377 U.S. at 372,379.

This country was born of disagreement – vociferous, boisterous, and often violent disagreement with government policy. It is in our national DNA. Our founders, particularly James Madison, understood that America is not a debating society, it is a street fight; and they made ample room in the First Amendment for loud, contentious confrontation between the citizenry and their government. In

1789, it was a bodacious experiment; but more than anything else, it is what sets us apart from the rest of the world. Even a cursory review of our history shows that every major policy advancement came not from polite conversation but from years, sometimes decades, of citizens coercing their government to change course. Civil rights, women's rights, labor rights were not achieved in the salons of polite society; they were achieved through citizens confronting government policy and forcing change. Power does not yield by mere debate. Madison understood this and so does our Constitution.

Perhaps sadly ironic, the man who for decades represented the land where Cop City is to be built and the people who will be dispossessed because of that construction; the conscience of the Congress, John Lewis, knew a little something about confronting unjust government policies. He called it 'good trouble', 'necessary trouble' and he encouraged people, especially young people like Ariel Ebaugh, to stand up and fight for what they believed. At the very worst, Ariel Ebaugh has found herself some 'necessary trouble'. That does not make her a terrorist; it makes her a citizen.

## As Applied to Ariel Ebaugh, 16-11-220 Cannot Withstand Constitutional Scrutiny

The linguistic contortions to which the police and prosecutor have resorted to jam Ariel Ebaugh's conduct in DeKalb County into the terms of the still pending Domestic Terrorism law only highlight the statute's overbreadth and vagueness. This is no mere academic exercise or speculative theoretical attack. As applied to Ebaugh has been charged with one count of Domestic Terrorism, a felony carrying a prison sentence of no less than five years and up to 35 years, as defined in Ga. Code §16-11-220. She is also charged with two counts of Possession of a Firearm or Knife during the Commission of the felony offense of Domestic Terrorism, a

violation of Ga. Code §16-11-106.

As best as can be determined from the sparse affidavits filed in support of Ms. Ebaugh's arrest warrant, she is being charged with domestic terrorism not based on any individualized act or intent but because she "affirmed their cooperation with Defend the Atlanta Forest (DTAF) by presenting herself onto the private property armed with a rifle dressed in the common attire of camouflage." Stated plainly, without any charge of a specific intent or action on her part, the defendant was charged based on exercising her right to freely associate, her freedom to dress as she chose, and her right to possess and carry a firearm as protected by the 2nd Amendment and the Georgia Constitution.

Even cursory review of the statute shows that Ms. Ebaugh's charged conduct and speech did not violate Georgia's Domestic Terrorism law. At a minimum, Section 16-4-110 requires the following: 1) a felony violation or attempt to commit a felony violation of the laws of Georgia; 2) intent to disable or destroy publicly or privately owned facilities deemed 'critical infrastructure' resulting in major economic loss; and 3) intent to alter, change, or coerce the policies of the government by intimidation or coercion.

By showing up at an undeveloped construction site Ariel Ebaugh did not "intend to disable or destroy" critical infrastructure or a state or government facility, thereby causing "major economic loss". It stretches the words in the statute to absurdity to argue that a person can disable or destroy something that does not exist. Yet, that is exactly what the government is alleging in the charging documents. The Legislature could have explicitly included construction sites in the "critical infrastructure" definition; many other states have done so. (See, generally relevant statutes of Arkansas, Kentucky, Louisiana, Mississippi, Missouri,

Montana, North Dakota, Tennessee, and Texas). It chose not to, and it is not for the prosecutor to expand what the Legislature has enacted. Moreover, even if the so-called Cop City facility did exist, it would not meet the "critical infrastructure" definition because it is not a "energy, fuel, water, agriculture, health care, finance, or communication facility providing or distributing services for the benefit of the public". Again, had the Legislature intended to include a public safety training facility in the definition, it would have done so.

An unbuilt Cop City is not a "State or government facility"; it is an idea, an aspiration. An unbuilt Cop City is not a "permanent or temporary facility or conveyance that is used or occupied by representatives of this state or any of its political subdivisions, by the legislature, by the judiciary, or by officials or employees of this state or any of its political subdivisions." Cop City may become a state facility if it is ever built and used for its intended purpose; but until built, it is not a facility of any sort, permanent or temporary.

Furthermore, what major economic loss has the government alleged? Had the Legislature intended to cover every broken window or slashed tire, it would have done so. Instead, the Legislature focused on economic disruption. Delaying the construction of Cop City may be disruptive to some people, but it will not cause major economic loss as required by the statute.

It is clear that a person cannot violate 16-11-220 without first committing or attempting to commit a felony as defined by Georgia law. It is equally clear that no underlying felony has or could be identified here. The plain text of the Georgia Domestic Terrorism law requires the commission of or attempt to commit a triggering felony. There is no other meaning to be ascribed to the opening lines of the statute: "Domestic terrorism means any felony violation of or attempt to

commit a felony violation of the laws of this state ..." Ga. Code §16-11-220 (2). If the words in the statute are not plain enough, its legislative history confirms that a triggering felony is necessary. The original Senate bill was specifically amended in the House to add the triggering felony requirement. *See* Crowley & Posada, at p. 22.

