# EXHIBIT D

1         IN THE SUPERIOR COURT OF DEKALB COUNTY

**EXHIBIT D**

2               STATE OF GEORGIA

3

4

  STATE OF GEORGIA

5

    -VS-                   CASE NO.  D0293186

6

  FRANCIS CARROLL

7 ARIEL EBAUGH

  SERENA HERTEL

8 LEONARDO VOISELLE

  NICOLAS DEAN OLSON

9 ARIEON ROBINSON

10     DEFENDANT.

11

12

13      TRANSCRIPT OF BOND HEARING HELD IN THE ABOVE-ENTITLED

14  CAUSE BEFORE THE HONORABLE MATHEW ROBINS, SENIOR JUDGE, AT

15  THE JUDICIAL TOWER, DEKALB COUNTY COURTHOUSE COMPLEX,

16  DECATUR, GEORGIA, DIVISION 11 ON DECEMBER 27TH, 2022 AT 9:00

17  AM VIA ZOOM.

18

19

20

21

22              LATASHA D. BETHEL

           OFFICIAL COURT REPORTER

23        556 N.  MCDONOUGH STREET

         DECATUR, GEORGIA 30030

24

25

                                       1

```
 1                         A-P-P-E-A-R-A-N-C-E-S:

 2
   ON BEHALF OF THE STATE:
 3
        PETE JOHNSON
 4      ASSISTANT DISTRICT ATTORNEY
        556 N. MCDONOUGH STREET
 5      SUITE 700
        DECATUR, GEORGIA 30030
 6
 7 ON BEHALF OF THE ATTORNEY GENERAL'S OFFICE:

 8      JOHN FOWLER
        DEPUTY ATTORNEY GENERAL
 9      OFFICE OF THE ATTORNEY GENERAL
        40 CAPITAL SQUARE SW
10      ATLANTA, GEORGIA 30334

11
   ON BEHALF OF FRANCIS CARROLL AND ARIEON ROBINSON
12
        JOSHUA G. SCHIFFER
13      3355 LENOX ROAD NE
        SUITE 750
14      ATLANTA, GEORGIA 30326
        404-842-0909
15

16
   ON BEHALF OF LEONARDO VOISELLE AND NICOLAS OLSON
17
        DANIEL KANE
18      133 NASSAU STREET NW
        ATLANTA, GEORGIA 30303
19      404-577-1200

20
21 ON BEHALF OF ARIEL EBAUGH AND SERENA HERTEL

22      RACHEL KAUFMAN
        133 NASSAU STREET NW
23      ATLANTA, GEORGIA 30303
        404-615-7588
24

25
```

```
 1
 2                    P-R-O-C-E-E-D-I-N-G-S
 3          THE COURT:  Let's start with the facts.  Why are they
 4     in jail?  Why is the AG involved in this?
 5          MR. JOHNSON:  Well, because this is a case of domestic
 6     terrorism which the AG has concurrent jurisdiction over.
 7          THE COURT:  I did not know it was a case of domestic
 8     terrorism.  You are fine.  Go ahead.
 9          MR. JOHNSON:  Yes, Judge.  You may be familiar with
10     this just from the news in general but there is a location
11     near 1327 Key Road here in DeKalb near the Old Atlanta
12     Prison Farm and over by Constitution where they are looking
13     to build a Public Safety training center for the Atlanta
14     Police Department.  There is also a movie studio that is
15     there as well and they are looking to build that as well as
16     a new park, Michelle Obama Park.
17          On Tuesday, December 13th of 2022 members of the GBI
18     and APD were at the location and they were attempting to
19     clear barricades because over the months they have put up --
20     "they" being groups of people who are calling themselves
21     Defend the Atlanta Forest have put up unauthorized
22     barricades, lit fires, there were buckets of human waste
23     which have feces and urine in it, tires and they have built
24     unauthorized treehouses as well, and when I say treehouses,
25     these are actual structures with floors and ceilings and
```

1     tarps.  So when the APD and GBI went in to clear the area so

2     construction can begin soon they found someone up in one of

3     the treehouses and historically when any workers or police

4     are on the grounds of the forest the Defend the Atlanta

5     Forest group will send out a message on social media or

6     through text and they will call for assistance.  When that

7     help call is answered usually folks will show up and throw

8     glass bottles, throw brick-sized rocks, light Molotov

9     cocktails, set things on fire, usually in a means to divert

10    the police or the people there in order to get their person

11    away or to basically scare people into not doing their job

12    because construction workers will come out, people from

13    AT&T, people who have no real interest in this other than to

14    do their jobs and they will be attacked and have their items

15    vandalized.

16         THE COURT:  Counsel, let me interrupt and you can

17    expect interruptions.  You said usually "they will do" and

18    you gave me a litany of things "they will do."

19         MR. JOHNSON:  Yes.

20         THE COURT:  Did they do similar things in the matter

21    that caused their arrest and now is before me?

22         MR. JOHNSON:  Yes.

23         THE COURT:  Okay.  Moving along then.  Go ahead.

24         MR. JOHNSON:  Yes.  So, while the personnel from the

25    GBI and APD were moving through the forest they saw a

1    treehouse that I was talking about before that had a wood

2    floor, tin roof, tarps, and there was someone in there and

3    that was one of the defendants before you today Serena

4    Hertel.  That is position number 10 on the calendar.

5         Defendant Hertel is from Los Angeles, California.  She

6    is a known member of this Defend the Atlanta Forest group.

7    This group as I have mentioned, Judge, is a well-funded,

8    well-organized group.  This isn't just a bunch of kids

9    playing in the woods.  This is a group that has illegally

10   occupied this area and caused vandalism and on this

11   particular day they yelled for the defendant to come down.

12   The defendant refused.  The defendant did not even answer

13   when they yelled up to her.  This went on for some time.

14   Special Agent Ryan Long from the GBI yelled up at least 20

15   times that she was trespassing on this property and was

16   under arrest and advised the defendant that if the defendant

17   did not come down and continue to obstruct the officers they

18   would have no choice but to fire pepper balls up into the

19   treehouse to get the defendant down.  The defendant still

20   did not answer, did not comply and at about 9:30 AM that

21   morning one round of pepper balls was fired into the

22   treehouse.  You could hear the defendant coughing and they

23   called up to her to come down, that they could give

24   assistance.  There was still no movement and in fact about

25   10:16 AM Special Agent Long from the GBI observed a video

1    posted to the Defend the Forest social media and it came

2    from defendant Hertel and it was a video from the treehouse

3    position that the defendant was in and the message said

4    forest defenders are in danger.  We need your physical

5    presence now.  Forest defenders need your disruptive

6    presence.  A few minutes after that Special Agent Long heard

7    on the radio that members of Defend the Forest went to

8    Intrenchment Creek Park which is on the east side of this

9    location and as we were talking about what they have done in

10   the past, they did on this occasion when defendant Hertel

11   sent the call for assistance out.  They started throwing

12   large brick-sized rocks at an APD patrol car and APD Officer

13   Morales.  They also threw glass bottles at firefighters

14   because fire station number 10 is right nearby there and

15   there were firefighters and EMTs and EMS from AMR who had

16   come out to try to help to see what was going on and it was

17   so bad that the police advised the firefighters and EMS to

18   leave the area for their own protection.  While this all

19   occurred they were throwing the rocks and bottles.  They

20   also lit several objects on fire and the APD officer's car

21   suffered visible damage because, again, I want you to

22   understand, Judge, these aren't just rocks that they are

23   throwing.  They are basically like bricks.  They caused

24   dents in the car and they are not just small things.

25       Investigator Sluss with the Atlanta Police Department

1    observed three people throwing these objects at the police

2    and at the firefighters and at the EMTs.  He identified

3    himself as a police officer and was able to arrest one of

4    them that he visibly observed throwing the brick rocks and

5    the glass bottles.  That was defendant Nicolas Olson who is

6    also on this calendar today in position 16.

7         He attempted to get the other two individuals who were

8    also throwing and essentially chased them into the woods.

9    The other two, one was able to get away.  One, he was able

10   to grab at the backpack and the defendant wiggled out of the

11   backpack and kept running.  They were able to identify the

12   backpack and who it belongs to.  It is actually position

13   number 6 Francis Carroll.  So Francis Carroll and Olson were

14   at least two of the people who were throwing rocks and

15   bottles at the law enforcement personnel on scene.  When

16   Investigator Sluss attempts to grab Carroll with the

17   backpack it caused Sluss to fall to the ground where he

18   sustained minor injuries.  Meanwhile they were still trying

19   to get defendant Hertel out of the treehouse when they heard

20   two explosions nearby and then another person came out of

21   the woods dressed in camouflage and lit some items on the

22   roadway on fire.  The fire department was requested to put

23   out the fire but they were not allowed to go in because of

24   the danger to them so APD officers went in instead and were

25   able to get the fire under control.

1     At this point the defendant Serena Hertel has now put a

2    gas mask on and has actually climbed up on the roof and tied

3    to the tree with a rope.  The GBI and APD personnel then

4    contacted arborist whose job it is to go into the trees and

5    they usually are there to cut a limb down or do what they

6    need to do.  Here they went up to try to get the treehouse

7    dismantled and to get the defendant down.  As they attempted

8    to climb, and they were quite high up, the defendant Hertel

9    brandished a knife and cut one of the ropes.  One of the

10    lines for the arborist in an attempt, from what the

11    witnesses observed, to have the arborist fall.  Luckily it

12    was not a lead rope line so the arborist was not injured,

13    however, there were about five to ten feet away from the

14    defendant when the defendant was brandishing this knife.

