# EXHIBIT E

FILED 5/27/2023 11:04 AM CLERK OF SUPERIOR COURT DEKALB COUNTY GEORGIA

# IN THE SUPERIOR COURT OF DEKALB COUNTY
## STATE OF GEORGIA

**Ariel Ebaugh,**

*Petitioner,*

**v.**

**Braddye Smith,**
Supervisor,
DeKalb County Pretrial Services;

**Melody M. Maddox,**
Sheriff, DeKalb County

**&**

**The State of Georgia**

*Respondents.*

No. _____

23CV5117

PETITION FOR A WRIT OF HABEAS CORPUS

Ariel Ebaugh, a person whose liberty is being restrained under pretext of a facially unconstitutional state statute, petitions for a writ of habeas corpus under Title 9, Chapter 14, Article I of the Official Code of Georgia, to restore to her the freedoms she is due under the Georgia Constitution of 1983.

☐

## Introduction

This petition asks the Court to ensure 23-year-old Petitioner Ariel Ebaugh's right to the freedom of speech promised to her in Art. I, § I, ¶ V of the Georgia Constitution of 1983, as well as the First and Fourteenth Amendments to the United States Constitution. That Georgia provision (¶ V) commands, *inter alia*, that "[n]o law shall be passed to curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish sentiments on all subjects but [of course] shall be responsible for the abuse of that liberty"—a right that if taken away, we may "dumb and

silent ... be led, like sheep, to the Slaughter."⬚ By design, ¶ V contains "broad and comprehensive language" empowering Georgians' to express themselves with "complete freedom until it affects the rights of another," that is at least as broad as the parallel right in the Federal Constitution."⬚

Although freedom of expression is not absolute, like the federal strict scrutiny standard, under Georgia law to pass constitutional muster, legislation which can adversely impact speech and association rights must be narrowly construed to ensure such core entitlements remain unhampered from any impermissible government intrusion. For example, under House Bill 1(OCGA §20-3-48) also known as the FORUM Act, several years ago the Georgia State Legislature expanded free speech protection for institutions of higher education requiring, among other things, academic communities to "maintain and publish policies addressing content-neutral time, place, and manner restrictions on expressive activities with the *least restrictive means, in accordance with relevant First Amendment jurisprudence*, necessary for providing use of facilities and resources under the control of the institution to all student groups and invited speakers." (emphasis provided).[1]

In recognizing the necessity of facilitating the widest range of expressive speech and conduct under OCGA § 20-3-48:

> "*Conduct or expressive activity shall not be considered a material or substantial disruption if it is protected under the Georgia Constitution or the First Amendment to the United States Constitution (id. At (b)(2)(B)...Protected expressive activity under this part consists of speech and other conduct protected by the First Amendment to the United States Constitution, including, but not limited to, lawful verbal, written, audio-visual, or electronic expression by which*

---

[1] Georgia State Law HB1 the *Forming Open and Robust University Minds Act* described by Governor Kemp on May 3, 2022 as a reaffirmation of "Freedom of expression is one of this great nation's fundamental liberties."

*individuals may communicate ideas to one another, including all forms of peaceful assembly, distributing literature, carrying signs, circulating petitions, demonstrations, protests, and speeches including those by guest speakers."* Id. At (7)(e).

This speech haven finds its genesis in a wide constitutional sweep endowed under the Georgia Bill of Rights.[2] So, too, the right to assemble and to petition enjoys the same broad protection in the State Constitution which proclaims "The people have the right to assemble peaceably for their common good and to apply by petition or remonstrance to those vested with the powers of government for redress of grievances."[3] Indeed, not long ago the General Assembly of Georgia "declare[d] that it is in the public interest to encourage participation by the citizens of Georgia in matters of public significance and public interest through the exercise of their constitutional rights of petition and freedom of speech [with]...rights of petition and freedom of speech...construed broadly." GA Code § 9-11-11.1 (a).

And yet Ms. Ebaugh was arrested for the offense of domestic terrorism under OCGA § 16–11–220(2)(B) for allegedly having been party to a crime with the intent to alter, change, or coerce, the policies of state government by intimidation or coercion. Setting aside that Ariel's only act was to appear in a public place while carrying (but not brandishing) a firearm—an act protected by state law—attempting by word or expressive action to alter, change, or coerce government policy is a quintessential act of free speech. And this Court should not sanction any restraints upon her liberty for allegedly engaging in it.

Ariel has no choice at this juncture but to seek redress through a writ of habeas corpus. The writ of habeas corpus has deep roots in American history and has been called "the most important human right in the

---

[2] *See* GA. CONST. art. 1, § 1, para. V.
[3] *Id.* At para. IX.

Constitution."[4] Today, habeas corpus procedures are generally set out in state and federal statutes. Georgia's habeas corpus procedures can be found in Title 9, Chapter 14 of its Official Code. Article II of that Chapter applies only to petitioners, unlike Ariel, who are under sentence by a state court of record. OCGA § 9–14–41. Ariel, however, may avail herself of Article I, whose remedies are available to "[a]ny person restrained of his liberty under any pretext whatsoever." OCGA § 9–14–1.

## Parties

(1)     Petitioner is Ariel Ebaugh, a proud 22-year-old daughter of Georgia whose liberty is being restrained by the conditions placed upon her by the DeKalb County Magistrate Court to secure her release on bond for the offense of domestic terrorism.[5]

(2)     Respondents are Braddye Smith, Supervisor of DeKalb County Pretrial Services, and Melody M. Maddox, Sheriff of DeKalb County Georgia, who in those capacities are responsible for ensuring Ms. Ebaugh's compliance with the conditions of her release on bond following her arrest for domestic terrorism, and the State of Georgia, whose authority Smith and Morgan are exercising.[6]

## Jurisdiction

(3)     Subject-matter jurisdiction is proper in this Court because it is the superior court of the circuit where Ms. Ebaugh's liberty is restrained.[7]

---

[4] *Ex parte Yerger*, 75 U.S. 85, 95 (1868) ("the best and only sufficient defense of personal freedom").

[5] *See* OCGA §§ 9–14–1(a) & 3(1).

[6] OCGA § 17–6–15(b)(1); *see* OCGA § 9–14–3(2).

[7] OCGA § 9–14–4.

(4)   Ms. Ebaugh has standing to invoke that jurisdiction because OCGA § 9–14–1(a) empowers her to inquire into the legality of the restraint. Further, that the restraint on Ms. Ebaugh's liberty flows from an arrest for an alleged criminal offense does not in this case strip her of standing because she was properly released on bail. OCGA § 9–14–16(1); *see Britt v. Conway*, 281 Ga. 189, 190, 637 S.E.2d 43, 44 (2006).