Prosecutors know how a triggering felony statute works. In charging Ariel Ebaugh with the Possession counts, another triggering felony statute, the underlying felony is clearly stated in the charging documents. Either the Dekalb County District Attorney does not believe the Domestic Terrorism law requires a triggering felony, an error of law fatal to the charge; or her office seeks to use the felonies of others as the predicate for Ms. Ebaugh's charges, an equally fatal mistake. There is no felony underlying the domestic terrorism charge and that charge must therefore fall. Without the underlying felony of domestic terrorism, the firearm possession charges must also fall.

The charging documents describe alleged felonious acts and intent claimed by DTAF. Although far from certain, perhaps those felonies committed by others and not even alleged to have been committed by the defendant are the undergirding of Ebaugh's charges. If so, these charges are a house of cards ready to tumble down in the first stiff constitutional wind. If the sins of DTAF are to be visited on the defendant let the government say so plainly so that they can be examined in the light of Ariel Ebaugh's "freedom to engage in association of beliefs and ideas" protected by the First Amendment. *NAACP v. ex rel. Patterson*, 357 U.S. 449, 460 (1958).[51]

---

[51] It is well established that "the act of associating with compatriots in crime is not a protected associational right. *Rodriguez v. State*, 284 Ga. 803, at 810, 671 S.E.2d 497 (2009) (*citing Helton v. State*, 624 N.E.2d 499 (Ind. Ct. App. 1993). However, "to support a conviction,

Likewise, the DeKalb County charging documents attempt to use constitutionally protected conduct and expression as evidence of criminal intent. Like everyone else, Ebaugh is entitled, within the bounds of "public health and decency", to wear what they choose, yet their choice of camouflage is cited as evidence of their terrorist intent. More importantly, the state is constitutionally prohibited from interfering with the defendant's right to keep and bear arms, yet the DeKalb charging documents ascribe criminal intent to her possession of firearms. Georgia law has long protected the right to keep and bear arms. In 2022, the Georgia Legislature codified that protection in a comprehensive "permitless carry" statute that repealed longstanding license application requirements. Ga. Code §§ 16-11-125.1;15-11- 138. Under the new law, Georgia now generally permits any "lawful weapons carrier" to carry handguns openly or concealed in most public spaces without any background check or permit required. It is thus perfectly legal-though some may find it intimidating-to attend a protest armed. The state's attempt to criminalize Ariel Ebaugh's exercise of her constitutional right to carry cannot stand.

As applied to the conduct charged to Ariel Ebaugh in the affidavit supporting her arrest, the following questions remain unanswered: 1) what felony or attempted felony is she alleged to have committed?; 2) what critical infrastructure or government facility did Ariel Ebaugh intend to damage or destroy?; 3) what major economic damage is she alleged to have caused; and 4) how did Ariel Ebaugh

---

the accused must be shown to have conducted or participated in criminal … activity through the commission of an actual criminal act. Mere association is insufficient." *Id.* (*citing State v. Walker*, 506 N.W.2d 444 (Iowa) (1993). In rejecting a constitutional challenge to the Georgia Street Gang Terrorism and Prevention Act, O.C.G.A. § 16-15-1 et seq., the Georgia high court ruled that the statute "comports with . . . due-process requirements . . . because it punishes conduct, not association. It does not unconstitutionally criminalize membership in an organization because the statute does not impermissibly establish guilt by association alone".

engage in intimidation or coercion to alter a government policy?

Although freedom of speech and expression is not absolute under Georgia State law, like the strict scrutiny standard required under federal law, legislation that seeks to limit any restriction of its reach and echo, "may be established only if it is prescribed by a clear and comprehensive, narrowly tailored law and the benefit protected by the restriction exceeds the damage caused by the restriction."[52]

One must ask how 'clear' and 'narrowly tailored' the Georgia Domestic Terrorism law is when the two prosecutors charged with enforcing the law cannot agree on its application to the facts of the Cop City protests. DeKalb County District Attorney Sherry Boston has withdrawn from the prosecution of the Cop City protesters stating publicly that she and the Attorney General could not agree on "who should be charged and what they should be charged with." If two highly respected career prosecutors, among the highest law enforcement officials in all of Georgia responsible for interpreting this law cannot agree on such a fundamental point, how are average citizens supposed to know what the law proscribes?

## Conclusion

"The constitution is either a superior, paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and, like other acts, is alterable when the legislature shall please to alter it. If the former part of the alternative be true, then a legislative act contrary to the constitution is not law: if the latter part be true, then written constitutions are absurd attempts, on the part of the people, to limit a power in its own nature illimitable …

---

[52] *Id.* Chapter II Article 8 (1) - Grounds for restriction of the freedom of speech and expression.