15    They yelled up to her to drop the knife and eventually --

16    this all took a very long time -- Hertel dropped the knife

17    and finally after this long standoff, came down.

18     The members of this Defend the Atlanta Forest are

19    parties to the same crime of domestic terrorism.  I imagine

20    the defense is going to say that this is an overreach but

21    the crime of domestic terrorism is exactly what we have

22    here.  If you use violence to basically get a policy

23    changed, that is domestic terrorism.

24     The State does not oppose any kind of protest or

25    picketing or however you want to do it as long as you are

8

1    not destroying property and hurting people and that is what

2    is the fear here.

3        When defendant Hertel was finally handcuffed and taken

4    she refused to comply with any actions.  She would not move,

5    wouldn't walk.  So the police picked her up, carried her to

6    an ATV where they were able to drive off the property and

7    place the defendant in a police car.  They searched the

8    treehouse and they found Hertel's driver's license which as

9    I said before is from California and they also found a

10   cooking stove, sleeping mats, sleeping bag, food, water,

11   camouflage, masks and other items.  While they continued

12   there patrol to look for other treehouses they found the

13   defendant Francis Carroll who I mentioned before occupying

14   another treehouse.  He was wearing a gas mask and a

15   camouflage jacket and they told Carroll this is trespassing

16   and Carroll had to leave.  Similar with Hertel, Carroll

17   refused to comply, refused to answer and they ultimately

18   fired a pepper ball up into the treehouse and Carroll

19   eventually agreed to come down.

20       Inside the treehouse that Carroll had been in was

21   gasoline, Orion road flares and several cell phones.  The

22   gas and road flares are important, Judge, because that is

23   the method they use to set fires and the special agent

24   involved here actually witnessed one of the Defend the

25   Forest members in a previous day use the road flare to set a

1    fire along a barricade.  When Carroll was brought to the
2    North gate of the entrance to be arrested he and Hertel were
3    placed in separate patrol cars.  Prior to them being placed
4    in the patrol cars the officers heard Hertel yell to Carroll
5    I love you.  I don't say that for any reason other than to
6    show that they know each other.  This isn't a bunch of
7    unknown people in the woods.  They care for each other.
8    They look out for each other.  They are all aiding,
9    encouraging and assisting in what is going on out in the
10   woods.  In the backpack that I mentioned before that they
11   located that was Carroll's they found in the backpack a cell
12   phone, a glass smoking pipe, two large concussive-type
13   fireworks and a lighter.

14        Nearby, Judge, is the Department of Juvenile Justice
15   and they could, kind of, see what was going on here and they
16   observed another treehouse which they pointed out to the
17   officers on scene.  In this treehouse was defendant Arieon
18   Robinson who is position, I believe, 19 on the calendar.
19   Arieon Robinson was wearing a mask and Ghillie suit pants
20   which are kind of like camouflage pants and he had a
21   respirator on as well.  He refused or Robinson refused to
22   come down or refused to comply even though the defendant was
23   given multiple opportunities.  Just like before, pepper
24   balls were deployed and eventually Robinson came down.
25        The last person on the calendar which is position

1    number 12 which is Leonardo Voiselle came out of the

2    woodlands also trespassing.  Voiselle had a backpack, was

3    wearing camouflage and inside the backpack were fireworks.

4         THE COURT:  Was the name Voiselle or Leonardo?

5         MR. JOHNSON:  On the calendar it is Voiselle Leonardo

6    but I believe his name is actually Leonardo Voiselle -- is

7    his actual name.

8         MR. KANE:  His name is Leonardo Voiselle.

9         THE COURT:  Okay.

10        MR. JOHNSON:  Yes, Judge.  Because Leonardo Voiselle

11   was in the location with fireworks and a backpack and had

12   answered this call that had been placed out by defendant

13   Hertel this defendant was assisting and therefore also

14   charged with these crimes and police also found pipe bombs,

15   trip wires and fortified structures that the Defend the

16   Atlanta Forest members had been inhabiting.

17        Later, Judge, defendant Ariel Ebaugh who is position

18   number 7 also had seen the call for assistance and defendant

19   Ebaugh arrived at the location, parked the car that Ebaugh

20   was in and then exited the car wearing camouflage and

21   carrying an AR-15 long rifle, a Glock 9 mm pistol.  The

22   AR-15 was loaded with 31 rounds.  The Glock had, I believe,

23   9 rounds and also a fixed boot knife was on her boot.  When

24   Ebaugh walked on to the property it was actually captured

25   via drone which had been in the air and you can see

1      defendant Ebaugh walk up, openly carrying the AR-15 rifle in

2      the low ready position and trespass onto the property.

3          Police yelled to her to immediately stop and put the

4      rifle down.  It took a moment.  The police were, quite

5      frankly, in fear that the defendant was about to raise up

6      the rifle and fire considering everything that had been

7      going on that day and it was on the property.  The defendant

8      did not.  The defendant lowered the rifle and placed it on

9      the ground and complied with the request of the officers at

10     that point.  Located in Ebaugh's car after Ebaugh was taken

11     under arrest were additional extra loaded firearm magazines,

12     camping gear and what is commonly known as a go bag.  A bag

13     full of clothes and other items that if you need to go

14     somewhere in a hurry.  That is why it is called a go bag.

15         All six were taken into custody on that date December

16     13th, 2022.  I should note, Judge, that there were other

17     people walking in the woods that day that were trespassing

18     but were not wearing camouflage, not setting off fireworks

19     or throwing rocks or throwing glass bottles who were not

20     arrested because they did not incite violence or cause

21     damage to property.

22         So those are the general facts, Judge.  Going into the

23     case itself or the defendants themselves, the first one on

24     the calendar, Judge, is position number 6 which is Francis

25     Carroll.  Francis Carroll is charged with interference with

1    government property, criminal trespass, aggravated assault,

2    obstruction and domestic terrorism.

3        Your Honor, Francis Carroll is originally from

4    Kennebunkport, Maine.   Information we have is that is where

5    he is from and where his family is from and he does not have

6    any prior arrests that we are aware of or any criminal

7    history other than what we have talked about here today.

8    Judge, he is 22 years old and we would oppose the granting

9    of a bond to Mr. Carroll.   I am not sure if you want to take

10   these up individually so I can stop there and then allow the

11   defense if you like, Judge --

12       THE COURT:   You have set a format that is easy to

13   follow.   You told me what you thought about Mr. Carroll.

14   Why don't you go on to another one and as briefly as you did

15   with Mr. Carroll we will try to move through the six.   I

16   will give the defense an opportunity to speak on behalf of

17   their clients.   I will do it any way you guys want to do it.

18       MR. KANE:   Judge, can I be heard just briefly?   This is

19   Daniel Kane.

20       THE COURT:   Yes.

21       MR. KANE:   We are going to follow your format.   It is

22   just I want you to know that we do not agree with the

23   State's representation of what happened.

24       THE COURT:   Wait.   I am not surprised but let me hear

25   -- I will give you that opportunity to espouse that in just

1    a moment.  I am just trying to get organized, all right?

2         MR. KANE:  Yes, sir.

3         THE COURT:  What I understand about Mr. Carroll, he is

4    22 years old.  He is from Maine.  Kennebunkport, is that in

5    Maine or Massachusetts?

6         MR. SCHIFFER:  Maine, Judge.  I think it is best that

7    we continue with the format without any other interruptions

8    from us until it is time for us to do the cases one at a

9    time.

10        THE COURT:  And Mr. Carroll has no criminal history.

11   State, what is your next defendant you want to talk about?

12        MR. JOHNSON:  Yes, Judge.  We can just go in order.

13   Position 7 is Ariel Ebaugh.

14        THE COURT:  Yes.

15        MR. JOHNSON:  Judge, Ariel Ebaugh you will recall is

16   the one that came on the property with the AR-15 long rifle,

17   a Glock 9 mm and a knife.

18        Ariel Ebaugh is 22 years old.  Also like Mr. Carroll

19   does not have a criminal history.  Ariel Ebaugh is charged

20   with domestic terrorism, simple assault, criminal trespass,

21   obstruction and two counts of possession of a firearm during

22   commission of a felony for the two guns, the rifle and the

23   pistol.

24        THE COURT:  Is Ariel Ebaugh a male or female?

25        MR. JOHNSON:  A female, Judge.  At least as far as the

1   history.

2          MS. KAUFMAN:  She is a female.

3          THE COURT:  It is not critical to my decision making.

4   I just want to make sure I keep the gender correctly.  Go

5   ahead, counsel.

6          MR. JOHNSON:  Judge, the next one would be the next

7   position on the calendar which is Serena Hertel.  That is

8   position number 10.