(5)   Equally important, Ms. Ebaugh has no recourse to pursue relief other than through the Great Writ. Normally, one would challenge the constitutionality of a criminal statute via general demurrer, plea in bar, or motion in arrest of judgment. Were such processes available to Ms. Ebaugh, she would be bound to pursue them in lieu of extraordinary relief. *Kearse v. Paulk*, 264 Ga. 509, 509, 448 S.E.2d 369, 370 (1994) (quoting *Jackson v. Lowry*, 170 Ga. 755, 756–57, 154 S.E. 228, 228–29 (1930)). But the State has not indicted Ms. Ebaugh, nor is it apparent when or if within the applicable limitations period it will do so. Without an indictment, there is no criminal proceeding to challenge. *See* OCGA § 16–1–3(4). And the law disallows preindictment challenges to criminal prosecutions. *Davis v. State*, 307 Ga. 784, 786–88, 838 S.E.2d 233, 234–35 (2020). Hence, Ms. Ebaugh files this petition.

## Facts and Allegations Underlying Ariel's Arrest

(6)   A "millennial baby," Ariel Ebaugh was born in December 2000 to the marriage of her father Stewart, a U.S. Army career veteran and local real estate broker, and her mother Carol, a lawyer by training (if not in practice), a homemaker, home-school organizer, and educator.

(7)   Ariel grew up in a devoutly Evangelical Christian household, following the Southern Baptist or unaffiliated Baptist traditions, with

membership for most of the last twenty-five years in a well-known "mega-church" outside Atlanta. Starting at age five, Ariel attended home school in a classroom of one. Her mother was her only teacher. Her younger brother, Ian, joined her in time. The two later continued their education in small-group home-schooling cooperatives of like-situated Christian families and their offspring—all of whom eschewed the local public school system as too permissive and insufficiently Christian. The family still attends church services every Sunday, and Ariel persists in her faith, albeit with less enthusiasm for the weekly meetings and religious life of her childhood.

(8)     A Fall 2021 graduate of Georgia College and State University, Ariel has earned her degree in English literature—mostly poetry—and creative writing, with a GPA of 3.9. She also participated in the exchange program at Regent's Park College, Oxford University, England where she studied poetry. Having graduated early, both cum laude and with college honors, Ariel is currently employed in multiple jobs, working approximately 50 hours per week.[8]

(9)     After graduation from GCSU, Ariel returned to her parent's home in Stockbridge. While there, she learned about various factions' growing opposition to the new police facility, which county officials had

---

[8] Since June of 2022, Ariel has worked primarily nights as a delivery driver for the fast-food app, DoorDash, driving approximately twenty hours per week, earning about $200 weekly. Licensed since age seventeen, Ariel drives from about 5 p.m. until just after midnight, and her monthly net, less gas and expenses on her 2006 Hyundai, is just under $600. She also tends bar during day shifts at the local Olive Garden, working approximately twenty-five hours per week, with an hourly wage of $5.50 plus tips, which together amounts to about $75.00 per shift. Lastly, Ariel also tutors local high school seniors in Math, English and writing skills in preparation for college entrance exams or applications, for a total of about four hours per week at $20/hour; she presently has one student and hopes to phase out the Olive Garden job and develop more college-bound kids in need of academic help this year.

approved the previous fall. She heard about the clashes that spring, which had led to some property destruction and violence and to further protests to save the forest that had been slated for clearance.

(10) While she did not join any particular eco-activist or anti-police group, she took a general interest in the protests, as a social and political activity and saw them as a way to register her voice and meet contemporaries.

(11) Ariel met some organizers who were providing support to the tree-sitting protesters, in particular a 30-year old-woman who worked as a paramedic. Through her, Ariel began intensive training classes being offered in a "street medic" training course.[9]

(12) Ariel also met a handful of other activists involved in the forest demonstrations. She asked how she could help, and the activists asked her to bring food to the forest "kitchen," which she shared with them on occasion. A few times, Ariel went to the forest to talk to and to listen to people play music there. And on one occasion, she handed out leaflets describing the controversy, which a demonstrator had given her, in nearby communities.

(13) Although Ariel had over a relatively short period become friends with half-a-dozen activists, she at no time attended any meetings

---

[9] The free classes met in a city park every two weeks for skills-sharing and demonstrations of paramedic basics. Ariel found the subject fascinating, and enrolled in a further, more complex course in September of 2022, that ran fifty hours of training in three weekends under supervision of professional paramedics. At the classes among other training, she learned how to control or stop bleeding; to administer aid to someone choking; how to splint a broken bone or wrap a sprain; how to identify basic medical conditions, and what to know about them; how to use NARCAN to save someone from an opiate overdose; how an Epi-pen works, and when to use one; and implementing emergency wound management.

where objectives or strategy were discussed—let alone join any structured or formalized group.

(14)  Among Ariel's new friends was a young forest demonstrator who gave Ariel his phone number. On the day of her arrest, Ariel had heard news reports that police had "raided" the forest the day before and made arrests. She had heard that people were being tear-gassed out of their tree bunks and platforms.

(15)  Ariel called the young demonstrator to find out if he was okay and what was going on. In a brief discussion, Ariel's friend asked her to cause a "distraction" so he could leave the forest to avoid a police encounter.

(16)  Eager to help the boy, Ariel drove to a parking area not far from the police line, took her otherwise-lawfully-possessed long rifle from her vehicle. With the rifle's safety on, Ariel walked toward the officers, hoping to attract their attention. Ariel drew no nearer than 50 yards to police and never aimed the rifle at them. Getting no closer to them than approximately 50 yards, at no time did Ariel aim the weapon at the officers. And when an officer ordered her to get on the ground, Ariel complied immediately. She was arrested without incident shortly thereafter.

### Ariel's Domestic Terrorism Charge

(17)  Ariel's brief, non-violent encounter with police, prompted them to charge her, *inter alia*, with domestic terrorism, OCGA § 16–11–220, *et seq*.

(18)  Relevantly, § 220(2)(B), coupled with § 221(a), punishes for a felony, anyone who commits "or attempt[s] to commit a felony violation of the laws of this state which, as part of a single unlawful act or a series of unlawful acts which are interrelated by distinguishing

characteristics, is intended to ... disable or destroy ... a state or government facility, and is intended to ... [a]lter, change, or coerce the policy of the government of this state or any of its political subdivisions by intimidation or coercion."

(19)   Though passed in 2017, the statute nevertheless provides this Court with a case of first impression: Prior to the forest demonstrations, no one has been arrested and prosecuted for violating its sweeping overbroad and vague restrictions which infringe upon long-settled and fundamental rights under both the state and federal constitutions.[10]

## The Domestic Terrorism Statute is Unconstitutional

(20)   Although freedom of expression is not absolute, under federal and state law both, legislation that can adversely impact speech and association rights is subject to strict scrutiny. Such legislation cannot pass constitutional muster unless it is narrowly construed to ensure that such core entitlements remain unhampered from any impermissible government intrusion.