If then the courts are to regard the constitution, and the constitution is superior to any ordinary act of the legislature; the constitution, and not such ordinary act, must govern the case to which they both apply…

So, if a law be in opposition to the constitution; if both the law and the constitution apply to a particular case, so that the court must either decide that case conformably to the law, disregarding the constitution; or conformably to the constitution, disregarding the law; the court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty."[53]

More than 200 years ago in *Marbury v. Madison*, 5 US 137,177-178 (1803) the Supreme Court of the United States penned these prophetic words as the very linchpin of our national aspiration yet to come. And while *Younger* and its judicial progeny have at times narrowed the stretch of *Marbury*'s reach, the passage of time has never weakened its constitutional imperative nor denied generations of Americans the safeguard of its lesson.

Indeed, while the Supreme Court has recognized that states "have important interests in administering certain aspects of their judicial systems,"[54] it has cautioned that where, as here, state judicial systems have refused to entertain or ignored litigation with regard to constitutional claims, federal courts must not turn a blind eye to local indifference. *See, Sprint Communs., Inc. v. Jacobs*, 571 U.S. 69 (2013)("The pendency of an action in a state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction.")(internal citations and quotations omitted). *See, also, Tokyo Gwinnett, LLC v. Gwinnett Cty.*, 940 F.3d 1254, 1267(11th Cir. 2019)("But the Supreme Court and this Court have

---

[53] Although an original example of where and when a Writ of Mandamus did not lie … the facts of *Marbury* bear no relevance to the controversy at bar. To the contrary, here, its age-old teach speaks with loud, intended application.
[54] *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 12-13 (1987).

recognized that Our Federalism does not mean blind deference to States Rights, but instead a system in which there is sensitivity to the legitimate interests of both State and National Governments."[55]); *Pettway v. Marshall*, 2022 U.S. App. LEXIS 29612(11th Cir. 2022)(Holding inasmuch as the state court proceedings did not provide an "adequate forum" to pursue petitioner's constitutional claims, *Younger* was not satisfied thus requiring a federal court to "undertake its virtually unflagging obligation to exercise its jurisdiction.").[56]

In the matter at hand, it is evident that the claims of Ariel Ebaugh raise fundamental concerns about the constitutionality of the state statute under which she is being prosecuted and which has imposed and continues to impose upon her conditions of release which impermissibly constrain her speech, association and assembly. It is no less obvious that the state court process has turned a blind eye and deaf ear to her legitimate claims with Georgia passing her valid challenges from court to court, judge to judge these past several months, each unwilling or unable to fulfill a judicial duty to entertain timely constitutional claims of an aggrieved Georgia state citizen. No less true stands the patent indifference by state

---

[55] "[W]e must be mindful that abstention from the exercise of federal jurisdiction is the exception, not the rule… In fact, federal courts have a virtually unflagging obligation to exercise their jurisdiction except in those extraordinary circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest." *Id.* at 1266-67. (internal citations and quotations omitted).

[56] *Cf. White v. Cox*, 2021 U.S. App. LEXIS 35107(11th Cir. 2021)(holding *Younger* abstention doctrine applied as petitioner failed to show that the state court proceeding does not provide an adequate remedy for his federal claim); *Morancy v. Salomon*, 2023 U.S. Dist. LEXIS 108121(M.D. Fla. 2023)("The allegations in the Complaint demonstrate Plaintiff is being given the opportunity to raise his claims in state court, as do the state court documents themselves"); *Johnson v. Miami-Dade Cnty. Sheriff*, 2022 U.S. Dist. LEXIS 195151(S.D. Fla 2022)("The Court must assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary. . . The allegations in the Complaint do not overcome the presumption, and [petitioner] has not otherwise demonstrated that the state remedies are not adequate")(internal citation and quotation omitted);

court prosecutors and county attorneys who have either ignored in whole the constitutional claims of Ariel Ebaugh, or delivered little more than perfunctory answers that reduce core constitutional concerns to evasive moot court glib.

Because Ariel Ebaugh has met her preliminary jurisdictional burden of establishing that the statute under which she stands charged is "flagrantly and patently" unconstitutional under the First Amendment, and inasmuch as Ms. Ebaugh has been denied any and all relief under Georgia state law and since she has suffered and continues to suffer irreparable injury by virtue of this invalid prosecution, and palpable state court indifference, this Court must intervene. To do otherwise would be to rework the *Younger* doctrine from an exception that recognizes and balances legitimate state interests to an absolute rule of "blind deference" to the whim and will of Federalism in all matters at all times. The First Amendment demands more.

Respectfully submitted
on September 25th, 2023

> /s/Stanley L. Cohen
> Stanley L. Cohen, Esq.
> N.Y. Bar No. 1941202
> Co-counsel for Ms. Ariel Ebaugh
> *pro hac vice* sought once filing accepted
> Stanleycohenlaw@gmail.com

> /s/Jason B. Sheffield
> Jason B. Sheffield, Esq.
> Co-counsel for Ms. Ariel Ebaugh
> Georgia Bar No. 639719
> 404-296-5300
> jasonsheffieldattorney@gmail.com

PETERS, RUBIN, SHEFFIELD &
HODGES, P.A.
2786 N. Decatur Rd., Suite 245
Decatur, GA 30033
404-296-5300
jasonsheffieldattorney@gmail.com


/s/Sarina Larson
3L, MC Law, Class of 2024
Intern to Stanley Cohen