9          Serena Hertel is 25 years old and is charged in this

10  case with domestic terrorism, aggravated assault and

11  criminal trespass.  Defendant Hertel does have some prior

12  arrests.  There was a case in 2015 out of what it appears is

13  Garden City, Idaho for obstruction, loitering and alcohol to

14  minors.  From September 2021 this defendant was arrested in

15  Eureka, California in Humboldt County for similar to what is

16  going on here.  We were able to obtain the report and it was

17  a trespassing, obstruction and destruction of a fence.  It

18  was a logging area that there were protests going on and

19  defendant Hertel was there as well.  I believe that case was

20  dismissed based on what we talked about or talked with the

21  Humboldt County folks about the case.  Not that it did not

22  happen.  They said they just decided not to go forward with

23  the charges because I think the logging folks left the area,

24  the protesters.  The last arrest, Judge, was just recently

25  other than this one which was November 20th of 2022 here in

1      Fulton County for possession or purchase of illegal

2      narcotics, possessing drug-related objects, a Schedule I

3      substance and providing a false name.  That case is still

4      open last we had checked with Fulton County.

5          As I stated, defendant Hertel is from Los Angeles,

6      California and I believe that is the summary on Serena

7      Hertel.

8          Mr. Fowler from the Attorney General's office is going

9      to, kind of, pick it up from here, Judge.  He has the final

10     three defendants.  So I will turn it to Mr. Fowler.

11         THE COURT:  All right.

12         MR. FOWLER:  Good afternoon, Judge.  John Fowler from

13     the Attorney General's office.  Thank you, Mr. Johnson.

14         I am going to address Mr. Voiselle, Mr. Olson and Mr.

15     Robinson.  Before that I would like to give a little bit

16     more background on the group Defend the Atlanta Forest.

17         They have been occupying the forest for a little over a

18     year in DeKalb County.  It is an area of just over 300 acres

19     out there.  So it's not a small area.  It is largely densely

20     forested so it is not an area where you can mostly see what

21     is going on inside.  It is difficult to get inside in

22     certain places and so a lot of people ask why in the world

23     can't you just go in and take people out of there and just

24     remove them.  Well, the reason why is because it is

25     difficult to get in there in certain places and there are

16

1    easy hiding locations.  With those hiding locations the

2    reasons why police and everyone are concerned about going in

3    is because as Mr. Johnson stated they found pipe bombs, trip

4    wires.  There is police surveillance from a helicopter at

5    night of multiple individuals that are patrolling the area

6    with AR-15s in the area.  This group stems from the 2020

7    anti-police demonstrations following the murder of George

8    Floyd and the local shooting of Rayshard Brooks.

9    These individuals use those two instances as an

10   opportunity to push forward their antigovernment beliefs.

11   This is coming from the FBI, the GBI, Atlanta Police

12   Department and the Dekalb County Police Department, to push

13   forward their antigovernment beliefs.  There are individuals

14   that are coming from all around the country and if you take

15   a look at where these folks are from, Wisconsin, Nebraska.

16   One person Mr. Voiselle is local here in Macon and I will

17   turn to him in just a moment.  These people are coming from

18   all around the country to occupy this forest and what we are

19   seeing is we are seeing more and more incidents occur.  Just

20   last week we had the defacing of a builders apartment up in

21   New York where they were saying stop cop city which is what

22   they say when they are trying to stop what is going on here.

23   Not only that but this group has been tied to the

24   vandalization of the Ebenezer Baptist Church here in Atlanta

25   which is Senator Warnock's church.  They have been tied to

1    the fire set in the Promise Center in Atlanta and Fulton

2    County and they have been tied to numerous other incidents

3    that are going on and they have made it pretty clear at this

4    point that they're willing to engage in violence and use

5    fire to keep anybody out of the forest.  So that forms a

6    little bit more nature of these charges.  It is not just the

7    singular incident that happened on the 13th.  There's more

8    to it and there are a lot more people out there.

9         Turning to Mr. Voiselle, he is number 12 on the

10   calendar, he doesn't have any criminal history but he is the

11   one individual on this calendar that has not wiped his

12   social media.  He is the one individual that we can take a

13   look at his social media and we have collected it thus far

14   and what we know is we know he is tied to extremist groups.

15   He follows those extremist groups and he interacts with

16   those extremists groups on Twitter.  We know that.  We can

17   see it and we have copies of it.  Mr. Voiselle --

18        THE COURT:  Counsel, how old is Mr. Voiselle?

19        MR. FOWLER:  I don't know off the top of my head how

20   old Mr. Voiselle is but they are all young.  I know that.

21   No one here is old or middle aged.

22        MR. KANE:  Mr. Voiselle is 20 years old.

23        THE COURT:  Thank you, counsel.

24        MR. FOWLER:  Mr. Olsen is 16.  He is from Nebraska.

25        MR. KANE:  He is not 16.

1          MR. FOWLER:  I am sorry.  He is 16 on the calendar.  He

2     is from Nebraska.  Mr. Robinson is 19 on the calendar and

3     he's all the way from Wisconsin.

4          Working backward, Mr. Robinson is the individual that

5     was clearing the Ghillie suit.  If the Court is unaware of

6     what that is -- he was weary Ghillie pants I should say.

7     They are pants that are not just camouflage but they almost

8     have fake-like grass on them so that if a sniper or someone

9     with a rifle wanted to hide -- you may have seen them in the

10    movies.  What they do is they wear a whole suit that looks

11    like it has long grass on it so you can lie in long grass

12    and no one can see you.  That is what a Ghillie suit is.  He

13    also had a respirator in case somebody came after them.

14         So for those reasons with that background, what

15    Mr. Johnson has stated including the items that were found,

16    particularly the trip wires, pipe bombs, we are opposed to

17    bond on all of these individuals.

18         MR. SCHIFFER:  Judge, if that concludes the State's

19    presentation, if I could speak very briefly and then the

20    three of us each have two of the defendants a piece.  I have

21    Arieon Robinson and Francis Carroll.

22         THE COURT:  Hold on.  I am trying to make notes.  You

23    are going to speak on behalf of Robinson?

24         MR. SCHIFFER:  Robinson and Carroll.  Mr. Kane has

25    Mr. Voiselle and Mr. Olson and Ms. Kaufman has the remaining

1      Ms. Hertel and --

2          THE COURT:  I can't write as fast as you are going.

3      Counsel, you have Robinson and?

4          MR. SCHIFFER:  I have Robinson and Carroll, Judge.

5          THE COURT:  Just a second.  Don't go any faster.

6          MR. SCHIFFER:  Yes, sir.

7          THE COURT:  And the next attorney is going to represent

8      Voiselle and?

9          MR. SCHIFFER:  Olson, correct, Mr. Kane.

10         MR. KANE:  Yes, that is right.

11         THE COURT:  And lastly we have someone representing --

12         MS. KAUFMAN:  Your Honor, I will be representing Ms.

13     Hertel and Ms. Ebaugh and they are position 7 and 10.

14         THE COURT:  Okay.  Thank you for your patience.  Go

15     ahead and make your presentation.

16         MR. SCHIFFER:  Thank you, Judge.  My name is Joshua

17     Schiffer.  I am a lawyer here in the Atlanta area for 20

18     years.  I am proud to be joined in any political case with

19     such fine counsel as Ms. Kaufman and Mr. Kane.

20         I don't know whether to begin with rolling my eyes at

21     the libel and slander or play the background music of the

22     old Benny Hill show.

23         We have 300 acres that has been occupied by protesters

24     for a year.  As the State literally just put out in front of

25     you that they are not being -- there's hundreds of people

1      from around the nation that have come to support this civil

2      disobedience celebrating the First Amendment and what we

3      have here is the State Attorney General's office, not the

4      local district attorney, we have the GBI, not local law

5      enforcement using its concurrent jurisdiction which is why

6      the State needs a felony for domestic terrorism.  We are

7      going to ask the court to look at the domestic terrorism

8      statute.  Without a felony there is no domestic terrorism

9      and I am going to encourage the Court to delve specifically

10     into the felony warrants for aggravated assault and the

11     scraped knee of --

12          THE COURT:  Counsel, so we understand each other, my

13     role is not to address those challenges that you're making,

14     whether or not there is a felony or not.  That would be

15     properly brought by motion and it would be assigned to a

16     judge.  I am just a presiding judge today for the sole

17     purpose of deciding whether or not your clients should have

18     a bond.

19          MR. SCHIFFER:  Yes, Judge.  I will go directly on to

20     the Ayala factors.

21          THE COURT:  Just please understand that if I sidestep

22     your issue I am not suggesting you have no issue or you do

23     but it is not my role today.

24          MR. SCHIFFER:  I understand that, Your Honor.  Thank

25     you.

1        As the State said they object to all bonds on all these

2    individuals.  Most of the charges brought are criminal

3    trespass misdemeanors, minor, outside the obvious felonies

4    that they have included in order to gain concurrent

5    jurisdiction.

6        Regarding Ayala for my two clients the flight risk and

7    likelihood to intimidate witnesses, danger to commit

8    additional felonies, danger to the community, those are all

9    relatively straightforward to address.  As the State

10   acknowledged my two clients have no record at all.  They

11   have loving, caring families and support groups.  In fact,

12   we have family from Kennebunkport, Maine that is present in

13   this hearing.  I have had extensive contact with the support

14   group for my other client Ms. Robinson.  There is no

15   likelihood of intimidating any witnesses because the

16   witnesses in this case are all GBI agents and Atlanta police

17   and other first responders.  Those are the witnesses and I

18   don't feel that they are subject to much intimidation.