   (a)   For example, several years ago, under House Bill 1 (OCGA § 20–3–48), also known as the FORUM Act, Georgia's General Assembly expanded free-speech protection for institutions of higher education, requiring, among other things, academic communities to "maintain and publish policies addressing content-neutral time, place, and manner restrictions

---

[10] *Cf.* O.C.G.A. § 20-3-48(7)(e)("Protected expressive activity under this part consists of speech and other conduct protected by the First Amendment to the United States Constitution, including, but not limited to, lawful verbal, written, audio- visual, or electronic expression by which individuals may communicate ideas to one another, including all forms of peaceful assembly, distributing literature, carrying signs, circulating petitions, demonstrations, protests, and speeches including those by guest speakers").

on expressive activities with the *least restrictive means, in accordance with relevant First Amendment jurisprudence*, necessary for providing use of facilities and resources under the control of the institution to all student groups and invited speakers."(emphasis provided).[11]

(b)   In recognizing the necessity of facilitating the widest range of expressive speech and conduct under OCGA § 20–3–48:

*Conduct or expressive activity shall not be considered a material or substantial disruption if it is protected under the Georgia Constitution or the First Amendment to the United States Constitution (id. at (b)(2)(B))(7)(e).*

(22)   This speech haven finds its genesis in a wide constitutional sweep endowed under the Georgia Bill of Rights."[12] So too does the right to assemble and to petition enjoys the same broad protection[13] "The people have the right to assemble peaceably for their common good and to apply by petition or remonstrance to those vested with the powers of government for redress of grievances."[14]

(23)   Indeed, not long ago the General Assembly "declare[d] that it is in the public interest to encourage participation by the citizens of Georgia in matters of public significance and public interest through the exercise of their constitutional rights of petition and freedom of speech [with] ... rights of petition and freedom of speech ... construed broadly." OCGA § 9–11–11.1 (a).

(23)   These constitutional shields are not of recent vintage, nor are they lightly taken. They have long protected unpopular, ground-breaking,

---

[11] Georgia State Law HB1 the *Forming Open and Robust University Minds Act* described by Governor Kemp on May 3,2022 as a reaffirmation of "Freedom of expression is one of this great nation's fundamental liberties."

[12] *See,* GA. CONST. art. 1, § 1, para. V.

[14] *Id.* at para. IX.

and even militant, voices and associations and know no limits of race, gender, identity, politics or generation. Throughout Georgia's history, citizens and visitors alike have never hesitated to assemble, to preach, to protest—to let their opinions and beliefs be known in an effort to participate meaningfully in the marketplace of ideas throughout the state. Venerable examples are myriad, including:

(a)    Margaret Mitchell;[15]

(b)    Emory Speer;[16]

(c)    Lee Roy Abernathy;[17]

(d)    Chief Tomo-Chi-Chi;[18]

(e)    May Dubignon Stiles Howard;[19]

---

[15] Author of *Gone With the Wind,* Margaret Mitchell was very much the written voice of women empowerment at the height of the Depression and not long after women had obtained the right to vote. Meredith Biesinger, Scarlett O'Hara, Southern Belle; Modern Woman, PRETTY SOUTHERN (June 9,2022), http://prettysouthern.com/2022/06/09/scarlett-ohara-southern-belle-modern-woman/.

[16] As a member of Congress, U.S. Attorney and federal judge, for decades Emory Speer was infamous among southern whites for his position protecting the rights of Black people in the Jim Crow South. GEORGIA ENCYCLOPEDIA (April 5, 2021), https://www.georgiaencyclopedia.org/articles/government-politics/emory-speer-1848-1918/.

[17] Famed for decades of lyrical gospel music urging justice, Lee Roy Abernathy composed political songs for Franklin D. Roosevelt's 1936 campaign and was himself a candidate for governor of Georgia in 1958. http://sghistory.com/index.php?n=L.LeeRoyAbernathy.

[18] Chief Tomochichi was a Yamacraw activist with the English colonists. In his activism, he mediated-with and attacked local tribes, to help establish the colony of Georgia.https://georgiahistory.com/education-outreach/online-exhibits/featured-historical-figures/james-edward-oglethorpe/oglethorpe-and-the-creeks/.

[19] May Dubignon Stiles Howard was an advocate for free dental care for children, education for children with special needs, and trained people how to participate in local government—all in a time when women had just obtained the right to vote. May Dubignon

(f)      Mary Clare de Graffenried;[20]

(g)      Dorian Rhea Debussy;[21]

(h)      Mary Harris Armor;[22]

(i)      Lewis Grizzard;[23]

(j)      William B. Hartsfield;[24]

(k)      Susan Myrick;[25]

---

Stiles Howard, GEORGIA WOMEN OF ACHIEVEMENT, https://www.georgiawomen.org/mary-dubignon-stiles-howard.

[20] A social investigator and community activist of the late nineteenth century, well before women had obtained the right to vote Mary Clare De Graffenried had published findings on poor working conditions of textile workers in Georgia and advocated unpopular solutions. LeeAnn Whites, *The De Graffenreid Controversy: Class, Race, and Gender in the New South*, 54 No.3J. S. Hist. 449 (1988), https://doi.org/10.2307/2208998

[21] Reared in Columbus Georgia, Dorian Rhea Debussy is an academic who teaches women's studies at Ohio State University, transgender activist and Director of External Affairs for Equitas Health, one of the largest LGBTQ and HIV/AIDS healthcare organizations in U.S. https://wgss.osu.edu/people/debussy.1

[22] Mary Harris Armor was an outspoken advocate for suffrage in the late nineteenth and early twentieth century, and held office within various organizations in Georgia. ENTERING THE FRAY: GENDER, POLITICS, AND CULTURE IN THE NEW SOUTH, 50 (2009).

[23] Accused of being a racist, Lewis Grizzard was a columnist in the Atlanta-Journal Constitution, known for columns supporting controversial issues such as abortion rights and gun control. Shane Harrison, Remembering AJC columnist and southern humorist Lexis Grizzard, ATLANTA JOURNAL- CONSTITUTION (Oct. 16, 2020), https://www.ajc.com/lifestyles/remembering-ajc-columnist-and-southern-humorist-lewis-grizzard/na4wUJcFB1I6RvpSGHrYFN/.

[24] While Mayor of Atlanta, William B. Hartsfield helped negotiate desegregation of Atlanta businesses and ensured criminal charges against Martin Luther King Jr. and others were dropped following a demonstration in 1960. https://kinginstitute.stanford.edu/encyclopedia/hartsfield-william-berry

[25] An outspoken journalist, educator, author and conservationist who was concerned with the accurate portrayal of customs and manners of the antebellum South, Susan "Sue" Dowdell Myrick was associate editor for Macon-based newspaper, The Telegraph,

(l)     Mildred Seydell;[26]

(m)    Celestine Sibley;[27] and

(n)     Martin Luther King;[28]

not to mention Ralph David Abernathy, Andrew Young, John Lewis, Xerona Clayton Brady,[29] Hank Aaron, Little Richard, James Brown, and Jimmy Carter. Truly, Georgia boasts a remarkable history of famed activists, orators, musicians, scientists, educators and politicians who found voice, comfort and community in robust speech and association.