19   Flight risk is zero.

20       These are political prisoners that are protesting using

21   their First Amendment right to set forth what is clearly a

22   popular opinion that this property should not be developed

23   in the manner that local government has determined it should

24   be.  I am not here to weigh in on that.  I love my police

25   friends.  I have represented a bunch of them but I love the

1    Constitution more than anything else and freedom of speech

2    and freedom of assembly and freedom to peacefully protest is

3    really inherent in our role as good citizens and what we are

4    seeing here is a very contrived, manufactured attempt by the

5    Attorney General's office to overstep local law enforcement

6    and silence, shill and scare hundreds, thousands of citizens

7    across this nation because they have helicopters with

8    machine guns yet they are going to complain about someone

9    lawfully possessing a firearm and openly displaying it as

10    has been supported by our governor and everybody else in our

11    state government.  Now, were police present?  Yes.  Was

12    there an active threat?  No, not at all.  It was in a

13    low-ready position.  The same position that officers when

14    they approach at the many courthouses hold their firearms.

15    I judge citizens the same way that I judge law enforcement.

16    I think the court should as well.  But, Judge, there is no

17    flight risk.  They all have attorneys.  They've all

18    dedicated themselves to supporting this movement whatever

19    Defend the Forest is and we will discuss that at length

20    later.

21        There are allegations in the press releases that the

22    GBI has been putting out about how it has been determined to

23    be a terrorist organization by homeland security and they've

24    clearly over a year exercised great law enforcement assets

25    to ensure that the State's goal of developing this property

23

```
 1        is met and that is a lawful State Interest.  I do not

 2        disagree with that.  The State has a plan to build this and

 3        these are citizens saying no, but to trump up and create a

 4        bunch of charges, arrest them, sweep the forest, this was

 5        nothing more than a manufactured criminal end to an

 6        otherwise reasonable protest where these were criminal

 7        trespasses.  These are people refusing to leave a place

 8        because they know the moment they leave they lose their

 9        fight and the State decided to end it by arresting them all

10        and now they are objecting to bond.  We just sat through

11        three hours of listening to the rest of the conditions of

12        this jail.  We are asking for a low and reasonable bond for

13        both of my clients of $1,000 on every charge.  They should

14        be released with no restrictions as to travel or who they

15        contact.  My two clients in particular pose no threat to

16        anybody and the State has struggled and I ask the Court

17        again just read the warrants to allocate that crimes have

18        really even been committed and I will pass this off now to

19        Ms. Kaufman.

20            THE COURT:  Counsel, before you pass the matter on,

21        because there is now a dispute of the facts.  You've

22        contended one set of facts.  The State has contended

23        another.  I am not surprised by that.  That is why we are

24        here.  Why there are trials.  The State has contended that

25        your clients who I have as Robinson and Carroll --- is that
```

1   accurate?

2          MR. SCHIFFER:   That is accurate, Your Honor.

3          THE COURT:   At least as to Carroll, participated in the

4   rock throwing, bottle throwing, starting fires, throwing

5   bricks.   Is that in dispute?

6          MR. SCHIFFER:   I believe that is not listed in any of

7   the warrants.

8          THE COURT:   I don't know about warrants because I do

9   not have access to that.   I am merely saying that is what

10   the State's attorney told me in his presentation.   You have

11   given me a different picture.

12          MR. SCHIFFER:   Yes.

13          THE COURT:   So in a matter of deciding a bond -- and

14   that is all we are deciding, not guilt or innocence.   I am

15   telling you what you already know but the State's attorney

16   has indicated that Mr. Carroll was living in a treehouse,

17   threw rocks and bottles at firefighters, started fires,

18   threw bricks.   Is that in dispute?

19          MR. SCHIFFER:   We definitely dispute that and there

20   wasn't enough specificity with my client in regards to their

21   --

22          THE COURT:   That is fine.   I just want to know what is

23   before me.

24          MR. JOHNSON:   Your Honor, I don't mean to interrupt but

25   just since we are right here on the issue I figure it would

25

1  be easier than going back.  The allegations that I set out

2  this morning that is actually what is charged in the

3  warrants.  Specifically the aggravated assault is for

4  throwing rocks and bottles at fire department and EMS

5  employees standing outside of a fire station and the

6  obstruction and the --

7      MR. SCHIFFER:  Would you read the details of the

8  officer case, please?  The details from the officer involved

9  warrant for Mr. Carroll, if you would read that.  The Court

10  does not have a copy of that warrant what the specific

11  language used by Chris Carr and the Attorney General's

12  office is.

13      MR. JOHNSON:  First off I guess I need to just put

14  something in here for a second, Judge.  This is a

15  multijurisdictional joint operation that includes the

16  District Attorney's Office, the Attorney General's office,

17  the GBI, the Dekalb County Police Department, the Atlanta

18  Police Department, and many other jurisdictions.  I am

19  perfectly willing to sit down as I did already with Ms.

20  Kaufman with Mr. Schiffer if he wants and talk a little bit

21  off line about this situation but Mr. Schiffer is just

22  throwing things out that quite quickly, Judge, are not true.

23  So I want it to be clear that he says on the one hand that

24  he is all for a lawful State interest which is to build on

25  the property but now we are confused about what the protest

1    is.  Is the protest writing a letter to your Congressman and

2    saying don't build or is the protest okay?  Because what I

3    am hearing is it is okay to throw bricks at cops.  It is

4    okay to set things on fire.  I guess my thing, Judge, is if

5    Mr. Schiffer wanted to build a shed on his yard and as a

6    neighbor I didn't care for that I don't think Mr. Schiffer

7    would like it if I went and put a bucket of urine on his

8    front lawn and set tires on fire because that is what's

9    going on here.

10    MS. KAUFMAN:  Your Honor --

11    THE COURT:  Everybody, hold on.  It is like I want to

12    herd the cats and do a small corral here.  My role is not to

13    hear motions to dismiss or motions to suppress.  I'm just

14    here to determine bond.  While everybody that I have heard

15    from so far has been very eloquent and I do not mean to

16    curtail, the emotions associated with your legal arguments

17    are outside of the scope of what I am doing.  I want to know

18    if they have criminal histories, why should I set a bond,

19    why should I not set a bond, the justification for the act

20    if at all as alleged are for another time and another place.

21    A jury perhaps.  A motion perhaps.  I am not here to hear

22    motions.  Just the motion for bond.  That's all I am here

23    for.  I admire and respect the eloquence, the advocacy, but

24    we are going too far a field.  I want to know from the

25    State's point of view why I should not set a bond or if I do

1    set a bond what is the State's view of what the bond should

2    be.  I want to know from defense counsel why I should set a

3    bond.  I don't need to know whether they are good people, no

4    people.  I need to know do they have criminal history.  Do

5    they come to court when they are supposed to.  Do they have

6    jobs.  Do they have a reason for being here.  Do I make my

7    point?  I'm trying to get everybody focused on why I am

8    here, not why you're here.  I am looking at you, Mr.

9    Schiffer.  You are here to advance a matter that is outside

10   the scope of why I am here.  I would love to be the judge in

11   your matters when the motions come on.  That is not up to

12   me.  I do not pick what I am selected to sit on.  It was my

13   good fortune to be selected to sit on bonds today.  I drew

14   the short straw.  I will hear the matter of bonds.  The

15   merits of your case is to be heard at another date, place,

16   another time, probably by another judge.

17        Having said that I have already heard from Mr. Schiffer

18   the arguments that his clients Robinson and Carroll, they

19   are not a flight risk and they have no criminal history.

20   Those are valid arguments at a bond hearing.  The merits of

21   why they were there or not there, that is not for me.  That

22   is for another judge, another place, another time.

23        If you have anything else, Mr. Schiffer, to convince me

24   why a bond, if any at all, should be set for your clients I

25   will hear from you, otherwise we will move on to the next

1       two defendants.

2              MR. SCHIFFER:  The only last issue is, Judge, the

3       community has jobs available for all of these people that

4       will also encourage them to continue participating in this

5       process but they are excellent candidates for bond.

6              THE COURT:  Your clients are Carroll and Robinson

7       you're are speaking about?

8              MR. SCHIFFER:  Yes, Judge, and I believe that carries

9       for the others as well.

10             THE COURT:  We will get to the others.  Let me look at

11      my notes.  Your clients, one is 22.  Carroll is 22. How old

12      is Robinson?

13             MR. SCHIFFER:  Yes, Judge.  Robinson, I believe, is 19

14      years old from Wisconsin.

15             THE COURT:  You could've told me that and I didn't

16      write it down.  Mr. Schiffer, is there anything else you

17      want to say on behalf of your clients or can we move on?

18             MR. SCHIFFER:  No, Judge.  It is frustrating to hear

19      mischaracterizations and not be able to respond about things

20      like Ghillie suits and waste buckets which isn't plumbing,

21      so.  I worry that the State as much as they are concerned

22      with my verbiage I am equally concerned with theirs.

23             THE COURT:  You know, counsel, if it goes to trial that

24      is what we call cross-examination.