(24)    Ariel Ebaugh too knows well her birthplace's proud history of dissent. For sharing in that tradition, she now stands accused of the

---

where she worked for fifty years. https://www.georgiaencyclopedia.org/articles/arts-culture/susan-myrick-1893-1978/

[26] A member of the National Women's Party and advocate for equal rights, Mildred Seydell was one of the first female journalists in Georgia and often wrote about women's rights in the early twentieth century. Gregory C. Lisby, Mildred Seydell, NEW GEORGIA ENCYCLOPEDIA (May 10, 2019), https://www.georgiaencyclopedia.org/articles/arts-culture/mildred-seydell-1889-1988/.

[27] As one of the first female editors of the Atlanta Constitution in the early 1940s, Celestine Sibley often exposed police and political corruption, and covered high-profile trials. Kim Purcell, Celestine Sibley: 1914-1999, New Georgia Encyclopedia (Oct. 6, 2019), https://www.georgiaencyclopedia.org/articles/arts-culture/celestine-sibley-1914-1999/.

[28] No further elucidation is provided as unnecessary for Dr. King, Ralph David Abernathy, Andrew Young, John Lewis, Hank Aaron, Little Richard, James Brown, and Jimmy Carter given their contemporary *sui generis* footprint in the recent history of Georgia and the world.

[29] A civil rights activist and journalist, Xernona Clayton Brady, who wrote for the Atlanta Voice in the 1960s, became the first black woman in the South to host a regularly-scheduled prime-time talk show, and was appointed by then Governor Jimmy Carter to the State Motion Picture and Television Commission. She convinced a Grand Dragon of the KKK to renounce the Klan. Xernona Clayton, THE HISTORY MAKERS (Feb. 21 2014), https://www.thehistorymakers.org/biography/xernona-clayton-40.

constitutionally untested crime of Domestic Terrorism, facing up to 35 years in prison if charged and convicted.

(25) Fundamental rights such as speech and assembly are among those for which the Supreme Court of the United States has required strong protection from government encroachment. Enshrined directly or implicitly in the penumbras of the Constitution,⌖ these rights are "fundamental" because they are so essential for individual liberty and should thus be beyond political grasp.

(26) Laws encroaching on a fundamental right must generally pass strict scrutiny to be upheld as constitutional—the highest standard of review which a court will use to evaluate the constitutionality of governmental discrimination. To satisfy scrutiny, a legislature must have passed the law to further a "compelling governmental interest," and must have narrowly tailored the law to achieve that interest. *See, New Ga. Proj. v. Raffensperger* (In re Ga. Senate Bill 202), No. 1:21-cv-01728-JPB, 2022 U.S. Dist. LEXIS 148357, at *71 (N.D. Ga. Aug. 18, 2022) (citing R.A.V. v. City of St. Paul, 505 U.S. 377 (1992)("Core political speech occupies the highest, most protected position' in the hierarchy, while obscenity and fighting words receive the least protection."); *Leitgeb v. Sark Wire Corp.*, No. 2:21-cv-259-RWS, 2022 U.S. Dist. LEXIS 238960, at *80 (N.D. Ga. Sept. 21, 2022)(*citing Texas v. Johnson, 491 U.S. 397* (1989)(A statute that regulates expressive conduct is subject "to the most exacting scrutiny."); *6420 Roswell Rd., Inc. v. City of Sandy Springs*, 484 F. Supp. 3d 1321, 1338 (N.D. Ga. 2020) (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)(First Amendment scrutiny must be applied to: statutes regulating conduct which has the incidental effect of burdening speech; and statutes which, although directed at activities with no expressive component, impose a disproportionate

burden upon those engaged in protected First Amendment activities.").[30] Georgia's Domestic Terrorism statute fails that test utterly.

---

[30] *See, also, United States v. Robel* 389 U.S. 258, 262, 268 (1967)(Indictment dismissed where the charge "sweeps indiscriminately across all types of association with Communist-action groups, without regard to the quality and degree of membership... [W]hen legitimate legislative concerns are expressed in a statute which imposes a substantial burden on protected First Amendment activities, Congress must achieve its goal by means which have a "less drastic" impact on the continued vitality of First Amendment freedoms.")(internal citations and quotation marks omitted); *Moore v. City of E. Cleveland*, 431 U.S. 494, 499 (1977) ("[W]hen the government intrudes [on a fundamental right], this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation."); *United States v. Grace*, 461 U.S. 171, 177(1983)("the government's ability to permissibly restrict expressive conduct is very limited: the government may enforce reasonable time, place, and manner regulations as long as the restrictions ... are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."); *Boos v. Barry*, 485 U.S. 312, 321 (1988)(holding that content-based speech restrictions must be "necessary to serve a compelling state interest and ... narrowly drawn to achieve that end")(internal citations and quotation marks omitted); *Ward v. Rock Against Racism*, 491 U.S. 781,791(1989)(internal citations and quotations omitted)(consistent with the First Amendment "the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions ... are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."); *June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2179 (2020)(Gorsuch, J., dissenting)("A court must determine whether protected speech is at issue, whether the restriction is content based or content neutral, whether the State's asserted interest is compelling or substantial, and whether the State might rely on less restrictive alternatives to achieve the same goals."); *Bourgeois v. Peters*, 387 F.3d 1303,1322 (11th Cir. 2004)(weighed against First Amendment freedoms of association, speech, and assembly, magnetometer searches of all participants at a demonstration in the name of public safety deemed unconstitutional as "magnetometer searches do not seem narrowly tailored at all to the City's professed interest in maintaining safety [and where] there are other ways of ensuring public safety at this event, and the availability of alternatives casts serious doubt on any narrow tailoring analysis.").

## Argument and Citation of Authority

Georgia and United States Supreme Court cases are by now familiar, some of them legendary. They concern themselves with different rules of construction and the parsing of statutes and the definition of specific words,
but, yet, they all come from the same place. In this country, and in this State,
probably unlike anywhere else in the world, by design, citizens' rights generally
predominate over government will or convenience. We must start then with Ariel Ebaugh's rights and determine if the State has interfered with those rights in
a constitutional manner.