25             MR. SCHIFFER:  Yes, Judge.

```
 1        THE COURT:  State's Attorney General, I interrupted you
 2    to try to corral all of you to get back to the issues.
 3    State's Attorney General, anything else you want to tell me?
 4        MR. FOWLER:  No, Your Honor.  Anything else I would say
 5    would be outside of the scope of what Court wishes to hear
 6    today.  So I will just leave it at that.
 7        THE COURT:  I do not want to limit what you want to
 8    tell me.  I can't tell you to not tell me.
 9        MR. FOWLER:  The only thing I would say is this, this
10    group does not abide by the traditional notions of politics
11    of the left and the right.  They embody extremist ideals
12    from the left and the right.  So this has nothing to do with
13    politics whatsoever.  That is all I would say.
14        THE COURT:  Lawyer Kane, do you want to address your
15    position regarding bond for your clients of Voiselle and
16    Olson?
17        MR. KANE:  Yes, I would, Your Honor.  I have listened
18    attentively to you for over three hours this morning.
19        I thank you for hearing us.  I will address the bond
20    issues but I do want to say a couple of things if you just
21    give me a moment.
22        The first is one of the comments that the prosecutor
23    said was, these parties have been in and around the forest
24    for over a year and I think that's enlightening to you
25    because there is no allegation until the GBI showed up of
```

1      any illegality other than a possible criminal trespass.

2           People have been living in and around or staying or

3      coming into the forest for over a year with no problem.  It

4      was on December 13th when the police showed up with

5      helicopters, tear gas, drones and plastic bullets and

6      shooting at these kids in a treehouse that there was an

7      issue.  So I do believe it's a manufactured prosecution and

8      I think your other insightful act of judicial wisdom was

9      asking why is the Attorney General here and it is because,

10     respectively, it's probably the AG that manufactured this

11     domestic terrorism case.

12          With that let me address my clients.  Leonardo

13     Voiselle, first of all, his mother and father are online and

14     they likewise have been sitting patiently.  Also online is

15     his grandfather Charlie Hall.  Also online is a family

16     friend Ernestina Kalavowski.  They are all members of this

17     community that support him.

18          THE COURT:  Mr. Kane?

19          MR. KANE  Yes, sir.

20          THE COURT:  I do have some basic information I want to

21     know.  How old is Mr. Olson?

22          MR. KANE:  No.  I was talking about Mr. Voiselle.  Now

23     you want to go to Mr. Olson?

24          THE COURT:  Either one.  How old is Mr. Voiselle?

25          MR. KANE:  MR. Voiselle is 20 years old.

1          THE COURT:  And he is from where?

2          MR. KANE:  He is from Macon, Georgia.

3          THE COURT:  Does he have a criminal history does

4     anybody know?

5          MR. KANE:  He has no criminal history.  He has never

6     been arrested.  In fact, he wasn't even in the woods.  That

7     showed how contrived this is.  No, sir, he has no criminal

8     history.

9          THE COURT:  Mr. Olson -- would you mind just jumping?

10    How old is Mr. Olson?

11         MR. KANE: Mr. Olson -- first of all Mr. Olson's mother

12    and father are online.

13         THE COURT:  They are sitting there.  I know.  I have

14    seen them.

15         MR. KANE:  Incidentally it is Aria Nicolas Olson.

16         THE COURT:  How old is Aria Nicolas Olson?  How old?

17         MR. KANE:  25 years old.

18         THE COURT:  Mr. Olson is from where?

19         MR. KANE:  He is from Elkhorn, Nebraska.

20         THE COURT:  Now go ahead and make your presentation.

21         MR. KANE:  Who do you want me to talk about Olson or

22    Voiselle?

23         THE COURT:  It is up to you.

24         MR. KANE:  We will go back to Voiselle.  20 years old,

25    no criminal history, graduated from high school, worked for

1    AT&T, was walking down the street when he was arrested on

2    the 13th.  He has his grandfather here, his family friend

3    here to support him.  Perfect candidate for bond.  Really an

4    OR bond is what I'd ask for Leonardo Voiselle.  His charge

5    is that he entered the property, which is a criminal

6    trespass which is he walked up to a policeman and then they

7    arrested him, walked down the street and then he is a

8    domestic terrorist because he walked down the street.  So I

9    would ask you to give him an OR bond on those.

10    Let me talk to you about Aria Nicolas Olson.  They are

11    25 years old.  He is a high school graduate.  He has had

12    several jobs.  Worked at a recording studio.  Also did

13    warehouse work for a BioLab.  His mom and dad are online.

14    They are very concerned and also Aria has health problems or

15    health issues.  He is in the Dekalb County medical and he

16    needs medicine every day and he is not getting it or she is

17    not getting it.  So, likewise, I would ask the Court to

18    grant an OR bond for Nicolas Aria Olson and I can answer any

19    questions you have for either party.

20    THE COURT:  Give me a second and let me look at my

21    notes.  Olson is a female?

22    MR. KANE:  Olson is transitioning from male to female.

23    She prefers to be called Aria.

24    THE COURT:  Olson, my notes indicated also participated

25    in rock throwing, bottle throwing, fire -- brick throwing.

 1          MR. KANE:  So what the allegation is is that he threw a

 2     rock at a -- it varies.  The government can't seem to get it

 3     straight.  One time it is a police car.  One time it is an

 4     EMS vehicle.  One time it is a fire engine.  So that is the

 5     allegation and it is disputed.

 6          THE COURT:  Is it disputed that it was thrown or is it

 7     disputed of what was thrown?

 8          MR. KANE:  That he threw a rock or a stone or a bottle

 9     at anyone.

10          THE COURT:  It is disputed that he threw anything?

11          MR. KANE:  Yes.

12          THE COURT:  Okay.

13          MR. KANE:  And let me add, he has no failures to

14     appear, no probation violation and presumed innocent.

15          THE COURT:  Did he have a criminal history?.

16          MR. KANE:  None.  25 years old, nothing.

17          THE COURT:  Now, he is a resident of Nebraska as is

18     your other client -- no.  Your other client is for Macon,

19     Georgia.

20          MR. KANE:  Mr. Voiselle is for Macon, Georgia and his

21     mom and dad are online.  Both these parties' parents are

22     online.

23          THE COURT:  Mr. Kane, you are giving me answers to

24     questions I have not asked.  What I say is get on the train

25     and let the train take you where it needs to go because I

1     know where I want to go.

2         Your client from Nebraska, what assurance is there that

3     he would return to court if he were granted bond?

4         MR. KANE:  Well, his parents will make sure he comes to

5     court.  If the Court is concerned you can put a must make a

6     good bond through a bondsmen.  That would give an assurance.

7         THE COURT:  What is your definition of a good bond?

8         MR. KANE:  I think it is an OR case but I would say

9     $10,000.

10         THE COURT:  How do you feel about -- well, again, your

11     other client is from Georgia.  Anything else you want to

12     tell me, counsel?

13         MR. KANE:  I would like to tell you a lot but you don't

14     want to hear it right now about the merits of the

15     government's case.  So that's all I have for now.  Thank

16     you.

17         THE COURT:  The merits of the case would not help me at

18     all.

19         MR. KANE:  And even the representations of the

20     government but I'll keep my mouth shut.

21         THE COURT:  Let me rephrase.  Sometimes -- and I'm not

22     trying to be funny and I'm not trying to drag this out.

23     Sometimes when I listen to defendant's attorneys present

24     their position on the case it comes out that there is a

25     reason to grant a bond when absent giving me that reason

1       there would not be a reason to grant a bond.  I know that is
2       stilted but the point I'm making is I have had it happen in
3       a murder case where the State wants to cut off the person's
4       head but yet the defense counsel said alibi.  My client was
5       in Alabama.  So now we've got a dispute as to facts and thus
6       might justify a bond because the facts will come out at
7       trial.  Am I making my point?  If you feel there's something
8       that I need to know that will affect the Court's giving a
9       bond to your client now is your day in court.  Now is your
10      chance to tell me.  The merits of the case are not for me to
11      decide.  If you think there are some defenses without giving
12      away your case to the State but will help the Court decide
13      bond now is your time for me to know it.  Am I making myself
14      --
15          MR. KANE:  You are making yourself abundantly clear.
16      Yes, sir.
17          THE COURT:  I just don't need to know about the case.
18      I have already got a picture.  People living in treehouses
19      --
20          MR. KANE:  Treehouses for a year.
21          THE COURT:  Whatever.  I want to know why you think I
22      should give your client a bond.  He has no criminal history,
23      has no failure to appears.  These are points well made which
24      I consider.  If you have anything else tell me now.
25          MR. KANE:  Yes, sir.  Leonardo Voiselle has worked

1     every day since he was 15 years old.

2          THE COURT:  He has no criminal history.  He is 20 years

3     old and he lives in Macon.

4          MR. KANE:  Yes, sir.

5          THE COURT:  Anything else, counsel?

6          MR. KANE:  No, sir.

7          THE COURT:  Thank you.

8          MR. KANE:  Thank you, sir.

9          THE COURT:  I will hear now from the last two.

10    Ms. Kaufman, are you counsel for Hertel and Ebaugh?

11         MS. KAUFMAN:  Yes, sir.  Position 7 is Ariel Ebaugh.

12         THE COURT:  Tell me what you want me to know.  Let me

13    start off with this, how old is your client Hertel?

14         MS. KAUFMAN:  My client Hertel is 25 years old.

15         THE COURT:  It is a female?

16         MS. KAUFMAN:  Yes.

17         THE COURT:  Female and 25 years old.  From California,

18    did I understand?

19         MS. KAUFMAN:  Yes, Your Honor.  Her mother lives in

20    California.  Her father -- she grew up in Boise, Idaho and

21    her father is on the call along with many other supporters

22    of Ms. Hertel.

23         THE COURT:  My notes indicate that Ms. Hertel does have

24    a criminal history albeit not a violent criminal history but

25    criminal history.  Is that accurate?