To be sure, the government has the authority, some would argue the responsibility, to protect itself from those who would tear it down through force or violence. But, when in seeking to protect itself, the government gets into the business of criminalizing its citizens' speech, it is entering into a constitutionally fraught arena where it must act carefully and with precision.
The line between constitutionally protected political persuasion and felonious coercion is razor thin. Therefore, that line must be crystal clear. The line drawn in 16-11-220 between protected speech and criminal conduct
is not clear; indeed, it is barely drawn at all. Instead, the Georgia Legislature
has shirked its responsibility by stating its pure intentions and leaving the line drawing to the prosecutor and ultimately the courts. This failure of precision gives far too little notice of proscribed conduct to the citizenry and
leaves far too much discretion in the hands of the prosecutor.

### 16-11-220 is Substantially Overbroad.

By seeking to enforce 16-11-220 against Ariel Ebaugh, the government is
attempting to level the force of the state against words and deeds protected by
the First Amendment. Georgia's Domestic Terrorism's terms have broad

application, tying criminal culpability to statements or acts that "intimidate or
coerce" private citizens or government actors. The statute's scope is impermissibly broad; the outer limits of its reach are impossible to discern.

As a statute that criminalizes expressive conduct and speech, "a careful examination [of 16-11-220] is critical." *State v. Miller*, 260 Ga. 669, (1990). First, does the statute "reach a substantial amount of constitutionally protected conduct?" *Johnson v. State*, 264 Ga. 590, 593 (1994) (citing *Miller v. State*, 260 Ga. 669, (1990). Stated differently, does the statute "stifle expression or conduct otherwise protected?" *Id*, at 591. If so, is the statute narrowly tailored to protect a vital government interest? *Cunningham v. State*, 260 Ga. 827 (1991). Georgia's Constitution has been interpreted to provide broad protection to expression. *State v. Miller*, 260 Ga. 669 (1990). Communicative conduct may only be limited by the government if the regulation furthers a substantial governmental interest that is unrelated to the suppression of free expression; and where the incidental restriction on First Amendment freedom is no greater than necessary to further the governmental interest. *Id*. Likewise, the United States Supreme Court has many times declared a law unconstitutional on its face under the First Amendment overbreadth doctrine, even though it may have some legitimate uses. *See e.g.*, *United States v. Stevens*, 559 U.S. 460, 473 (2010); *Sabri v. United States*, 541 U.S. 600, 609-10 (2004); *NAACP v. Button*, 371 U.S. 415 (1963)(in order to preserve the First Amendment's requisite "breathing space to survive, government may regulate in the area only with narrow specificity").

If, as is commonly accepted, Justice Holmes was correct when he

stated in his famous *Gitlow* dissent "every idea is an incitement,"[31] then every
attempt to persuade is coercive. Coercion is a rhetorical device that fits comfortably within the pathos leg of the Aristotelian rhetorical triangle.[32] Pathos, the appeal to emotions of the audience, is sometimes passion, sometimes love, often fear. But, of course, not all appeals to the decision maker's fear can or should be criminalized. As with incitement, there is constitutionally protected coercion and coercion that falls outside the zone of
protection.[33] The Georgia criminal law makes no attempt to distinguish between the two and therefore is substantially overbroad.

Several examples illuminate the folly of seeking to criminalize all coercion whose aim is to alter government policy. When he penned our Declaration of Independence wherein he asserted a person's right to throw off the yoke of an oppressive government through violence, if necessary, was
Thomas Jefferson a domestic terrorist? Threatening rebellion is coercive indeed. Or, what of the Salt March and Mahatma Gandhi's famous letter to Lord Viceroy Irwin? Was it not coercive to suggest that if the salt tax were not
repealed the march would "shake the foundations of the British Empire"?

From Dr. King to Nelson Mandela to Bobby Sands to the unnamed student who stood against Chinese tanks in Tiananmen Square came marches, demonstrations, boycotts and fasts. All were attempts to coerce changes to

---

[31] "Every idea is an incitement. It offers itself for belief, and, if believed, it is acted on unless some other belief outweighs it or some failure of energy stifles the movement at its birth. The only difference between the expression of an opinion and an incitement in the narrower sense is the speaker's enthusiasm for the result. Eloquence may set fire to reason." *Gitlow v. New York*, 268 U.S.652 at 673 (1925).

[32] *Aristotle, The Rhetoric of Aristotle: A Translation.* Cambridge [Cambridgeshire]: The University Press (1909) (three elements of rhetoric are logos, ethos, and pathos).

[33] The Supreme Court's seminal decision in *Brandenburg v. Ohio* is instructive on this point. In *Brandenburg* the Court struck down an Ohio statute, stating "the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444 at 447 (1969). The First Amendment requires no less of the Georgia Domestic Terrorism law.

established law and policy. Are they to be celebrated as courageous forms of protest or are they to be criminalized by an ill-conceived and poorly drawn Georgia statute?

Far less dramatic or historically noteworthy, but perhaps just as important, is the speech of ordinary citizens seeking redress from their government. Implicit in every entreaty made to an elected official to alter government policy is the negative threat. The simple petition to a local mayor to fill the potholes in the street carries with it; sometimes directly, sometimes not, the threat that if she does not fill the potholes, she will lose political support or may even face a challenger in the next election. The simple fact is, virtually all elected officials live in fear of being voted out of office and are duly motivated by that fear. That type of coercion is the lifeblood of political communication between our citizenry and their elected representatives. It cannot be constitutionally proscribed. Yet, other than codifying their pure intentions, the Georgia Legislature did nothing to distinguish constitutionally protected coercion from credible threats of significant, imminent harm. The failure to do so has yielded a statute that is substantially overbroad and infringes on rights protected by the First Amendment.

### 16-11-220 is Unconstitutionally Vague.

In addition to infringing recognized First Amendment protections in violation of the overbreadth doctrine, 16-11-220 also violates "a faithful expression
of ancient due process" principles, the void-for-vagueness doctrine. *Sessions v.
Dimaya*, 138 S. Ct. 1204, 1224 (2018) (Gorsuch, J., concurring).

Although the concepts underlying overbreadth and vagueness are often "logically related," *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983), the void-for-vagueness doctrine entails a separate inquiry deserving of

independent attention given the severe uncertainty and risk of arbitrary en-forcement that 16-11-220 creates. The statute under which Ariel Ebaugh was charged cannot withstand constitutional scrutiny where, in addition to violating the First Amendment, it also offends basic principles of due pro-cess guaranteed by the Fifth Amendment.

Georgia Code 16-11-220 violates the Fifth and Fourteenth Amend-ment's prohibition of vague criminal laws. "No person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V, XIV.  A criminal statute is unconstitutionally vague in violation of due process for either of two reasons: first, if "it fails to give ordinary people fair notice" of what is proscribed; and, second, if it is "so standardless that it in-vites arbitrary enforcement." *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015); *Johnson v. State*, 264 Ga. 590, 591 (1994).