1  MS. KAUFMAN:  Your Honor, my understanding is there was

2  a 2021 arrest in Eureka, California.  That case was

3  dismissed and there is a pending Fulton County case

4  involving marijuana and obstruction, apparently.

5  THE COURT:  A 2015 case for obstruction and loitering.

6  Minor issues, but nonetheless a criminal history.

7  MS. KAUFMAN:  Yes.  She has an open case and a 2015

8  case.  Should I go on or do you want to ask me more

9  questions?

10  THE COURT:  This is Ms. Hertel.  She is from

11  California.

12  Now the question I have asked before, if bond is

13  granted what assurances do we have that she would return for

14  the issues pending in this county?

15  MS. KAUFMAN:  Your Honor, obviously, and I guess the

16  other two attorneys did not mention this.  These are really

17  serious charges.  Ms. Hertel has a college degree.  She

18  works in environmental analysis.  She is somebody who really

19  does not want -- I mean she wants to fight the charges.  So

20  you can best believe that she's going to be coming back to

21  handle this if and when the State is able to get an

22  indictment.

23  Furthermore, her family members, she has several

24  professors that have actually provided me with letters of

25  recommendation in support of her, which I've never seen

1   before.  Professors have never done that for me.  So what I

2   want Your Honor to know is that there are tons of people --

3   Ms. Hertel has every intention of being here if the Court

4   wants her to be here whenever she needs to be here.  Her

5   intentions would be to live with her father in Boise, Idaho

6   if the Court would allow that.  She can also have a

7   residence.  I could get the Court an address in Georgia if

8   the Court would prefer that she stay here.

9       What I can tell Your Honor is that she is an incredibly

10   talented bright young lady who is clearly passionate about

11   things, however, she has been in jail now more than a week

12   and she fully understands that she cannot be living in the

13   trees or go back to the area that they were in.  So I just

14   want to make that very clear.  Any stay away order she will

15   abide by.

16       THE COURT:  Counsel, I am concerned again about the

17   suggestion by State's counsel that your client participated

18   in throwing rocks, bottles at firefighters, started fires,

19   throwing bricks.

20       MS. KAUFMAN:  Well, Your Honor, we absolutely dispute

21   those facts.  I look forward to having our day in court on

22   those issues.  She is presumed innocent and she denies doing

23   --

24       THE COURT:  I am not presuming her guilt.  I am just

25   saying the State has made a representation.  Okay, that is

1       fine.  What is your position on bond for Ms. Hertel?

2           MS. KAUFMAN:  For Ms. Hertel I would ask for $1,000

3       bond on each count for a total of 3,000.  I think she has 3

4       charges, I believe.  The State can confirm.

5           MR. SCHIFFER:  I believe three is correct on Hertel.

6       Aggravated assault, criminal trespass and domestic

7       terrorism.

8           THE COURT:  Ms. Kaufman, anything else you want to say

9       on behalf of your client?

10          MS. KAUFMAN:  On behalf of Ms. Hertel she is not a

11      significant risk to the community, of committing felonies,

12      of being a danger, of intimidating witnesses.  She is a

13      pacifist and she will absolutely come back here and she is

14      not a flight risk.

15          THE COURT:  Thank you, counsel.  Anybody else wish to

16      address the Court before I make a decision?

17          MS. KAUFMAN:  Your Honor, I still have one other client

18      that we did not speak about.  About Ariel Ebaugh which is

19      position 7.

20          THE COURT:  I stand corrected, counsel.  Go ahead.

21          MS. KAUFMAN:  She is 22 years old.  She is a resident

22      of Stockbridge, Georgia.  Both of her parents are on this

23      call.  She is a college graduate.  She is employed at Olive

24      Garden and she does DoorDash.

25          I know you had asked her gender.  She is a 90-pound

1    female.  She is alleged to have legally possessed weapons.

2    Those are two of the charges.  Possessing of a firearm

3    during a felony.  I guess the felony is the domestic

4    terrorism.

5         THE COURT:  She has a criminal history?

6         MS. KAUFMAN:  She has no criminal history.  Zero.

7         THE COURT:  What are you referencing then?

8         MS. KAUFMAN:  I am referencing the charges as they have

9    alleged them against her.  I am just saying that she is

10   alleged to have had firearms and obstruction.  There might

11   be five or six charges.  I did not write them down fast

12   enough.  Go ahead.

13        MR. SCHIFFER:  Domestic terrorism, simple assault,

14   criminal trespass, obstruction.  I believe misdemeanor

15   obstruction but it may be a felony, and two counts of

16   possession of a firearm during the commission of a felony

17   which I believe was the obstruction because criminal

18   trespass and the simple assault are misdemeanor and domestic

19   terrorism needs a predicate felony.

20        MS. KAUFMAN:  By the way, Your Honor, her parents are

21   on the call.  She's from a good Christian family in

22   Stockbridge.  Her parents will absolutely assure that she

23   gets here.  She has ties to the community.  She's not a risk

24   and the allegations in this case are that she walked into a

25   field possessing a firearm.  I would like to say to, Your

1       Honor, if somebody wanted to do something with it she could

2       have and there is no allegation that she did.  When told to

3       put it down, I believe, the State said within a moment she

4       put it down.

5           THE COURT:  I am going to stray a little bit from what

6       is before me.  I am sorry for all of you but I am about to

7       ask a question.  If someone has no intention to use a

8       firearm at a gathering why are they carrying a firearm?

9           MS. KAUFMAN:  Your Honor, I am not the right person to

10      ask because I'm not someone who carries or believes in

11      carrying firearms.  There's lots of other people from

12      Georgia that have different feelings on that and people do

13      it at the gas station -- people do it all of the time.  I

14      don't know why.

15          MR. SCHIFFER:  Judge, I will speak as someone in

16      Georgia that knows a lot about firearms and people with

17      firearms.  The display of firearms is in overtly political

18      act and part of celebrating our First Amendment right about

19      what rights you like or do not like.

20          The display of a firearm has been protected many many

21      times and it is at the heart of the firearm's litigation but

22      it is in overtly political statement to be in public openly

23      carrying a  firearm if you are allowed to do so, which in

24      Georgia is basically everybody that does not have a felony

25      or is otherwise precluded and is of the appropriate age.

1      THE COURT:  Counsel, you are right but to the degree I

2  disagree it is more than just First Amendment.  It is an

3  effort to intimidate.

4      MR. SCHIFFER:  I agree.  We could talk about that

5  endlessly elsewhere, Judge.

6      THE COURT:  Another time.  I appreciate your input.  Is

7  there anything else that needs to be said before I make a

8  decision?

9      MR. SCHIFFER:  Judge, I just wanted to make sure --

10  Judge, I realized that I kind of jumped through my two in an

11  effort to move along.  Both of my clients besides having no

12  record are attached to this community.  Are absolutely

13  willing, ready and able to come back.  They have substantive

14  education as well as people in the community that support

15  them including family online.

16      THE COURT:  Your clients are Robinson and Carroll?

17      MR. SCHIFFER:  Yes, Judge.

18      THE COURT:  Carroll is from Maine.

19      MR. SCHIFFER:  Yes, Judge, and his parents are here.

20      THE COURT:  Anybody else wish to address the Court?

21      MR. JOHNSON:  Judge, before you make your decision just

22  to let you know the State's position is if you are inclined

23  to grant a bond we are not against the folks who live out of

24  state going back to where they came and going back home

25  until such time as they need to come back for court or court

1   matters because any request if you do grant a bond would be

2   for them to stay away from the location and to have no

3   contact with the organization any further.  So those are

4   some of the things we would request if you are inclined to

5   give a bond.  Also so the Court is aware we've also in case

6   the Court should grant it have reached out to a monitoring

7   company called Talitrix which is similar to an ankle monitor

8   except it is a little more affordable and it also is a

9   smartwatch.  So it is a little less stigmatizing from

10  wearing an ankle monitor.

11      So those are some of the things that we would request

12  if the Court is inclined to grand a bond and we can

13  obviously talk in more detail about that depending on which

14  way the Court is headed.

15      THE COURT:  Anything else?

16      MR. JOHNSON:  No, Judge.

17      THE COURT:  The Court is of several different minds

18  about what to do with this.  It is not my purpose to

19  pontificate about First Amendment, guns.  As I have tried to

20  give everybody, my role is to focus on bond.  Is there a

21  justification for granting a bond or not granting a bond?

22      The things that I consider when granting a bond among

23  others are criminal history, age of the participants,

24  failure to appears, those kind of things as distinguished

25  from the facts of the case.  That is to be addressed at

44

1   trial.  I am not a fact finder.  On the one hand the facts
2   as shared with me would suggest the six-part persons ought
3   to remain in jail for various reasons.  Some are from out of
4   state.  Their desire to return are questionable.  Why do I
5   say that?  Years ago I had the PETA riots out of Emory.
6   They were from all over the country.  They would get in a
7   van and travel all over the country and in the name of
8   protecting animals they would throw rocks and bricks and
9   start fires much as the people in this situation.  They were
10  granted bond.  I don't know if any of them ever came back.
11  Those were misdemeanors.  On the other hand the facts that
12  took place are in dispute.  Defendants say we did not throw
13  rocks and bricks and start fires.  So the facts are in
14  dispute.  So the things I dwell on are criminal history and
15  the likelihood they will return.  In candor I really doubt
16  that anybody from out of state will return.  I have not just
17  fallen off the back of a turnip truck.  I've gone through
18  this for many years of people who have the opportunity to
19  not return, they don't return, but on the other hand I don't
20  think it's justifiable to keep these people in jail awaiting
21  indictment and trial.  So I will set a bond.
22      I will need a few minutes to go through my notes,
23  please, so I can figure out what kind of bond to give.
24      MR. SCHIFFER:  Thank you.  If I may make one brief
25  comment regarding what Your Honor just shared.