16-11-220's terms violate the fair notice element of the void-for-vagueness doctrine, whose "purpose is to enable the ordinary citizen to con-form his or her conduct to the law." *City of Chicago v. Morales*, 527 U.S. 41, 58 (1999); *see also Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939) ("No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes."). A criminal law provides inadequate notice where the meaning of its terms depends on "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *United States v. Williams*, 553 U.S. 285, 306 (2008); *Slakman v. Continen-tal Cas. Co.*, 277 Ga. 189, 191 (2003)(in order to determine whether a stat-ute is unconstitutionally vague, "we apply the fundamental rules of statu-tory construction that require us to construe [the] statute according to its terms, to give words their plain and ordinary meaning, and to avoid a con-struction that makes some language mere surplusage").

Section 16-11-220's expansive terms are undefined creating ambiguity about what the law intends to criminalize. The statute's expansiveness and imprecision are particularly dangerous and cannot comply with due process. Taking the statutory terms at face value, it is unclear where the Georgia Legislature has drawn the line between confrontational speech protected by the First Amendment and criminal coercion. The United States Supreme Court instructs, difficulty in "determin[ing] whether the incriminating fact . . . has been proved" is not what renders a statute vague. Instead, vagueness results when it is impossible to determine "precisely what that [incriminating] fact is." *Williams,* 553 U.S. at 306. The endless array of prosecutable cases illustrates its expanse and ambiguity about what conduct is covered and what is not. The fatal flaw in 16-11-220 is that the line between persuasion protected by the First Amendment and a prosecutable felony depends on the subjective reaction of the audience and not the objective intent of the speaker. Whether one criminally intends to intimidate or coerce is incapable of objective meaning: what coerces one person may have no effect on, or may even discourage, another. *Coates v. Cincinnati,* 402 U.S. 611,614 (finding unconstitutionally vague an ordinance criminalizing conduct "annoying to persons passing by" because "[c]onduct that annoys some people does not annoy others"); *Baggett v. Bullitt,* 377 U.S. 360, 368 (1964)(invalidating on vagueness and overbreadth grounds an oath requiring teachers to forswear an "undefined variety" of behavior considered "subversive" to the government). Liability under 16-11-220 hinges on the subjective reactions of others and therefore fails to give the ordinary person notice of what the state permits and what it forbids.

The constitutional concern caused by the statute's subjectivity is compounded by the risk that charging decisions will be based on the political

needs of elected officials and the whims of law enforcement. Section 16-11-220's imprecision in defining the explicit *mens rea* standard for "intimidation or coercion" highlights the lack of notice and risks extending criminal liability to speech protected by the First Amendment. *United States v. Ragen*, 314 U.S. 513, 524 (1942) ("Because of the absence of a scienter requirement in the provision . . . the statute is little more than a trap for those who act in good faith."). Unlike other criminal statutes that the Supreme Court has upheld against vagueness challenges, 16-11-220 contains no "narrowing definitions" for the operative words "intimidation and coercion". *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 20–21 (2010) (noting that "Congress also took care to add narrowing definitions to the material-support statute over time [which] increased the clarity of the statute's terms"). On their face, "intimidation' and "coercion" are broad and ambiguous terms so we must look to the rest of the statute for context and meaning. Applying the familiar canon of statutory construction, *noscitur a sociis*, we search for words to limit the imprecision and expanse. Alas, here our search is in vain, for there are no definitions or qualifiers to be found.

"Vague laws invite arbitrary power." *Dimaya,* 138 S. Ct. at 1223 (Gorsuch, J., concurring). By predicating liability on such imprecise terms, section 16-11-220 authorizes arbitrary and discriminatory enforcement. Criminal laws must "establish minimal guidelines to govern law enforcement." *Kolender v. Lawson,* 461 U.S. 352,358 (1983). The indeterminate nature of what behavior might rise to the level of "intimidation or coercion" grants prosecutors unrestrained discretion, creating risk of unguided enforcement under the statute. There lies the denial of due process. *See Grayned v. City of Rockford*, 408 U.S. 104,108 (1972) ("a vague law impermissibly delegates

basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis").

The so-called savings clause, added to the statute in the 11th hour to sway some fence-sitting House Representatives, admonishing that the statute was not intended to trample on the First Amendment and assurances by the government of fair enforcement of 16-11-220, even if "well-intentioned", "do not neutralize the vice of a vague law." *Baggett,* 377 U.S. at 373. "It is the statute, not the accusation under it, that prescribes the rule to govern conduct and warns against transgression." *Lanzetta*, 306 U.S. at 453. Allowing prosecutors to "shap[e] a vague statute's contours through their enforcement decisions" would transfer to them a job that belongs to Congress. *Dimaya*, 138 S. Ct. at 1228 (Gorsuch, J., concurring). "[T]he [vagueness] doctrine is a corollary of the separation of powers—requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not ... It is for the people, through their elected representatives, to choose the rules that will govern their future conduct." *Dimaya*, 138 S. Ct. at 1212, 1227 (Gorsuch, J., concurring).

Section 16-11-224 is probably the most damning evidence that the Domestic Terrorism Law is overbroad and vague enough to be interpreted to infringe on constitutionally protected speech and assembly. Why else would the Legislature have added such an absurdly redundant provision? Of course. The Legislature did not intend for the statute to be applied in an unconstitutional manner, that goes without saying and usually does. But here, rather than pass a narrow, precise law to achieve its ends, the Georgia Legislature punted. It passed an ill-defined, expansive law with a statement of pure intent, and left it entirely to others to make the critical

constitutional judgment calls. This is precisely the impermissible delegation of authority and responsibility Justice Gorsuch wrote of in *Dimaya*.

Section 16-11-220's vagueness chills protected speech in violation of the First Amendment, compounding the statute's constitutional infirmities. A statute deserves even more exacting scrutiny when it interferes with First Amendment freedoms. While the vagueness doctrine is "an outgrowth not of the First Amendment, but of the Due Process Clause," *Williams*, 553 U.S. at 304, the Supreme Court applies "a more stringent vagueness test," requiring greater statutory precision, where "the law interferes with the right of free speech or of association." *Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 499(1982). The reason why the test is stricter in the First Amendment context is "to ensure that ambiguity does not chill protected speech." *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2309–10 (2012); *Hoffman Estates* 455 U.S. at 499 ("[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights."). 16-11-220 (4)—by its plain terms and scope—criminalizes protected speech. The very threat of prosecution under the Domestic Terrorism law deters people from exercising their free speech rights. Due to its ambiguity, the surest way to avoid prosecution under the statute is self-censorship. Those citizens who might otherwise seek to persuade the government to alter a policy will "'steer far wide of the unlawful zone." As a result, "the free dissemination of ideas may be the loser." *Baggett*, 377 U.S. at 372,379.