1          THE COURT:  Yes.

2          MR. SCHIFFER:  With the top charge being domestic

3     terrorism the punishment range is very substantial.  I

4     believe it even includes death.  I expect that all 50 states

5     --

6          THE COURT:  Nobody is going to --

7          MR. SCHIFFER:  I totally understand that, Judge.

8          THE COURT:  Go ahead.

9          MR. SCHIFFER:  But what I am saying is should the State

10    of Georgia request the extradition of people charged with

11    this gravity of a charge I imagine that they would be

12    returned to Georgia relatively quickly.  This isn't a slap

13    and tickle.  This is a very serious charge.

14         THE COURT:  I did among other things when I was in the

15    criminal divisions at the Attorney General's office, I

16    participated in extraditions.  So I am confident that the

17    Attorney General, if they think the charge is serious enough

18    they will pursue it.  I had to go to several states to

19    pursue extraditions.

20         Anyway, enough of me.  Again, anything else?  I need a

21    few minutes to go through my notes.  Just give you a few

22    minutes, please.

23                    (Pause in proceedings.)

24         THE COURT:  State's attorney?  Not the AG.

25         MR. JOHNSON:  Yes, Judge?

1      THE COURT:  Regarding Francis Carroll.

2      MR. JOHNSON:  Yes, sir.

3      THE COURT:  Counts 4 and 5 domestic terrorism.

4      MR. JOHNSON:  Yes.

5      THE COURT:  What is the State alleging as the acts of

6  domestic terrorism?

7      MR. JOHNSON:  For Francis Carroll it is a combination

8  of -- he is one that we have alleged actually threw rocks

9  and threw bottles.  Additionally by occupying the treehouse

10  with the gasoline and fireworks contained inside of it and

11  the backpack that he had that had some other items in it

12  that he is both a party to the crime and an actual actor in

13  the crime.

14      THE COURT:  Okay.

15      MR. SCHIFFER:  Judge, should Your Honor be interested I

16  can read the actual caption from warrant Number D0293186

17  which is the charge taken out by Special Agent Ryan Long

18  against Francis Carroll for 16-14-10 domestic terrorism if

19  you would like it verbatim.

20      THE COURT:  No.  I wouldn't.

21      MR. SCHIFFER:  It is pretty similar to the same one

22  that they lodged against everybody.

23      THE COURT:  No.  I have sufficient overview of what is

24  before the court.

25      MR. SCHIFFER:  Yes, Judge.

1                               (Pause in proceedings.)

2          THE COURT:  Not in any particular order the Court

3    orders as follows; in the matter of a bond in State versus

4    Hertel the Court sets a bond of $8,000 cash, surety or

5    property; report to pretrial services within 48 hours of

6    release; do not return to -- I don't know what to call this

7    place.  What designation is it?  What do we call it?  The

8    proper name?

9          MS. KAUFMAN:  Cop city.

10        MR. JOHNSON:  That is what they like to call it.  We

11    call it 1327 Key Road in and around that area of the forest

12    and in the bond order in the conditions, Judge, we can put

13    the exact location.

14        THE COURT:  All right.  I want the exact location and

15    not some euphemism.  Do not return to 1327 Key Road or

16    whatever it is called.  What other conditions, State?

17    Because I am going to go through all six of these.  They may

18    have some of the same conditions.

19        MR. JOHNSON:  Yes, Your Honor.  We would ask that the

20    defendants have no contact with each other except,

21    obviously, through their defense counsel can talk to each

22    other but no contact with any of the codefendants in this

23    case.

24        THE COURT:  Defense, do you want to speak to that?  Is

25    there any reason why contact should be necessary?

1      MR. SCHIFFER:  Is this on one individual at a time or

2   is this for the group, Judge?

3      THE COURT:  I am asking the State to give me some

4   conditions of some bonds because I am going to set some

5   bonds and probably the conditions may be the same on all of

6   the bonds.  So I am trying to get from the State what

7   conditions would they like for me to add.  The State has

8   suggested insofar as Hertel is concerned, do not return and

9   no contact with the other defendants.  If any lawyer for the

10  defendants wish to address this I will hear from you now

11  about no contact.  Is there any reason why Ms. Hertel has to

12  have any contact with Carroll, Ebaugh etcetera, etcetera?

13     MS. KAUFMAN:  There is no reason, Your Honor.  And if

14  she needs to it can be through her attorney.

15     THE COURT:  That is the way it should be.

16     MS. KAUFMAN:  That is fine, Your Honor.

17     THE COURT:  Hearing no objection Ms. Hertel shall have

18  no contact directly or indirectly with any other defendant

19  or State's witness in the case.  You've already heard me.

20  You've called my attention, you've been here three or four

21  hours about how I feel about no contact.  I do not need to

22  go through it all again.  Make sure your clients understand

23  no emails, no messages through third person.  That is as to

24  defendant Hertel.

25     As to defendant Carroll -- with that bond what did I

1  just say?  Was $8,000 cash, surety or property.  Defendant
2  Carroll a bond of $13,500 cash, surety or property; report
3  to pretrial services within 48 hours of release; no contact
4  directly or indirectly with any other defendant or State's
5  witness; do not return to the property in issue.

6      Defendant Ebaugh a bond of $10,000 cash, surety or
7  property; do not return to the property at issue; no contact
8  with any other defendant directly or indirectly.

9      Defendant Voiselle a bond of $6,000 cash, surety or
10  property; report to pretrial services.  I don't think I said
11  that with Ebaugh.  Ebaugh is to report to pretrial services
12  within 48 hours of release.

13      Voiselle $6,000 bond; report to pretrial services
14  within 48 hours of release; no contact directly or
15  indirectly with any other defendant or State's witness; do
16  not return to the property in issue.

17      Defendant Olson a bond of $7,500 dollars cash, surety
18  or property; do not return to the property in issue; have no
19  contact directly or indirectly with any other defendant or
20  any State's witness; report to pretrial services if I did
21  not already say that.

22      Defendant Robinson a bond of $6,000 cash, surety or
23  property; report to pretrial services within 48 hours of
24  release; do not return to the property in issue; no contact
25  directly or indirectly with any other defendant or any

1      State's witness.

2           State, have I overlooked any conditions that you would

3      like to see implemented?

4           MR. JOHNSON:  Yes, Judge.  There are a few.  Just with

5      Robinson just so I have it right.  What was the number you

6      gave?

7           THE COURT:  $6,000 cash, surety or property.

8           MR. JOHNSON:  Yes, Judge.  There are several conditions

9      and they would apply to all the defendants.  So this would

10     be something for all defendants.  In addition to no contact

11     with each other, also must have no contact with the Defend

12     the Atlanta Forest organization either through social media,

13     in person.  Any type of platform we would say a condition

14     should be no contact.

15          THE COURT:  The Atlanta Forest organization?  Is that

16     what you call it?

17          MR. JOHNSON:  Defend the Atlanta Forest, yes.  It is

18     the group that this set of defendants belong --

19          THE COURT:  Do not give me an answer to a question I

20     have not asked.  I just want to know the name of the group.

21          MR. KANE:  Defend the Atlanta Forest.

22          THE COURT:  Defend Atlanta Forest.  That is the name of

23     it?

24          MR. KANE:  Defend the Atlanta Forest.

25          THE COURT:  Is that a real group?

1    MR. SCHIFFER:  We would love their definition of it and
2    we would love to know a lot more about it because that is
3    kind of like saying those people.

4    MR. JOHNSON:  Actually if you go on social media, Mr.
5    Schiffer, they have a website and you can learn all about
6    it.

7    MR. SCHIFFER:  I know but you don't have a membership
8    list or a list of people that you have shared with anybody
9    so it is hard to say stay away from those people without a
10   definition considering the violation of it could lead to
11   problems.

12   MR. JOHNSON:  I get it but I can't put everybody's name
13   on a list.  I understand.  I was very specific no contact
14   with Defend the Atlanta Forest through social media.  They
15   have a very robust social media presence.  It would not take
16   very long for us to probably see if they were posting.

17   THE COURT:  Stop, stop, stop.  No contact with the
18   group known as Defend the Atlanta Forest through social
19   media.  If it exists, fine.  If it doesn't exist, fine.

20   What other conditions, State?

21   MR. JOHNSON:  They must possess no firearms or weapons
22   of any kind, Judge.

23   THE COURT:  Some of them have been -- a charge with
24   possession of a firearm and some have not.

25   MS. KAUFMAN:  Just briefly, Your Honor, those that have

1    been charged with possessing a firearm have not even been

2    charged with using it or pointing it at anyone and so on

3    behalf of Ms. Ebaugh who I believe is the one charged with

4    possession of the weapon.  She is a 90-pound small woman and

5    I know that she would like to continue to be able to carry.

6         MR. SCHIFFER:  Judge, Georgia is going through a crime

7    issue that has been on the front page of everything.  So

8    restricting Second Amendment rights for someone who's not

9    been accused of using a firearm in an offensive manner, that

10   seems to run contrary to the promises of the Constitution.