This country was born of disagreement – vociferous, boisterous, and often violent disagreement with government policy. It is in our national DNA. Our founders, particularly James Madison, understood that America is not a debating society; it is a street fight, and they made ample room in

the First Amendment for loud, contentious confrontation between the citizenry and their government. In 1789, it was a bodacious experiment; but more than anything else, it is what sets us apart from the rest of the world. Even a cursory review of our history shows that every major policy advancement came not from polite conversation but from years, sometimes decades, of citizens coercing their government to change course. Civil rights, women's rights, labor rights were not achieved in the salons of polite society; they were achieved through citizens confronting government policy and forcing change. Power does not yield by mere debate. Madison understood this and so does our Constitution.

<u>The Domestic Terrorism law's passage violated Georgia's Constitution</u>

Georgia's Constitution states:

> No bill or resolution intended to have the effect of law which shall have been rejected by either house shall again be proposed during the same regular or special session under the same or any other title without the consent of two-thirds of the house by which the same was rejected.

GA Const. Art III, § 5 ¶ 12.

The Georgia Legislature violated this provision in passing the domestic terrorism law.

Georgia first enacted a domestic terrorism statute in 2002 following the 9/11

attacks (Ga. Code § 16-4-10). In 2017, Senate Bill (SB 1) was introduced in the

Georgia Senate, which sought to change the definition of domestic terrorism in

response to the 2015 Charleston, South Carolina massacre.[34] The bill was assigned

---

[34] The 2002 Domestic Terrorism law was limited to instances where 10 or people were injured or killed. Nine persons were killed in the 2015 Charlestown massacre and therefore it would not have qualified as domestic terrorism under the original statute.

to committee where it was reported favorably with, several amendments.[35]

Pursuant to Georgia legislative process, the Senate bill was "read" (i.e. considered by the body) for a second time and then a third. Opponents of the bill worried it was too broad and might be used to prosecute protesters.[36] Two floor amendments were offered, including new language expressing the Legislature's desire that the law not be used to prosecute free speech and assembly activities. The Senate adopted both amendments and passed the committee substitute as amended by a vote of 42 to 12.

The bill was then sent to the Georgia House of Representatives, where it was read a first time and assigned to committee. The House read the bill for a second time and then the committee amended the bill and reported a substitute. The House committee made some significant changes to the bill in the substitute, requiring that the underlying predicate act be a felony and adding other elements of the crime. The committee also removed language requiring the predicate act be "intended to advance, further, or effectuate any ideology or belief whether committed alone or as part of a command structure involving an identifiable set of other individuals."

The House read the bill a third time but failed to pass the substitute; the vote failed 85 to 83. The House then voted on a motion to reconsider, which passed 94 to 73. On reconsideration, SB 1 failed again, losing 84 to 83. House Rules permit bills to be reconsidered only one time, so SB 1 officially died.

---

[35] A detailed chronology of the passage of Georgia's current Domestic Terrorism statute can be found at John J. Crowley & Tatiana E. Posada, *HB 452- Domestic Terrorism*, 34 Ga. St. U. L. Rev. 17, 19-21 (2018).

[36] Michelle Baruchman, *Civil Rights Groups Oppose State Bills Affecting Ability to Protest*, Atl. J.-Const. (Mar. 15,2017).

The Senate then took an entirely different bill, House Bill (HB) 452, and inserted, word for word, the failed language from SB 1. HB 452 passed the Senate in a vote of 36 to 18. The House received the Senate substitute of HB 452, amended the domestic terrorism language as it had with SB 1, and passed the Senate substitute to HB 452, as amended by the House, in a vote of 96 to 77. The bill then was returned to the Senate, where it passed 35 to 16. The Governor signed the bill into law shortly thereafter.

Within the same legislative session, the original bill, SB 1, failed on the motion to reconsider in the House. Thereafter, the second iteration, HB 452, did not pass in the House by a two-thirds vote (it passed 96-77, i.e., 55%). The eventual passage of HB 452 violated Art II, sec 5 of the Georgia Constitution. For the same reason, the law's passage also violated Rule 144 of the Rules, Ethics, and Decorum of the Georgia House of Representatives (House Rules), that states, "No bill, resolution, or amendment shall be re-considered more than once. Here the bill was reconsidered more than once" when its language was added to HB 452 by the Senate.

The language of the Georgia Constitution is not precatory, it is mandatory. Article III, sec 5 may well be technical and procedural, but it is nonetheless clear. There is no exception for 'really important' bills. Indeed, given the public notoriety of the proposed law, one would have thought the Legislature would have been particularly careful in its passage. Some may contend that HB 452 and SB1 are not the same bill and therefore the provision does not apply. However, the language of the Constitution appears to have anticipated the Legislature's 'work around' by forbidding second consideration of a bill "under the same or any other title." SB 1 and HB 452 contain the same words arranged into the same sentences and sections. It

will take a giant judicial wink to conclude that they are not the same bill with different titles.

Although rare, legislative procedural violations have been struck down by other state courts. *See Naifeh v. State ex rel. Okla. Tax Comm'n*, 400 P.3d 759 (Okla. 2017)(striking down law as unconstitutional for violating procedural requirement of state constitution); *Anderson v. Oakland County Clerk*, 419 Mich. 492 (1984)(striking down law for violating Michigan Constitution regarding amended bill's "original purpose provision"). *But see Missouri Coalition for Environment v. State of Missouri*, 593 S.W.3d 534 (2020).

This appears to be a question of first impression in Georgia and the courts are understandably reluctant to interfere with the inner workings of a coequal branch. However, this is not some House Rule under consideration; it is the Georgia Constitution. If the Legislature cannot be bothered to run its own affairs by the clear mandate of the Constitution, how can the citizenry be expected to respect the rule of law?

The Domestic Terrorism Statute as applied to Ariel Ebaugh

Ariel Ebaugh has been charged with one count of Domestic Terrorism, a felony carrying a prison sentence of no less than five years and up to 35 years, as defined in Ga. Code §16-11-220. She is also charged with two counts of Possession of a Firearm or Knife during the Commission of the felony offense of Domestic Terrorism, a violation of Ga. Code §16-11-106.

As best as can be determined from the sparse affidavits filed in support of Ms. Ebaugh's arrest warrant, she is being charged with domestic terrorism not based on any individualized act or intent but because she "affirmed their cooperation with Defend the Atlanta Forest (DTAF) by presenting herself onto the private property armed with a rifle and handgun

dressed in the common attire of camouflage." Stated plainly, without any charge of a specific intent or action on her part, the defendant was charged based on exercising her right to freely associate, her freedom to dress as she chose, and her right to possess and carry firearms protected by the 2nd Amendment and the Georgia Constitution.

Even cursory review of the statute shows that Ms. Ebaugh's charged conduct and speech did not violate Georgia's Domestic Terrorism law. At a minimum, Section 16-4-110 requires the following: 1) a felony violation or attempt to commit a felony violation of the laws of Georgia; 2) intent to disable or destroy publicly or privately owned facilities deemed 'critical infrastructure' resulting in major economic loss; and 3) intent to alter, change, or coerce the policies of the government by intimidation or coercion.