11        MR. JOHNSON:  This is a bond situation so there is a

12   difference here.  This is a --

13        MR. SCHIFFER:  No.  They are presumed innocent though

14   and that's something that -- removing someone's Second

15   Amendment right as a condition of bond would be appropriate

16   should there be an allegation involving wrongful use of a

17   firearm but there's been no allegation other than open

18   display.

19        MR. JOHNSON:  She is charged with simple assault with a

20   weapon.

21        MR. SCHIFFER:  Was that included in the simple assault?

22   So a misdemeanor simple assault for displaying the weapon?

23        MR. JOHNSON:  It was the appropriate charge for what

24   she did.

25        MR. SCHIFFER:  So a misdemeanor should result in the

1      removal of a constitutional right?

2          MR. JOHNSON:  That is the Judge's call, Mr. Schiffer.

3      Per my request the Judge can grant it --

4          MR. SCHIFFER:  It is a request though.  The request is

5      to remove a constitutional right for an allegation of a

6      misdemeanor?

7          MR. JOHNSON:  No.  The request is to remove a firearm

8      from a potentially dangerous person so we don't have someone

9      else getting hurt.

10         Look, the whole reason for this whole thing is nobody

11     wants to see anybody get hurt and it is only a matter of

12     time if these types of acts continue that someone is going

13     to get hurt out there whether it is one of the people trying

14     to stop the forest from being plowed down or people going

15     there to work on it.

16         THE COURT:  I will tell you what, if you all want to

17     debate the merits of the Constitution I am going to take a

18     break.  I will let you all debate and when you all are

19     through I will come back.

20         Again, this is not the place to discuss these things.

21     Mr. Schiffer, I am not dissuaded from taking away a

22     constitutional right in a bond hearing because you can take

23     that up in a proper motion to dismiss or amend or whatever

24     you want to do.  This is just a bond hearing and where

25     someone who has been charged with a felony, not necessarily

1   possession of a -- restricting their right to a weapon

2   doesn't bother me.  Now you all can argue it on all you want

3   but not here in front of me.  Take it up with whoever is

4   assigned this case.  I am just hearing bonds.  Do we

5   understand each other?  Do you want to argue this more, if

6   so, I'm going to go have lunch.  When you are through

7   arguing I will come back and we will finish with the bond

8   hearing.  Hearing no objection we will move on.

9       State, aside from do not possess a weapon what other

10  conditions are you urging?

11      MR. JOHNSON:  We are requesting what I mentioned

12  earlier a monitoring system.  It is called Talitrix.

13      THE COURT:  I am not going to do that.  Go ahead.

14      MR. JOHNSON:  Okay.  Then we would request a curfew if

15  you are going to release them and that they only be allowed

16  to go out for work, school or doctor's visits and that kind

17  of thing.

18      THE COURT:  Not going to do that either.  What else?

19      MR. JOHNSON:  That they waive their 4th Amendment right

20  to search and seizure while on bond.

21      THE COURT:  I won't do that either.  What else?

22      MR. JOHNSON:  That they submit to random drug screens.

23      THE COURT:  Nobody has been charged with a drug

24  violation.  What else?

25      MR. JOHNSON:  One of the defendants has a Fulton open

1    case.

2          THE COURT:  But I am just dealing with DeKalb and I

3    don't see where anybody has been charged with a drug

4    offense.  What else?

5          MR. JOHNSON:  The defendants that are out of state that

6    as a part of their bond condition they waive extradition and

7    if they fight it then they would have to pay to come back

8    into the state.

9          THE COURT:  I am not opposed to that.  Does the defense

10   want to address that?

11         MR. KANE:  No objection on behalf of Olson.

12         MR. SCHIFFER:  No objection on mine either.  They

13   intend to fully comply and participate with this case.  I

14   think that if you're waiving extradition that should

15   potentially reduce the bond but since Your Honor set the

16   bond at the amount chosen and now they have given additional

17   assurances to make it easier I would ask the court to reduce

18   all the bonds measurably.

19         THE COURT:  It is so noted but the request is denied.

20         MR. SCHIFFER:  Thank you.

21         THE COURT:  All right.  The State where we were was do

22   not have any connection with the Atlanta Forest or whatever

23   it's called -- Defend the Forest, through social media.  I

24   have granted that.  The defendants are required to -- those

25   who live out of state are required to waive extradition.

1    I'm granting that.  Do not use a weapon.  I will deny that.

2         What other conditions?

3         MR. JOHNSON:  I guess the only other one and this is

4    something we do on most bond cases that they not break the

5    law.  The only reason we do that is because if it is not

6    specifically in the bond order sometimes that is not a basis

7    for revocation, so.

8         MR. KANE:  It is overreaching.

9         THE COURT:  I think breaking the law is -- you're not

10   supposed to do that anyway whether you are charged or not.

11   I have not had that situation.  I've had it in probation

12   revocations where somebody got arrested.  I am not going to

13   add that in.  Anything else?

14        MR. JOHNSON:  Judge, I believe that is all.  Mr. Fowler

15   is on the Zoom.  I just want to ask if he has anything that

16   I have missed.

17        MR. FOWLER:  I don't think so.  We had previously

18   discussed this and I think that everything that Mr. Johnson

19   has said is covered everything that the State from the

20   Attorney General's office has requested as well.  So I won't

21   recover everything.

22        THE COURT:  All right.

23        MR. JOHNSON:  That is all, Judge.

24        THE COURT:  I have already gone through the bonds for

25   all six persons, right?

1      MR. JOHNSON:  Yes, Judge.

2      THE COURT:  And that there are now three conditions.

3  No communications through social media from or to Defend the

4  Atlanta Forest.  I don't know how you are going to regulate

5  that, but still.  I would require that the defendants waive

6  the right to extradition.  There was one more and I didn't

7  write it down.  Was that it?

8      MR. JOHNSON:  Do not return to the location, Judge.

9      THE COURT:  Yes.  Do not return to the location in

10  issue.  Anything else?

11      MR. JOHNSON:  And no contact with any co-defendants in

12  the case.

13      THE COURT:  No contact directly or indirectly with any

14  other defendant.  Anything else?

15      MS. KAUFMAN:  But through their attorneys.

16      MR. SCHIFFER:  I just want to clarify the no further

17  contact.  The no further contact as Your Honor just put is

18  with any other co-defendant except through their attorneys

19  and no further contact with Defend the Atlanta Forest

20  through social media.  Is that accurate and correct?

21      THE COURT:  That is accurate.  I did not say through

22  attorneys because that is the ethics of the profession

23  anyway but you are correct.  Anything else, anybody?

24      MR. JOHNSON:  Nothing further.

25      THE COURT:  Anything else, Attorney General?

1        MR. FOWLER:  No, Judge.

2        THE COURT:  DeKalb County?

3        MR. JOHNSON:  No, Judge.  That is all.

4        THE COURT:  Any defense attorney?

5        MS. KAUFMAN:  Is the State going to be drafting the

6  bond order?

7        THE COURT:  They are supposed to.

8        MR. JOHNSON:  Yes.  As soon as we get off the Zoom call

9  we will draft all the bond orders and send them in the queue

10  to Judge Robins to be signed.

11        MS. KAUFMAN:  Thank you very much.

12        MR. SCHIFFER:  Judge, I just want to say thank you to

13  Your Honor and everybody in the court for entertaining this

14  zealous advocacy from all parties.  That is what makes our

15  system wonderful.

16        THE COURT:  I agree with you, counsel.  I am a believer

17  in advocacy.  You all have been very good at your jobs.  I

18  commend you for it.

19        Everybody have a good holiday.  Do not drink and drive.

20        MR. SCHIFFER:  Thank you, Judge.

21        THE COURT:  Court is in recess.

22                (Proceedings concluded.)

23

24

25

1

2                      C E R T I F I C A T E

3
STATE OF GEORGIA
4
COUNTY OF DEKALB
5

6

7

8       I, LATASHA BETHEL, HEREBY CERTIFY THAT THE FOREGOING

9  TRANSCRIPT WAS TAKEN DOWN, AS STATED IN THE CAPTION, AND THE

10 COLLOQUIES, QUESTIONS AND ANSWERS WERE REDUCED TO PRINT BY ME

11 OR UNDER MY DIRECTION; THAT THE FOREGOING PAGES REPRESENT A

12 TRUE, COMPLETE RECORD OF THE SAID PROCEEDINGS; THAT IN

13 ACCORDANCE WITH O.C.G.A 9-11-28(C), I AM NOT A RELATIVE,

14 EMPLOYEE, ATTORNEY, OR COUNSEL OF ANY PARTY, NOR AM I

15 FINANCIALLY INTERESTED IN THE ACTION.

16      THE ABOVE CERTIFICATION IS EXPRESSLY WITHDRAWN AND DENIED

17 UPON ANY ATTEMPT TO ALTER SAID TRANSCRIPT FROM ITS ORIGINAL

18 FORM FROM WHENCE IT WAS TRANSMITTED AND DELIVERED TO THE CLERK

19 OF COURT.

20          THIS, THE 24TH DAY OF JULY, 2023.

21

22

23                        _Latasha Bethel_
                          _____
24                        LaTasha D. Bethel
                          Certified Court Reporter
25                        Certificate No. 2660