By showing up at an undeveloped construction site Ariel Ebaugh did not "intend to disable or destroy" critical infrastructure or a state or government facility, thereby causing "major economic loss". It stretches the words in the statute to absurdity to argue that a person can disable or destroy something that does not exist. Yet, that is exactly what the government is alleging in the charging documents. The Legislature could have explicitly included construction sites in the "critical infrastructure" definition; many other states have done so. (Arkansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, North Dakota, Tennessee, and Texas). It chose not to and it is not for the prosecutor to expand what the Legislature has enacted. Moreover, even if the so-called Cop City facility did exist, it would not meet the "critical infrastructure" definition because it is not a "energy, fuel, water, agriculture, health care, finance, or communication facility providing or distributing services for the benefit of the public". Again, had the legislature

intended to include a public safety training facility in the definition, it would have done so.

An unbuilt so-called Cop City is not a "State or government facility"; it is an idea, an aspiration. An unbuilt Cop City is not a "permanent or temporary facility or conveyance that is used or occupied by representatives of this state or any of its political subdivisions, by the legislature, by the judiciary, or by officials or employees of this state or any of its political subdivisions." Cop City may become a state facility if it is ever built and used for its intended purpose; but until built, it is not a facility of any sort, permanent or temporary.

Furthermore, what major economic loss has the government alleged? Had the Legislature intended to cover every broken window or slashed tire, it would have done so. Instead, the Legislature focused on economic disruption. Delaying the construction of Cop City may be disruptive to some people, but it will not cause major economic loss as required by the statute.

It is clear that a person cannot violate 16-11-220 without first committing or attempting to commit a felony as defined by Georgia law. It is equally clear that no underlying felony has or could be identified here. The plain text of the Georgia Domestic Terrorism law requires the commission of or attempt to commit a triggering felony. There is no other meaning to be ascribed to the opening lines of the statute: "Domestic terrorism means any felony violation of, or attempt to commit a felony violation of the laws of this state ..." Ga. Code §16-11-220 (2). If the words in the statute are not plain enough, its legislative history confirms that a triggering felony is necessary. The original Senate bill was specifically amended in the House to add the triggering felony requirement. See Crowley & Posada, at p. 22.

Prosecutors know how a triggering felony statute works. In charging Ariel Ebaugh with the Possession counts, another triggering felony statute, the underlying felony is clearly stated in the charging documents. Either the Dekalb County District Attorney does not believe the Domestic Terrorism law requires a triggering felony, an error of law fatal to the charge; or her office seeks to use the felonies of others as the predicate for Ms. Ebaugh's charges, an equally fatal mistake. There is no felony underlying the domestic terrorism charge and that charge must therefore fall. Without the underlying felony of domestic terrorism, the firearm possession charges must also fall.

The charging documents describe alleged felonious acts and intent claimed by DTAF. Although far from certain, perhaps those felonies committed by others and not even alleged to have been committed by the defendant are the undergirding of Ms. Ebaugh's charges. If so, these charges are a house of cards ready to tumble down in the first stiff constitutional wind. If the sins of DTAF are to be visited on the defendant let the government say so plainly so that they can be examined in the light of Ariel Ebaugh's "freedom to engage in association of beliefs and ideas" protected by the First Amendment. *NAACP v. ex rel. Patterson*, 357 U.S. 449, 460 (1958).

Likewise, the charging documents attempt to use constitutionally protected conduct and expression as evidence of criminal intent. Like everyone else, Ms. Ebaugh is entitled, within the bounds of "public health and decency", to wear what she chooses, yet their choice of camouflage is cited as evidence of her terrorist intent. More importantly, the government is constitutionally prohibited from interfering with the defendant's right to keep and bear arms, yet the charging documents ascribe criminal intent to her

possession of firearms. Georgia law has long protected the right to keep and bear arms. In 2022, the Georgia Legislature codified that protection in a comprehensive "permitless carry" statute that repealed longstanding license application requirements. Ga. Code §§ 16-11-125.1;15-11- 138. Under the new law, Georgia now generally permits any "lawful weapons carrier" to carry handguns openly or concealed in most public spaces without any background check or permit required. It is thus perfectly legal-though some may find it intimidating-to attend a protest armed. The government's attempt to assign criminal intent to Ariel Ebaugh's exercise of her constitutional right to carry cannot stand.

As applied to the conduct charged to Ariel Ebaugh in the affidavit supporting her arrest, the following questions remain unanswered:

1) what felony or attempted felony is she alleged to have committed?

2) what critical infrastructure or government facility did Ariel Ebaugh intend to damage or destroy?

3) what major economic damage is she alleged to have caused? and

4) how did Ariel Ebaugh engage in intimidation or coercion to alter a government policy?


WHEREFORE, counsel for Ms. Ebaugh respectfully submits that this Honorable Court grant her writ of habeas corpus and strike down Georgia's Domestic Terrorism statute as both procedurally and substantively unconstitutional under the state and federal constitutions.

This 26th day of May, 2023.

Respectfully Submitted,

/s/Stanley Cohen
Stanley Cohen, Esq.
Co-counsel for Ms. Ariel Ebaugh
Admitted Pro Hac Vice


/s/Jason B. Sheffield
Jason B. Sheffield, Esq.
Co-counsel for Ms. Ariel Ebaugh
Georgia Bar No. 639719


PETERS, RUBIN, SHEFFIELD, & HODGES P.A.
2786 N. Decatur Rd., Suite 245
Decatur, GA 30033
404-296-5300
jasonsheffieldattorney@gmail.com


## CERTIFICATE OF SERVICE

As permitted by OCGA § 9–14–45, *Capote v. Ray*, 276 Ga. 1, 3 n.8, 573 S.E.2d 25, 28 n.8, *opinion corrected and superseded*, 276 Ga. 1, 577 S.E.2d 755 (2002), I served a copy of this petition via first-class mail with adequate postage on the following parties:

**Braddye Smith,** Supervisor,
DeKalb County Pretrial Services,
DeKalb County Courthouse
Room 120, 1st Floor
556 N. McDonough Street
Decatur, Georgia 30030

**Melody M. Maddox,**
Sheriff, DeKalb County
4415 Memorial Drive

Decatur, GA 30032

**Mr. Lance Cross**, ADA, DeKalb County District Attorney's Office
via email at clcross@dekalbcountyga.gov.

This 26th day of May, 2023.

Respectfully Submitted,

/s/Jason B. Sheffield
Jason B. Sheffield, Esq.
Co-counsel for Ms. Ariel Ebaugh
Georgia Bar No. 639719

PETERS, RUBIN, SHEFFIELD, & HODGES P.A.
2786 N. Decatur Rd., Suite 245
Decatur, GA 30033
404-296-5300
jasonsheffieldattorney@gmail.com