UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | | |
|---|---|---|
| **ARIEL EBAUGH** | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | **Civil Action No.:**  **1:23-cv-04337** |
| v. | ) | |
| | ) | |
| **THE SUPERIOR COURT OF DEKALB COUNTY & THE STATE OF GEORGIA** | ) ) ) ) | |
| Defendants. | ) | |
| | ) | |

<u>PETITION FOR WRIT OF MANDAMUS</u>

Plaintiff Ariel Ebaugh seeks an order of this court pursuant to 28 U.S.C. § 1651 striking down Georgia Statute OCGA § 16–11–220(2)(B)(2022) the Georgia State Domestic terrorism statute is a per se infringement upon and violation of the First Amendment to the United States Constitution.

## PARTIES

1. Ariel Ebaugh
2. The State of Georgia
3. DeKalb County, Georgia
4. The Superior Court of DeKalb County
5. The DeKalb County Sheriff's Department

## JURISDICTION AND VENUE

Original jurisdiction is vested in this Court pursuant to 28 USC 133 as the claim arises under the Constitution and laws of the United States.

Venue is vested in this Court as the Constitutional violation of the First Amendment aggrieved of herein is taking place within the United States District Court for the Northern District of Georgia.

## ARGUMENT

1. For the reasons fully discussed in the appended Memorandum of Law, the prosecution of petitioner Ariel Ebaugh's pursuant to the Georgia State Domestic Terrorism statute (OCGA § 16–11–220(2)(B)(2022) arising from the so-called "Cop City" protests is both facially and as applied in clear violation of the First Amendment. To be sure, the domestic terrorism statute suffers from a dramatic undeniable merger of unconstitutional vagueness and overbreadth.

2. To be sure it is clear that 16-11-220's terms violate the fair notice element of the void-for-vagueness doctrine, whose "purpose is to enable the ordinary citizen to conform his or her conduct to the law." *City of Chicago v. Morales*, 527 U.S. 41, 58 (1999). No less true the statute 16-11-220 represents a palpable attempt to apply the force of the state against words and deeds protected by the First Amendment, tying criminal culpability to mere statements or acts that "intimidate or coerce."

That the statute's scope is impermissibly broad with outer limits of its reach impossible to discern is beyond dispute. Such statutes have often been declared unconstitutional on its face under the First Amendment overbreadth doctrine, even though it may have some legitimate uses. *See* e.g., *United States v. Stevens*, 559 U.S. 460, 473 (2010).

3. In addition, the conditions of release imposed upon Ms. Ebaugh following her arrest on this charge unconstitutionally infringe upon her First Amendment rights to speech, association and assembly.

4. For these reasons these interconnected First Amendment challenges to OCGA § 16–11–220(2)(B)(2022) present a multilayered federal issue of first impression to this Court: A state criminal charge for domestic terrorism arising under a statute that is unconstitutional and which subsequently forms the basis for additional unconstitutional terms and conditions of a defendant's release.

5. In addition, because Ms. Ebaugh meets and satisfies the requisite threshold pleading requirements of *Cheney v. U.S. Dist. Court for Dist. Of Columbia*, 542 U.S. 367 (2004),[1] it is respectfully submitted that this Court should issue and must issue a Writ of Mandamus.

6. As set forth more fully in the appended Memorandum of Law, to date, Ms. Ebaugh has been denied any and all adequate, let alone meaningful vehicles within the state court process by which to pursue the relief she desires and is clearly entitled to. Thus, having appropriately moved some three months ago to challenge

---

[1] "Three conditions must be satisfied before a writ of mandamus may issue: first, the party seeking issuance of the writ must have no other adequate means to attain the relief he desires; second, the petitioner must satisfy the burden of showing that his right to issuance of the writ is clear and indisputable; third, even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Cheney v. U.S. Dist. Court for Dist. Of Columbia*, 542 U.S. 367 (2004).

the constitutionality of the state domestic terrorism statute under a local habeas corpus procedure, to date petitioner's effort remains little more than a state court procedural tease.

7. Thus, although Petitioner sought judicial intervention in DeKalb County Superior Court on or about May 30,2023 on the grounds that the extremely serious domestic terrorism law under which she stands charged[2] is unconstitutional[3] to date no action has been taken by any court other than to recuse itself[4] with not so much as a motion schedule set for reply briefs by named and properly served respondents. In addition, not long after the motion was filed the DeKalb County District Attorney announced that because of policy disagreements with the Attorney General she would no longer handle any prosecutions relating to "Cop City" protests including defendants such as Ariele Ebaugh charged with domestic terrorism. In addition, as of the filing of this application the Georgia State Attorney General's Office has ignored the filing of Ariel Ebaugh in its entirety submitting no response to her application whatsoever.  And while the DeKalb County Attorney acting on behalf of the DeKalb County Sheriff did file a reply it ignored in its

---

[2] Under OCGA § 16–11–220(2)(B)(2022), upon a conviction, a defendant can be sentenced up to 35 years in state prison.

[3] Because the State has not indicted Ms. Ebaugh, nor is it apparent when or if within the applicable limitations period it will do so, without an indictment, there is no criminal proceeding to challenge. *See* OCGA § 16– 1–3(4). In this light and because the law disallows preindictment challenges to criminal prosecutions [*Davis v. State*, 307 Ga. 784, 786–88, 838 S.E.2d 233, 234–35 (2020)], Ms. Ebaugh sought the relief she did in state court by her habeas petition.

[4] On May 5th, 2023, Chief Judge LaTisha Dear Jackson of the DeKalb County Superior Court recused herself without as permitted under state law setting forth grounds for her refusal. Assigned next to DeKalb County Superior Court Judge Courtney L. Johnson on June 7th, 2023 she also recused herself on June 26th, 2023, also without setting forth a basis for her recusal. The case was then assigned on the same day to Judge Asha F. Jackson, who recused herself on July 20th, 2023. As of the time of this submission no DeKalb County Superior Court Judge has been assigned the matter, as it languishes without judicial action of any sort by the Court Clerk, with regard to a fourth assignment.

entirety petitioners' constitutional claims and arguments resting instead on a rote denial rooted in insufficient information about the claims to reply.[5]

8. On or about August 29, 2023 an indictment was banded down in Fulton County Superior Court accusing 61 persons or entities mostly of violations of the Georgia Racketeering law.[6]  Brought by the Office of the Attorney General, under act number 124, it is alleged that" on December 14, 2022, ARIEL EBAUGH [sic] did approach DeKalb law enforcement with a rifle, knives, and a pistol in a threatening manner in an attempt to intimidate officers, thus committing an Aggravated Assault against DeKalb law enforcement. This is an overt act in furtherance of the conspiracy."[7]

9. The overt act attributed to Ms. Ebaugh under this indictment is the identical conduct at the very time and place which served and continues to serve as the basis for her arrest and the ensuing charge of Domestic Terrorism in DeKalb County.

10. As of the time of this application, although indicted in Fulton County for identical conduct under the RICO charge, the Domestic Terrorism charge remains pending and active against Ms. Ebaugh in DeKalb County.

11. Given the indictment of Ms. Ebaugh in Fulton County, on September 12, 2023 a request was made by counsel to the Office of the Attorney General to end the charging contradiction whereby Ms. Ebaugh stands charged under

---

[5] A plain read of the County Attorney's reply is very much the kind of respondent denial of sufficient knowledge and facts typically submitted in a classic tort claim arising from, for example, a traffic accident.

[6] Copy of which appended hereto as Exhibit A.

[7] Of the 225 overt acts set forth in the indictment, this is the sole activity attributed to Ms. Ebaugh. For purposes of the underlying RICO conspiracy itself, there is no evidence delineated in the indictment which connects Ms. Ebaugh to knowing participation in the agreed-to illegal end.

two different statutes, for identical conduct, at the same time and place, but with on-going prosecution in two separate counties.[8]

12. To date, Deputy Attorney General Fowler has not responded to the writ of habeas corpus filed on behalf of Ariel Ebaugh some six months ago in state court. So, too he has ignored our most recent request to dismiss the domestic terrorism charge in DeKalb County now that the RICO charge has been returned against Ms. Ebaugh alleging the identical conduct. Likewise, to date, other than two judicial recusals, there has been no action undertaken by the Superior Court in DeKalb County concerning the pending application by Ms. Ebaugh for judicial relief from ongoing prosecution under an unconstitutional statute.

13. Under these circumstances it is abundantly clear that the entirety of the DeKalb County Superior Court and its criminal justice system not only holds a preconceived prejudice against granting habeas consideration to Ms. Ebaugh, but is the very kind of indifference that triggers the doctrine of futility, which constitutes a well-settled exception to the need to exhaust local remedies.[9]

---

[8] In relevant part, the request to Deputy Attorney General Fowler states "Inasmuch as we still have pending an unresolve writ of habeas corpus in Superior Court challenging the constitutionality of that statute, and were preparing to seek a writ of mandamus in federal court against it as well, I write now to clarify whether the indictment identified as Fulton County case # 23SC189192 is in full satisfaction of those charges. If so, upon an application by your Office to dismiss the DeKalb County charges we will move to withdraw our writ in Superior Court and forgo, at this time, seeking any federal relief. On the other hand, absent such an application we will ask the Superior Court to proceed with our writ and consider seeking such other and further relief as is necessary to challenge the still pending Domestic Terrorism charge against our client." See, Letter to Deputy Attorney General Fowler, appended hereto as Exhibit B at para. 3.

[9] See, Alabama Dept. of Rehabilitation Services v. U.S. Dept. of Veterans Affairs, 165 F.Supp.2d 1262, 1271-72 (M.D. Al. 2001). See, also, Petitioners Memorandum of Law, infra, fn. 18 (and related arguments therein) setting forth myriad Eleventh Circuit Cases which-- in considering the doctrine of futility-- would, given the predicate circumstances of this matter, find it entirely applicable to the petition before this court.

14. Moreover as set forth more fully in petitioner's Memorandum of Law the domestic terrorism statute is "flagrantly and patently violative of express constitutional prohibitions"[10] and of such magnitude as to result "irreparable injury." *Id*. Under these circumstances it is respectfully submitted that this court should exercise its clear and necessary discretion and grant the Writ of Mandamus. *Cheney v. U.S. Dist. Court for Dist. Of Columbia*, 542 U.S. 367 (2004).

15. Finally to the degree respondent argue that the *Younger* abstention doctrine[11] requires this court to abstain from entertaining this claim as it arises from an "on-going" state court proceeding to do so here would be a safety valve with nothing to escape, but state court inaction. As set forth fully in Petitioner's Memorandum of Law here Ms. Ebaugh presents this court multiple but connected reasons why *Younger* is entirely inapposite to the matter at hand- because: the state proceedings against Ms. Ebaugh are motivated by bad faith; the Domestic Terrorism state law being challenged is patently unconstitutional; there is no alternative forum where constitutional issues can be raised; or a federal injunction against enforcement of the Domestic Terrorism statute is necessary to precent great and immediate irreparable injury to Ms. Ebaugh.

---

[10] *See, generally, Kugler v. Helfant*, 421 U.S. 117, 123-25 (1979).
[11] *Younger v. Harris*, 401 U.S. 37, 45, 53-54 (1971)(explaining the exceptions to the *Younger* doctrine where abstention is not required). For Younger abstention to apply, certain factors must be met: (1) the state judicial proceeding must be ongoing; (2) the proceedings must implicate important state interests; and (3) the federal plaintiff must have had an ample opportunity to raise constitutional challenges in state proceedings. *Sundy v. Friendship Pavilion Acquisition Co., LLC*, 807 Fed. Appx. 977 (11th Cir. 2020) (citing *Foster Children v. Bush*, 329 F.3d 1255,1274–75 (11th Cir. 2003).

## RELIEF SOUGHT

In issuing a Writ of Mandamus, Ms. Ebaugh requests the following:

First, and concurrently, to issue a preliminary injunction against enforcement of the Domestic Terrorism statute while this matter proceeds; and

Second upon full briefing, argument and consideration issuing an Order striking down OCGA § 16–11–220(2)(B)(2022) as in violation of the First Amendment and thus unconstitutional.

# MEMORANDUM OF LAW

## Introduction

Ariel Ebaugh is twenty-two years old. Every bit a daughter of Georgia, she was born, raised and resided much of her life in the suburbs of Atlanta, save for the years when she resided in the Persian Gulf with her parents[12] and then for a year when she attended Cambridge University in the UK as an exchange student studying poetry. A graduate of Georgia College and State University where she earned a 3.9 GPA and high honors in the study of English with a concentration in creative writing, she is currently working in several different jobs[13] while pursuing a license as an EMT.[14]

Following graduation from College, Ariel learned of the so-called "Cop-City" protests in the South River Forest and upon returning home to Stockbridge, some twenty minutes away, she went to the forest on several occasions to learn more about the protest. While there she participated in a community dinner, on another occasion helped prepare food and attended a concert. In addition, she befriended a young man with whom she participated in a twenty-hour first-aid training session in Atlanta. That friendship, and nothing else, lead to the event

---

[12] The daughter of a U.S. army career veteran and a mother who is an attorney, Ariel grew up in a career-Army/military-contractor family, and during her critical adolescent years lived in the Persian Gulf during war-time, traveling extensively as a teen throughout the Middle East, Europe and western Asia with her parents. Raised as an evangelical Christian Ariel was home schooled from age five until eleventh grade as her parents saw the local public school system as too permissive. *See*, appended hereto as Exhibit C, full biography of Ariel provided to prosecutors with the Dekalb County District Attorney's Office when it still exercised jurisdiction over Cop City prosecutions to provide insight into her life and accomplishments.

[13] Among other employment, Ariel is tutoring elementary students, driving for Doordash (a food delivery service) and cleaning Airbnb's on a per diem basis.

[14] The license process involves a year of study and practical experience with classes meeting up to eight hours a week after which, and upon passing a rigorous examination, Ariel can obtain a state issued license to work as an EMT for a government or private entity.

which culminated in Ariels arrest, her first and only brush with law enforcement at any time or any place.

On December 14, 2022, the day of her arrest, Ariel heard from her friend that police were getting ready to enter and to clear the forest and he asked her to cause a "distraction" so that he could avoid arrest.  In what can only be described as utter foolhardiness, Ariel drove to the police staging ground, removed a lawfully owned and possessed long rifle from the trunk of her vehicle and approached officers with the rifle draped over her shoulder.  At no time did she fire or aim the weapon at officers or remove it from her shoulder. Ordered by police to drop to the ground, Ariel immediately complied and was placed under arrest without further incident. Later that day, she was charged with, *inter alia*, a count of domestic terrorism in violation of OCGA § 16–11–220(2)(B) which upon conviction carries a potential sentence of up to thirty-five years.[15] Eventually released on bond among the conditions of her release, were court-imposed limits on Ariels speech, association and assembly.[16]

With almost six months having passed since Ariel's arrest and not having heard from either the Dekalb County District Attorney or the Office of the Attorney General of Georgia[17] about whether or when they were proceeding to grand jury presentation with regard to Ms. Ebaugh's, on May 31, 2023 petitioner filed a Writ

---

[15] There are no allegations that Ariel engaged in any other criminal conduct with regard to the protests before her arrest. *See*, appended hereto as Exhibit D, minutes of bond proceeding on December 27, 2022 as a result of which Ms. Ebaugh was released two days later on ten-thousand dollars cash bail.

[16] *See*, Exhibit D, p. 50, Lines 6-8.

[17] Initially, both law enforcement agencies were prosecuting Ms. Ebaugh and the others charged with like offenses in DeKalb County.

of Habeas Corpus[18] in Superior Court[19] seeking dismissal of the Domestic
terrorism charge as in violation of Art. I, § I, ¶ V of the Georgia Constitution of
1983, as well as the First and Fourteenth Amendments to the United States
Constitution.[20]

What has followed in the months since petitioner sought relief through the
state court process against the overbearing reach of a clearly unconstitutional
statute and arrest has proven to be very much a dystopian voyage for Ms. Ebaugh.
Thus, not long after the writ was filed, citing policy disagreements with the
Attorney General's Office, the DeKalb District Attorney ceased any and all
prosecutions of those arrested in DeKalb County for charges arising from the
protests, including for domestic terrorism. With this unprecedented move the
prosecution of Ariel and all DeKalb demonstrators was left solely in the hands of
the Attorney General. Not long thereafter the Superior Court Judge assigned the
writ recused herself without setting forth a basis for the recusal.[21] Several weeks
thereafter a second judge was assigned the writ and, in short order, also recused
themself without setting forth the basis for the recusal. As of the submission of this

---

[18] *See*, appended hereto as Exhibit E, Writ of Habeas Corpus filed in Superior Court, filed
May 27, 2023.
[19] Under Georgia law one need not be in custody in order to seek relief through a writ of
habeas corpus where limiting conditions of bond have been imposed, in particular where a claim
can be raised that the underlying basis for one's arrest was in violation of Georgia law or the
state constitution. *See*, *generally*, OCGA § 9–14–1(a) which empowered Petitioner to inquire
into the legality of the restraint in state court. Further, that the restraint on Ms. Ebaugh's liberty
flows from an arrest for an alleged criminal offense did not in this case strip her of standing
because she was properly released on bail. OCGA § 9–14–16(1); *see Britt v. Conway,* 281 Ga.
189, 190, 637 S.E.2d 43, 44 (2006).
[20] Service of the writ upon respondents was effected by electronic service on the Office of
the Attorney General, on the Office of the DeKalb District Attorney and the DeKalb Sheriff's
Department, the arresting agency, via the online filing system for DeKalb County. Summons for
an answer to writ was dated May 30, 2023, requesting answer within the statutory 30 days.
[21] Under Georgia Superior Court Rule 25.7, a judge may voluntarily recusing themself
from overseeing a matter – be it criminal or civil – without setting forth basis for that recusal.

petition Ms. Ebaugh's writ is frozen in time and place without the appointment of a Superior Court Judge to oversee the application.[22] Most shocking, although being served with the writ, the Office of the Attorney General has not responded to the application in any way.[23] While the Dekalb County Attorney did file a response to the writ, it did not address in any way, shape or form the constitutional challenges or relief sought within it. Very much a perfunctory rote response to the "classic' civil tort claim, the County Attorney's response is simply a compendium of denials essentially based upon a lack of information.[24]

Against this backdrop, recent events have evolved which strengthen the claims of Ms. Ebaugh before this court. On or about August 29, 2023 an indictment was handed down in Fulton County Superior Court against 61 persons charging, *inter alia,* Racketeering. Brought by the Attorney General, it includes 250 overt acts in furtherance of the conspiracy with but one attributed to Ariel Ebaugh- the identical act at the identical time and place set forth in her still pending[25] charges in DeKalb County for Domestic Terrorism.[26] As set forth in our introduction, to date all efforts to have the Attorney General dismiss the Domestic Terrorism charge in DeKalb County against Ms. Ebaugh have failed as have our efforts to move the Superior Court to proceed on her writ of habeas corpus challenging the

---

[22] As of September 25th 2023, counsel learned from the DeKalb County Superior Court Clerk that no reassignment has been accomplished.

[23] The failure to respond mirrors the inaction of the Dekalb District Attorney which likewise did not respond to the writ prior to withdrawing from all local prosecutions.

[24] *See* response of DeKalb County Attorney appended hereto as Exhibit F.

[25] As of the time of this submission a check with the court clerk of Dekalb County shows the Domestic terrorism charge still pending against Ms. Ebaugh.

[26] The only violation of law returned against Ms. Ebaugh in the Fulton County indictment is for Racketeering.

constitutionality of that statute under the constitutions of Georgia and the United States.

If ever the doctrine of futility[27] has surfaced as palpable evidence that state court redress for well rooted claims of constitutional injury is unavailable to its victim, it is the matter now before this court.  Since the time of her illegal arrest months ago under a constitutionally void state statute, and conditions of release which, likewise, raise significant constitutional alarms over petitioner's protected rights to speech, association and assembly, Ariel Ebaugh has sought but repeatedly been denied relief through the Georgia state court process. In sum, to date Ms. Ebaugh's meritorious claims have been ignored by prosecutors and county attorneys in total, and passed from judge to judge with no state court judicial intervention underway, or apparently contemplated.

Under these circumstances nothing stops this court from intervening in a state court proceeding that is remarkable here for little more than palpable and punishing avoidance. And while the doctrine of federal court abstention from pending state court proceedings is well recognized, it is not absolute.  Indeed, given the facts of this matter the petition of Ariel Ebaugh is the precise kind of

---

[27] *See, generally, Foster Children v. Bush,* 329 F.3d 1255, 1279 (11th Cir. 2003)(holding that while "[a] federal court should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary … The relevant question is not whether the state courts can do all that Plaintiffs wish they could, but whether the available remedies are … adequate.")(internal quotation omitted). Given the record of the proceedings below, it is clear that the available remedies in state court for petitioner have to date proven entirely inadequate. *See, also, Leonard v. Ala. State Bd. of Pharm.,* 61 F.4th 902, 909 (11th Cir. 2023)(holding the burden is on petitioner, as here, to establish that their claims have been procedurally prevented in a state tribunal in such a way as to "allow a district court to evaluate whether the plaintiff's federal claims will effectively be shut out from the judicial system and cut off from effective review in the courts."); *Pettway v. Marshall,* 2022 U.S. App. LEXIS 29612 (11th Cir. 2022) (holding *Younger* abstention not required where state court proceedings did not provide an adequate forum for the petitioner to pursue his constitutional claims).

claim that climbs well above and beyond the abstention doctrine, and one which calls out for justice from the federal courts.

<u>This Court Has Jurisdiction</u>

In *Younger v. Harris*, 401 U.S. 37 (1971) "the Supreme Court held that a federal district court may not enjoin a pending criminal state-court proceeding except under extraordinary circumstances."[28] *Sundy v. Friendship Pavilion Acquisition Co., LLC*, 807 Fed. Appx. 977, 979 (11th Cir. 2020)(internal citation omitted). Under *Younger*, abstention is generally triggered out of "a proper respect for state functions and the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *Green v. Jefferson County Comm'n*, 563 F.3d 1243,1250 (11th Cir. 2009) (internal citation and quotation omitted). Yet *Younger* is not absolute. Nor is its long-settled doctrine an amorphous teach left to the rudderless chase of criminal defendants or civil litigants.[29]

---

[28] Although examples of extraordinary circumstances are necessarily decided on a case-by-case basis, the *Younger* Court specifically adopted as a linchpin inquiry the question of whether "irreparable injury" to a petitioner will result by virtue of abstention. "The precise reasons for this longstanding public policy against federal court interference with state court proceedings have never been specifically identified but the primary sources of the policy are plain. One is the basic doctrine of equity jurisprudence that courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Younger* 401 U.S. at 43. *See*, *Hughes v. AG of Fla.*, 377 F.3d 1258,1263 (11th Cir. 2004)("Federal courts have consistently recognized [a] limitation on enjoining state criminal prosecutions unless one of a few narrow exceptions is met… [a] pertinent exception is the exception for irreparable injury."); *Turner v. Bradshaw*, 2022 U.S. App. LEXIS 2594 (11th Cir. 2022)(applying *Younger* certificate of appealability denied for pre-trial detainee where there is no claim that his criminal proceedings were motivated by bad faith or that he suffered an irreparable injury).

[29] Subsequently the *Younger* abstention doctrine was extended to civil proceedings as well where "important state interests" were implicated. *See*, *generally Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975); *Juidice v. Vail*, 430 U.S. 327 (1977); *Trainor v. Hernandez*, 431 U.S. 434 (1977); *Moore v. Sims*, 442 U.S. 415 (1979). *But see Sprint Communications v. Jacobs*, 571 U.S. 69,73 (2013) where, in holding the district court should not have abstained from considering a

To the contrary, in case after case the Supreme Court as well as the Eleventh Circuit has affirmed and reaffirmed that for *Younger* to preclude federal relief "certain factors must be met— (1) the state judicial proceedings must be ongoing, (2) the proceedings must implicate important state interests, and (3) the federal plaintiff must have had an adequate opportunity to raise constitutional challenges in the state proceedings." *Sunday* 807 Fed. Appx. 977 at 981. This rule was further expounded upon in *Kugler v. Helfant*, 421 U.S. 117, 123-25 (1979) where the Supreme Court held that federal equitable intervention is permitted "in a state criminal trial where there is a showing of bad faith or harassment by state officials responsible for the prosecution, where the state law to be applied in the criminal proceeding is flagrantly and patently violative of express constitutional prohibitions, or where there exist other extraordinary circumstances in which the necessary irreparable injury can be shown even in the absence of the usual prerequisites of bad faith and harassment."(internal citations and quotations omitted.).

Irreparable injury is an extraordinary circumstance permitting intervention where, as here, a "challenged statute is flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph." *Huffman v. Pursue, Ltd.,* 420 U.S. 592,611 (1975). *Accord Moore v. Sims,* 442 U.S. 415, 2377-78 (1979)("Younger, and its civil counterpart which we apply today, do of course allow intervention in those cases where the District Court properly finds that the state proceeding is … flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it.")(internal citation and

---

claim against a state entity, the Supreme Court "cautioned federal courts not to extend *Younger* beyond [its intended] breadth."

quotations omitted). *See, also, Henry v. Harkness*, 701 Fed. Appx. 878,882 (11th Cir. 2017)("A state statute may cause irreparable injury, justifying an exception to *Younger* abstention, when it flagrantly and patently violates express constitutional prohibitions); *Hughes v. AG of Fla.*, 377 F.3d 1258,1263n.7 (11th Cir. 2004)(Irreparable injury is an extraordinary circumstance where a petitioner is being prosecuted by a statute that "flagrantly and patently violates express constitutional prohibitions."); *Redner v. Citrus County,* 919 F2d. 646 649 (11th Cir. 1990)(affirming exceptions to *Younger* abstention include application of a patently invalid state statute.).

Moreover, under the facts presented by this matter Ariel Ebaugh has, to date, been denied "an adequate opportunity to raise [her] constitutional challenges in the state proceedings." *Sundy v. Friendship Pavilion Acquisition Co., LLC*, 807 Fed. Appx. 977 (11th Cir. 2020).[30] Although a federal court "should assume that state procedures will afford an adequate remedy" [*Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1,5(1987)][31] this is not an irrebuttable presumption. And, where, as here, the state court process has failed to consider, let alone resolve, the petitioner's constitutional claims,[32] and where, as here, Ariel Ebaugh is faced with on-going extraordinary

---

[30] To the extent the Attorney General argues that with the return of an indictment, Ms. Ebaugh now has an adequate means to raise whatever constitutional challenges she believes she has before the trial judge, any such claim proves to be a relief without remedy as there exists no basis for any such challenge under the single Racketeering charge returned against the defendant. Obviously, absent a count of domestic terrorism, the Fulton County Judge has no jurisdiction to entertain Ms. Ebaugh's constitutional challenge to it.

[31] "[W]hen a litigant has not attempted to present his federal claims in related state-court proceedings, a federal court should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary." *Pennzoil* 481 U.S. at 15.

[32] *Cf. Butler v. Ala. Judicial Inquiry Comm'n*, 261 F.3d 1154,1160 (11th Cir. 2001)(holding "[a]bstention is appropriate here, in part, because the Alabama Supreme Court's speedy and competent response dispels some of the district court's concerns about not abstaining."); *Leonard v. Ala. State Bd. of Pharm.*, 61 F.4th 902,908 (11th Cir. 2023)("[w]hen the plaintiff has not attempted to present their federal claims in related state-court proceedings, a

circumstances, this Court is duty bound to intervene and to resolve the tension between the Georgia State domestic terrorism statute and petitioner's First Amendment rights.

In sum, the factors presented by this matter are the precise kind of "extraordinary circumstances" contemplated under *Younger* which permit, indeed, compel this Court to exercise its discretion and to accept jurisdiction over petitioner's claims. To do otherwise would be to sentence petitioner to "irreparable injury" in the absence of any constitutional conviction.

For all the reasons to follow, it is respectfully submitted that upon consideration, the state domestic terrorism statute under which Ms. Ebaugh stands charged must be struck down as "flagrantly and patently" violative of express constitutional prohibitions under the First Amendment to the United States Constitution.

<u>The Factual Backdrop</u>

For over a year, activists have exercised their First Amendment rights to protest the construction of the Atlanta Public Safety Training Center, "Cop City." Since then, a "draconian crackdown" began against those protestors, and against anti-Cop-City advocates and journalists more broadly.[33] The crackdown reached

---

federal court should assume that the state proceedings are adequate, except upon unambiguous authority to the contrary.").

[33] The author, Spencer Reynolds, who is counsel at the Brennan Center for Justice Liberty and National Security Program was previously senior intelligence counsel at the Office of the General Counsel of the U.S. Department of Homeland Security. *See* DHS's Newest Target: Atlanta "Cop City" Activists, JUST SECURITY (June 13, 2023), https://www.justsecurity.org/86876/dhss-newest-target-atlanta-cop-city-activists/

unprecedented levels when state and local authorities began arresting dozens of "forest defenders who had been camping on public park land near where the training center is planned in protest against the project."[34]

As of today, 42 activists, including an attorney-legal-observer, have been charged under state law with domestic terrorism;[35] one protestor named Tortuguita has been killed during a raid by local and state authorities; a journalist detained and arrested for documenting Cop City protests;[36] three people who work at a bail-fund charged with charity fraud;[37] and three activists arrested for felony intimidation of an officer for merely distributing pamphlets on mailboxes that identified the officers who likely killed Tortuguita.[38] And while community organizations have launched a referendum ballot initiative to ensure Atlanta voters decide whether Cop City is built, the City of Atlanta has repeatedly refused to recognize this effort

---

[34] Timothy Pratt, 'Cop City': civil rights groups urge US to investigate surveillance of protestors, GUARDIAN (Aug 3, 2023), https://www.theguardian.com/us-news/2023/aug/03/cop-city-protesters-homeland-security-letter.

[35] *Id*. Among those detained for domestic terrorism charges were those who's overt acts apparently included attending a music festival protesting 'Cop City' in the forest on March 5; those who had phone number for a bail fund written on their body or on their clothes; and those who wore muddy, black, or camouflage clothing. *See* https://time.com/6276994/georgia-domestic-terrorism-law-cop-city/.*See*, *also*, https://www.justsecurity.org/86944/how-dhs-is-fueling-georgias-terrorism-crackdown-on-cop-city-protests/ reporting domestic terrorism charges had been filed where "the accused affirmed their cooperation with DTAF (Defend the Atlanta Forest) by occupying a tree house while wearing a gas mask and camouflage clothing."

[36] Zane McNeill, Detained "Cop City" Journalist Sues Atlanta Police, Alleges Intimidation: The lawsuit alleges that the arrest is part of a pattern of retaliation against journalists by Atlanta police, TRUTHOUT (May 17, 2023), https://truthout.org/articles/detained-cop-city-journalist-sues-atlanta-police-alleges-intimidation/.

[37] LDF Raises Serious Concerns About Recent Arrest of Atlanta Solidarity Fund Members in Cop City Advocacy and Calls for DOJ Investigation, NAACP LDF (June 6, 2023), https://www.naacpldf.org/press-release/ldf-raises-serious-concerns-about-recent-arrest-of-atlanta-solidarity-fund-members-in-cop-city-advocacy-and-calls-for-doj-investigation/.

[38] Natasha Lennard &amp; Akela Lacy, ACTIVISTS FACE FELONIES FOR DISTRIBUTING FLYERS ON "COP CITY" PROTESTER KILLING: The activists face 20 years in prison for handing out flyers that identified a cop they said was linked to the killing of a protester in the Atlanta Forest, THE INTERCEPT (May 2, 2023) https://theintercept.com/2023/05/02/cop-city-activists-arrest-flyers/.

even as this Court has deemed provisions of the City banning ordinance likely unconstitutional under the First Amendment.[39]

That there has been a coordinated effort this past year by state and local officials to tamp down on constitutionally protected political protest against Cop City is beyond debate. That this effort has been framed and fueled by a variety of unconstitutional strategies which seek to chill speech, association and assembly is no less true. Though the constitutionality of partisan political efforts to interfere with the referendum desires of thousands of Atlantans who oppose Cop City [40] remains a question to be resolved another day, here and now this court is presented a clear case of the application of an unconstitutional criminal statute used to unlawfully arrest, prosecute and victimize demonstrators. Ariel Ebaugh is one such victim. For the reasons advanced below, it is respectfully submitted that the Georgia domestic terrorism statute is unconstitutional as violative of the First Amendment.[41]

### OCGA § 16–11–220(2)(B) violates the First Amendment

---

[39] Jozsef Papp & Jeremy Redmon, Judge issues order in favor of Atlanta public safety training center opponents People living outside of city allowed to collect referendum signatures; 60-day clock restarted, ATLANTA JOURNAL CONSTITUTION (July 27, 2023), https://www.ajc.com/news/crime/dekalb- residents-allowed-to-collect-referendum-signatures-60-day-clock-restarted/ KNZEJPCPXBGG3PARQKLP47QQDI/#:~:text=A%20federal%20court%20judge%20 has, training%20center%20on%20the%20ballot.

[40] R.J. RICO, Atlanta Cop City activists say they are confident of getting 70K signatures. But big hurdles remain. Hundreds of canvassers have spread out across Atlanta in hopes of convincing more than 70,000 residents to sign onto a petition that activists believe is their best chance to halt the planned construction of a huge police and firefighter training center, OPELIKA-AUBURN NEWS (July 29, 2023), https://oanow.com/ap/national/atlanta-cop-city-activists-say-theyre-confident-of-getting- 70k-signatures-but-big-hurdles-remain/article_ece290d4-1018-5916-a91f-7f9344c09069.html. *See, also* https://roughdraftatlanta.com/2023/09/01/11th-circuit-court-issues-stay-in-favor-of-atlanta-in-cop-city-referendum-case/.

[41] As noted in the original habeas corpus application in state court, the domestic terrorism statute also violates procedurally and substantively Art. I, § I, ¶ V of the Georgia Constitution.

The government has the authority, some would reasonably argue the responsibility, to protect itself and its institutions from those who would tear it down by force or violence. But, when, in seeking to secure itself, the government undertakes to limit or to criminalize the speech of its citizenry, it is entering into a constitutionally fraught arena where to survive judicial scrutiny it must act cautiously and with precision. That is not the case at bar.  To be sure, the line between constitutionally protected political persuasion and felonious coercion is razor thin. Therefore, that line must be crystal clear. The line drawn in OCGA § 16–11–220 between protected speech and criminal conduct is not at all clear; indeed, it is barely drawn at all. Instead, the Georgia Legislature has shirked its constitutional responsibility by announcing pure indiscriminate intentions, but leaving the line drawing ultimately to the unchecked pleasure of prosecutors and the final say to courts- while accused sit in jail or see their fundamental rights of speech, association and assembly reduced to but mere aspiration. This failure of precision gives far too little notice of proscribed conduct to engaged citizenry and leaves far too much vague, often political, judgement in the hands of a given prosecutor.

### 16-11-220 is Substantially Overbroad

By seeking to enforce 16-11-220 against Ariel Ebaugh, the government is attempting to level the force of the State against words and deeds protected by the First Amendment. Georgia's Domestic Terrorism's terms have sweeping broad application, tying criminal culpability to statements or acts that "intimidate or coerce" private citizens or government actors. The statute's scope is impermissibly ill-defined; the outer limits of its reach impossible to discern.

The United States Supreme Court has many times declared a law such as this unconstitutional on its face under the First Amendment overbreadth doctrine, even

though it may, on occasion, have some legitimate use. *See* e.g., *United States v. Stevens*, 559 U.S. 460, 473 (2010); *Sabri v. United States*, 541 U.S. 600, 609-10 (2004); NAACP *v. Button*, 371 U.S. 415 (1963)(in order to preserve the First Amendment's requisite "breathing space to survive, government may regulate in the area only with narrow specificity").[42]

If, as is commonly accepted, Justice Holmes was correct when he stated in his famous *Gitlow* dissent "every idea is an incitement,"[43] then every attempt to persuade is necessarily coercive. Coercion is a rhetorical device that fits comfortably within the pathos leg of the Aristotelian rhetorical triangle.[44] Pathos, the appeal to emotions of the audience, is sometimes passion, sometimes love, often fear. But, of course, not all appeals to the decision makers discomfort, even fear, can or should be criminalized. As with incitement, there is constitutionally protected coercion and coercion that falls outside the zone of protection.[45] The

---

[42] Georgia's Constitution has been interpreted to provide equally broad protection to expression. *State v. Miller*, 260 Ga. 669 (1990). Communicative conduct may only be limited by the government if the regulation furthers a substantial governmental interest that is unrelated to the suppression of free expression; and where the incidental restriction on First Amendment freedom is no greater than necessary to further the governmental interest. *Id.* As a statute that criminalizes expressive conduct and speech, "a careful examination [of 16-11-220] is critical." *State v. Miller*, 260 Ga. 669, (1990). First, does the statute "reach a substantial amount of constitutionally protected conduct?" *Johnson v. State*, 264 Ga. 590, 593 (1994) (citing *Miller v. State,* 260 Ga. 669, (1990). Stated differently, does the statute "stifle expression or conduct otherwise protected?" *Id*, at 591. If so, is the statute narrowly tailored to protect a vital government interest? *Cunningham v. State*, 260 Ga. 827 (1991).

[43] "Every idea is an incitement. It offers itself for belief, and, if believed, it is acted on unless some other belief outweighs it or some failure of energy stifles the movement at its birth. The only difference between the expression of an opinion and an incitement in the narrower sense is the speaker's enthusiasm for the result. Eloquence may set fire to reason." *Gitlow v. New York*, 268 U.S. 652 at 673 (1925).

[44] Aristotle, *The Rhetoric of Aristotle: A Translation.* Cambridge [Cambridgeshire]: The University Press (1909) (three elements of rhetoric are logos, ethos, and pathos).

[45] The Supreme Court's seminal decision in *Brandenburg v. Ohio* is instructive on this point. In Brandenburg the Court struck down an Ohio statute, stating "the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to

Georgia Domestic Terrorism statute makes no attempt to distinguish between the two and therefore, is substantially overbroad.

Several examples illuminate the folly of seeking to criminalize all coercion whose aim is to alter government policy. When he penned our Declaration of Independence wherein he asserted a person's right to throw off the yoke of an oppressive government through violence, if necessary, was Thomas Jefferson a domestic terrorist? Threatening rebellion is coercive indeed. Or, what of the Salt March and Mahatma Gandhi's famous letter to Lord Viceroy Irwin? Was it not coercive to suggest that if the salt tax were not repealed the march would "shake the foundations of the British Empire"? From Dr. King to Nelson Mandela to Bobby Sands to the unnamed student who stood against Chinese tanks in Tiananmen Square came marches, demonstrations, boycotts and fasts. All were attempts to coerce changes to established law and policy. Are they to be celebrated as courageous forms of protest or are they to be criminalized by an ill-conceived and poorly drawn statute such as OCGA 16-11-220?

Far less dramatic or historically noteworthy, but perhaps just as important, is the speech of ordinary citizens seeking redress from their government. Implicit in every entreaty made to an elected official to alter government policy is the negative threat. The simple petition to a local mayor to fill the potholes in the street carries with it; sometimes directly, sometimes not, the threat that if she does not fill the potholes, she will lose political support or may even face a challenger in the next election. The simple fact is, virtually all elected officials live in fear of being voted out of office and are duly motivated by that fear. That type of coercion is the

---

inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444 at 447 (1969). The First Amendment requires no less of the Georgia Domestic Terrorism law.

lifeblood of political communication between our citizenry and their elected representatives. It cannot be constitutionally proscribed. Yet, other than codifying their pure abstract intentions, the Georgia Legislature did nothing to distinguish constitutionally protected coercion from credible threats of significant, imminent harm. The failure to do so has yielded a statute that is substantially overbroad and infringes on fundamental rights protected by the First Amendment. See, *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)(First Amendment scrutiny *must* be applied to: statutes regulating conduct which has the incidental effect of *burdening* speech; and statutes which, although directed at activities with no *expressive* component, impose a disproportionate burden upon those engaged in *protected* First Amendment activities.")(emphasis in original).[46]

---

[46] *See, also*, *United States v. Robel* 389 U.S. 258, 262, 268 (1967)(Indictment dismissed where the charge "sweeps indiscriminately across all types of association with Communist-action groups, without regard to the quality and degree of membership... [W]hen legitimate legislative concerns are expressed in a statute which imposes a substantial burden on protected First Amendment activities, Congress must achieve its goal by means which have a "less drastic" impact on the continued vitality of First Amendment freedoms.")(internal citations and quotation marks omitted); *Moore v. City of E. Cleveland*, 431 U.S. 494, 499 (1977) ("[W]hen the government intrudes [on a fundamental right], this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation."); *United States v. Grace*, 461 U.S. 171, 177(1983)("the government's ability to permissibly restrict expressive conduct is very limited: the government may enforce reasonable time, place, and manner regulations as long as the restrictions ... are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."); *Boos v. Barry*, 485 U.S. 312, 321 (1988)(holding that content-based speech restrictions must be "necessary to serve a compelling state interest and ... narrowly drawn to achieve that end")(internal citations and quotation marks omitted); *Ward v. Rock Against Racism*, 491 U.S. 781,791(1989)(internal citations and quotations omitted)(consistent with the First Amendment "the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions ... are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."); *June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2179 (2020)(Gorsuch, J., dissenting)("A court must determine whether protected speech is at issue, whether the restriction is content based or content neutral, whether the State's asserted interest is compelling or substantial, and whether the State might rely on less restrictive alternatives to achieve the same goals."); *Bourgeois v. Peters*, 387 F.3d 1303,1322 (11th Cir. 2004)(weighed against First

16-11-220 is Unconstitutionally Vague

In addition to infringing upon recognized First Amendment protections in violation of the overbreadth doctrine, 16-11-220 also violates "a faithful expression of ancient due process" principles, the void-for-vagueness doctrine.[47] *Sessions v. Dimaya*, 138 S. Ct. 1204, 1224 (2018)(Gorsuch, J., concurring).

Although the concepts underlying overbreadth and vagueness are often "logically related," *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983), the void-for- vagueness doctrine entails a separate inquiry deserving of independent judicial attention given the severe uncertainty and the risk of arbitrary enforcement that 16-11- 220 creates. The statute under which Ariel Ebaugh was charged cannot and does not withstand constitutional scrutiny where, in addition to violating the First Amendment, it also offends basic principles of due process guaranteed her by the Fifth Amendment.

Georgia Code 16-11-220 violates the Fifth and Fourteenth Amendment's prohibition of vague criminal laws. "No person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V, XIV. A

---

Amendment freedoms of association, speech, and assembly, magnetometer searches of all participants at a demonstration in the name of public safety deemed  unconstitutional as "magnetometer searches do not seem narrowly tailored at all to the City's professed interest in maintaining safety [and where] there are other ways of ensuring public safety at this event, and the availability of alternatives casts serious doubt on any narrow tailoring analysis.").

[47] In addition to being substantively unconstitutional under the First Amendment of the United States Constitution and Art. I, § I, ¶ V of the Georgia Constitution of 1983, as noted in petitioner's Writ of Habeas Corpus (appended hereto as Exhibit E) 16-11-220 is procedurally unconstitutional under the state constitution as having been passed in violation of the mandate of GA Const. Art III, § 5 ¶ 12. Under this section "[n]o bill or resolution intended to have the effect of law which shall have been rejected by either house shall again be proposed during the same regular or special session under the same or any other title without the consent of two-thirds of the house by which the same was rejected." *Id.* at pp 27-30.  A plain read of the legislative history of 16-11-220 establishes that in passing the Domestic Terrorism statute the Legislature ignored the strict procedural passage rules of Art III, § 5 ¶ 12 of the Georgia Constitution. *Id.*

criminal statute is unconstitutionally vague in violation of due process for either of two reasons: first, if "it fails to give ordinary people fair notice" of what is proscribed; and second, if as here it is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015).[48]

Section 16-11-220's terms violate the fair notice element of the void-for-vagueness doctrine, whose "purpose is to enable the ordinary citizen to conform his or her conduct to the law." *City of Chicago v. Morales*, 527 U.S. 41, 58 (1999); *see also Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939)("No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes."). A criminal law provides inadequate notice where the meaning of its terms depends on "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *United States v. Williams*, 553 U.S. 285, 306 (2008).[49] *See, also United States v. Hansen,* 143 S. Ct. 1932,1935 (2023)("A court will hold a statute facially invalid under the overbreadth doctrine if the law "prohibits a substantial amount of protected speech" relative to its plainly legitimate sweep…  In such a circumstance, society's interest in free expression outweighs its interest in the statute's lawful applications.")(internal citations and quotations omitted.)

Section 16-11-220's expansive terms are undefined; creating ambiguity about what the law intends to criminalize. The statute's expansiveness and imprecision is particularly dangerous and cannot comply with due process.

---

[48] *Johnson v. State*, 264 Ga. 590, 591 (1994).

[49] The Georgia Constitution is no less exacting. *See, Slakman v. Continental Cas. Co.*, 277 Ga. 189, 191 (2003)(in order to determine whether a statute is unconstitutionally vague, "we apply the fundamental rules of statutory construction that require us to construe [the] statute according to its terms, to give words their plain and ordinary meaning, and to avoid a construction that makes some language mere surplusage.").

Taking the statutory terms at face value, it is unclear where the Georgia Legislature has drawn the line between confrontational speech protected by the First Amendment and criminal coercion. The United States Supreme Court instructs, difficulty in "determin[ing] whether the incriminating fact . . . has been proved" is not what renders a statute vague. Instead, vagueness results when it is impossible to determine "precisely what that [incriminating] fact is." *Williams*, 553 U.S. at 306. The endless array of prosecutable cases illustrates its expanse and ambiguity about what conduct is covered and what is not. The fatal flaw in 16-11-220 is that the line between persuasion protected by the First Amendment and a prosecutable felony depends not on the objective intent of the speaker, but the subjective reaction of the audience. Whether one criminally intends to intimidate or coerce is incapable of objective meaning: what coerces one person may have no effect on, or may even discourage, another. *Coates v. Cincinnati*, 402 U.S. 611,614 (finding unconstitutionally vague an ordinance criminalizing conduct "annoying to persons passing by" because "[c]onduct that annoys some people does not annoy others"); *Baggett v. Bullitt*, 377 U.S. 360, 368 (1964)(invalidating on vagueness and overbreadth grounds an oath requiring teachers to forswear an "undefined variety" of behavior considered "subversive" to the government). Liability under 16-11-220 hinges on the subjective reactions of others and therefore fails to give the ordinary person notice of what the state permits and what it forbids.

The constitutional concern caused by the statute's rank subjectivity is compounded by the risk that charging decisions will be based on the political needs of elected officials and the whims of law enforcement. Section 16-11-220's imprecision in defining the explicit *mens rea* standard for "intimidation or coercion" highlights the lack of notice and risks extending criminal liability to

speech protected by the First Amendment. *United States v. Ragen*, 314 U.S. 513, 524 (1942) ("Because of the absence of a scienter requirement in the provision . . . the statute is little more than a trap for those who act in good faith."). Unlike other criminal statutes that the Supreme Court has upheld against vagueness challenges, 16-11-220 contains no "narrowing definitions" for the operative words "intimidation and coercion". *Compare*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20−21 (2010) (noting that "Congress also took care to add narrowing definitions to the material-support statute over time [which]increased the clarity of the statute's terms"). On their face, "intimidation' and "coercion" are broad and ambiguous terms so we must look to the rest of the statute for context and meaning. Applying the familiar canon of statutory construction, *noscitur a sociis*, we search for words to limit the imprecision and expanse. Alas, here our search is in vain, for there are no definitions or qualifiers to be found.

"Vague laws invite arbitrary power." *Dimaya*, 138 S. Ct. at 1223 (Gorsuch, J., concurring). By predicating liability on such imprecise terms, section 16-11-220 authorizes arbitrary and discriminatory enforcement. Criminal laws must "establish minimal guidelines to govern law enforcement." *Kolender v. Lawson*, 461 U.S. 352,358 (1983). The indeterminate nature of what behavior might rise to the level of "intimidation or coercion" grants prosecutors unrestrained discretion, creating risk of unguided enforcement under the statute. There lies the denial of due process. *See Grayned v. City of Rockford*, 408 U.S. 104,108 (1972) ("a vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis").

The so-called savings clause of Section 16-11-224 with its last minute effort to sway fence-sitting Representatives by incantation alone that "This article

shall not be construed to infringe upon constitutionally protected speech or assembly[50] with assurances by the government of fair enforcement of 16-11-220, even if "well-intentioned" simply "d[id] not neutralize the vice of a vague law." *Baggett,* 377 U.S. at 373. "It is the statute, not the accusation under it, that prescribes the rule to govern conduct and warns against transgression." *Lanzetta,* 306 U.S. at 453. Allowing prosecutors to "shap[e] a vague statute's contours through their enforcement decisions" would transfer to them a job that belongs to Congress. *Dimaya,* 138 S. Ct. at 1228 (Gorsuch, J., concurring). "[T]he [vagueness] doctrine is a corollary of the separation of powers—requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not … It is for the people, through their elected representatives, to choose the rules that will govern their future conduct." *Dimaya,* 138 S. Ct. at 1212, 1227 (Gorsuch, J., concurring).

Indeed, Section 16-11-224 is probably the most damning evidence that the Domestic Terrorism Law is overbroad and vague enough to be sensibly interpreted to infringe on constitutionally protected speech and assembly. Why else would the Legislature have added such an absurdly redundant provision? Of course, the Legislature did not intend for the Domestic Terrorism Statute to be applied in an unconstitutional manner, that goes without saying and usually does. But here, rather than pass a narrow, precise law to achieve its ends, the Georgia Legislature punted. It passed an ill-defined, expansive law which left it entirely to others to make the critical constitutional judgment calls. This is precisely the impermissible delegation of authority and responsibility Justice Gorsuch wrote of in *Dimaya*.

---

[50] *See* § 16-11-224 "Construction; Constitutional Protections" (2022).

Section 16-11-220's vagueness chills protected speech in violation of the First Amendment, compounding the statute's constitutional infirmities. A statute deserves even more exacting scrutiny when it interferes with First Amendment freedoms. While the vagueness doctrine is "an outgrowth not of the First Amendment, but of the Due Process Clause," *Williams*, 553 U.S. at 304, the Supreme Court applies "a more stringent vagueness test," requiring greater statutory precision, where "the law interferes with the right of free speech or of association." *Hoffman Estates v. Flipside*, 455 U.S. 489, 499(1982). The reason why the test is stricter in the First Amendment context is "to ensure that ambiguity does not chill protected speech." *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2309−10 (2012); *Hoffman Estates* 455 U.S. at 499 ("[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights."). 16-11-220 (4)—by its plain terms and scope—criminalizes protected speech. The very threat of prosecution under the Domestic Terrorism law deters people from exercising their free speech rights. Due to its ambiguity, the surest way to avoid prosecution under the statute is self-censorship. Those citizens who might otherwise seek to persuade the government to alter a policy will "'steer far wide of the unlawful zone." As a result, "the free dissemination of ideas may be the loser." *Baggett*, 377 U.S. at 372,379.

This country was born of disagreement – vociferous, boisterous, and often violent disagreement with government policy. It is in our national DNA. Our founders, particularly James Madison, understood that America is not a debating society, it is a street fight; and they made ample room in the First Amendment for loud, contentious confrontation between the citizenry and their government. In

1789, it was a bodacious experiment; but more than anything else, it is what sets us apart from the rest of the world. Even a cursory review of our history shows that every major policy advancement came not from polite conversation but from years, sometimes decades, of citizens coercing their government to change course. Civil rights, women's rights, labor rights were not achieved in the salons of polite society; they were achieved through citizens confronting government policy and forcing change. Power does not yield by mere debate. Madison understood this and so does our Constitution.

Perhaps sadly ironic, the man who for decades represented the land where Cop City is to be built and the people who will be dispossessed because of that construction; the conscience of the Congress, John Lewis, knew a little something about confronting unjust government policies. He called it 'good trouble', 'necessary trouble' and he encouraged people, especially young people like Ariel Ebaugh, to stand up and fight for what they believed. At the very worst, Ariel Ebaugh has found herself some 'necessary trouble'. That does not make her a terrorist; it makes her a citizen.

### As Applied to Ariel Ebaugh, 16-11-220 Cannot Withstand Constitutional Scrutiny

The linguistic contortions to which the police and prosecutor have resorted to jam Ariel Ebaugh's conduct in DeKalb County into the terms of the still pending Domestic Terrorism law only highlight the statute's overbreadth and vagueness. This is no mere academic exercise or speculative theoretical attack. As applied to Ebaugh has been charged with one count of Domestic Terrorism, a felony carrying a prison sentence of no less than five years and up to 35 years, as defined in Ga. Code §16-11-220.  She is also charged with two counts of Possession of a Firearm or Knife during the  Commission of the felony offense of Domestic Terrorism, a

violation of Ga. Code §16-11-106.

As best as can be determined from the sparse affidavits filed in support of Ms. Ebaugh's arrest warrant, she is being charged with domestic terrorism not based on any individualized act or intent but because she "affirmed their cooperation with Defend the Atlanta Forest (DTAF) by presenting herself onto the private property armed with a rifle dressed in the common attire of camouflage." Stated plainly, without any charge of a specific intent or action on her part, the defendant was charged based on exercising her right to freely associate, her freedom to dress as she chose, and her right to possess and carry a firearm as protected by the 2nd Amendment and the Georgia Constitution.

Even cursory review of the statute shows that Ms. Ebaugh's charged conduct and speech did not violate Georgia's Domestic Terrorism law. At a minimum, Section 16-4-110 requires the following: 1) a felony violation or attempt to commit a felony violation of the laws of Georgia; 2) intent to disable or destroy publicly or privately owned facilities deemed 'critical infrastructure' resulting in major economic loss; and 3) intent to alter, change, or coerce the policies of the government by intimidation or coercion.

By showing up at an undeveloped construction site Ariel Ebaugh did not "intend to disable or destroy" critical infrastructure or a state or government facility, thereby causing "major economic loss". It stretches the words in the statute to absurdity to argue that a person can disable or destroy something that does not exist. Yet, that is exactly what the government is alleging in the charging documents. The Legislature could have explicitly included construction sites in the "critical infrastructure" definition; many other states have done so. (*See*, generally relevant statutes of Arkansas, Kentucky, Louisiana, Mississippi, Missouri,

Montana, North Dakota, Tennessee, and Texas). It chose not to, and it is not for the prosecutor to expand what the Legislature has enacted. Moreover, even if the so-called Cop City facility did exist, it would not meet the "critical infrastructure" definition because it is not a "energy, fuel, water, agriculture, health care, finance, or communication facility providing or distributing services for the benefit of the public". Again, had the Legislature intended to include a public safety training facility in the definition, it would have done so.

An unbuilt Cop City is not a "State or government facility"; it is an idea, an aspiration. An unbuilt Cop City is not a "permanent or temporary facility or conveyance that is used or occupied by representatives of this state or any of its political subdivisions, by the legislature, by the judiciary, or by officials or employees of this state or any of its political subdivisions." Cop City may become a state facility if it is ever built and used for its intended purpose; but until built, it is not a facility of any sort, permanent or temporary.

Furthermore, what major economic loss has the government alleged? Had the Legislature intended to cover every broken window or slashed tire, it would have done so. Instead, the Legislature focused on economic disruption. Delaying the construction of Cop City may be disruptive to some people, but it will not cause major economic loss as required by the statute.

It is clear that a person cannot violate 16-11-220 without first committing or attempting to commit a felony as defined by Georgia law. It is equally clear that no underlying felony has or could be identified here. The plain text of the Georgia Domestic Terrorism law requires the commission of or attempt to commit a triggering felony. There is no other meaning to be ascribed to the opening lines of the statute: "Domestic terrorism means any felony violation of or attempt to

commit a felony violation of the laws of this state ..." Ga. Code §16-11-220 (2). If the words in the statute are not plain enough, its legislative history confirms that a triggering felony is necessary. The original Senate bill was specifically amended in the House to add the triggering felony requirement. *See* Crowley & Posada, at p. 22.

Prosecutors know how a triggering felony statute works. In charging Ariel Ebaugh with the Possession counts, another triggering felony statute, the underlying felony is clearly stated in the charging documents. Either the Dekalb County District Attorney does not believe the Domestic Terrorism law requires a triggering felony, an error of law fatal to the charge; or her office seeks to use the felonies of others as the predicate for Ms. Ebaugh's charges, an equally fatal mistake. There is no felony underlying the domestic terrorism charge and that charge must therefore fall. Without the underlying felony of domestic terrorism, the firearm possession charges must also fall.

The charging documents describe alleged felonious acts and intent claimed by DTAF. Although far from certain, perhaps those felonies committed by others and not even alleged to have been committed by the defendant are the undergirding of Ebaugh's charges. If so, these charges are a house of cards ready to tumble down in the first stiff constitutional wind. If the sins of DTAF are to be visited on the defendant let the government say so plainly so that they can be examined in the light of Ariel Ebaugh's "freedom to engage in association of beliefs and ideas" protected by the First Amendment. *NAACP v. ex rel. Patterson*, 357 U.S. 449, 460 (1958).[51]

---

[51] It is well established that "the act of associating with compatriots in crime is not a protected associational right. *Rodriguez v. State*, 284 Ga. 803, at 810, 671 S.E.2d 497 (2009) (*citing Helton v. State*, 624 N.E.2d 499 (Ind. Ct. App. 1993). However, "to support a conviction,

Likewise, the DeKalb County charging documents attempt to use constitutionally protected conduct and expression as evidence of criminal intent. Like everyone else, Ebaugh is entitled, within the bounds of "public health and decency", to wear what they choose, yet their choice of camouflage is cited as evidence of their terrorist intent. More importantly, the state is constitutionally prohibited from interfering with the defendant's right to keep and bear arms, yet the DeKalb charging documents ascribe criminal intent to her possession of firearms. Georgia law has long protected the right to keep and bear arms. In 2022, the Georgia Legislature codified that protection in a comprehensive "permitless carry" statute that repealed longstanding license application requirements. Ga. Code §§ 16-11-125.1;15-11- 138. Under the new law, Georgia now generally permits any "lawful weapons carrier" to carry handguns openly or concealed in most public spaces without any background check or permit required. It is thus perfectly legal-though some may find it intimidating-to attend a protest armed. The state's attempt to criminalize Ariel Ebaugh's exercise of her constitutional right to carry cannot stand.

As applied to the conduct charged to Ariel Ebaugh in the affidavit supporting her arrest, the following questions remain unanswered: 1) what felony or attempted felony is she alleged to have committed?; 2) what critical infrastructure or government facility did Ariel Ebaugh intend to damage or destroy?; 3) what major economic damage is she alleged to have caused; and 4) how did Ariel Ebaugh

---

the accused must be shown to have conducted or participated in criminal … activity through the commission of an actual criminal act. Mere association is insufficient." *Id.* (*citing State v. Walker*, 506 N.W.2d 444 (Iowa) (1993). In rejecting a constitutional challenge to the Georgia Street Gang Terrorism and Prevention Act, O.C.G.A. § 16-15-1 et seq., the Georgia high court ruled that the statute "comports with . . . due-process requirements . . . because it punishes conduct, not association. It does not unconstitutionally criminalize membership in an organization because the statute does not impermissibly establish guilt by association alone".

engage in intimidation or coercion to alter a government policy?

Although freedom of speech and expression is not absolute under Georgia State law, like the strict scrutiny standard required under federal law, legislation that seeks to limit any restriction of its reach and echo, "may be established only if it is prescribed by a clear and comprehensive, narrowly tailored law and the benefit protected by the restriction exceeds the damage caused by the restriction."[52]

One must ask how 'clear' and 'narrowly tailored' the Georgia Domestic Terrorism law is when the two prosecutors charged with enforcing the law cannot agree on its application to the facts of the Cop City protests. DeKalb County District Attorney Sherry Boston has withdrawn from the prosecution of the Cop City protesters stating publicly that she and the Attorney General could not agree on "who should be charged and what they should be charged with." If two highly respected career prosecutors, among the highest law enforcement officials in all of Georgia responsible for interpreting this law cannot agree on such a fundamental point, how are average citizens supposed to know what the law proscribes?

Conclusion

> "The constitution is either a superior, paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and, like other acts, is alterable when the legislature shall please to alter it. If the former part of the alternative be true, then a legislative act contrary to the constitution is not law: if the latter part be true, then written constitutions are absurd attempts, on the part of the people, to limit a power in its own nature illimitable …

---

[52] *Id.* Chapter II Article 8 (1) - Grounds for restriction of the freedom of speech and expression.

If then the courts are to regard the constitution, and the constitution is superior to any ordinary act of the legislature; the constitution, and not such ordinary act, must govern the case to which they both apply…

So, if a law be in opposition to the constitution; if both the law and the constitution apply to a particular case, so that the court must either decide that case conformably to the law, disregarding the constitution; or conformably to the constitution, disregarding the law; the court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty."[53]

More than 200 years ago in *Marbury v. Madison*, 5 US 137,177-178 (1803) the Supreme Court of the United States penned these prophetic words as the very linchpin of our national aspiration yet to come. And while *Younger* and its judicial progeny have at times narrowed the stretch of *Marbury*'s reach, the passage of time has never weakened its constitutional imperative nor denied generations of Americans the safeguard of its lesson.

Indeed, while the Supreme Court has recognized that states "have important interests in administering certain aspects of their judicial systems,"[54] it has cautioned that where, as here, state judicial systems have refused to entertain or ignored litigation with regard to constitutional claims, federal courts must not turn a blind eye to local indifference. *See*, *Sprint Communs., Inc. v. Jacobs*, 571 U.S. 69 (2013)("The pendency of an action in a state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction.")(internal citations and quotations omitted). *See*, *also*, *Tokyo Gwinnett, LLC v. Gwinnett Cty.*, 940 F.3d 1254, 1267(11th Cir. 2019)("But the Supreme Court and this Court have

---

[53] Although an original example of where and when a Writ of Mandamus did not lie … the facts of *Marbury* bear no relevance to the controversy at bar. To the contrary, here, its age-old teach speaks with loud, intended application.

[54] *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 12-13 (1987).

recognized that Our Federalism does not mean blind deference to States Rights, but instead a system in which there is sensitivity to the legitimate interests of both State and National Governments."[55]); *Pettway v. Marshall*, 2022 U.S. App. LEXIS 29612(11th Cir. 2022)(Holding inasmuch as the state court proceedings did not provide an "adequate forum" to pursue petitioner's constitutional claims, *Younger* was not satisfied thus requiring a federal court to "undertake its virtually unflagging obligation to exercise its jurisdiction.").[56]

In the matter at hand, it is evident that the claims of Ariel Ebaugh raise fundamental concerns about the constitutionality of the state statute under which she is being prosecuted and which has imposed and continues to impose upon her conditions of release which impermissibly constrain her speech, association and assembly. It is no less obvious that the state court process has turned a blind eye and deaf ear to her legitimate claims with Georgia passing her valid challenges from court to court, judge to judge these past several months, each unwilling or unable to fulfill a judicial duty to entertain timely constitutional claims of an aggrieved Georgia state citizen. No less true stands the patent indifference by state

---

[55] "[W]e must be mindful that abstention from the exercise of federal jurisdiction is the exception, not the rule… In fact, federal courts have a virtually unflagging obligation to exercise their jurisdiction except in those extraordinary circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest." *Id.* at 1266-67. (internal citations and quotations omitted).

[56] *Cf. White v. Cox*, 2021 U.S. App. LEXIS 35107(11th Cir. 2021)(holding *Younger* abstention doctrine applied as petitioner failed to show that the state court proceeding does not provide an adequate remedy for his federal claim); *Morancy v. Salomon*, 2023 U.S. Dist. LEXIS 108121(M.D. Fla. 2023)("The allegations in the Complaint demonstrate Plaintiff is being given the opportunity to raise his claims in state court, as do the state court documents themselves"); *Johnson v. Miami-Dade Cnty. Sheriff*, 2022 U.S. Dist. LEXIS 195151(S.D. Fla 2022)("The Court must assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary. . . The allegations in the Complaint do not overcome the presumption, and [petitioner] has not otherwise demonstrated that the state remedies are not adequate")(internal citation and quotation omitted);

court prosecutors and county attorneys who have either ignored in whole the constitutional claims of Ariel Ebaugh, or delivered little more than perfunctory answers that reduce core constitutional concerns to evasive moot court glib.

Because Ariel Ebaugh has met her preliminary jurisdictional burden of establishing that the statute under which she stands charged is "flagrantly and patently" unconstitutional under the First Amendment, and inasmuch as Ms. Ebaugh has been denied any and all relief under Georgia state law and since she has suffered and continues to suffer irreparable injury by virtue of this invalid prosecution, and palpable state court indifference, this Court must intervene. To do otherwise would be to rework the *Younger* doctrine from an exception that recognizes and balances legitimate state interests to an absolute rule of "blind deference" to the whim and will of Federalism in all matters at all times. The First Amendment demands more.

Respectfully submitted
on September 25th, 2023

/s/Stanley L. Cohen
Stanley L. Cohen, Esq.
N.Y. Bar No. 1941202
Co-counsel for Ms. Ariel Ebaugh
*pro hac vice* sought once filing accepted
Stanleycohenlaw@gmail.com


/s/Jason B. Sheffield
Jason B. Sheffield, Esq.
Co-counsel for Ms. Ariel Ebaugh
Georgia Bar No. 639719
404-296-5300
jasonsheffieldattorney@gmail.com

PETERS, RUBIN, SHEFFIELD &
HODGES, P.A.
2786 N. Decatur Rd., Suite 245
Decatur, GA 30033
404-296-5300
jasonsheffieldattorney@gmail.com

/s/Sarina Larson
3L, MC Law, Class of 2024
Intern to Stanley Cohen

# EXHIBIT

# A


EXHIBIT
A

# INDICTMENT

*GC*

Fulton County Superior Court
**FILED** ET
Date: 8/29/2023
Che Alexander, Clerk of Court

**Clerk No.** *23SC189192*

## FULTON COUNTY SUPERIOR COURT

### JULY 2023 TERM

### STATE OF GEORGIA

### v.

Beamon, Jack Morgan

Biederman, Max Jacob

Bilodeau, Timothy E.

Bogush, Emma Katherine

Carlisle, Andrew

Carroll, Francis M.

Chaoui, Amin Jalal

Courtemanche, Brooke Elaine

Dorsey, Colin Patrick

DuPuis, Julia Caroline

Ebaugh, Ariel Caitlin

Ellis, Lillian Pearl

Feola, Madeleine

Ferguson, Ivan James

Flagg, Phillip Allen

Gates, Maggie June

1

Geier, Nadja

Grim, Priscilla Christine

Gupta, Sonali

Harper, Luke Edward

Hertel, Serena Abby

Hoitt-Lange, Marianna Elizabeth

Jurgens, Thomas Webb

Kass, Hannah Margaret

Kautz, Marlon Scott

King, Ayla Elegia

Kloth, Katie Marie

Kodat, Madeleine Gunther

Larmey, Zoe C.

Lee, Ana Gypsy

LeNy, Dimitri Roger

Liberto, Spencer Bernard

Luini, Mattia

Macar, Matthew Ernest

MacLean, Adele Garrett

Marsicano, James Lee

Martin, Grace Taylor

Meissner, Kayley Cheryl

Murphy, Emily

Murphy, Timothy A.R.

Norman, Tyler John

Novak, Leif Kingfisher Nicholas

Nottingham, Ehret William

Olson, Nicholas Dean

Papali, Alexis Achilles

Parsons, Geoffrey

Patterson, Savannah D.

Pipes, Kamryn Durel

Puertas, Victor Enrique

Reynolds, Christopher

Robert-Paul, Fredrique

Robinson, Arieon T.

Shen, Teresa Yue

Skapyak, Abigail Elizabeth

Tennenbaum, Caroline Hart

Tilbury, Geneva Rose

Vassail, Abeeku Osei

Voiselle, Leonard Zen AKA Leonardo Zen

Ward, Samuel Clemens

Warren, William Budden

Wasalewski, Sarah

---

Filed in office:

_____, Grand Jury Bailiff

Date: _August 29_____ 20_23_

_____Clerk, S. C.

_True_ BILL

3

_____ Foreman

_____
**CHRISTOPHER M. CARR, Attorney General**

| | | |
|---|---|---|
| The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty. | The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty. | The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty. |
| _____ Defendant | _____ Defendant | _____ Defendant |
| _____ Attorney for Defendant | _____ Attorney for Defendant | _____ Attorney for Defendant |
| _____ Prosecutor | _____ Prosecutor | _____ Prosecutor |
| This____ day of_____,_____ | This____ day of_____,_____ | This____ day of_____,_____ |

4

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

_____

Defendant

_____

Attorney for Defendant

_____

Prosecutor

This____day of_____,_____

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

_____

Defendant

_____

Attorney for Defendant

_____

Prosecutor

This____day of_____,_____


The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

_____

Defendant

_____

Attorney for Defendant

_____

Prosecutor

This____day of_____,_____

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

_____

Defendant

_____

Attorney for Defendant

_____

Prosecutor

This____day of_____,_____


The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

_____

Defendant

_____

Attorney for Defendant

_____

Prosecutor

This____day of_____,_____

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

_____

Defendant

_____

Attorney for Defendant

_____

Prosecutor

This____day of_____,_____

5

| | | |
|---|---|---|
| The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty. | The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty. | The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty. |

_____
Defendant

_____
Attorney for Defendant

_____
Prosecutor

This\_\_\_\_day of_____,\_\_\_\_\_

_____
Defendant

_____
Attorney for Defendant

_____
Prosecutor

This\_\_\_\_day of_____,\_\_\_\_\_

_____
Defendant

_____
Attorney for Defendant

_____
Prosecutor

This\_\_\_\_day of_____,\_\_\_\_\_

The Defendant waives copy of
indictment, list of witnesses,
formal arraignment and pleads
_____ Guilty.

The Defendant waives copy of
indictment, list of witnesses,
formal arraignment and pleads
_____ Guilty.

The Defendant waives copy of
indictment, list of witnesses,
formal arraignment and pleads
_____ Guilty.

_____
Defendant

_____
Defendant

_____
Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Prosecutor

_____
Prosecutor

_____
Prosecutor

This____day of_____,_____

This____day of_____._____

This____day of_____._____

7

The Defendant waives copy of
indictment, list of witnesses,
formal arraignment and pleads
_____ Guilty.

The Defendant waives copy of
indictment, list of witnesses,
formal arraignment and pleads
_____ Guilty.

The Defendant waives copy of
indictment, list of witnesses,
formal arraignment and pleads
_____ Guilty.

_____
Defendant

_____
Defendant

_____
Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Prosecutor

_____
Prosecutor

_____
Prosecutor

This____ day of_____,_____

This____ day of_____,_____

This____ day of_____,_____

The Defendant waives copy of
indictment, list of witnesses,
formal arraignment and pleads
_____ Guilty.

The Defendant waives copy of
indictment, list of witnesses,
formal arraignment and pleads
_____ Guilty.

The Defendant waives copy of
indictment, list of witnesses,
formal arraignment and pleads
_____ Guilty.

_____
Defendant

_____
Defendant

_____
Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Prosecutor

_____
Prosecutor

_____
Prosecutor

This____ day of_____,_____

This____ day of_____,_____

This____ day of_____,_____

8

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

_____
Defendant

_____
Defendant

_____
Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Prosecutor

_____
Prosecutor

_____
Prosecutor

This____day of_____,_____

This____day of_____,_____

This____day of_____,_____

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

_____
Defendant

_____
Defendant

_____
Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Prosecutor

_____
Prosecutor

_____
Prosecutor

This____day of_____,_____

This____day of_____,_____

This____day of_____,_____

9

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

_____
Defendant

_____
Defendant

_____
Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Prosecutor

_____
Prosecutor

_____
Prosecutor

This____day of_____,_____

This____day of_____,_____

This____day of_____,_____

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

_____
Defendant

_____
Defendant

_____
Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Prosecutor

_____
Prosecutor

_____
Prosecutor

This____day of_____,_____

This____day of_____,_____

This____day of_____,_____

10

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

_____
Defendant

_____
Defendant

_____
Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Prosecutor

_____
Prosecutor

_____
Prosecutor

This____ day of _____,_____

This____ day of _____,_____

This____ day of _____,_____

11

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

_____
Defendant

_____
Defendant

_____
Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Prosecutor

_____
Prosecutor

_____
Prosecutor

This____day of_____,_____

This____day of_____._____

This____day of_____._____

12

The Defendant waives copy of
indictment, list of witnesses,
formal arraignment and pleads
_____ Guilty.

The Defendant waives copy of
indictment, list of witnesses,
formal arraignment and pleads
_____ Guilty.

The Defendant waives copy of
indictment, list of witnesses,
formal arraignment and pleads
_____ Guilty.

_____
Defendant

_____
Defendant

_____
Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Prosecutor

_____
Prosecutor

_____
Prosecutor

This____day of_____,_____

This____day of_____,_____

This____day of_____,_____

13

The Defendant waives copy of
indictment, list of witnesses,
formal arraignment and pleads
_____ Guilty.

The Defendant waives copy of
indictment, list of witnesses,
formal arraignment and pleads
_____ Guilty.

The Defendant waives copy of
indictment, list of witnesses,
formal arraignment and pleads
_____ Guilty.

_____
Defendant

_____
Defendant

_____
Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Prosecutor

_____
Prosecutor

_____
Prosecutor

This____day of_____,_____

This____day of_____,_____

This____day of_____,_____

14

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

_____

Defendant

_____

Defendant

_____

Defendant

_____

Attorney for Defendant

_____

Attorney for Defendant

_____

Attorney for Defendant

_____

Prosecutor

_____

Prosecutor

_____

Prosecutor

This____day of_____,_____

This____day of_____,_____

This____day of_____,_____

15

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

_____
Defendant

_____
Defendant

_____
Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Prosecutor

_____
Prosecutor

_____
Prosecutor

This____ day of_____,____

This____ day of_____,____

This____ day of_____,____

16

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

_____

Defendant

_____

Defendant

_____

Defendant

_____

Attorney for Defendant

_____

Attorney for Defendant

_____

Attorney for Defendant

_____

Prosecutor

_____

Prosecutor

_____

Prosecutor

This____ day of_____,_____

This____ day of_____,_____

This____ day of_____,_____

17

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

_____
Defendant

_____
Defendant

_____
Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Prosecutor

_____
Prosecutor

_____
Prosecutor

This____day of_____,_____

This____day of_____,_____

This____day of_____,_____

18

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

_____
Defendant

_____
Defendant

_____
Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Prosecutor

_____
Prosecutor

_____
Prosecutor

This____day of_____,_____

This____day of_____,_____

This____day of_____,_____

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

_____
Defendant

_____
Defendant

_____
Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Prosecutor

_____
Prosecutor

_____
Prosecutor

This____ day of_____, _____

This____day of_____,_____

This____day of_____,_____

20

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

The Defendant waives copy of indictment, list of witnesses, formal arraignment and pleads _____ Guilty.

_____
Defendant

_____
Defendant

_____
Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Attorney for Defendant

_____
Prosecutor

_____
Prosecutor

_____
Prosecutor

This____ day of_____,_____

This____day of_____,_____

This____ day of_____,_____

## COUNT 1 - RACKETEERING

The Grand Jurors aforesaid, in the name and behalf of the citizens of Georgia, charge and accuse
**JACK MORGAN BEAMON, MAX JACOB BIEDERMAN, TIMOTHY E. BILODEAU, EMMA KATHERINE BOGUSH, ANDREW CARLISLE, FRANCIS M. CARROLL, AMIN JALAL CHAOUI, BROOKE ELAINE COURTEMANCHE A.K.A. BROOKE ELAINE COURTEMANCHE, COLIN PATRICK DORSEY, JULIA CAROLINE DUPUIS, ARIEL CAITLIN EBAUGH, LILLIAN PEARL ELLIS, MADELEINE FEOLA, IVAN JAMES FERGUSON, PHILLIP ALLEN FLAGG, MAGGIE JUNE GATES, NADJA GEIER, PRISCILLA CHRISTINE GRIM, SONALI GUPTA, LUKE EDWARD HARPER, SERENA ABBY HERTEL, MARIANNA ELIZABETH HOITT-LANGE, THOMAS WEBB JURGENS, HANNAH MARGARET KASS, MARLON SCOTT KAUTZ, AYLA ELEGIA KING, KATIE MARIE KLOTH, MADELEINE GUNTHER KODAT, ZOE C. LARMEY, ANA GYPSY LEE, DIMITRI ROGER LENY, SPENCER BERNARD LIBERTO, MATTIA LUINI, MATTHEW ERNEST MACAR, ADELE GARRETT MACLEAN, JAMES LEE MARSICANO, GRACE TAYLOR MARTIN, KAYLEY CHERYL MEISSNER, EMILY MURPHY, TIMOTHY A.R. MURPHY, TYLER JOHN NORMAN, EHRET WILLIAM NOTTINGHAM, LEIF KINGFISHER NICHOLAS NOVAK, NICHOLAS DEAN OLSON, ALEXIS ACHILLES PAPALI, GEOFFREY PARSONS, SAVANNAH D. PATTERSON, KAMRYN DUREL PIPES, VICTOR ENRIQUE PUERTAS, CHRISTOPHER REYNOLDS, FREDRIQUE ROBERT-PAUL, ARIEON T. ROBINSON, TERESA YUE SHEN, ABAGAIL ELIZABETH SKAPYAK, CAROLINE HART TENNENBAUM, GENEVA ROSE TILBURY, ABEEKU OSEI VASSAIL, LEONARD ZEN VOISELLE AKA LEONARDO ZEN VOISELLE, SAMUEL CLEMENS WARD, WILLIAM BUDDEN WARREN, AND SARAH**

23

**WASALEWSKI** (hereafter referred to collectively as **"THE ACCUSED" in Count 1**), with the offense of **VIOLATION OF THE GEORGIA RACKETEEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, O.C.G.A. § 16-14-4(c),** for the said accused, individually and as persons concerned in the commission of a crime, and together with unindicted co-conspirators, in the State of Georgia and the County of Fulton, on or between May 25, 2020 and August 25, 2023, while associated with an enterprise, did unlawfully conspire and endeavor to conduct and participate in, directly and indirectly, such enterprise through a pattern of racketeering activity in violation of **O.C.G.A. § 16-14-4(b)** as more particularly described below and incorporated by reference as if fully set forth herein; contrary to the laws of the State of Georgia, the good order, peace, and dignity thereof;

<u>PART I</u>

**THE ENTERPRISE**

### a.  Introduction

The purpose of Defend the Atlanta Forest is to occupy of parts or all of 381 forested acres in DeKalb County, Georgia that is owned by Atlanta Police Foundation and leased by the City of Atlanta for the purpose of preventing the construction of the Atlanta Public Safety Training Center. Each individual charged in this indictment knowing joined the conspiracy in an attempt to prevent the training center from being built. That conspiracy contained a common purpose to commit two or more acts of racketeering activity in Fulton County, Georgia, elsewhere in the State of Georgia, and in other states.

### b. Defend the Atlanta Forest

Defend the Atlanta Forest is a self-identified coalition and enterprise of militant anarchists, eco-activists, and community organizers. Based in Atlanta, this anarchist, anti-police, and environmental activism organization coordinates, advertises, and conducts "direct action" designed to prevent the construction of the Atlanta Police Public Safety Training Center and Shadowbox Studios (previously known as Blackhall Studios) and promote anarchist ideas. This self-proclaimed "direct action" has included vandalizing of private property, arson, destruction of government property, attacks on utility workers, attacks on law enforcement, attacks on private citizens, and gun violence. The purpose of these actions is to prevent the construction of the Atlanta Police Public Safety Training Center and a movie studio, all while promoting virulent anarchist ideals.

### c. Anarchy Background of Defend the Atlanta Forest

Anarchy is a philosophy that is opposed to forms of authority or hierarchy. Beginnings of anarchist ideals date back centuries, though usage of the term "anarchy" did not exist until the 1800s. Over time, various philosophical forms of anarchy have emerged. Numerous anarchist philosophies exist, though anarchists are not required to subscribe to one particular belief of anarchy. Rather, the notion of anarchy, being grounded in an anti-authority mindset, primarily targets government because it views government as unnecessarily oppressive. Instead of relying on a modicum of government structure, anarchy relies on human association instead of government to fulfill all human needs. Some of the major ideas that anarchists promote include collectivism, mutualism/mutual aid, and social solidarity, and these same ideas are frequently seen in the Defend the Atlanta Forest movement.

Collectivism is the idea that individual needs are subordinate to the good of the whole society. That is, decisions are made based upon what is best for the group and not necessarily what is best for individuals. In embracing collectivism, individuals are expected to sacrifice personal income, personal liberty, or personal property if it benefits society as a whole. The decision of whether an individual should sacrifice their own individual needs is not made by the individual. Rather, in a true collectivist society, the society as a whole decides whether the individual must forfeit their own needs or property if it is deemed to benefit the society. Nevertheless, in an ideal collectivist society, individuals already make the decision to donate to the collective without prompting from others.

Mutual Aid is a term popularized by anarchists to describe individuals who exchange goods and services to assist other individuals in society without government intervention. Closely related to collectivism, mutual aid is not a new term, nor is it limited to anarchy. However, the major factor in anarchist mutual aid is the absence of government and the absence of hierarchy. Indeed, an anarchist belief relies on the notion that once government is abolished, individuals will rely on mutual aid to exist. In doing so, anarchists believe that individuals will work together and voluntarily contribute their own resources to insure that each individual has its own needs met.

Social solidarity is another term that is embraced by anarchists that is tied closely to mutual aid and collectivism. Social solidarity is the idea that individuals can live together without government and can provide for each other. The notion of social solidarity relies heavily on the idea of human altruism; that is, individuals will voluntarily offer goods, services, and resources without anything compelling it. Anarchists often shorten the term "social solidarity" simply into the term "solidarity," and it is frequently woven into the speeches, statements, and

writings of anarchists. In addition to the term "solidarity," and other anarchist terms, anarchists often weave the term "mutual aid" and "collective" into their jargon and writings.

Violence is part of the anarchism in some anarchist beliefs. Viewing their own violent acts as political violence, violent anarchists attempt to frame the government as violent oppressionists, thereby justifying the anarchists' own violence. Indeed, the belief is that the government is engaging in a form of violence by denying individuals basic needs through capitalism, government action, and law enforcement by police. Anarchists often point to law enforcement as one of the chief violent actors, and they accuse the government of using law enforcement to oppress societal change, and they view the structure of government as inherently oppressive and violent. As a result, violent anarchists often engage in violent activity towards law enforcement, and it is justified because of the anarchist belief that the ends justify the anarchist means. A local anarchist supporting the Stop Cop City movement recently wrote as such:

> The movement's militant direct action, land occupation, and sabotage of construction machinery have not only kept the struggle alive, but shifted the Overton window when it comes to how even nonprofits are willing to engage the struggle. When asked about the sabotage of construction and police machinery, the referendum campaign—notably, headed by nonprofits and electoral organizers—has continuously reiterated its support for a diversity of tactics, in a stark departure from many nonprofits' more risk-averse approach to political action. Through a combination of tactics, the Stop Cop City has built a united front against Cop City that is willing to fight by any means necessary.

Just as with tactics that directly engage the system, much of the militant direct action has also heightened contradictions and exposed hypocrisies, thrusting fundamental questions into public consciousness: Are we more concerned about the "violence" of destroying construction machinery and police property, or about the violence of capitalist exploitation, environmental devastation, and police murder? What do we do when it's liberal Democrats, rather than Republicans, who are leading the efforts to destroy an urban forest, suppress residents' right to vote, and expand the police state? Do we truly believe that Cop City is a matter of life and death, and, if we do, what are we willing to do to stop it?

As noted by the anarchist above, the militant anarchists engage in violence to bring attention to their own political goals and their perceived government violence. But political violence is not simply a philosophy; Defend the Atlanta Forest has put the philosophy into action. Indeed, in one example, a known Defend the Atlanta Forest arsonist was recorded complaining that there were not enough violent members in protests against the Training Center.

The spread of anarchist ideas is conducted through word of mouth, internet, and written form. As with any political ideology, the promotion of anarchist ideas exists and is spread on the internet. Additionally, as noted later in this indictment, Defend the Atlanta Forest anarchists target and recruit individuals with a certain personal profile. Once these individuals have been recruited, members of Defend the Atlanta Forest also promote anarchist ideas through written documents and word of mouth. A leading anarchist member of Defend the Atlanta Forest wrote that they recruit and "radicalize Liberals by providing subversive narrative w/o encouraging state solutions." Other written documents, known colloquially as "zines," promote anarchist ideas. Anarchist documents located with the Defend the Atlanta Forest group decry capitalism in any

28

form, condemn government, and cast all law enforcement as violent murderers. The documents subsequently often conclude that the remedy for the perceived "repression" conducted by government is to do acts of violence. These anarchist "zines" have been located throughout the forested areas occupied by the so-called "Forest Defenders" in addition to other locations where anarchists are known to be.

In addition to handing out documents, individuals who join Defend the Atlanta Forest are offered financial, personal, and emotional support to remain loyal to the movement. Indeed, the "Forest Defenders," are provided with monetary, emotional, and personal support during their occupation of the forest, during their incarceration, and after their incarceration. The discussions of support often refer to providing "mutual aid" and "solidarity." In addition to providing monetary and emotional support, there is preparation for arrest. Most "Forest Defenders" are aware that they are preparing to break the law, and this is demonstrated by premeditation of attacks. Preparation efforts including efforts to avoid detection, plans to disguise their identity, and preparation in case of arrest despite efforts to avoid capture. Preparation includes, but is not limited to, disguising their face, bringing changes of clothing to blend in after the crime is committed, hiding in crowds, and using technology avoidance devices such as Faraday bags and burner phones, and memorizing or writing the Atlanta Solidarity Fund's phone number on their body in case of arrest. Shortly afterward, in an effort to de-legitimize the facts as relayed by law enforcement and to keep the loyalty of the Forest Defendants, members of Defend the Atlanta Forest often contact news media and flood social media with claims that their unlawful actions are protected by the First Amendment.

After arrest, emotional and personal support is offered through letter writing campaigns and encouragements of "solidarity." In doing so, this offers emotional support and maintains the

loyalty of the accused with the Defend the Atlanta Forest movement.  On the other hand, an accused that demonstrates potential disloyalty to Defend the Atlanta Forest risk losing all financial, personal, and emotional support that is offered.  One example included a threat to refuse to post bail for an incarcerated Defend the Atlanta Forest arrestee unless he complied with Defend the Atlanta Forest's demands.

These anarchist ideals and actions undergird the occupation of the forested area that will be the site of the Atlanta Public Training Center.

### d.  Beginnings of the Defend the Atlanta Forest Enterprise

The beginnings of the anarchist Defend the Atlanta Forest movement formed in 2020 following the high-profile killing of George Floyd by Minneapolis Police Officers.  In the weeks following Floyd's murder, Atlanta resident Rayshard Brooks was shot and killed by Atlanta police in a Wendy's parking lot after Brooks violently concussed a police officer, stole the officer's Taser, and pointed the Taser at another police officer while fleeing.  While the Brooks shooting was justified, it caused anti-police violence tensions to boil over, and it further flamed political tensions surrounding policing.  As a result, nationwide demonstrations and protests increased, including in the Atlanta area.  Nearly all of the demonstrations centered around a message of anti-police violence that arose from a spate of high-profile nationwide police shootings.

While most demonstrations landed within Constitutional protections, not all demonstrations were peaceful.  In the aftermath of Floyd's murder and shortly after Brooks' shooting death, a 24-hour "autonomous zone" was formed in the area surrounding the Wendy's

where Brooks was killed. The Wendy's was burned to the ground by protestors, and the zone began to be occupied individuals who were heavily armed with rifles, shotguns, and handguns. Within the area of the autonomous zone was a significant population of armed Blood street gang members. As part of this autonomous zone, busy public roads were blocked by these armed individuals and gang members, effectively creating a "Checkpoint Charlie" in downtown Atlanta. On July 4, 2020, the zone reached its pinnacle of violence: A MARTA bus had guns drawn on it as it pulled up to the autonomous zone. Several hours later, when a couple drove up to a barricade, a shotgun was pointed at them and they were forced to turn around. While they were turning around, a rifle was pointed at them by another zone occupant to ensure that they left the area. Minutes later, an innocent 8-year old would be shot and killed by armed gang members of the autonomous zone. A car occupied by 8-year-old Secoria Turner and her mother bypassed an autonomous zone checkpoint, and gang members fired on the car, killing Secoria. In the 23 days that the autonomous zone existed in Atlanta, the occupants promoted violence centered around an anti-police sentiment.

Meanwhile, anti-government anarchists in Atlanta recognized an opportunity to rally against the law enforcement. On July 5, 2020, the night after Secoria Turner's shooting death and during evening demonstrations that protested police violence, masked demonstrators attacked the Georgia Department of Public Safety headquarters. Department of Public Safety headquarters houses the Georgia State Patrol. The masked demonstrators echoed a familiar theme: an extreme anti-police message. DPS headquarters was vandalized using thrown rocks and other objects. The attack did not stop with vandalizing, however, as it escalated into a known anarchist hurling a Molotov cocktail through a window. The ensuing fire resulted in two employees suffering injuries and the building catching fire. The demonstrations and protests

eventually ended, but an undercurrent of threatening, violent anti-police sentiment persisted with some individuals in the Atlanta area, including those that make up Defend the Atlanta Forest, and it remains as one of Defend the Atlanta Forest's core driving motives.

### e.   The Atlanta Police Public Safety Training Center

In April of 2021, Atlanta Mayor Keisha Lance Bottoms announced the lease of 381 acres in DeKalb County, Georgia from the Atlanta Police Foundation for the purpose of building a police training facility.  On September 7, 2021, the Atlanta City Council approved the lease by a 10-4 vote during an open meeting and after public discussion.  The land will be used for the development of an 85 acre police/fire training facility that would be built on part of the grounds. The purpose of the police training site is to better train police to deal with Atlanta's increase in violence while also training law enforcement in de-escalation techniques that avoid unnecessary violence.  When completed, the site will be the largest and most advanced police training site in the United States.

### f.   Shadowbox Studios, DeKalb County, and the "Land Swap"

In addition to the land leased to the City of Atlanta, DeKalb County and Shadowbox Studios owned two other portions of the land at or near the forest.  Shadowbox Studios is a film studio that serves as a location where films are created and produced. Shadowbox owns a successful studio across Constitution Road, just south of the forest that is occupied by Defend the Atlanta Forest, though it has not remained untouched by Defend the Atlanta Forest.  Indeed, multiple instances of vandalism and arson by Defend the Atlanta Forest members have occurred against Shadowbox Studios.  The Studio also owns undeveloped land inside and outside of the forest at issue.  The location outside of the forest is adjacent to the Studio to the south with public plans to develop the land into an expansion of the studios.  Though Defend the Atlanta

Forest members have not occupied the forest south of Shadowbox Studios, they have used outrage at the proposed development to recruit individuals to join the Defend the Atlanta Forest movement.

Shadowbox Studios used to own approximately 50 acres near Intrenchment Creek Park that straddled Bouldercrest Road and was broken into three smaller parcels. This was located within the area of the forest occupied by the Defend the Atlanta Forest members. At the same time, DeKalb County owned 40 acres of land in a single location with the southeast point at the intersection of Bouldercrest Road and Constitution Road. In February of 2021, by agreement of Shadowbox and DeKalb County, the parties conducted a "land swap" where the titles to the land was exchanged so that Shadowbox took possession of the 40 acres of land, and DeKalb County took possession of the 50 acres previously owned by Shadowbox. The purpose was so Shadowbox could expand its studio, and DeKalb County could have a better location to establish Michelle Obama Park for enjoyment of the public at large.

Given that both Shadowbox Studios and DeKalb County swapped the land in an effort to promote development, Defend the Atlanta Forest expressed further outrage. As stated by the group via social media, "We will not let our forest be destroyed for the convenience of politicians, Hollywood and the police. No cop city. No Hollywood dystopia. Only forest." While Defend the Atlanta Forest has since expressed outrage at this development, the group did not begin its occupation of the land or campaign of property destruction and violence until the announcement of the Atlanta Public Safety Training Center. Once the announcement of the training center was announced, Defend the Atlanta Forest used the outrage stemming from the George Floyd murder and shooting of Rayshard Brooks to promote its anti-police, anti-government, and anti-development views. With this movement beginning to gain traction among

33

anti-police factions, Defend the Atlanta Forest quickly expanded its public sentiments to include objections to Shadowbox Studios and the development of Michelle Obama Park. This way, the group could recruit more members by expanding its message from a simple anti-police message to an anti-government message. Recruiting anti-police, anti-government, and anti-development people from around the country resulted in the Defend the Atlanta Forest group that exists today to conduct acts of violence, intimidation, and property destruction.

### g. Defend the Atlanta Forest Overview

Defend the Atlanta Forest is an unofficial, Atlanta-based organization that frames itself as a broad, decentralized, autonomous movement that uses advocacy and direct action to stop the "forest [from being] bulldozed in favor of police and sold out to Hollywood." Defend the Atlanta Forest does not recruit from a single location, nor do all Defend the Atlanta Forest members have a history of working together as a group in a single location. Nevertheless, the group shares a unified opposition to the construction of the Atlanta Police Department Training Facility, construction companies associated with the project, and companies associated with construction properties in the around surrounding the forest. As the group has grown and recruited, it has evolved into a broader anti-government, anti-police, and anti-corporate extremist organization.

Defend the Atlanta Forest is made up of three primary ideologies. The first ideology is an anti-law enforcement ideology that attempts to push a narrative that all police are violent, militant individuals that frequently use excessive force and violence against innocent citizens. The goal of this ideology is the elimination of police forces in their entirety. The second ideology is protection of the environment at all costs. This ideology promotes the belief that the environment has the same rights as humans, and therefore violence is acceptable to defend the environment. The Defend the Atlanta Forest organization has acknowledged that they embrace

this extremist ideology. This is demonstrated by the group's justification of shooting a Georgia State Trooper: "Tortuguita died trying to kill a cop in defense of the Weelaunee forest." The third ideology is an anarchist ideology. As a result of all three ideologies joining forces, the group has been able to quickly recruit nationwide support of extremists, including out-of-state extremists that have traveled to Georgia. Many of these extremists embrace violence and anarchy, and they use the forest as a guise for their violent agenda.

The United States Department of Homeland Security has classified the individuals as alleged Domestic Violent Extremists (DVE). In a bulletin posting, the Department of Homeland Security concluded that "alleged DVEs in Georgia have cited anarchist violent extremism, animal rights/environmental violent extremism, and anti-law enforcement sentiment to justify criminal activity in opposition to a planned public safety training facility in Atlanta. Criminal acts have included an alleged shooting and assaults targeting law enforcement and property damage targeting the facility, construction companies, and financial institutions for their perceived involvement with the planned facility."

Defend the Atlanta Forest frequently uses symbols associated with anarchist movements, to include but not limited to, the capital letter "A" surrounded by a circle, a raised clenched fist, Antifa flags and symbols associated with anti-fascist movements, graffiti which includes these symbols, as well as "Defend the Atlanta Forest," "Defend the Atlanta Forest," "Stop Cop City," "Kill Cops," "All Cops are Bastards" (ACAB), and "1312" – the numerical equivalent of ACAB. These are prevalent in the area surrounding Intrenchment Creek Park and the neighboring abandoned Old Atlanta Prison farm. Additional graffiti which encourages violence against law enforcement is visible throughout the Atlanta area, and it has appeared in other large cities across the country.

35

Historical anarchist and activist movements in the United States have included the creation of "autonomous zones" in which participants do not recognize the lawful authority of local, state, or federal government. Such examples include the 2020 movements in Portland, Oregon and Seattle, Washington, the latter known as the "Capitol Hill Autonomous Zone" (CHAZ) which received a high volume of national and international media attention. A second example is the previously mentioned autonomous zone in Atlanta during the George Floyd demonstrations. A sign reading "You are now leaving the U.S.A." is frequently featured in social media posts and blogs about Defend the Atlanta Forest and exemplifies the underlying anti-government and anti-authority ideology of Defend the Atlanta Forest.

Defend the Atlanta Forest maintains a strong social media presence on Facebook, Instagram, Twitter, and various blogs, and has also worked with external entities to produce videos and podcast interviews. Many of these videos and recordings are available on open-source platforms, and contain discussions of "militant actors" and "direct action," tactics, strategy, and structure for anti-authority movements. In one video, a black-clad Defend the Atlanta Forest participant refers to historical insurgents or violent guerilla movements such as the Mexican Zapatistas and Syrian Revolution as a reference point for strategy and to anchor smaller movements to larger revolutions. The black-clad Defend the Atlanta Forest participant states that "the fate of the Kurdish revolutionaries in Kobani and Sere Kanive, and all of these places, it was partially determined by the bloodbath in Damascus and Aleppo," and "I think that with the current movement here, it's clear to me that the fate of the South River, Weelaunee Forest will be determined in midtown Atlanta and it will be determined in Chicago and in New York and in Los Angeles and in Seattle."

The same black-clad Defend the Atlanta Forest participant goes on to detail the role of sabotage and militant actors in the Defend the Atlanta Forest movement by referencing US

36

Department of Defense theory on the role of defense and offense. Specifically, that "the role of defense is to open the space for offense" and that,

> "Defenders, of course, especially in an urban context, not only in an urban context, but a wooded urban context, will always have an inherent advantage, especially if they perceive their role as defensive and they're able to engage really on their own terms. They're just trying to open space for offense."

The black-clad Defend the Atlanta Forest participant describes the Atlanta Police Foundation (APF) as a "consumer" in purchasing construction services from a general contractor, Brasfield & Gorrie. Brasfield & Gorrie is in charge of major Atlanta Police Foundation project components such as structural engineering, blueprint making, and zoning, and works with subcontractors to achieve these objectives. The Defend the Atlanta Forest strategy, drawing from The Art of War by Sun Tzu, is to attack the strategy and allies of your enemy in order to "separate the subcontractors from the contractor and the contractor from the APF." The Defend the Atlanta Forest speaker specifically mentions Reeves Young, a subcontactor for Brasfield & Gorrie, and references attacks against construction equipment in Georgia, and other states, which include arson and vandalism, protest and vandalism events at Reeves Young facilities, and "action at the home of the CEO" – referring to an incident in which activists committed acts of vandalism and hung threatening banners at a private residence. The black-clad Defend the Atlanta Forest participant states that Reeves Young "ultimately did the right thing. You know, they moved their money elsewhere, because that's part of how all of this is working."   The black-clad Defend the Atlanta Forest participant justifies the property destruction and violence by stating that it is not an "existential attack on the company" because these companies have various of contracts and make of money elsewhere, and:

> "The idea is, if you deal with the APF, you'll deal with us. For this one contract, people are coming to your house. For this one contract, people are visiting your church. For this

37

one contract, people are flooding your phone lines, people are sending you faxes, people are visiting your office. Some people are vandalising your stores, are burning your equipment, for the one contract."

The Defend the Atlanta Forest particpant also describes previous engagement with the City Council, and a canvassing campaign, and describes the escalation of Defend the Atlanta Forest activities as a "natural consequence" emerging as a result of frustration and the "intransigence and immovability of the electoral system, of the political system." The participant further states that the movement "intends to win," and that this is a struggle that extends beyond Atlanta to the entire country. Defend the Atlanta Forest, and the struggle, plays a larger role in the climate crisis in which a petroleum-based, global capitalist structure is propped up with tear gas and violence. To prevent this domination, Defend the Atlanta Forest is "going to have to get our hands dirty. We're going to have to do this ourselves."

Utilizing various social media platforms, Defend the Atlanta Forest regularly promotes "Week of Action" events, and later claims responsibility for vandalism or arson committed during these specified timeframes on different websites. The websites used to claim activity are often foreign-hosted, and Defend the Atlanta Forest participants often promote online security measures which disguise a user's true identity, such as the use of Virtual Private Networks (VPN).

### h. Defend the Atlanta Forest Funding

The group is supported by three individuals that live at 80 Mayson Ave. in Atlanta. The three individuals use 80 Mayson Ave. as a primary residence, and all three work to support Defend the Atlanta Forest. The first individual is named Marlon Scott Kautz. Kautz is a lifelong community activist that controls and operates the Network for Strong Communities in Atlanta, which is a non-profit registered as a 501(c)(3) and serves as partial financial backing for Defend

38

the Atlanta Forest. Kautz self-identifies as the Chief Financial Officer for the Network for Strong Communities. Also living at 80 Mayson Ave. is Adele MacLean, who assists Kautz in running the Network for Strong Communities and identifies as the Chief Executive Officer. The third resident of 80 Mayson Avenue is Savannah Patterson, who is the Secretary and Treasurer of Network for Strong Communities. The Network for Strong Communities also operates the Atlanta Solidarity Fund which identifies itself as "[providing] support for people who are arrested at protests, or otherwise prosecuted for their movement involvement." These members facilitate finances to support the occupation of the forested area near Intrenchment Creek.

The Network for Strong Communities portrays itself as providing community support in five different areas. The five areas are food access, mutual aid, bail fund, police accountability, and leadership development. For food access, the Network for Strong Communities operates a group known as Food4Life. Food4Life purports to raise money to purchase and distribute food to areas and communities that are in need of food. For mutual aid, there is not a known separate established group for mutual aid. For police accountability, the Network for Strong Communities operates CopWatch which is a loosely affiliated group that brings attention to police misconduct. Finally, as for a bail fund, the Network for Strong Communities operates the Atlanta Solidarity Fund.

Notably, according to the website for the Network for Strong Communities, the Atlanta Solidarity Fund is not primarily designed as a bail fund to pay for bonds of indigent inmates that cannot afford bond. Rather, the Atlanta Solidarity Fund's primary purpose is to "[provide] support for people who get arrested at protests, or otherwise prosecuted for their movement involvement." A recent example includes posting a $392,000 cash bond for a Defendant charged with Domestic Terrorism while indigent defendants remained incarcerated as pre-trial detainees.

39

This did not leave that bank account without funds, however; the Atlanta Solidarity Fund simply chooses to only bond out certain individuals with certain belief structures.

Marlon Kautz, Adele MacLean, and Savannah Patterson created the Forest Justice Defense Fund as an arm of the Network for Strong Communities in July of 2021, and they were the administrators of the Fund. This is the same month as the protests surrounding the shooting of Rayshard Brooks and at the height of protests against police violence. In piggybacking off the momentum of the protests, the Network for Strong Communities began co-mingling funds from its various causes and raising money to support the occupation of the forest where the Atlanta Public Safety Training Center would be built. As a result, good faith donors donated their own money to a certain charitable cause, and the money was spent on the occupation of the forest.

Since 2021, the Network for Strong Communities has operated bank accounts that support the occupation of Defend the Atlanta Forest and promote anarchist ideas. The various accounts are controlled by Kautz, MacLean, and Patterson, and money has been moved via various banks. At times, the various bank accounts supporting the occupation of the forest has had millions of dollars, though the number has dropped at times due to prolific spending by the Network for Strong Communities. Seed money for the Network for Strong Communities was received from a larger political organization, but the significant majority of the funds come from public donation and political donations. The Network for Strong Communities accomplished this fundraising by painting itself as legitimate, law-abiding social justice organization, and as a result, members of the public donated to the organization with the legitimate belief that their monies go to lawful purposes. In 2021 alone, the account received over 70,000 donations from the public. Some donations are very small, ranging from a few cents to a few dollars, and other donations are many thousands of dollars.

The Network for Strong Communities also raises money via Defend the Atlanta Forest websites. Website links exist in various internet forums and social media. Twitter, Instagram, and other social media accounts for Defend the Atlanta Forest have links to fundraising. Not only do these accounts promote the occupation of the disputed forest, but some of them celebrate and promote violence and property damage.

Monies of the Network for Strong Communities are directly used to support the Defend the Atlanta Forest members that occupy the forest near Intrenchment Creek. Indeed, the funds are used to support the operations of the self-titled "Forest Defenders" that are inside and outside of the forest. One of the ways that the Defend the Atlanta Forest members are financially supported in the forest is via reimbursement for costs submitted by "Forest Defenders." The reimbursement operates in the same way that a traditional business conducts reimbursement. First, the Forest Defender spends money on goods or services related to Defend the Atlanta Forest operations and retains a receipt. The receipt is submitted to a fund known as the "Forest Justice Defense Fund" along with a description of the expense, and the expense must be approved. The expense is reviewed by an administrator of the account and the expense is approved or denied. The three administrators of the account are Marlon Kautz, Adele MacLean, and Savannah Patterson. One example of an expense includes Kautz submitting a receipt for handheld radios so that Forest Defenders can communicate without using cellphones. Kautz submitted the receipt, approved his own submission, and he received reimbursement for that expense. Other examples include food, supplies, camping equipment, rope, climbing equipment, ammunition, gear, surveillance equipment, tools, building supplies, a drone, and other items used to continually occupy the forest.

41

The reimbursement program is operated on a public website known as The Open Collective.  Advertising itself to mutual aid groups, community initiatives, and other non-corporate entities, the Open Collective is a website that allows the general public to see any transactions that are conducted by an entity.  The Open Collective does not require public disclosure of the identities of the transactioning parties, and individuals submitting transactions may remain anonymous through usernames.  However, while the username can be anonymous, the account must be tied to a corporation that conducts financial transactions such as PayPal or Venmo.  By tying itself to a company that conduct financial transactions, identities of some of the individuals occupying the forest and supporting the occupation were discovered.

The Open Collective is a platform for "fiscal hosts."  The website for the Open Collective describes a "fiscal host" as "an organization that welcomes others to operate through their structure, so projects can use the host.  The host provides administrative services, oversight, and support."  In this instance, the Network for Strong Communities acted as the "fiscal host" for the Forest Justice Defense Fund.  For the Forest Justice Defense Fund, Marlon Kautz, Adele MacLean, and Savannah Patterson were registered as administrators of the account.  That is, they had the power to approve or reject payments and reimbursements.  In attempting to disguise their identities, Kautz registered as "Mouse," MacLean registered as "Earthworm," and Patterson registered as "Spud."  Patterson would later change her user name to "Danny."  Over the course of the many months, Kautz, MacLean, and Patterson approved individual reimbursements to "Forest Defenders" to assist in the occupation of the disputed forest.

In May of 2023, Kautz, MacLean, and Patterson learned that the State was aware of the payments being made in support of the forest occupation.  One day after the State publicly disclosed the investigation of the Open Collective transactions during a Court hearing, an attempt

was made to disconnect the Forest Justice Defense Fund from the Network for Strong Communities. Kautz, MacLean, and Patterson accomplished this by changing the "fiscal host" of the Forest Justice Defense Fund. The "fiscal host" of the Forest Justice Defense Fund was transferred from the Network for Strong Communities to a new fiscal host known as "Siskiyou Mutual Aid," and control of the funds available to the Forest Justice Defense Fund was changed to Siskiyou Mutual Aid. The entirety of the amount totaled $48,864.88, and control of all of these funds was moved away from the Network for Strong Communities.

The Forest Justice Defense Fund alone has disbursed approximately $89,000 to the Defend the Atlanta Forest members, though this does not account for all monies that Defend the Atlanta Forest has used to support its operations. Defend the Atlanta Forest estimates that its annual budget from the Forest Justice Defense Fund alone is approximately $100,000, and this is only one example of monies used to support Defend the Atlanta Forest.

### i. Communication

Communication from the Defend the Atlanta Forest management is conducted in many ways. Indeed, communication among the Defend the Atlanta Forest members is often cloaked in secrecy using sophisticated technology aimed at preventing law enforcement from viewing their communication and preventing recovery of the information. Members often use the dark web via Tor, use end-to-end encrypted messaging app Signal or Telegram, or use hand-held radios such as walkie-talkies while in the forest. Additionally, Defend the Atlanta Forest uses websites to broadly instruct its members on where to go and what to do. The communication paints itself as a "call to action" so that its appearance is benign; nevertheless, Defend the Atlanta Forest members are aware of the purpose of these calls to action, and they include violence and

43

property damage. A final way that the Defend the Atlanta Forest members communicate is in person. A loose network of homes and buildings around the East Atlanta area serve as places where Defend the Atlanta Forest members can received "mutual aid" and remain "in solidarity" with other Defend the Atlanta Forest members.

### j.   Occupation Inside the Forest

The forested area occupied by the "Forest Defenders" is in the middle of the disputed property. Numerous tents and living supplies were found throughout the area when law enforcement has attempted to remove the individuals from the privately held property. While there is not one singular location where "Forest Defenders" live, an area existed for a period of time that the "Forest Defenders" called the Living Room. As its name implies, it is an area where "Forest Defenders" gathered as if living inside of a house. Numerous tents were located in the surrounding area where "Forest Defenders" would sleep and store personal effects. In addition to a so-called living room, the area had a rudimentary bathroom where a toilet seat was attached to four vertical plastic poles to emulate a very basic toilet. It sat above a crude hole in the ground so that a toilet user's waste would fall into the hole. In themes consistent with anarchy and anti-police sentiment, a painted sign titled the bathroom and toilet as "9/11 Memorial."

The "Forest Defenders" did not occupy the forest without protection, however. In approaching the occupied areas, law enforcement encountered dangerous, sharp traps designed to injure approaching individuals. Additionally, various ingredients for making Molotov cocktails were located in addition to a rudimentary pipe bomb that had not been completed. In one incident, a civilian metal scrapper was trapped and held at gunpoint by "Forest Defenders" and

44

forced to leave a forested area simply because entered the premises to collect scrap metal. Some "Forest Defenders also act as "scouts." The "scouts" watch for law enforcement or any threat to their occupation of the forest, and intelligence is spread in end-to-end encrypted texts so that "Forest Defenders" can actively avoid or fight the pending threat.

### k. Propaganda and Recruitment

Defend the Atlanta Forest uses websites, social media, and statements to traditional media to sow disinformation and propaganda to promote its extremist political agenda, legitimize its behavior, and recruit new members. This is a traditional activity of anarchist organizations. To assist its members in promoting disinformation, Defend the Atlanta Forest uses written anarchist pamphlets, booklets, and writings.

An extremist anarchist website known as the "Scenes Blog" raises money for the Network for Strong Communities and promotes violent anarchy. The Scenes Blog is a website that claims responsibility for violence and property damage done in furtherance of the movement to stop the building of the Training Center. The site advocates and calls for additional violence against government and corporations, encourages violence ahead of government meetings, posts personal information and photographs of law enforcement, court officials, and private citizens and calls upon anarchists to visit these individuals and engage in intimidation, property damage, and violence. The site is tied to the Defend the Atlanta Forest movement in many ways, including raising money for the Network for Strong Communities, acknowledging that it is based in Atlanta, and centering itself around the "Stop Cop City" movement. Most tellingly, in a posted extremist video, Defend the Atlanta Forest acknowledges that it operates the Scenes Blog.

Anarchist zines instruct its members on how to effectively promote its political messages while also promoting the false idea that the group is non-violent. These publications are used to teach and influence Defend the Atlanta Forest members and recruits on how to deal with the media to promote its political message. An example of one of the publications is "Talking to the Media: A Guide for Anarchists." Telling its members to "have extremely low expectations" of the media, the zines paint the media as its enemy by writing that "you are a carnival freak for Homo Journalisticus," and tells the reader that the media will immediately condescend to them. As such, the publications instruct the Defend the Atlanta Forest member how to manipulate the media to take up as much column space or television time as possible. Following these instructions, Defend the Atlanta Forest holds media-attended press conferences to control the story and promote their own narrative.

Anarchists publish their own zines and publish their own statements because they do not trust the media to carry their message. Defend the Atlanta Forest documentation recommended publishing zines and conducting publicity on their own because "the best advice is to trust a reporter about as far as you can throw them" because they view media "as lying scum, and it's best to treat them as such." This is why Defend the Atlanta Forest anarchists often publish their own documents or conduct their own press conferences instead of allowing the media to report the story.

One of the most common false narratives promoted by Defend the Atlanta Forest is that of police aggression. The purpose of this disinformation campaign is to turn public opinion against law enforcement, thus justifying their violence and destruction of property. On or about January 18, 2023, a Defend the Atlanta Forest member shot a Georgia State Trooper who was assisting in clearing the forest. Troopers returned fire, killing the suspect. Defend the Atlanta

46

Forest immediately began a propaganda campaign against police by claiming that Troopers shot the Defend the Atlanta Forest member first. Despite its efforts to sway public opinion with false information, evidence demonstrated that the Defend the Atlanta Forest member shot the trooper first, and a Scenes Blog posting even admitted that its member shot the trooper first:

> "Tortuguita died trying to kill a cop in defense of the Weelaunee forest…We attack the same machines that threaten the forest in Atlanta and everything wild. FIRE TO THE EARTH DESTROYERS. Until every cop is dead and all they defend burnt to ashes."

Defend the Atlanta Forest also operates a website located at defendtheatlantaforest.org where it posts press releases, misleading information, propaganda, and disinformation. Using this website, Defend the Atlanta Forest solicits donations to the Forest Justice Defense Fund. As previously noted, this fund directly supports the occupation of the forest. The website, however, does not acknowledge the violence and destruction that it supports, however. Instead, Defend the Atlanta Forest posits itself as an advocacy group with the goal of saving the forest. The site goes on to recruit civilians in support of Defend the Atlanta Forest, including inviting civilians to join the movement in person. Once a civilian joins Defend the Atlanta Forest in person, Defend the Atlanta Forest members use disinformation, incomplete information, and propaganda to try to successfully radicalize the civilian.

Defend the Atlanta Forest posts many of its invitations to join the movement on various social media outlets such as Twitter and Telegram. Knowing that their posts are followed and re-posted by other decentralized extremist groups, most prominently Antifa, many violent anarchists and extremists travel from out of state to join the Defend the Atlanta Forest movement. While these individuals may not share a pro-environment ideology, Defend the Atlanta Forest knowingly reaps the benefits of these violent non-Georgians by using violence,

threats, and property damage to intimidate businesses, government, and civilians, thus promoting the anarchy movement.

Defend the Atlanta Forest and its anarchists documented a general profile of the person that is desirable for the violent movement. A cautious approach is highly recommended, as it recommends that "how you approach potential accomplices needs to be done right." When looking for recruits, the documentation insists "don't work with people who are not committed to the cause. When the stakes are high – as it is with any illegal direct action – trust your gut. If you are uncomfortable with any cell member – don't work with them. PERIOD." The documentation further recommends not allowing trusted friends to "vouch" for others, imagining yourself as a cellmate with the recruit, and asking yourself whether your recruit would "break."

The ideal violent anarchist recruit also has a particular mental state according to documentation located with Defend the Atlanta Forest supporters. The ideal person is "someone who has enough anger about the state of the world to compel them to act. But it must be someone who is not overly angry and has control of their emotions. Ideally the person will be enthusiastic but not reckless." Additionally, they "want people who are moved by their emotions, not so much by an intellectual understanding of our crisis. They need to be committed."

And in addition to a personal profile, the ideal Defend the Atlanta Forest recruit will not harm the overall movement by giving evidence to the government. The recruiter should make sure that "they all are ready to go to jail for 5 to 30 years or life, if the worst happens. All cell-mates should be able to discuss what would be the hardest thing for them to cope with should

that happen – i.e. supporting children, pressure from parents to capitulate, fear of being beaten in jail or whatever."

## PART II

**The Defendants committed overt acts to effect the object of the conspiracy which include acts of racketeering activity as described below:**

**OVERT ACTS IN FURTHERANCE OF THE RACKETEERING CONSPIRACY**

(1) On or about July 5, 2020, **ANDREW CARLISLE** and **SONALI GUPTA** threw objects and a Molotov cocktail at the Georgia State Patrol headquarters.  These are overt acts in furtherance of the conspiracy.

(2) On or about October 28, 2020, **SAVANNAH PATTERSON** transferred $100.00 to an unindicted co-conspirator, whose identity is known by the Grand Jury, for ammunition. This was an overt act in furtherance of the conspiracy.

(3) On or about November 1, 2020, **SAVANNAH PATTERSON** did transfer $80.00 to **MARLON KAUTZ** for radio communication devices.  This was an overt act in furtherance of the conspiracy.

(4) On or about November 6, 2020, **SAVANNAH PATTERSON** did transfer $40.00 to **MARLON KAUTZ** for radio communication devices and camp fuel.  This was an overt act in furtherance of the conspiracy.

(5) On May 20, 2021, **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to the Grand Jury, did publish a post on scenes.noblogs.org linking to a post on anarchistnews.org that threatens property damage if construction on Blackhall Studios, Michelle Obama Park, and the Atlanta Public Safety Training Facility is not halted, thereby knowingly using threats against construction officials with the intent to cause and induce the construction officials to withhold records, documents, and testimony in official proceedings. This was an overt act in furtherance of the conspiracy.

(6) On May 20, 2021, **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to the Grand Jury, did publish a post on scenes.noblogs.org claiming responsibility for property damage to a construction equipment at the proposed site of the Atlanta Public Safety Training Facility, and implying a threat of further property damage, thereby knowingly using threats against construction officials with the intent to cause and induce the construction officials to withhold records, documents, and testimony in official proceedings. This was an overt act in furtherance of the conspiracy.

(7) On June 3, 2021, **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to the Grand Jury, did publish a post on scenes.noblogs.org calling for a Week of Action from June 20-26, 2021.  This was an overt act in furtherance of the conspiracy.

(8) On June 9, 2021, **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to the Grand Jury, did publish a post on scenes.noblogs.org claiming responsibility for property damage to three excavators at the proposed site of the Atlanta Public Safety Training Facility, and implying a threat of further property damage, thereby knowingly using threats against construction officials with the intent to cause and induce the construction officials to withhold records, documents, and testimony in official proceedings.  This was an overt act in furtherance of the conspiracy.

(9) On June 25, 2021, **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to the Grand Jury, did publish a post on scenes.noblogs.org linking to another article on itsgoingdown.com that advocates for more property damage, and encouraging further property damage, thereby knowingly using threats against construction officials with the intent to cause and induce the construction officials to withhold records, documents, and testimony in official proceedings.  This was an overt act in furtherance of the conspiracy.

(10)　　　On June 26, 2021, **MARLON KAUTZ, ADELE MACLEAN,** and

**SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to

the Grand Jury, did publish a post on scenes.noblogs.org linking to an Atlanta News First

news report demonstrating that Defend the Atlanta Forest's usage of property damage is

making headlines, hence encouraging further property damage, thereby knowingly using

threats against construction officials with the intent to cause and induce the construction

officials to withhold records, documents, and testimony in official proceedings.  This was

an overt act in furtherance of the conspiracy.


(11)　　　On June 27, 2021, **MARLON KAUTZ, ADELE MACLEAN,** and

**SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to

the Grand Jury, did publish a post on scenes.noblogs.org linking to a website that posts

Ryan Millsap's home address and advocating for property violence against his personal

home, thereby knowingly using threats against Ryan Millsap with the intent to cause and

induce Ryan Millsap to withhold records, documents, and testimony in official

proceedings.  This was an overt act in furtherance of the conspiracy.

(12)　　　On or about August 4, 2021, **SAVANNAH PATTERSON** transferred $80.00 to

an unindicted co-conspirator, whose identity is known by the Grand Jury, for

ammunition.  This was an overt act in furtherance of the conspiracy.

(13)    On August 22, 2021, **MARLON KAUTZ, ADELE MACLEAN,** and

**SAVANNAH PATTERSON,** along with unindicted co-conspirators that are unknown to

the Grand Jury, did publish a post on scenes.noblogs.org that publicized Defend the

Atlanta Forest members issuing tree spike warnings, thereby knowingly using threats

against construction officials with the intent to cause and induce the construction officials

to withhold records, documents, and testimony in official proceedings. This was an overt

act in furtherance of the conspiracy.

(14)    On August 24, 2021, **MARLON KAUTZ, ADELE MACLEAN,** and

**SAVANNAH PATTERSON,** along with unindicted co-conspirators that are unknown to

the Grand Jury, did publish a post on scenes.noblogs.org claimed responsibility for an

attack on a CSC regional office in Roseville, Minnesota from the August 18th, 2021 "Day

of Action," thereby knowingly using threats against construction officials with the intent

to cause and induce the construction officials to withhold records, documents, and

testimony in official proceedings an overt act in furtherance of the conspiracy.

(15)    On September 9, 2021, **MARLON KAUTZ, ADELE MACLEAN,** and

**SAVANNAH PATTERSON,** along with unindicted co-conspirators that are unknown to

the Grand Jury, did publish a post on scenes.noblogs.org where they claimed

responsibility for criminal trespass at Atlanta Councilwoman Natalyn Archibong's home,

thereby knowingly using threats against Natalyn Archibong with the intent to cause and

induce the Natalyn Archibong to withhold records, documents, and testimony in official

proceedings. This was an overt act in furtherance of the conspiracy.

(16)      On or about September 23, 2021, **MARLON KAUTZ** transferred $100.00 to an unindicted co-conspirator, whose identity is known by the Grand Jury, for Defend the Forest delegation expenses.  This was an overt act in furtherance of the conspiracy.

(17)      On October 18, 2021, **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to the Grand Jury, did publish a post on scenes.noblogs.org promoting property destruction at the site of the future Atlanta Public Safety Training Facility, thereby knowingly using threats against construction officials with the intent to cause and induce the construction officials to withhold records, documents, and testimony in official proceedings.  This was an overt act in furtherance of the conspiracy.

(18)      On November 9, 2021, **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to the Grand Jury, did publish a post on scenes.noblogs.org calling for a Week of Action from November 10-November 14, 2021, thereby knowingly using threats against construction officials with the intent to cause and induce the construction officials to withhold records, documents, and testimony in official proceedings.  This was an overt act in furtherance of the conspiracy.

(19)     On November 18, 2021, **MARLON KAUTZ, ADELE MACLEAN,** and

**SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to

the Grand Jury, did publish a post on scenes.noblogs.org asking for supporters to flood

the phones of Reeves Young Contractors to advocate for Reeves Young to pull out of its

contract to build the Atlanta Public Safety Training Facility, thereby knowingly using

threats against construction officials with the intent to cause and induce the construction

officials to withhold records, documents, and testimony in official proceedings.  This was

an overt act in furtherance of the conspiracy.


(20)     On or about November 21, 2021, **MARLON KAUTZ** received $298.54 in

reimbursement from the Network for Strong Communities for forest monitoring

equipment.  This was an overt act in furtherance of the conspiracy.


(21)     On November 22, 2021, **MARLON KAUTZ, ADELE MACLEAN,** and

**SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to

the Grand Jury, did publish a post on scenes.noblogs.org claiming responsibility for the

November 21st, 2021 destruction of two bulldozers, thereby knowingly using threats

against construction officials with the intent to cause and induce the construction officials

to withhold records, documents, and testimony in official proceedings.  This was an overt

act in furtherance of the conspiracy.

(22)     On December 21, 2021, **MARLON KAUTZ, ADELE MACLEAN,** and

**SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to

the Grand Jury, did publish a post on scenes.noblogs.org claiming responsibility for

threats to the owner of Reeves Young Construction and posting his home address online

thereby inviting property damage, thereby knowingly using threats against construction

officials with the intent to cause and induce the construction officials to withhold records,

documents, and testimony in official proceedings.  This was an overt act in furtherance of

the conspiracy.

(23)     On December 24, 2021, **MARLON KAUTZ, ADELE MACLEAN,** and

**SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to

the Grand Jury, did publish a post on scenes.noblogs.org claiming responsibility for

threats to the owner of Reeves Young Construction.  This was an overt act in furtherance

of the conspiracy, thereby knowingly using threats against construction officials with the

intent to cause and induce the construction officials to withhold records, documents, and

testimony in official proceedings.

(24)     On December 28, 2021, **MARLON KAUTZ, ADELE MACLEAN,** and

**SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to

the Grand Jury, did publish a post on scenes.noblogs.org claiming responsibility for

disruption of Blackhall Studios, thereby knowingly using threats against construction

officials with the intent to cause and induce the construction officials to withhold records,

documents, and testimony in official proceedings.  This was an overt act in furtherance of

the conspiracy.


(25)     On or about January 10, 2022, **MARLON KAUTZ, ADELE MACLEAN, and**

**SAVANNAH PATTERSON** transferred $61.21 in reimbursement from the Network for

Strong Communities to Brooke Courtemanche for forest kitchen materials.  This was an

overt act in furtherance of the conspiracy.


(26)     On or about January 10, 2022, **MARLON KAUTZ, ADELE MACLEAN, and**

**SAVANNAH PATTERSON** transferred $27.62 in reimbursement from the Network for

Strong Communities to Brooke Courtemanche for forest tools.  This was an overt act in

furtherance of the conspiracy.


(27)     On or about January 10, 2022, **BROOKE COURTEMANCHE** received $52.22

in reimbursement from the Network for Strong Communities for forest kitchen food.

This was an overt act in furtherance of the conspiracy.

(28)      On or about January 10, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $52.22 in reimbursement from the Network for Strong Communities to Brooke Courtemanche for forest kitchen food.  This was an overt act in furtherance of the conspiracy.

(29)      On or about January 10, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $256.16 in reimbursement from the Network for Strong Communities to Brooke Courtemanche for tools, rope, and tarps.  This was an overt act in furtherance of the conspiracy.

(30)      On or about January 10, 2022, **BROOKE COURTEMANCHE** received $256.16 in reimbursement from the Network for Strong Communities for tools, rope, and tarps.  This was an overt act in furtherance of the conspiracy.

(31)      On or about January 10, 2022, **BROOKE COURTEMANCHE** received $27.62 in reimbursement from the Network for Strong Communities for forest tools.  This was an overt act in furtherance of the conspiracy.

(32)      On or about January 19, 2022, **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON,** along with unindicted co-conspirators that are unknown to the Grand Jury, did publish a post on scenes.noblogs.org claiming responsibility for property damage from January 18th, 2022, thereby knowingly using threats against construction officials with the intent to cause and induce the construction officials to withhold records, documents, and testimony in official proceedings.  This was an overt act in furtherance of the conspiracy.

(33)     On or about January 19, 2022, **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to the Grand Jury, did publish a post on scenes.noblogs.org requesting that Defend the Atlanta Forest members affirmatively approach construction workers and "take solidarity action," thereby knowingly using threats against construction officials with the intent to cause and induce the construction officials to withhold records, documents, and testimony in official proceedings.  This was an overt act in furtherance of the conspiracy.

(34)     On or about January 25, 2022, **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to the Grand Jury, did publish a post on scenes.noblogs.org posting a photo of the Atlanta Police Foundation project manager, thereby subjecting him to threats and potential violence, thereby knowingly using threats against Atlanta Police Foundation officials with the intent to cause and induce Atlanta Police Foundation officials to withhold records, documents, and testimony in official proceedings.  This was an overt act in furtherance of the conspiracy.

(35)      On or about January 25, 2022, **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON,** along with unindicted co-conspirators that are unknown to the Grand Jury, did publish a post on scenes.noblogs.org encouraging Defend the Atlanta Forest members to confront contractors and police, thereby knowingly using threats against construction officials with the intent to cause and induce the construction officials to withhold records, documents, and testimony in official proceedings. This was an overt act in furtherance of the conspiracy.

(36)      On or about January 27, 2022, **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON,** along with unindicted co-conspirators that are unknown to the Grand Jury, did publish a post on scenes.noblogs.org publishing police scanner activity, thereby knowingly using threats against construction officials with the intent to cause and induce the construction officials to withhold records, documents, and testimony in official proceedings. This was an overt act in furtherance of the conspiracy.

(37)      On or about January 27, 2022, **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON,** along with unindicted co-conspirators that are unknown to the Grand Jury, did publish a post on scenes.noblogs.org encouraging Defend the Atlanta Forest members to engage in property damage, thereby knowingly using threats against construction officials with the intent to cause and induce the construction officials to withhold records, documents, and testimony in official proceedings. This was an overt act in furtherance of the conspiracy.

(38)     On or about January 28, 2022, **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON,** along with unindicted co-conspirators that are unknown to the Grand Jury, did publish a post on scenes.noblogs.org recruiting more Defend the Atlanta Forest members.  This was an overt act in furtherance of the conspiracy.

(39)     On or about March 3, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $200.00 in reimbursement from the Network for Strong Communities to an unindicted co-conspirator, whose identity is known to the Grand Jury, for a cellphone lost in an arrest at the DeKalb forest.  This was an overt act in furtherance of the conspiracy.

(40)     On or about March 10, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $12.52 in reimbursement from the Network for Strong Communities to Brooke Courtemanche for forest kitchen materials.  This was an overt act in furtherance of the conspiracy.

(41)     On or about March 10, 2022, **BROOKE COURTEMANCHE** received $12.52 in reimbursement from the Network for Strong Communities for forest kitchen materials.  This was an overt act in furtherance of the conspiracy.

(42)     On or about March 10, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $68.81 in reimbursement from the Network for Strong Communities to Brooke Courtemanche for forest kitchen materials.  This was an overt act in furtherance of the conspiracy.

(43)     On or about March 10, 2022, **BROOKE COURTEMANCHE** received $68.81 in reimbursement from the Network for Strong Communities for forest kitchen materials. This was an overt act in furtherance of the conspiracy.

(44)     On or about March 10, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $93.04 in reimbursement from the Network for Strong Communities to Brooke Courtemanche for camping supplies. This was an overt act in furtherance of the conspiracy.

(45)     On or about March 10, 2022, **BROOKE COURTEMANCHE** received $93.04 in reimbursement from the Network for Strong Communities for camping supplies. This was an overt act in furtherance of the conspiracy.

(46)     On or about March 10, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $99.41 in reimbursement from the Network for Strong Communities to Brooke Courtemanche for camping supplies. This was an overt act in furtherance of the conspiracy.

(47)     On or about March 10, 2022, **BROOKE COURTEMANCHE** received $99.41 in reimbursement from the Network for Strong Communities for camping supplies. This was an overt act in furtherance of the conspiracy.

(48)     On or about March 10, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $68.54 in reimbursement from the Network for Strong Communities to Brooke Courtemanche for forest kitchen materials. This was an overt act in furtherance of the conspiracy.

(49)     On or about March 10, 2022, **BROOKE COURTEMANCHE** received $68.54

in reimbursement from the Network for Strong Communities for forest kitchen materials.

This was an overt act in furtherance of the conspiracy.

(50)     On or about March 10, 2022, **MARLON KAUTZ, ADELE MACLEAN, and**

**SAVANNAH PATTERSON** transferred $140.48 in reimbursement from the Network

for Strong Communities to Brooke Courtemanche for forest kitchen and outdoor supplies.

This was an overt act in furtherance of the conspiracy.

(51)     On or about March 10, 2022, **BROOKE COURTEMANCHE** received $140.48

in reimbursement from the Network for Strong Communities for forest kitchen and

outdoor supplies.  This was an overt act in furtherance of the conspiracy.

(52)     On or about March 10, 2022, **MARLON KAUTZ, ADELE MACLEAN, and**

**SAVANNAH PATTERSON** transferred $61.98 in reimbursement from the Network for

Strong Communities to Brooke Courtemanche for food for the Forest Defenders.  This

was an overt act in furtherance of the conspiracy.

(53)     On or about March 10, 2022, **BROOKE COURTEMANCHE** received $61.98

in reimbursement from the Network for Strong Communities for food for the Forest

Defenders.  This was an overt act in furtherance of the conspiracy.

(54)　　　On or about March 10, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $48.06 in reimbursement from the Network for Strong Communities to Brooke Courtemanche for supplies for Forest Defenders. This was an overt act in furtherance of the conspiracy.

(55)　　　On or about March 10, 2022, **BROOKE COURTEMANCHE** received $48.06 in reimbursement from the Network for Strong Communities for supplies for Forest Defenders. This was an overt act in furtherance of the conspiracy.

(56)　　　On or about March 10, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $107.82 in reimbursement from the Network for Strong Communities to Brooke Courtemanche for forest set up supplies. This was an overt act in furtherance of the conspiracy.

(57)　　　On or about March 10, 2022, **BROOKE COURTEMANCHE** received $107.82 in reimbursement from the Network for Strong Communities for forest set up supplies. This was an overt act in furtherance of the conspiracy.

(58)　　　On or about March 10, 2022, **ADELE MACLEAN** received $39.15 in reimbursement from the Network for Strong Communities for food for a church gate lock that exists on the DeKalb forest land that was used as supplies storage. This was an overt act in furtherance of the conspiracy.

(59)　　　On or about March 10, 2022, **ADELE MACLEAN** received $37.11 in reimbursement from the Network for Strong Communities for building materials for the DeKalb forest. This was an overt act in furtherance of the conspiracy.

(60)     On or about March 11, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $38.66 in reimbursement from the Network for Strong Communities to Brooke Courtemanche for forest kitchen materials.  This was an overt act in furtherance of the conspiracy.

(61)     On or about March 11, 2022, **BROOKE COURTEMANCHE** received $38.66 in reimbursement from the Network for Strong Communities for forest kitchen materials.  This was an overt act in furtherance of the conspiracy.

(62)     On or about March 16, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $91.84 in reimbursement from the Network for Strong Communities to Brooke Courtemanche for forest kitchen materials.  This was an overt act in furtherance of the conspiracy.

(63)     On or about March 30, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $105.08 in reimbursement from the Network for Strong Communities to an unindicted co-conspirator, whose identity is known to the Grand Jury, for materials and supplies.  This was an overt act in furtherance of the conspiracy.

(64)     On or about March 30, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $71.18 in reimbursement from the Network for Strong Communities to an unindicted co-conspirator, whose identity is known to the Grand Jury, for tarps.  This was an overt act in furtherance of the conspiracy.

(65)     On or about March 30, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $163.23 in reimbursement from the Network for Strong Communities to an unindicted co-conspirator, whose identity is known to the Grand Jury, for tarp and gloves. This was an overt act in furtherance of the conspiracy.

(66)     On or about March 30, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $49.64 in reimbursement from the Network for Strong Communities to an unindicted co-conspirator, whose identity is known to the Grand Jury, for a tarp. This was an overt act in furtherance of the conspiracy.

(67)     On or about March 30, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $105.08 in reimbursement from the Network for Strong Communities to an unindicted co-conspirator, whose identity is known to the Grand Jury, for materials and supplies. This was an overt act in furtherance of the conspiracy.

(68)     On or about March 30, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $119.84 in reimbursement from the Network for Strong Communities to an unindicted co-conspirator, whose identity is known to the Grand Jury, for communications infrastructure. This was an overt act in furtherance of the conspiracy.

(69)     On or about March 30, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $30.03 in reimbursement from the Network for Strong Communities to Brooke Courtemanche for event supplies. This was an overt act in furtherance of the conspiracy.

(70)     On or about April 1, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $52.79 in reimbursement from the Network for Strong Communities to an unindicted co-conspirator, whose identity is known to the Grand Jury, for warming supplies for Forest Defenders.  This was an overt act in furtherance of the conspiracy.

(71)     On May 12, 2022, **KATIE KLOTH, TYLER NORMAN,** and **HANNAH KASS** vandalized a Brasfield and Gorrie office building in Cobb County, thereby knowingly using threats against Brasfield and Gorrie officials with the intent to cause and induce the Brasfield and Gorrie officials to withhold records, documents, and testimony in official proceedings.  This is an overt act in furtherance of the conspiracy.

(72)     On May 17, 2022, **ABAGAIL SKAPYAK, PHILIP FLAGG, MADELEINE KODAT, BROOKE COURTEMANCHE, MARIANNA HOITT-LANGE, ANA GYPSY LEE** and two unindicted co-conspirators did throw Molotov cocktails and glass bottles at at police officers.  This is an overt act in furtherance of the conspiracy.

(73)     On May 17, 2022, **ABAGAIL SKAPYAK, PHILIP FLAGG, MADELEINE KODAT, BROOKE COURTEMANCHE, MARIANNA HOITT-LANGE, ANA GYPSY LEE,** and two unindicted co-conspirators did attempt to occupy the forest thereby attempting to prevent police presence.  This is an overt act in furtherance of the conspiracy.

(74)     On or about May 25, 2022, **ADELE MACLEAN** received $14.08 in
reimbursement from the Network for Strong Communities for a lock on a trailer that
stored Forest Defender items in the DeKalb forest. This was an overt act in furtherance
of the conspiracy.

(75)     On or about May 25, 2022, **MARLON KAUTZ, ADELE MACLEAN, and
SAVANNAH PATTERSON** transferred $87.00 in reimbursement from the Network for
Strong Communities to an unindicted co-conspirator, whose identity is known to the
Grand Jury, for rain tarps and rain equipment for Forest Defenders. This was an overt act
in furtherance of the conspiracy.

(76)     On or about May 25, 2022, **MARLON KAUTZ, ADELE MACLEAN, and
SAVANNAH PATTERSON** transferred $108.81 in reimbursement from the Network
for Strong Communities to an unindicted co-conspirator, whose identity is known to the
Grand Jury, for a shovel, rope, and gloves. This was an overt act in furtherance of the
conspiracy.

(77)     On or about May 25, 2022, **MARLON KAUTZ, ADELE MACLEAN, and
SAVANNAH PATTERSON** transferred $174.66 in reimbursement from the Network
for Strong Communities to Brooke Courtemanche for tarps and tents for a week of action.
This was an overt act in furtherance of the conspiracy.

(78)     On or about May 25, 2022, **BROOKE COURTEMANCHE** received $174.66 in
reimbursement from the Network for Strong Communities for tents and tarps for a week
of action. This was an overt act in furtherance of the conspiracy.

(79)    .    On or about May 25, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $15.18 in reimbursement from the Network for Strong Communities to Brooke Courtemanche for goods to further living in the forest. This was an overt act in furtherance of the conspiracy.

(80)    On or about May 25, 2022, **BROOKE COURTEMANCHE** received $15.18 in reimbursement from the Network for Strong Communities for goods to further living in the forest. This was an overt act in furtherance of the conspiracy.

(81)    On May 26, 2022, **CHRISTOPHER REYNOLDS** and **MARIANNA HOITT-LANGE** did attempt to occupy the forest thereby attempting to prevent police presence. This is an overt act in furtherance of the conspiracy.

(82)    On June 6, 2022, **WILLIAM BUDDEN WARREN**, while employed with Flock, did provide locations of future Flock camera installations so that Defend the Atlanta Forest members could avoid detection. This would allow Defend the Atlanta Forest members to further occupy the forest. This is an overt act in furtherance of the conspiracy.

(83)    On or about June 19, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $178.80 in reimbursement from the Network for Strong Communities to Ivan Ferguson for materials for climb training in the forest. This was an overt act in furtherance of the conspiracy.

69

(84)     On or about June 19, 2022, **IVAN FERGUSON** received $178.80 in

reimbursement from the Network for Strong Communities for materials for climb

training in the forest. This was an overt act in furtherance of the conspiracy.

(85)     On or about June 25, 2022, **MARLON KAUTZ, ADELE MACLEAN, and**

**SAVANNAH PATTERSON** transferred $77.04 in reimbursement from the Network for

Strong Communities to Brooke Courtemanche for a tent. This was an overt act in

furtherance of the conspiracy.

(86)     On or about June 25, 2022, **BROOKE COURTEMANCHE** received $77.04 in

reimbursement from the Network for Strong Communities for a tent. This was an overt

act in furtherance of the conspiracy.

(87)     On or about June 25, 2022, **MARLON KAUTZ, ADELE MACLEAN, and**

**SAVANNAH PATTERSON** transferred $134.96 in reimbursement from the Network

for Strong Communities to Brooke Courtemanche for tents and tarps. This was an overt

act in furtherance of the conspiracy.

(88)     On or about June 25, 2022, **BROOKE COURTEMANCHE** received $134.96 in

reimbursement from the Network for Strong Communities for tents and tarps. This was

an overt act in furtherance of the conspiracy.

(89)     On or about June 25, 2022, **MARLON KAUTZ, ADELE MACLEAN, and**

**SAVANNAH PATTERSON** transferred $173.14 in reimbursement from the Network

for Strong Communities to an unindicted co-conspirator, whose identity is known to the

Grand Jury, for radio communications supplies. This was an overt act in furtherance of

the conspiracy.

(90)      On or about July 2, 2022, **MARLON KAUTZ, ADELE MACLEAN, and**

**SAVANNAH PATTERSON** transferred $96.86 in reimbursement from the Network for

Strong Communities to Caroline Tennenbaum for power packs.  This was an overt act in

furtherance of the conspiracy.

(91)      On or about July 2, 2022, **CAROLINE TENNENBAUM** received $96.86 in

reimbursement from the Network for Strong Communities for power packs.  This was an

overt act in furtherance of the conspiracy.

(92)      On or about July 2, 2022, **MARLON KAUTZ, ADELE MACLEAN, and**

**SAVANNAH PATTERSON** transferred $457.78 in reimbursement from the Network

for Strong Communities to Nadja Geier for materials to host climb-training sessions in

the woods.  This was an overt act in furtherance of the conspiracy.

(93)      On or about July 2, 2022, **NADJA GEIER** received $457.78 in reimbursement

from the Network for Strong Communities for materials to host climb-training sessions in

the woods.  This was an overt act in furtherance of the conspiracy.

(94)      On or about July 3, 2022, **MARLON KAUTZ, ADELE MACLEAN, and**

**SAVANNAH PATTERSON** transferred $404.95 in reimbursement from the Network

for Strong Communities to Ivan Ferguson for materials to host climb-training sessions in

the woods.  This was an overt act in furtherance of the conspiracy.

(95)      On or about July 3, 2022, **IVAN FERGUSON** received $404.95 in

reimbursement from the Network for Strong Communities for materials to host climb-

training sessions in the woods.  This was an overt act in furtherance of the conspiracy.

(96)     On or about July 3, 2022, **BROOKE COURTEMANCHE,** along with five

uninducted co-conspirators, whose identities are unknown to the Grand Jury, did

vandalize Ebenezer Baptist Church with paint. This was an overt act in furtherance of the

conspiracy.

(97)     On or about July 20, 2022, **MARLON KAUTZ** transferred $250.00 in

reimbursement from the Network for Strong Communities to Adele MacLean for

DeepMay tuition. This was an overt act in furtherance of the conspiracy.

(98)     On or about July 26, 2022, **MARLON KAUTZ, ADELE MACLEAN, and**

**SAVANNAH PATTERSON** transferred $152.96 in reimbursement from the Network

for Strong Communities to an unindicted co-conspirator, whose identity is known to the

Grand Jury, for a water hose to sustain occupation in the forest. This was an overt act in

furtherance of the conspiracy.

(99)     On or about August 9, 2022, **EMILY MURPHY** received $11.91 in

reimbursement from the Network for Strong Communities for glue. This was an overt

act in furtherance of the conspiracy.

(100)     On or about August 9, 2022, **EMILY MURPHY** received $39.98 in

reimbursement from the Network for Strong Communities for bins for a week of action.

This was an overt act in furtherance of the conspiracy.

(101)     On or about August 29, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $1,004.39 in reimbursement from the Network for Strong Communities to an unindicted co-conspirator, whose identity is known to the Grand Jury, for a generator.  This was an overt act in furtherance of the conspiracy.

(102)     On or about August 29, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $313.19 in reimbursement from the Network for Strong Communities to an unindicted co-conspirator, whose identity is known to the Grand Jury, for a printed documents in support of the occupation of the forest.  This was an overt act in furtherance of the conspiracy.

(103)     On or about September 23, 2022, **LILLIAN ELLIS** drove to the residence of Jim Gorrie and his family, with three unindicted co-conspirators whose identities is not known to the Grand Jury, to vandalize his vehicles, thereby knowingly using threats against Jim Gorrie with the intent to cause and induce Jim Gorrie to withhold records, documents, and testimony in official proceedings.  This was an overt act in furtherance of the conspiracy.

(104)     On or about September 24, 2022, **BROOKE COURTEMANCHE** received $310.52 in reimbursement from the Network for Strong Communities for week of action bulk goods.  This was an overt act in furtherance of the conspiracy.

(105)     On or about October 12, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $19.42 in reimbursement from the Network for Strong Communities to an unindicted co-conspirator, whose identity is known to the Grand Jury, for harm reduction supplies which provided support for the Forest Defenders. This was an overt act in furtherance of the conspiracy.

(106)     On or about November 5, 2022, **EMILY MURPHY** received $83.19 in reimbursement from the Network for Strong Communities for supplies to maintain occupation in the forest.  This was an overt act in furtherance of the conspiracy.

(107)     On or about November 5, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $83.19 in reimbursement from the Network for Strong Communities to Emily Murphy for supplies to maintain occupation in the forest. This was an overt act in furtherance of the conspiracy.

(108)     On or about November 5, 2022, **EMILY MURPHY** received $169.56 in reimbursement from the Network for Strong Communities for setup for welcome area for a weekend of action.  This was an overt act in furtherance of the conspiracy.

(109)     On or about November 5, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $169.56 in reimbursement from the Network for Strong Communities to Emily Murphy for setup for welcome area for a weekend of action.  This was an overt act in furtherance of the conspiracy.

(110)　　On November 8, 2022, **ABAGAIL SKAPYAK** did provide information to a

masked, unknown individual that held Richard Porter, a metal scrapper, at gunpoint in

Intrenchment Creek Park, thus committing an Aggravated Assault against Richard Porter.

This is an overt act in furtherance of the conspiracy.

(111)　　On or about December 12, 2023, **ADELE MACLEAN** received $43.90 in

reimbursement from the Network for Strong Communities for grip tape and rust reformer

for trailer that stored Defend the Atlanta Forest items.  This was an overt act in

furtherance of the conspiracy.

(112)　　On December 13, 2022, **FRANCIS CARROLL, SERENA HERTEL,**

**NICHOLAS OLSON, LEONARD VOISELLE, GENEVA TILLBURY,** and

**ARIEON ROBINSON** did attempt to occupy the forest thereby attempting to prevent

police presence.  This is an overt act in furtherance of the conspiracy.

(113)　　On December 13, 2022, **FRANCIS CARROLL, SERENA HERTEL,**

**NICHOLAS OLSON, LEONARD VOISELLE, GENEVA TILLBURY,** and

**ARIEON ROBINSON** did attempt to occupy the forest and prevent the construction of

the Atlanta Public Safety Training Center.  This is an overt act in furtherance of the

conspiracy.

(114)     On December 13, 2022, **LEONARD VOISELLE** did carry a backpack with
fireworks in the DeKalb forest. This is an overt act in furtherance of the conspiracy.

(115)     On December 13, 2022, **ARIEON ROBINSON** did wear a ghillie suit in an
attempt to avoid police detection and in a further attempt to occupy the DeKalb forest.
This is an overt act in furtherance of the conspiracy.

(116)     On December 13, 2022, **FRANCIS CARROLL, GENEVA TILLBURY, and
NICHOLAS OLSON** did throw rocks, a bottle, and shoot fireworks at firefighters and
EMTs. This is an overt act in furtherance of the conspiracy.

(117)     On December 13, 2022, **FRANCIS CARROLL, GENEVA TILLBURY, and
NICHOLAS OLSON** did damage an Atlanta Police Department vehicle. This is an
overt act in furtherance of the conspiracy.

(118)     On December 13, 2022, **SERENA HERTEL** did occupy a treehouse in a DeKalb
Forest where the Atlanta Public Safety Training Center will be built and did refuse to
come down from the treehouse. This is an overt act in furtherance of the conspiracy.

(119)     On December 13, 2022, **SERENA HERTEL** did issue a call to action on
Instagram for "Forest Defenders" to deliver a "physical response" to prevent her arrest.
This is an overt act in furtherance of the conspiracy.

(120)     On December 13, 2022, **SERENA HERTEL** did attach a wooden board with
metal spikes to a treehouse to prevent law enforcement from reaching the treehouse. This
is an overt act in furtherance of the conspiracy.

(121)    On December 13, 2022, **SERENA HERTEL** did cut a rope in an attempt to cause an arborist to fall during climbing. This is an overt act in furtherance of the conspiracy.

(122)    On December 13, 2022, **GENEVA TILLBURY** did drive Nicholas Olson and Francis Carroll further into the DeKalb Forest property in an attempt to evade police and further occupy the forest. This is an overt act in furtherance of the conspiracy.

(123)    On December 13, 2022, **FRANCIS CARROLL** did flee from Detective Ronald Sluss in an attempt to evade capture and further occupy the forest. This is an overt act in furtherance of the conspiracy.

(124)    On December 14, 2022, **ARIEL EBAUGH** did approach DeKalb law enforcement with a rifle, knives, and a pistol in a threatening manner in an attempt to intimidate officers, thus committing an Aggravated Assault against Dekalb law enforcement. This is an overt act in furtherance of the conspiracy.

(125)    On December 21, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to the Grand Jury, did publish a post on scenes.noblogs.org claiming responsibility for an attack on an apartment building in New York City where an Atlas employee lived and demanded that the City of Atlanta stop attempting to build the Atlanta Public Safety Training Facility, thereby knowingly using threats against construction officials with the intent to cause and induce the construction officials to withhold records, documents, and testimony in official proceedings. This was an overt act in furtherance of the conspiracy.

(126)    On or about December 22, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $935.00 from the Network for Strong Communities to Archipelago, Inc. for restroom support for a Week of Action 4. This was an overt act in furtherance of the conspiracy.

(127)    On December 23, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to the Grand Jury, did publish a post on scenes.noblogs.org providing information on construction that occurred and publicly posted the neighborhoods where the Chairman of Blackhall Studios lived, thereby knowingly using threats against the Chairman of Blackhall Studios with the intent to cause and induce the Chairman of Blackhall Studios to withhold records, documents, and testimony in official proceedings. This was an overt act in furtherance of the conspiracy.

(128)    On December 27, 2022, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to the Grand Jury, did publish a post on scenes.noblogs.org claiming responsibility for banners in Asheville, North Carolina in an effort to promote violence and property damage, thereby knowingly using threats against construction officials with the intent to cause and induce the construction officials to withhold records, documents, and testimony in official proceedings. This was an overt act in furtherance of the conspiracy.

(129)    On or about December 27, 2023, **MARLON KAUTZ** accepted $38.66 in reimbursement from the Network for Strong Communities for a DeepMay Server. This was an overt act in furtherance of the conspiracy.

(130)    On or about January 1, 2023, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to the Grand Jury, did publish a post on scenes.noblogs.org claiming responsibility for an arson on a Bank of America in Portland, Oregon as revenge for the arrest of six members of Defend the Atlanta Forest due to their opposition to the Atlanta Public Safety Training Facility, thereby knowingly using threats against construction officials with the intent to cause and induce the construction officials to withhold records, documents, and testimony in official proceedings. This was an overt act in furtherance of the conspiracy.

(131)    On or about January 6, 2023, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to the Grand Jury, did publish a post on scenes.noblogs.org calling for a week of Solidarity from January 13-16, 2023. This was an overt act in furtherance of the conspiracy.

(132)    On or about January 10, 2023, **SONALI GUPTA** received $400 in reimbursement from the Network for Strong Communities for a DeepMay Project Manager. This was an overt act in furtherance of the conspiracy.

(133)     On or about January 11, 2023, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to the Grand Jury, did publish a post on scenes.noblogs.org claiming responsibility for property damage to Brasfield and Gorrie building in Miami, Florida while demanded that the City of Atlanta stop attempting to build the Atlanta Public Safety Training Facility. This was an overt act in furtherance of the conspiracy, thereby knowingly using threats against Brasfield and Gorrie officials with the intent to cause and induce Brasfield and Gorrie officials to withhold records, documents, and testimony in official proceedings.

(134)     On or about January 15, 2023, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to the Grand Jury, did publish a post on scenes.noblogs.org claiming responsibility for property damage to tree cutting machines building in the Ozarks while demanding that the City of Atlanta stop attempting to build the Atlanta Public Safety Training Facility. This was an overt act in furtherance of the conspiracy, thereby knowingly using threats against construction officials with the intent to cause and induce the construction officials to withhold records, documents, and testimony in official proceedings.

(135)     On or about January 17, 2023, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $171.65 in reimbursement from the Network for Strong Communities to an unindicted co-conspirator, whose identity is known to the Grand Jury, for a tool library contribution.  This was an overt act in furtherance of the conspiracy.

(136)    On or about January 17, 2023, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $75.66 in reimbursement from the Network for Strong Communities to an unindicted co-conspirator, whose identity is known to the Grand Jury, for food to support resilience anti-repression trainings. This was an overt act in furtherance of the conspiracy.

(137)    On or about January 18, 2023, **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to the Grand Jury, did publish a "call to retaliation" on scenes.noblogs.org inviting citizens to participate in a "Night of Rage," thereby encouraging Domestic Terrorism. This was an overt act in furtherance of the conspiracy.

(138)    On or about January 18, 2023, **CHRISTOPHER REYNOLDS** did occupy a tree house in the DeKalb Woods in an effort to occupy the DeKalb forest and prevent the construction of the Atlanta Public Safety Training Center. This was an overt act in furtherance of the conspiracy.

(139)    On or about January 18, 2023, **CHRISTOPHER REYNOLDS** did refuse police commands to exit a tree house in the DeKalb Forest. This was an overt act in furtherance of the conspiracy.

(140)    On or about January 18, 2023, **CHRISTOPHER REYNOLDS** did take photos and video of police officers as police attempted to remove Reynolds from the treehouse. The photos and video were subsequently posted on social media. This was done to spread the message of Defend the Atlanta Forest. This was an overt act in furtherance of the conspiracy.

(141)     On or about January 18, 2023, **MATTHEW MACAR** did attempt occupy the

DeKalb forest with camouflage, camping gear, and living supplies.  This was done to

prevent the construction of the Atlanta Public Safety Training Center.  This was an overt

act in furtherance of the conspiracy.

(142)     On or about January 18, 2023, **SARAH WASALEWSKI** did attempt occupy the

DeKalb forest with camouflage, camping gear, and living supplies.  This was done to

prevent the construction of the Atlanta Public Safety Training Center.  This was an overt

act in furtherance of the conspiracy.

(143)     On or about January 18, 2023, **SPENCER LIBERTO** did attempt occupy the

DeKalb forest with camouflage, camping gear, and living supplies.  This was done to

prevent the construction of the Atlanta Public Safety Training Center.  This was an overt

act in furtherance of the conspiracy.

(144)     On or about January 18, 2023, **TIMOTHY MURPHY** did occupy a tree house in

the DeKalb Woods in an effort to occupy the DeKalb forest and prevent the construction

of the Atlanta Public Safety Training Center.  This was an overt act in furtherance of the

conspiracy.

(145)     On or about January 18, 2023, **TERESA SHEN** did attempt to occupy the

DeKalb forest and prevent the construction of the Atlanta Public Safety Training Center.

This was an overt act in furtherance of the conspiracy.

(146)     On or about January 18, 2023, **TERESA SHEN** did possess phone chargers,

food, camouflage clothing, climber's belt, and medication.  These items were to facilitate

long term occupation of the DeKalb forest and prevent the construction of the Atlanta.

This was an overt act in furtherance of the conspiracy.

(147)     On or about January 18, 2023, **GEOFFREY PARSONS** did attempt to occupy

the DeKalb forest and prevent the construction of the Atlanta Public Safety Training

Center. This was an overt act in furtherance of the conspiracy.

(148)     On or about January 18, 2023, **GEOFFREY PARSONS** did sign his name as

"ACAB." This was an overt act in furtherance of the conspiracy.

(149)     On or about January 19, 2023, **MARLON KAUTZ, ADELE MACLEAN, and**

**SAVANNAH PATTERSON,** along with unindicted co-conspirators that are unknown to

the Grand Jury, did publish a post on scenes.noblogs.org claiming responsibility for

property damage to Atlas Technical Consultants while demanding that Atlas drop its

contract to help build the Atlanta Public Safety Training Facility, thereby knowingly

using threats against construction officials with the intent to cause and induce the

construction officials to withhold records, documents, and testimony in official

proceedings. This was an overt act in furtherance of the conspiracy.


(150)     On or about January 20, 2023, **MARLON KAUTZ, ADELE MACLEAN, and**

**SAVANNAH PATTERSON,** along with unindicted co-conspirators that are unknown to

the Grand Jury, did publish a post on scenes.noblogs.org advocating for total war and

violence, thereby knowingly using threats against construction officials with the intent to

cause and induce the construction officials to withhold records, documents, and

testimony in official proceedings. This was an overt act in furtherance of the conspiracy.

(151)     On or about January 20, 2023, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to the Grand Jury, did publish a post on scenes.noblogs.org inviting people to come to Atlanta to engage in property destruction, thereby knowingly using threats against construction officials with the intent to cause and induce the construction officials to withhold records, documents, and testimony in official proceedings. This was an overt act in furtherance of the conspiracy.

(152)     On or about January 21, 2023, **NADJA GEIER, MADELEINE FEOLA, EMILY MURPHY, FRANCIS CARROLL,** and **IVAN FERGUSON** did join the "Night of Rage" in Atlanta and caused arson and property damage, and thereby committed the offense of Domestic Terrorism. This is an overt act in furtherance of the conspiracy.

(153)     On or about January 21, 2023, **IVAN FERGUSON** and **NADJA GEIER** rode together to the "Night of Rage" in Atlanta. Inside of the truck was a gas can, camping gear, and climbing gear. This is an overt act in furtherance of the conspiracy.

(154)     On or about January 21, 2023, **IVAN FERGUSON** and **NADJA GEIER** rode together to the "Night of Rage" in Atlanta. Inside of the truck was a gas can, camping gear, and climbing gear. This is an overt act in furtherance of the conspiracy.

(155)     On or about January 21, 2023, **FRANCIS CARROLL** did possess a lighter and accelerant while attempting to break into 191 Peachtree Street in Atlanta and did commit the offense of Domestic Terrorism. This is an overt act in furtherance of the conspiracy.

(156)     On or about January 21, 2023, **FRANCIS CARROLL** did possess a hammer
while attempting to break into 191 Peachtree Street in Atlanta and did commit the offense
of Domestic Terrorism.  This is an overt act in furtherance of the conspiracy.

(157)     On or about January 21, 2023, **FRANCIS CARROLL** did possess spray paint
while attempting to break into 191 Peachtree Street in Atlanta.  This is an overt act in
furtherance of the conspiracy.

(158)     On or about January 21, 2023, **MARLON KAUTZ, ADELE MACLEAN, and
SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to
the Grand Jury, did publish a post on scenes.noblogs.org claiming responsibility for
property damage to a Bank of America and demanding that the City of Atlanta stop
attempting to build the Atlanta Public Safety Training Facility, thereby knowingly using
threats against construction officials with the intent to cause and induce the construction
officials to withhold records, documents, and testimony in official proceedings.  This was
an overt act in furtherance of the conspiracy.  This was an overt act in furtherance of the
conspiracy.

(159)     On or about January 21, 2023, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to the Grand Jury, did publish a post on scenes.noblogs.org advocating for violence and bloodshed in an effort to stop the building of the Atlanta Public Safety Training Facility, thereby knowingly using threats against construction officials with the intent to cause and induce the construction officials to withhold records, documents, and testimony in official proceedings.  This was an overt act in furtherance of the conspiracy.  This was an overt act in furtherance of the conspiracy.

(160)     On or about January 22, 2023, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to the Grand Jury, did publish a post on scenes.noblogs.org claiming responsibility for property damage to an Atlas facility and demanding that Atlas drop its contract to assist in building the Atlanta Public Safety Training Facility, thereby knowingly using threats against construction officials with the intent to cause and induce the construction officials to withhold records, documents, and testimony in official proceedings.  This was an overt act in furtherance of the conspiracy.  This was an overt act in furtherance of the conspiracy.

(161)     On or about January 23, 2023, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to the Grand Jury, did publish a post on scenes.noblogs.org claiming responsibility for property damage to building in Philadelphia and advocating for death to civilization, thereby knowingly using threats against construction officials with the intent to cause and induce the construction officials to withhold records, documents, and testimony in official proceedings.  This was an overt act in furtherance of the conspiracy.  This was an overt act in furtherance of the conspiracy.

(162)     On or about January 23, 2023, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to the Grand Jury, did publish a post on scenes.noblogs.org claiming responsibility for property damage to an excavator in Portland, Oregon and advocating for death to all police officers, thereby knowingly using threats against construction officials with the intent to cause and induce the construction officials to withhold records, documents, and testimony in official proceedings.  This was an overt act in furtherance of the conspiracy. This was an overt act in furtherance of the conspiracy.

(163)     On or about January 23, 2023, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to the Grand Jury, did publish a post on scenes.noblogs.org claiming responsibility for property damage to a KPMG building and advocating against the Atlanta Public Safety Training Facility, thereby knowingly using threats against construction officials with the intent to cause and induce the construction officials to withhold records, documents, and testimony in official proceedings. This was an overt act in furtherance of the conspiracy. This was an overt act in furtherance of the conspiracy.

(164)     On or about January 24, 2023, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON**, along with unindicted co-conspirators that are unknown to the Grand Jury, did publish a post on scenes.noblogs.org claiming responsibility for property damage to an Atlas building in Detroit, Michigan and advocating against the Atlanta Public Safety Training Facility, thereby knowingly using threats against construction officials with the intent to cause and induce the construction officials to withhold records, documents, and testimony in official proceedings. This was an overt act in furtherance of the conspiracy. This was an overt act in furtherance of the conspiracy.

(165)     On or about January 25, 2023, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $467 in reimbursement from the Network for Strong Communities to an unindicted co-conspirator, whose identity is known to the Grand Jury, for tools for a tool library. This was an overt act in furtherance of the conspiracy.

(166)     On or about January 25, 2023, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** transferred $665.90 in reimbursement from the Network for Strong Communities to an unindicted co-conspirator, whose identity is known to the Grand Jury, for tools for a tool library.  This was an overt act in furtherance of the conspiracy.

(167)     On or about February 2, 2023, **SONALI GUPTA** accepted $400.00 in reimbursement from the Network for Strong Communities to be a DeepMay Project Manager.  This was an overt act in furtherance of the conspiracy.

(168)     On or about March 2, 2023, **SAVANNAH PATTERSON** accepted $1,999.00 in reimbursement from the Network for Strong Communities to pay for Defend the Atlanta Forest merchandise.  This was an overt act in furtherance of the conspiracy.

(169)     On or about March 5, 2023, **SAMUEL WARD, MAX BIEDERMAN, MATTIA LUINI, EMMA BOGUSH, KAYLEY MEISSNER, LUKE HARPER, JACK BEAMON, AYLA KING, KAMRYN PIPES, MAGGIE GATES, EHRET NOTTINGHAM, GRACE MARTIN, COLIN DORSEY, FREDRIQUE ROBERT-PAUL, ZOE LARMEY, THOMAS JURGEN, PRISCILLA GRIM, ALEXIS PAPALI, TIMOTHY BILODEAU, VICTOR PUERTAS, AMIN CHAOUI, JAMES MARSICANO, and DIMITRI LENY** did commit a Criminal Trespass in an attempt to further the occupation the DeKalb forest.  This is an overt act in furtherance of the conspiracy.

(170)     On or about March 5, 2023, **SAMUEL WARD** did join an organized mob of individuals designed to overwhelm the police force in an attempt to occupy the DeKalb forest and cause property damage. This is an overt act in furtherance of the conspiracy.

(171)     On or about March 5, 2023, **MAX BIEDERMAN** did join an organized mob of individuals designed to overwhelm the police force in an attempt to occupy the DeKalb forest and cause property damage. This is an overt act in furtherance of the conspiracy.

(172)     On or about March 5, 2023, **MATTIA LUINI** did join an organized mob of individuals designed to overwhelm the police force in an attempt to occupy the DeKalb forest and cause property damage. This is an overt act in furtherance of the conspiracy.

(173)     On or about March 5, 2023, **EMMA BOGUSH** did join an organized mob of individuals designed to overwhelm the police force in an attempt to occupy the DeKalb forest and cause property damage. This is an overt act in furtherance of the conspiracy.

(174)     On or about March 5, 2023, **KAYLEY MEISSNER** did join an organized mob of individuals designed to overwhelm the police force in an attempt to occupy the DeKalb forest and cause property damage. This is an overt act in furtherance of the conspiracy.

(175)     On or about March 5, 2023, **LUKE HARPER** did join an organized mob of individuals designed to overwhelm the police force in an attempt to occupy the DeKalb forest and cause property damage. This is an overt act in furtherance of the conspiracy.

(176)     On or about March 5, 2023, **JACK BEAMON** did join an organized mob of individuals designed to overwhelm the police force in an attempt to occupy the DeKalb forest and cause property damage. This is an overt act in furtherance of the conspiracy.

(177)     On or about March 5, 2023, **AYLA KING** did join an organized mob of individuals designed to overwhelm the police force in an attempt to occupy the DeKalb forest and cause property damage.  This is an overt act in furtherance of the conspiracy.

(178)     On or about March 5, 2023, **KAMRYN PIPES** did join an organized mob of individuals designed to overwhelm the police force in an attempt to occupy the DeKalb forest and cause property damage.  This is an overt act in furtherance of the conspiracy.

(179)     On or about March 5, 2023, **MAGGIE GATES** did join an organized mob of individuals designed to overwhelm the police force in an attempt to occupy the DeKalb forest and cause property damage.  This is an overt act in furtherance of the conspiracy.

(180)     On or about March 5, 2023, **EHRET NOTTINGHAM** did join an organized mob of individuals designed to overwhelm the police force in an attempt to occupy the DeKalb forest and cause property damage.  This is an overt act in furtherance of the conspiracy.

(181)     On or about March 5, 2023, **GRACE MARTIN** did join an organized mob of individuals designed to overwhelm the police force in an attempt to occupy the DeKalb forest and cause property damage.  This is an overt act in furtherance of the conspiracy.

(182)     On or about March 5, 2023, **COLIN DORSEY** did join an organized mob of individuals designed to overwhelm the police force in an attempt to occupy the DeKalb forest and cause property damage.  This is an overt act in furtherance of the conspiracy.

(183)     On or about March 5, 2023, **FREDRIQUE ROBERT-PAUL** did join an organized mob of individuals designed to overwhelm the police force in an attempt to occupy the DeKalb forest and cause property damage.  This is an overt act in furtherance of the conspiracy.

(184)     On or about March 5, 2023, **ZOE LARMEY** did join an organized mob of individuals designed to overwhelm the police force in an attempt to occupy the DeKalb forest and cause property damage. This is an overt act in furtherance of the conspiracy.

(185)     On or about March 5, 2023, **THOMAS JURGEN** did assist and join an organized mob of individuals designed to overwhelm the police force in an attempt to occupy the DeKalb forest and cause property damage. This is an overt act in furtherance of the conspiracy.

(186)     On or about March 5, 2023, **PRISCILLA GRIM** did join an organized mob of individuals designed to overwhelm the police force in an attempt to occupy the DeKalb forest and cause property damage. This is an overt act in furtherance of the conspiracy.

(187)     On or about March 5, 2023, **ALEXIS PAPALI** did join an organized mob of individuals designed to overwhelm the police force in an attempt to occupy the DeKalb forest and cause property damage. This is an overt act in furtherance of the conspiracy.

(188)     On or about March 5, 2023, **TIMOTHY BILODEAU** did join an organized mob of individuals designed to overwhelm the police force in an attempt to occupy the DeKalb forest and cause property damage. This is an overt act in furtherance of the conspiracy.

(189)     On or about March 5, 2023, **VICTOR PUERTAS** did join an organized mob of individuals designed to overwhelm the police force in an attempt to occupy the DeKalb forest and cause property damage. This is an overt act in furtherance of the conspiracy.

(190)     On or about March 5, 2023, **AMIN CHAOUI** did join an organized mob of individuals designed to overwhelm the police force in an attempt to occupy the DeKalb forest and cause property damage. This is an overt act in furtherance of the conspiracy.

(191)     On or about March 5, 2023, **JAMES MARSICANO** did join an organized mob of individuals designed to overwhelm the police force in an attempt to occupy the DeKalb forest and cause property damage.  This is an overt act in furtherance of the conspiracy.

(192)     On or about March 5, 2023, **DIMITRI LENY** did join an organized mob of individuals designed to overwhelm the police force in an attempt to occupy the DeKalb forest and cause property damage.  This is an overt act in furtherance of the conspiracy.

(193)     On or about March 5, 2023, **LEIF NOVAK** did join an organized mob of individuals designed to overwhelm the police force in an attempt to occupy the DeKalb forest and cause property damage.  This is an overt act in furtherance of the conspiracy.

(194)     On or about March 5, 2023, **SAMUEL WARD** did join an organized mob and succeeded in overwhelming the police force, thereby aiding and abetting in the offense of Arson and Domestic Terrorism in an attempt to occupy the DeKalb forest and prevent the building of the Atlanta Public Safety Training Center.  This is an overt act in furtherance of the conspiracy.

(195)     On or about March 5, 2023, **MAX BIEDERMAN** did join an organized mob and succeeded in overwhelming the police force, thereby aiding and abetting in the offense of Arson and Domestic Terrorism in an attempt to occupy the DeKalb forest and prevent the building of the Atlanta Public Safety Training Center.  This is an overt act in furtherance of the conspiracy.

(196)     On or about March 5, 2023, **MATTIA LUINI** did join an organized mob and
succeeded in overwhelming the police force, thereby aiding and abetting in the offense of
Arson and Domestic Terrorism in an attempt to occupy the DeKalb forest and prevent the
building of the Atlanta Public Safety Training Center.  This is an overt act in furtherance
of the conspiracy.

(197)     On or about March 5, 2023, **EMMA BOGUSH** did join an organized mob and
succeeded in overwhelming the police force, thereby aiding and abetting in the offense of
Arson and Domestic Terrorism in an attempt to occupy the DeKalb forest and prevent the
building of the Atlanta Public Safety Training Center.  This is an overt act in furtherance
of the conspiracy.

(198)     On or about March 5, 2023, **KAYLEY MEISSNER** did join an organized mob
and succeeded in overwhelming the police force, thereby aiding and abetting in the
offense of Arson and Domestic Terrorism in an attempt to occupy the DeKalb forest and
prevent the building of the Atlanta Public Safety Training Center.  This is an overt act in
furtherance of the conspiracy.

(199)     On or about March 5, 2023, **LUKE HARPER** did join an organized mob and
succeeded in overwhelming the police force, thereby aiding and abetting in the offense of
Arson and Domestic Terrorism in an attempt to occupy the DeKalb forest and prevent the
building of the Atlanta Public Safety Training Center.  This is an overt act in furtherance
of the conspiracy.

(200)     On or about March 5, 2023, **JACK BEAMON** did join an organized mob and succeeded in overwhelming the police force, thereby aiding and abetting in the offense of Arson and Domestic Terrorism in an attempt to occupy the DeKalb forest and prevent the building of the Atlanta Public Safety Training Center.  This is an overt act in furtherance of the conspiracy.

(201)     On or about March 5, 2023, **AYLA KING** did join an organized mob and succeeded in overwhelming the police force, thereby aiding and abetting in the offense of Arson and Domestic Terrorism in an attempt to occupy the DeKalb forest and prevent the building of the Atlanta Public Safety Training Center.  This is an overt act in furtherance of the conspiracy.

(202)     On or about March 5, 2023, **KAMRYN PIPES** did join an organized mob and succeeded in overwhelming the police force, thereby aiding and abetting in the offense of Arson and Domestic Terrorism in an attempt to occupy the DeKalb forest and prevent the building of the Atlanta Public Safety Training Center.  This is an overt act in furtherance of the conspiracy.

(203)     On or about March 5, 2023, **MAGGIE GATES** did join an organized mob and succeeded in overwhelming the police force, thereby aiding and abetting in the offense of Arson and Domestic Terrorism in an attempt to occupy the DeKalb forest and prevent the building of the Atlanta Public Safety Training Center.  This is an overt act in furtherance of the conspiracy.

(204)     On or about March 5, 2023, **EHRET NOTTINGHAM** did join an organized mob and succeeded in overwhelming the police force, thereby aiding and abetting in the offense of Arson and Domestic Terrorism in an attempt to occupy the DeKalb forest and prevent the building of the Atlanta Public Safety Training Center. This is an overt act in furtherance of the conspiracy.

(205)     On or about March 5, 2023, **GRACE MARTIN** did join an organized mob and succeeded in overwhelming the police force, thereby aiding and abetting in the offense of Arson and Domestic Terrorism in an attempt to occupy the DeKalb forest and prevent the building of the Atlanta Public Safety Training Center. This is an overt act in furtherance of the conspiracy.

(206)     On or about March 5, 2023, **COLIN DORSEY** did join an organized mob and succeeded in overwhelming the police force, thereby aiding and abetting in the offense of Arson and Domestic Terrorism in an attempt to occupy the DeKalb forest and prevent the building of the Atlanta Public Safety Training Center. This is an overt act in furtherance of the conspiracy.

(207)     On or about March 5, 2023, **FREDRIQUE ROBERT-PAUL** did join an organized mob and succeeded in overwhelming the police force, thereby aiding and abetting in the offense of Arson and Domestic Terrorism in an attempt to occupy the DeKalb forest and prevent the building of the Atlanta Public Safety Training Center. This is an overt act in furtherance of the conspiracy.

(208)     On or about March 5, 2023, **ZOE LARMEY** did join an organized mob and
succeeded in overwhelming the police force, thereby aiding and abetting in the offense of
Arson and Domestic Terrorism in an attempt to occupy the DeKalb forest and prevent the
building of the Atlanta Public Safety Training Center.  This is an overt act in furtherance
of the conspiracy.

(209)     On or about March 5, 2023, **THOMAS JURGENS** did join an organized mob
and succeeded in overwhelming the police force, thereby aiding and abetting in the
offense of Arson and Domestic Terrorism in an attempt to occupy the DeKalb forest and
prevent the building of the Atlanta Public Safety Training Center.  This is an overt act in
furtherance of the conspiracy.

(210)     On or about March 5, 2023, **PRISCILLA GRIM** did join an organized mob and
succeeded in overwhelming the police force, thereby aiding and abetting in the offense of
Arson and Domestic Terrorism in an attempt to occupy the DeKalb forest and prevent the
building of the Atlanta Public Safety Training Center.  This is an overt act in furtherance
of the conspiracy.

(211)     On or about March 5, 2023, **ALEXIS PAPALI** did join an organized mob and
succeeded in overwhelming the police force, thereby aiding and abetting in the offense of
Arson and Domestic Terrorism in an attempt to occupy the DeKalb forest and prevent the
building of the Atlanta Public Safety Training Center.  This is an overt act in furtherance
of the conspiracy.

(212)    On or about March 5, 2023, **TIMOTHY MURPHY** did join an organized mob and succeeded in overwhelming the police force, thereby aiding and abetting in the offense of Arson and Domestic Terrorism in an attempt to occupy the DeKalb forest and prevent the building of the Atlanta Public Safety Training Center.  This is an overt act in furtherance of the conspiracy.

(213)    On or about March 5, 2023, **VICTOR PUERTAS** did join an organized mob and succeeded in overwhelming the police force, thereby aiding and abetting in the offense of Arson and Domestic Terrorism in an attempt to occupy the DeKalb forest and prevent the building of the Atlanta Public Safety Training Center.  This is an overt act in furtherance of the conspiracy.

(214)    On or about March 5, 2023, **AMIN CHAOUI** did join an organized mob and succeeded in overwhelming the police force, thereby aiding and abetting in the offense of Arson and Domestic Terrorism in an attempt to occupy the DeKalb forest and prevent the building of the Atlanta Public Safety Training Center.  This is an overt act in furtherance of the conspiracy.

(215)    On or about March 5, 2023, **JAMES MARSICANO** did join an organized mob and succeeded in overwhelming the police force, thereby aiding and abetting in the offense of Arson and Domestic Terrorism in an attempt to occupy the DeKalb forest and prevent the building of the Atlanta Public Safety Training Center.  This is an overt act in furtherance of the conspiracy.

(216)     On or about March 5, 2023, **DIMITRI LENY** did join an organized mob and succeeded in overwhelming the police force, thereby aiding and abetting in the offense of Arson and Domestic Terrorism in an attempt to occupy the DeKalb forest and prevent the building of the Atlanta Public Safety Training Center.  This is an overt act in furtherance of the conspiracy.

(217)     On or about March 5, 2023, **LEIF NOVAK** did join an organized mob and succeeded in overwhelming the police force, thereby aiding and abetting in the offense of Arson and Domestic Terrorism in an attempt to occupy the DeKalb forest and prevent the building of the Atlanta Public Safety Training Center.  This is an overt act in furtherance of the conspiracy.

(218)     On or about March 5, 2023, **LEIF NOVAK** did punch a police officer.  This is an overt act in furtherance of the conspiracy.

(219)     On or about March 16, 2023, **MARLON KAUTZ** accepted $36.83 in reimbursement from the Network for Strong Communities for a DeepMay Server.  This was an overt act in furtherance of the conspiracy.

(220)     On or about April 29, 2023, **CAROLINE TENNENBAUM, ABEEKU VASSAIL, and JULIA DUPUIS** did research and electronically map directions to Trooper Jonathan Saucedo's house in Bartow County, Georgia.  This is an overt act in furtherance of the conspiracy.

(221)     On or about April 29, 2023, **CAROLINE TENNENBAUM, ABEEKU VASSAIL, and JULIA DUPUIS** did travel to Trooper Jonathan Saucedo's neighborhood and house in Bartow County, Georgia.  This is an overt act in furtherance of the conspiracy.

(222)     On or about April 29, 2023, **CAROLINE TENNENBAUM, ABEEKU VASSAIL, and JULIA DUPUIS** did distribute flyers calling Trooper Jonathan Saucedo a murderer in Trooper Saucedo's neighborhood in Bartow County, Georgia.  This is an overt act in furtherance of the conspiracy.

(223)     On or about April 29, 2023, **CAROLINE TENNENBAUM, ABEEKU VASSAIL, and JULIA DUPUIS** did possess a Faraday bag, masks, goggles, wig, and change of clothes in Bartow County, Georgia.  This is an overt act in furtherance of the conspiracy.

(224)     On or about May 31, 2023, **MARLON KAUTZ, ADELE MACLEAN, and SAVANNAH PATTERSON** did possess a document named "Security Handbook" that describes methods of committing violent crimes and property crimes, recruiting co-conspirators, how to get away with crimes, and other methods of promoting anarchy. This is an overt act in furtherance of the conspiracy.

(225)     On or about August 25, 2023, **PRISCILLA GRIM** did fill out a background and recruitment slip with the Atlanta Police Department at a hiring table so that she could gather the location of the table to provide to Defend the Atlanta Forest activists, resulting in activists attacking the Atlanta Police Department table the next day.  This is an overt act in furtherance of the conspiracy.

## COUNT II – DOMESTIC TERRORISM

The Grand Jurors aforesaid, in the name and behalf of the citizens of Georgia, charge and accuse **NADJA GEIER, MADELEINE FEOLA, EMILY MURPHY, FRANCIS CARROLL,** and **IVAN FERGUSON,** individually and as parties to the crime, with the offense of Domestic Terrorism, for the said accused, in the County of Fulton and the State of Georgia, on or about the 21st day of January, 2023, did attempt to commit the offense of Arson in the First Degree, a felony, with the intent to destroy and disable critical infrastructure, and such destruction and disabling would result in major economic loss, to wit: Atlanta Police Department vehicles, a bank, and the 191 Peachtree tower, and said acts are intended to intimidate a political subdivision, to wit: The City of Atlanta, contrary to the laws of this State, the good order, peace, and dignity thereof,

## COUNT III – ARSON IN THE FIRST DEGREE

The Grand Jurors aforesaid, in the name and behalf of the citizens of Georgia, charge and accuse **NADJA GEIER, MADELEINE FEOLA, EMILY MURPHY, FRANCIS CARROLL,** and **IVAN FERGUSON,** individually and as parties to the crime, with the offense of Criminal Attempt to Commit Arson, for the said accused, in the County of Fulton and the State of Georgia, on or about the 21st day of January, 2023, did attempt to commit the offense of Arson in the First Degree, a felony, and performed acts, any of which, that constitute a substantial step toward the commission of arson, to wit: did travel to the City of Atlanta during a "Night of Rage," did possess means of fire and explosive by possessing accelerant and a lighter, and did attempt to break into the 191 Peachtree Street tower, contrary to the laws of this State, the good order, peace, and dignity thereof.

## COUNT IV – MONEY LAUNDERING

The Grand Jurors aforesaid, in the name and behalf of the citizens of Georgia, charge and accuse **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON,** individually and as parties to the crime, with the offense of Money Laundering, **O.C.G.A. § 7-1-915**, for the said accused, in the County of Fulton and the State of Georgia, on or about the 10th day of January, 2022, with the intent to promote the carrying on the specified unlawful activity of Criminal Trespass and while knowing that the moneys involved in said currency transaction represent the proceeds of a form the unlawful activity of Charity Fraud, did conduct said currency transaction by transferring $61.21 from the Network for Strong Communities to Brooke Courtemanche for forest kitchen materials, contrary to the laws of this State, the good order, peace, and dignity thereof.

## COUNT V – MONEY LAUNDERING

The Grand Jurors aforesaid, in the name and behalf of the citizens of Georgia, charge and accuse **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON,** individually and as parties to the crime, with the offense of Money Laundering, **O.C.G.A. § 7-1-915**, for the said accused, in the County of Fulton and the State of Georgia, on or about the 10th day of January, 2022, with the intent to promote the carrying on the specified unlawful activity of Criminal Trespass and while knowing that the moneys involved in said currency transaction represent the proceeds of a form the unlawful activity of Charity Fraud, did conduct said currency transaction by transferring $27.62 from the Network for Strong Communities to Brooke Courtemanche for forest tools, contrary to the laws of this State, the good order, peace, and dignity thereof.

## COUNT VI – MONEY LAUNDERING

The Grand Jurors aforesaid, in the name and behalf of the citizens of Georgia, charge and accuse **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON,** individually and as parties to the crime, with the offense of Money Laundering, **O.C.G.A. § 7-1-915,** for the said accused, in the County of Fulton and the State of Georgia, on or about the 10th day of January, 2022, with the intent to promote the carrying on the specified unlawful activity of Criminal Trespass and while knowing that the moneys involved in said currency transaction represent the proceeds of a form the unlawful activity of Charity Fraud, did conduct said currency transaction by transferring $52.22 from the Network for Strong Communities to Brooke Courtemanche for forest kitchen food, contrary to the laws of this State, the good order, peace, and dignity thereof.

## COUNT VII – MONEY LAUNDERING

The Grand Jurors aforesaid, in the name and behalf of the citizens of Georgia, charge and accuse **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON,** individually and as parties to the crime, with the offense of Money Laundering, **O.C.G.A. § 7-1-915,** for the said accused, in the County of Fulton and the State of Georgia, on or about the 10th day of January, 2022, with the intent to promote the carrying on the specified unlawful activity of Criminal Trespass and while knowing that the moneys involved in said currency transaction represent the proceeds of a form the unlawful activity of Charity Fraud, did conduct said currency transaction by transferring $256.16 from the Network for Strong Communities to Brooke Courtemanche for tools, rope, and tarps, contrary to the laws of this State, the good order, peace, and dignity thereof.

## COUNT VIII – MONEY LAUNDERING

The Grand Jurors aforesaid, in the name and behalf of the citizens of Georgia, charge and accuse **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON,** individually and as parties to the crime, with the offense of Money Laundering, **O.C.G.A. § 7-1-915,** for the said accused, in the County of Fulton and the State of Georgia, on or about the 10th day of January, 2022, with the intent to promote the carrying on the specified unlawful activity of Criminal Trespass and while knowing that the moneys involved in said currency transaction represent the proceeds of a form the unlawful activity of Charity Fraud, did conduct said currency transaction by transferring $27.62 from the Network for Strong Communities to Brooke Courtemanche for forest tools, contrary to the laws of this State, the good order, peace, and dignity thereof.

## COUNT XI – MONEY LAUNDERING

The Grand Jurors aforesaid, in the name and behalf of the citizens of Georgia, charge and accuse **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON,** individually and as parties to the crime, with the offense of Money Laundering, **O.C.G.A. § 7-1-915,** for the said accused, in the County of Fulton and the State of Georgia, on or about the 10th day of March, 2022, with the intent to promote the carrying on the specified unlawful activity of Criminal Trespass and while knowing that the moneys involved in said currency transaction represent the proceeds of a form the unlawful activity of Charity Fraud, did conduct said currency transaction by transferring $12.52 from the Network for Strong Communities to Brooke Courtemanche for forest kitchen materials, contrary to the laws of this State, the good order, peace, and dignity thereof.

## COUNT X – MONEY LAUNDERING

The Grand Jurors aforesaid, in the name and behalf of the citizens of Georgia, charge and accuse **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON,** individually and as parties to the crime, with the offense of Money Laundering, **O.C.G.A. § 7-1-915**, for the said accused, in the County of Fulton and the State of Georgia, on or about the 10th day of March, 2022, with the intent to promote the carrying on the specified unlawful activity of Criminal Trespass and while knowing that the moneys involved in said currency transaction represent the proceeds of a form the unlawful activity of Charity Fraud, did conduct said currency transaction by transferring $68.81 from the Network for Strong Communities to Brooke Courtemanche for forest kitchen materials, contrary to the laws of this State, the good order, peace, and dignity thereof.

## COUNT XI – MONEY LAUNDERING

The Grand Jurors aforesaid, in the name and behalf of the citizens of Georgia, charge and accuse **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON,** individually and as parties to the crime, with the offense of Money Laundering, **O.C.G.A. § 7-1-915**, for the said accused, in the County of Fulton and the State of Georgia, on or about the 10th day of March, 2022, with the intent to promote the carrying on the specified unlawful activity of Criminal Trespass and while knowing that the moneys involved in said currency transaction represent the proceeds of a form the unlawful activity of Charity Fraud, did conduct said currency transaction by transferring $93.04 from the Network for Strong Communities to Brooke Courtemanche for camping supplies, contrary to the laws of this State, the good order, peace, and dignity thereof.

## COUNT XII – MONEY LAUNDERING

The Grand Jurors aforesaid, in the name and behalf of the citizens of Georgia, charge and accuse **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON,** individually and as parties to the crime, with the offense of Money Laundering, **O.C.G.A. § 7-1-915**, for the said accused, in the County of Fulton and the State of Georgia, on or about the 10th day of March, 2022, with the intent to promote the carrying on the specified unlawful activity of Criminal Trespass and while knowing that the moneys involved in said currency transaction represent the proceeds of a form the unlawful activity of Charity Fraud, did conduct said currency transaction by transferring $99.41 from the Network for Strong Communities to Brooke Courtemanche for camping supplies, contrary to the laws of this State, the good order, peace, and dignity thereof.

## COUNT XIII – MONEY LAUNDERING

The Grand Jurors aforesaid, in the name and behalf of the citizens of Georgia, charge and accuse **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON,** individually and as parties to the crime, with the offense of Money Laundering, **O.C.G.A. § 7-1-915**, for the said accused, in the County of Fulton and the State of Georgia, on or about the 10th day of March, 2022, with the intent to promote the carrying on the specified unlawful activity of Criminal Trespass and while knowing that the moneys involved in said currency transaction represent the proceeds of a form the unlawful activity of Charity Fraud, did conduct said currency transaction by transferring $68.54 from the Network for Strong Communities to Brooke Courtemanche for forest kitchen materials, contrary to the laws of this State, the good order, peace, and dignity thereof.

## COUNT XIV – MONEY LAUNDERING

The Grand Jurors aforesaid, in the name and behalf of the citizens of Georgia, charge and accuse **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON,** individually and as parties to the crime, with the offense of Money Laundering, **O.C.G.A. § 7-1-915**, for the said accused, in the County of Fulton and the State of Georgia, on or about the 10th day of March, 2022, with the intent to promote the carrying on the specified unlawful activity of Criminal Trespass and while knowing that the moneys involved in said currency transaction represent the proceeds of a form the unlawful activity of Charity Fraud, did conduct said currency transaction by transferring $140.48 from the Network for Strong Communities to Brooke Courtemanche for forest kitchen and outdoor supplies, contrary to the laws of this State, the good order, peace, and dignity thereof.

## COUNT XV – MONEY LAUNDERING

The Grand Jurors aforesaid, in the name and behalf of the citizens of Georgia, charge and accuse **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON,** individually and as parties to the crime, with the offense of Money Laundering, **O.C.G.A. § 7-1-915**, for the said accused, in the County of Fulton and the State of Georgia, on or about the 10th day of March, 2022, with the intent to promote the carrying on the specified unlawful activity of Criminal Trespass and while knowing that the moneys involved in said currency transaction represent the proceeds of a form the unlawful activity of Charity Fraud, did conduct said currency transaction by transferring $61.98 from the Network for Strong Communities to Brooke Courtemanche for food for the Forest Defenders, contrary to the laws of this State, the good order, peace, and dignity thereof.

## COUNT XVI – MONEY LAUNDERING

The Grand Jurors aforesaid, in the name and behalf of the citizens of Georgia, charge and accuse **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON,** individually and as parties to the crime, with the offense of Money Laundering, **O.C.G.A. § 7-1-915,** for the said accused, in the County of Fulton and the State of Georgia, on or about the 10th day of March, 2022, with the intent to promote the carrying on the specified unlawful activity of Criminal Trespass and while knowing that the moneys involved in said currency transaction represent the proceeds of a form the unlawful activity of Charity Fraud, did conduct said currency transaction by transferring $48.06 from the Network for Strong Communities to Brooke Courtemanche for supplies for Forest Defenders, contrary to the laws of this State, the good order, peace, and dignity thereof.

## COUNT XVII – MONEY LAUNDERING

The Grand Jurors aforesaid, in the name and behalf of the citizens of Georgia, charge and accuse **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON,** individually and as parties to the crime, with the offense of Money Laundering, **O.C.G.A. § 7-1-915,** for the said accused, in the County of Fulton and the State of Georgia, on or about the 10th day of March, 2022, with the intent to promote the carrying on the specified unlawful activity of Criminal Trespass and while knowing that the moneys involved in said currency transaction represent the proceeds of a form the unlawful activity of Charity Fraud, did conduct said currency transaction by transferring $107.82 from the Network for Strong Communities to Brooke Courtemanche for forest set up supplies, contrary to the laws of this State, the good order, peace, and dignity thereof.

## COUNT XVIII – MONEY LAUNDERING

The Grand Jurors aforesaid, in the name and behalf of the citizens of Georgia, charge and accuse **MARLON KAUTZ, ADELE MACLEAN,** and **SAVANNAH PATTERSON,** individually and as parties to the crime, with the offense of Money Laundering, **O.C.G.A. § 7-1-915**, for the said accused, in the County of Fulton and the State of Georgia, on or about the 11th day of March, 2022, with the intent to promote the carrying on the specified unlawful activity of Criminal Trespass and while knowing that the moneys involved in said currency transaction represent the proceeds of a form the unlawful activity of Charity Fraud, did conduct said currency transaction by transferring $38.66 from the Network for Strong Communities to Brooke Courtemanche for forest kitchen materials, contrary to the laws of this State, the good order, peace, and dignity thereof.

**CHRISTOPHER M. CARR**

**ATTORNEY GENERAL**

**STATE OF GEORGIA**

**JOHN FOWLER**

**DEPUTY ATTORNEY GENERAL**

**STATE OF GEORGIA**

109

# WITNESS LIST

Special Agent Ryan Long – Georgia Bureau of Investigation, Region 10

# EXHIBIT B

EXHIBIT
B

**STANLEY L. COHEN**
ATTORNEY AT LAW

79 Blackberry Lake Road
P.O. Box 629
Jeffersonville, N.Y. 12748
Cell (917) 544-5471
Fax (718) 499-2629
Stanleycohenlaw@gmail.com

September 12, 2023

John Fowler
Deputy Attorney General
Office of the Attorney General Chris Carr
Prosecution Division
Georgia Department of Law
1 Martin Luther King, Jr. Drive, SW
Atlanta, Georgia 30334
By email: jfowler@law.ga.gov
Hard copy to follow

Re: *State of Georgia v. Ariel Ebaugh, et. al.*
Case # 23SC189192

Dear Mr. Fowler:

I am writing to you with the concurrence of co-counsel Jason Sheffield, Esq regarding a number of issues on behalf of our client Ariel Ebaugh who was recently indicted by your Office in Fulton County for a Racketeering Conspiracy related to the so-called "Cop-City" demonstrations.

Preliminarily, although your Office is obviously free to seek a superseding indictment as to our client if and when new evidence may develop that you believe justifies expanding the charges recently returned against her, currently there apparently remains in place the DeKalb County charges for which our client was arrested last December, including a count of Domestic Terrorism.[1]

Inasmuch as we still have pending an unresolve writ of habeas corpus in Superior Court challenging the constitutionality of that statute, and were preparing

---

[1] When last checked with the Clerk's Office, the original charges against Ms. Ebaugh remain in place in DeKalb County.

**STANLEY L. COHEN**

to seek a writ of mandamus in federal court against it as well, I write now to clarify whether the indictment identified as Fulton County case # 23SC189192 is in full satisfaction of those charges. If so, upon an application by your Office to dismiss the DeKalb County charges we will move to withdraw our writ in Superior Court and forgo, at this time, seeking any federal relief. On the other hand, absent such an application we will ask the Superior Court to proceed with our writ and consider seeking such other and further relief as is necessary to challenge the still pending Domestic Terrorism charge against our client.

In addition, although there are several theories as to why your Office elected to proceed with the prosecution of Ms. Ebaugh (and others arrested in DeKalb County), it is obvious that having undertaken an exhaustive review of the evidence and the law, District Attorney Boston withdrew from prosecuting our client having determined the charges which gave rise to her arrest were not appropriate or could not be proven beyond a reasonable doubt.

In that light, we would ask that you provide to us any and all evidence in your possession or that of law enforcement agencies involved with you in the investigation that is favorable or helpful to the defense. This would of course include evidence that is either exculpatory of the crime or impeaching of any witness, on the issue of guilt or sentencing. *See Brady v. Maryland*, 373 U.S. 83 (1963). *See, also, Danforth v. Chapman*, 297 Ga. 29, 29 (771 SE2d 886) (2015) ("[t]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."). (internal quotations and citations omitted).

Respectfully yours,

Stanley L. Cohen, Esq.

cc: jasonsheffieldattorney@gmail.com

2

# EXHIBIT
# C



EXHIBIT C

The Defendant Ariel Ebaugh is a twenty-two-year-old woman recently graduated with a bachelor's degree from Georgia College and State University, who lives at home with her parents in the south Atlanta suburb of Stockbridge. She presently works shifts at a popular franchise restaurant, while driving for DoorDash, and doing some academic tutoring. Although the criminal conduct in the case at bar—that is, it's bare, factual recitation—may seem bafflingly inexplicable, Ms. Ebaugh in the fullness of her person indeed presents a complex and compelling figure, a young person experimenting at the threshold of adulthood in troubled times. A home-grown and home-schooled daughter of Georgia, gripped by the tides of socio-political and cultural upheaval, she has seen more than the average twenty-something.

Raised as an evangelical Christian, she grew up in a career-Army/military-contractor family, and during her critical adolescent years she lived in the Persian Gulf during war-time, traveling extensively as a teen throughout the Middle East, Europe and western Asia with her parents. She attended Oxford University for two college terms as an exchange student, studying poetry there, and has written incisively on an obscure traditional Japanese poetic form little-known in America. Ariel is a thoughtful writer and thinker—earning a 3.9 GPA and high honors at her university—adept at poetry, politics and drama alike; she is full of eloquence and Whitmanic contradiction. Yet paradoxically—and perhaps defying explication-she also founded a Libertarian student group at her school, and has campaigned as a campus activist for various hard-right conservative Republican candidates in southern states. She has canvassed door-to-door on behalf of Second Amendment initiatives and GOP culture-war issues; yet Ariel identifies as

bisexual, and expresses an antipathy to rigid gender hierarchies, like many young people today. Even more, Ms. Ebaugh can dress a bleeding chest wound, treat a concussion, or save someone from an overdose, all learned in her EMT training and rooted in her desire to contribute positive community service. And with all this, Ariel can presently be found most nights clearing glasses at an Olive Garden, or bouncing along in her battered, fifteen-year-old Hyundai Sonata, delivering someone's takeout dinner in an Atlanta suburb for minimum wage. While these snapshot-tiles may together form an intriguing mosaic portrait of Ariel, it is a less than coherent one; the addition of the very serious charges in the subject indictment have the potential to take this picture from curious to tragically life-altering.

To better situate this defendant within the broader context of her life, education and family history, and how these factors have informed her conduct in the matter at bar, the herein information is submitted so that a resolution may be fashioned befitting these unique facts and circumstances. If it is fair to say that we all live today in hyper-politicized times, fully-immersed in a heady stew of continual information-conflict and outrage, then it goes double for the youth of this country. The effect of this intensely-wrought political, totalizing environment on our younger citizens— "digital natives" who have never known any other mode of being than the current vita vulgi Americani—should not be underestimated, and the case at bar is emblematic of the era. Yet likewise, we must not over-state what are the intellectual growing pains of a woman on the verge of independent adult-hood, learning the modes of being in the world, and the differences between thought and action, ideals, intentions and outcomes—all in the midst of the

pandemic's global disruption, its attendant political upheaval, and grand changes to our collective zeitgeist.

Ms. Ebaugh was born in December 2000 to the marriage of her father Stewart, a U.S. Army career veteran and a local real estate broker, and her mother Carol, a lawyer by training (if not in practice), who has been a home-maker and home- school organizer and educator. A "millennial baby," Ariel grew up in a devoutly Christian evangelical household, following the Southern Baptist or unaffiliated Baptist traditions, with membership for most of the last twenty-five years in a well- known "mega-church" outside Atlanta. From the age of five, she was educated at home, with only her mother as her educator, then later alongside her younger brother Ian, and later still, in small-group home-schooling cooperatives of like- situated Christian families and their offspring, who eschewed the local public school system as too permissive and insufficiently Christian in its curriculum. The family still attends church services every Sunday, and Ariel continues in her faith to this day, while perhaps less enthusiastic about the weekly meetings and religious life than she had been while growing up.

Ariel's father Stewart enlisted in the U.S. Army in 1984, and served a two year hitch in South Korea and Japan, including a long posting to Okinawa; he enrolled in ROTC afterward, and re-enlisted from 1988 to 1998, attending flight school during the years of the first Gulf War (U.S. expedition to expel invading Iraqi forces from Kuwait), then serving as a helicopter pilot throughout the 90s.[1]

---

[1] Mr. Ebaugh attended flight school in South Korea, becoming helicopter rated on Hueys and Blackhawks in air assault and infantry ground support operations, battalion moving, and medevac, eventually joining the 82nd Airborne Division at Fort Bragg. Ultimately, he would serve in the Georgia Army National Guard based at Fort McPherson, Fort Gillum, and Dobbins AFB, from 1998 to 2002 (the period when Ariel was born), and finally in the US Army Reserves.

Mr. Ebaugh left active duty in the services in 1998, then served four years as a National Guardsman and the Army Reserves, before he went into local real estate, gradually building his residential practice in the area around Stockbridge and the Atlanta suburban market. When the financial collapse arrived in 2008, his business all but closed its doors in the terrible market which ensued; he turned then to his old military contacts, and soon found a promising position as a civilian logistics contractor at the newest addition to CENTCOM's rear-guard supply operations, Camp Arifjan, south of Kuwait City, supplying American forces in Iraq in the second Gulf War.

Ariel was nine years old when she and her brother, with their mom Carol, arrived in Kuwait in the middle of what history has come to call the "long war," on the eve of the second decade of US combat operations in Iraq and Afghanistan. From 2010 to the summer of 2015, the family would live in a series of off-base civilian housing complexes and various apartment blocks, eventually settling for the last two years in the coastal ex-pat enclave of Al-Faraheel, about an hour south of the city, along the seawall. Camp Arifjan replaced older facilities in Qatar and Kuwait, and was designed to maintain pre-positioned equipment, supplies and materials for rapid deployment to battle zones; and to direct joint exercises with the Kuwait armed forces; and ensure security operations around Kuwait. Ariel remembers how her father spent all his time organizing meetings and PowerPoint presentations for military brass and commanders at the base,[2] but she rarely went there. Instead, the family lived in an apartment house full of foreign nationals, in its own community by the sea, as the war raged on close at hand, to the north in

---

[2] Mr. Ebaugh's various logistics support contracts including operational management for everything from armed base security to making ice for soldiers, supplying bottled water, constructing PX structures, and maintaining IT systems.

Iraq, and further off in the east, in Afghanistan. From the family home, Ariel would watch massive airlift jets fly in low over the Persian Gulf to touch down at Arifjian, delivering logistical needs for the U.S. Army, Marines and Navy, a ringside seat on the front lines of a two-war mobilization. Ms. Ebaugh stayed close to the apartment complex mostly, where her mother continued her home-schooling for middle school. The ex-pats had a non-denominational Christian group that met every Friday, as well, where her friends were all kids of other civilian contractor and oil industry families—British, Canadian, Germans, South Africans, Bangladeshi, Pakistani and West African. While Mr. Ebaugh had a sponsored work visa, his wife and children were in Kuwait on renewable ninety-day tourist visas, which meant every three months, the family departed for a few days or a few weeks to visit other countries to reset their visas. During her five years in Kuwait, Ariel would travel to Oman, Jordan, Turkey, Greece, Cypress, Dubai, as well as countries in Europe. She saw the cities of the ancient and modern world, and learned history amid the imperial remains of the Romans, Persians, Greeks, Byzantium and the Islamic world.

Throughout all this time, Carol Ebaugh, the Defendant's mother, took charge of her daughter's education with a sophisticated regimen of home-schooling, both in Georgia as well as all their years in the Middle East, while Mr. Ebaugh served in the American military's war on terror. Mrs. Ebaugh exhibited a real fearlessness in tackling pedagogy, and instilling a fierce intellectual confidence and moral backbone in her daughter and son. She selected the texts herself, mostly emphasizing history, poetry and literature, geography and drama. "It was a lot of work," she notes today, and she deployed a classical approach based on her own

education—a bachelor's degree in Art History and Criticism, augmented by a J.D. degree from the University of North Carolina-Chapel Hill School of Law. During Ariel's years in Kuwait, Carol's home-schooling provided a foundation of Western core values—memorizing poems by Shelley, Frost and Poe,[3] learning classical public declamation and recitation, studying world events—mixed with field trips to Kuwaiti cultural sites, the grand mosque, and the national museum; all the while finding time to be a kid by playing softball with others her own age. Each time the family had to depart Kuwait for visa requirements to visit another country, Carol Ebaugh used the trip as a teaching moment in geography, history and languages.

Back in Georgia at age sixteen, the Ebaughs enrolled their daughter in the eleventh grade at the New Creation Christian Academy in nearby McDonough, GA, which offered a "university-model" style of education for high school students in a non-denominational Christian setting. There she excelled in literature and math, made the honor roll all four semesters through her graduation and developed a passion for hiking and camping in the woods and mountains of central Georgia. After five years in the desert of Kuwait along the flat, barren shores of the polluted Persian Gulf, Ariel filled with a newfound love of her central Georgia homeland— its dense forests and green mountain ridges, and the parks and wild rivers all around Henry County. The Ebaughs had rented their home while overseas, and once home again, the Defendant settled back into her old life like a familiar old coat. She finished high school with a singular focus[4] and applied for admission to

---

[3] Ms. Ebaugh was taught by age fourteen, *inter alia*, to recite from memory Edgar Allen Poe's "The Bells," and Percy Shelley's sonnet "Ozymandias,"—with its warning of imperial ruin in the desert and the temporal nature of earthly power.

Georgia College and State University, about an hour away in Milledgeville, Georgia's erstwhile capital city, and once the center of its cultural world.

Ms. Ebaugh's period at GCSU marks the beginning of her political education, and as with many undergraduates, she would vacillate wildly across a broad spectrum of ideological values. GCSU is a small college and represents the Georgia state system's "Public Liberal Arts University," attracting a student body comprising budding artists, writers[5] and performers. The college itself is a descendant of the earlier system of vocational teachers' colleges, educating (mostly) young women to become public school teachers. At GCSU, Ariel studied English literature—mostly poetry [6]—and creative writing, with a minor in theater studies. From the Fall 2018 semester to her finish in Fall 2021, Ms. Ebaugh carried a full slate of courses every semester, including summer sessions during the pandemic. Ariel made the President's or the Dean's List (with better than a 3.8 GPA) five out of nine semesters, having a cumulative GPA of 3.9; and she attended the exchange program in England at Regent's Park College, Oxford University, where she studied poetry. Ms. Ebaugh graduated early, earning both college honors and "Cum Laude" distinction.

Yet notwithstanding her distinguished academic achievement, Ms. Ebaugh also cut a bold swathe on her campus by co-founding a new chapter there of the

---

[4] Ms. Ebaugh earned sixteen credits of college credit in her last semester at the Academy, in Calculus, English, History and other subjects, via Advanced Placement course work, all of which was accepted on her entry at GCSU.

[5] The town's most famous resident was the great American writer Flannery O'Connor, who went to high school there, then attended the campus when it was known as the Georgia State College for Women; O'Connor lived and died on a farm just outside of town and her gravesite is beside the college, where the literary review there bears the author's name.

[6] Ms. Ebaugh served on the staff at the GCSU campus literary journal, the Peacock's Feet.

libertarian political group, Young Americans for Liberty,[7] in her sophomore year. For the next four years, she would campaign, canvas and fund-raise for libertarian candidates approved by the organization, in local Georgia races for state assembly; state house races in Texas; and libertarian ballot initiatives in Alabama and Mississippi. In part, her activism dove-tailed with a campus romance with her first real boyfriend, who also worked for the group. Together, they would attend YAL's national conventions in Texas and Pennsylvania, and went on a canvassing trip in southern states to support ballot initiatives on "constitutional carry"—the permit-less assertion of the right to carry firearms in public and private, which has in recent years become law in twenty-five states, including most recently, Georgia.

While her college was a clear "liberal-democrat" political zone in an otherwise, reliable "red state," Ms. Ebaugh believed fervently in what she was doing, even in the face of stiff ostracizing by other students. While it would be an overstatement to say the experience "radicalized" her, in fact, Ms. Ebaugh became engrossed by civics lesson inherent in taking an active role in the election process, year after year—campaigning for Georgia candidates, national figures, and ballot drives. Rather, she became a fervent patriot, and a believer in the American system of democracy and representation, and the will of the people. The summer of her senior year, she took a paying job for YAL, canvassing for First and Second Amendment issues in three states;[8] her plan at that point was to "take over" the

---

[7] Young Americans for Liberty is in fact the descendant campus organization of U.S. Rep. Ron Paul's (TX, 22nd) unsuccessful campaign for President in the 2012 election cycle; reportedly, Rep. Paul converted the remaining campaign war chest into a political action committee, which spun off a youth organization still active ten years later at the center of Libertarian organizing.

[8] During the short period Ms. Ebaugh was paid by Young Americans for Liberty, she earned $2,000 per month, plus gas, lodging and food expenses.

campus group, and get a permanent job in Washington in the ranks of conservative lobbyists and congressional aides. Ariel would ultimately quit the group [9] to study poetry at Oxford; yet while she never returned to the libertarian canvassing work, the year after her return, she bought her first firearm, the AR-15 in the matter at bar.

As demonstrated through her academic dedication, the Defendant is no stranger to hard work, and she currently labors approximately fifty hours per week, split between three jobs. Primarily, she works nights since June of 2022 as a delivery driver for the fast-food app, DoorDash, driving approximately twenty hours per week, earning about $200 weekly—licensed since age seventeen, Ariel drives from about 5 p.m. until just after midnight, and her monthly net, less gas and expenses on her 2006 Hyundai, is just under $600. Next, she tends bar during day shifts at the local Olive Garden, working approximately twenty-five hours per week, with an hourly wage of $5.50 plus tips, which together amounts to about $75.00 per shift. Lastly, Ariel also tutors local high school seniors in Math, English and writing skills in preparation for college entrance exams or applications, for a total of about four hours per week at $20/hour; she presently has one student, and hopes to phase out the Olive Garden and develop more college-bound kids in need of academic help this year.

---

[9] Ms. Ebaugh's romance with a young man in the organization followed a path across several states as they canvassed together, and stayed together at the YAL convention in Austin, TX twice, in August of 2020 and January of 2021. In fact, her boyfriend was in charge of seeding campus chapters for Young Americans, and had met Ariel on one of his first trips to organize GCSU. Later, her boyfriend would become a chief YAL organizer in Pennsylvania and the east, then Nebraska; Ariel's interest in the group waned at approximately the same time she realized she no longer wanted to be exclusively with the young man, or to pursue a "long-distance" relationship, and she left for Oxford. Her next boyfriend served as the intermediary in her purchase of the rifle which she carried on the day of her arrest in the matter at bar.

While still a student in June 2020, the summer after her junior year, Ariel followed the local Atlanta area protests in the wake of the police shooting of Rayshard Brooks, watching the unrest on television every night. A year later, in the midst of the George Floyd protests sweeping the country, she paid very close attention, and wanted to join in the marches, but was forbidden to do so by her parents. Her mother Carol was convinced that violence would ensue, and her father was frankly dubious of the marchers' intent, and viewed the unrest as undermining the authority of the police.[10] Some members of Ariel's church[11] congregation formed a sympathetic, anti-racism group to march with the demonstrators in Atlanta that fall, but still Ariel did not attend, as she was back at Milledgeville, finishing her bachelor's degree. The next spring, in 2022, she was back in her parents' house in Stockbridge, and learned more about Black Lives Matter organizers in Atlanta, and later about the opposition to the new police facility forming among various factions, which county officials had approved the previous fall. Ms. Ebaugh heard about the clashes that spring which had led to property destruction and violence, and to further protest to save the forest slated for clearance. While she did not join any particular eco-activist or anti-police group, she took an interest in the movement in general, as a social activity and counter-balance to her long and deep experience with conservative student organizing, and thought it might be a way to make new friends and meet people. Ariel met some

---

[10] Both the Defendant and her father noted separately that their neighbors across the street and a house over are police officers; and Ariel says that while they do not know any of their neighbors and live quite socially isolated from the homes around them, her father's insistence on backing the police as a rule was iron-clad, and socially "baked-in" the DNA of living in Stockbridge, a predominantly white conservative community.

[11] The Defendant has attended Eagle's Landing First Baptist Church in McDonough, GA, since she was a young girl.

organizers providing support to the tree-sitting protesters, and in particular met a thirty-year old woman who worked as a paramedic. Eager to get involved in some kind of community activism, Ariel attended a "street medic" training course[12] in July of 2022, focused on First Aid for use at demonstrations and protests, thinking that if demonstrations happened that summer, she wanted to be a positive force, helping people who may get injured in exercising their First Amendment rights. The free classes met in a city park every two weeks for skills-sharing and demonstrations of paramedic basics. Ariel found the subject fascinating, and enrolled in a further, more complex course in September of 2022, that ran fifty hours of training in three weekends[13] under supervision of professional paramedics.

At the classes she learned how to control or stop bleeding; to administer aid to someone choking; to attend to someone suffering from tear-gas, pepper spray or other irritants; how to splint a broken bone or wrap a sprain; how to identify basic medical conditions, and what to know about them; how to use NARCAN to save someone from an opiate overdose; how an Epi-pen works, and when to use one; and what to do with a wound from a non-lethal, low-velocity projectile, including head wounds. Ariel became vitally interested in the training and the new knowledge she had acquired, and began to look at official EMT training and job recruitment requirements, thinking this might be a new career path for her, instead of working for Olive Garden. Ariel continues to hope she can develop the skills

---

[12] The courses in paramedic basics were taught by licensed and qualified paramedics under the aegis of the Atlanta Resistance Collective.

[13] While her training was informal and community-based, it was in fact quite rigorous, comprising two twenty-hour sessions over two weekends, with a further ten-hour session review and "exam" follow-up.

she learned last summer and fall into a true vocation, as she indeed feels called to the practice, in all its practical skills, compassion and community betterment. Ms. Ebaugh worries that a felony conviction in the present indictment may likely bar her from seeking employment as an EMT in any state or county job, and she grows despondent that her new vocational enthusiasm and dream of a future as an ambulance medic will be dashed by her ill-thought isolated actions at the forest the day of her arrest.

In the matter at hand there can be no claim nor will we try to convince your Office that Ariel Ebaugh exercised good, sound judgement at the time of the isolated incident which gave rise to her arrest. That she acted foolishly, indeed, dangerously to herself and others cannot be debated. But yet cast in the overall context of the evidence, or lack thereof, an objective read of her intent and conduct falls far short of that necessary to establish her knowing witting participation in any act of domestic terrorism as written or contemplated by that Georgia statute, or that she committed the offense of assault at the time and place alleged.

We believe the evidence will show that having graduated from college Ariel returned to her home not far from the forest in controversy and became interested in the issues underlying the dispute and the then lawful demonstrations surrounding the project. Although Ariel, as a young woman of tomorrow, has long been concerned about environmental issues and community input in directing their own destiny, and had heard of the demonstrations while at university, she had no prior familiarity with the "group" leading the protests at the forest and knew of no one so involved.

Returning home and interested in the issues surrounding the forest, and her local community, the evidence will show that Ariel was interested in making new

acquaintances and finding answers to questions that she had about what was happening and why. On occasion she met a handful of concerned people who shared her passion for preservation. When asked how she could help, they asked that she bring food to the forest "kitchen," which she shared with them on occasion. A few times, she went to the forest to talk to and to listen to people play music there. On another occasion, she handed out leaflets in nearby communities that a demonstrator had given her which described the controversy. Although, over a relatively short period of time, Ariel became friends with half a dozen people, at no time did she attend any meetings in which objectives or strategy was discussed, let alone join any structure or formalized group involved in the demonstrations.

That is not to say that Ariel as a local citizen long away at university and concerned with environmental issues was indifferent to the controversy at the forest upon her return, but rather to emphasize that her political and social concerns did not play any formal or de facto role whatsoever with the "group" that had apparently long occupied the forest in opposition to its planned redevelopment. Nor did she participate in any discussions with others over how the demonstration should proceed or why.

In this light, evidence we have assembled will establish that on the day in question Ariel, who was concerned about news reports regarding a police "raid" and arrests in the forest the day before, called one of the demonstrators - a young man who referred to himself in the plural (they, them, we). She had befriended "them" and "they" had provided "their" phone number to her.  After hearing about raids in the forest, she called the young man to find out if he was okay and to learn what was going on. She had heard that people were being tear-gassed out of their tree bunks and platforms. In a brief discussion, the young man asked Ariel to cause a "distraction" so "that we" could leave the forest to

avoid a police encounter. Ariel drove to a parking area not far from the police line, took her otherwise lawfully possessed long rifle from her vehicle which had its safety on and walked toward officers in the hope of attracting their attention only. Getting no closer to them than approximately 50 yards, at no time did Ariel aim the weapon at the officers and when ordered by one of them to get on the ground she immediately complied, and was arrested without incident shortly thereafter.

A plain read of Ariel's conduct at the time covered by these charges establishes her immaturity and poor judgement. Was it however an act of domestic terrorism? NO. Was it an assault? No. Did it amount to a low-grade offense of obstruction of justice? Perhaps.

Ariel Ebaugh is not just named for the character in Shakespeare's The Tempest but in fact evolved that way.  A complex spirit of the air, servant to a wise magician, and gender-fluid (it's not clear male or female) …. who causes a bit of mayhem, then sorts it out and puts everything right in the end.  She has made a huge journey, ideologically.  Ariel has gone from Baptist church-every-Sunday, home-schooled because public schools are insufficiently Xtian, to joining the messy, politically-complex, bisexual liberated youth cohort of her times.

She can simultaneously hold BLM in one hand, and Christian values in the other; having lived in the Army at the frontlines of the Gulf War she can process gun culture and yet be an environmentalist.   She went to college to study poetry, and ended up canvassing for the Second Amendment, getting paid by a conservative political action committee.  This is an incredible journey—one which makes her a special kind of motivated local "genius" of sorts. Most important- she works three jobs, she isn't lazy; is not lying around the shack playing video games.

The offense conduct on the day of Ariel's arrest was a confused anomaly, just another one in a life made of anomalies. Ariel's a politicized, moony, love-struck, bi gal who writes poetry—she can see beyond her Christian fundamentalist Georgia upbringing and having been around the world, she wants to get out there in the world, and to make a positive difference.

Ariel knows her conduct on the day of her arrest was terrible. And it isn't happening again, as this has been a journey that took her from poetry to prison … from the pride of mom and dad to pissed off parents. A tough informative taste of reality.

In the light of her youth, background, diligent work and accomplishment at university and her love of family, local community and church, does justice call out for, let alone require, Ariel Ebaugh to stand convicted of a felony in the matter at hand let alone to go to prison? Absolutely not.

# EXHIBIT D

1         IN THE SUPERIOR COURT OF DEKALB COUNTY

2                    STATE OF GEORGIA

EXHIBIT
D

3

4

STATE OF GEORGIA

5

   -VS-                        CASE NO.   D0293186

6

FRANCIS CARROLL
7 ARIEL EBAUGH
SERENA HERTEL
8 LEONARDO VOISELLE
NICOLAS DEAN OLSON
9 ARIEON ROBINSON

10     DEFENDANT.

11

12

13       TRANSCRIPT OF BOND HEARING HELD IN THE ABOVE-ENTITLED

14   CAUSE BEFORE THE HONORABLE MATHEW ROBINS, SENIOR JUDGE, AT

15   THE JUDICIAL TOWER, DEKALB COUNTY COURTHOUSE COMPLEX,

16   DECATUR, GEORGIA, DIVISION 11 ON DECEMBER 27TH, 2022 AT 9:00

17   AM VIA ZOOM.

18

19

20

21

22                    LATASHA D. BETHEL
                    OFFICIAL COURT REPORTER
23                  556 N.  MCDONOUGH STREET
                    DECATUR, GEORGIA 30030
24

25

1

```
 1                    A-P-P-E-A-R-A-N-C-E-S:

 2
    ON BEHALF OF THE STATE:
 3
         PETE JOHNSON
 4       ASSISTANT DISTRICT ATTORNEY
         556 N. MCDONOUGH STREET
 5       SUITE 700
         DECATUR, GEORGIA 30030
 6

 7  ON BEHALF OF THE ATTORNEY GENERAL'S OFFICE:

 8       JOHN FOWLER
         DEPUTY ATTORNEY GENERAL
 9       OFFICE OF THE ATTORNEY GENERAL
         40 CAPITAL SQUARE SW
10       ATLANTA, GEORGIA 30334

11
    ON BEHALF OF FRANCIS CARROLL AND ARIEON ROBINSON
12
         JOSHUA G. SCHIFFER
13       3355 LENOX ROAD NE
         SUITE 750
14       ATLANTA, GEORGIA 30326
         404-842-0909
15

16
    ON BEHALF OF LEONARDO VOISELLE AND NICOLAS OLSON
17
         DANIEL KANE
18       133 NASSAU STREET NW
         ATLANTA, GEORGIA 30303
19       404-577-1200

20

21  ON BEHALF OF ARIEL EBAUGH AND SERENA HERTEL

22       RACHEL KAUFMAN
         133 NASSAU STREET NW
23       ATLANTA, GEORGIA 30303
         404-615-7588
24

25
```

2

1
2                          P-R-O-C-E-E-D-I-N-G-S

3          THE COURT:  Let's start with the facts.  Why are they

4      in jail?  Why is the AG involved in this?

5          MR. JOHNSON:  Well, because this is a case of domestic

6      terrorism which the AG has concurrent jurisdiction over.

7          THE COURT:  I did not know it was a case of domestic

8      terrorism.  You are fine.  Go ahead.

9          MR. JOHNSON:  Yes, Judge.  You may be familiar with

10     this just from the news in general but there is a location

11     near 1327 Key Road here in DeKalb near the Old Atlanta

12     Prison Farm and over by Constitution where they are looking

13     to build a Public Safety training center for the Atlanta

14     Police Department.  There is also a movie studio that is

15     there as well and they are looking to build that as well as

16     a new park, Michelle Obama Park.

17          On Tuesday, December 13th of 2022 members of the GBI

18     and APD were at the location and they were attempting to

19     clear barricades because over the months they have put up --

20     "they" being groups of people who are calling themselves

21     Defend the Atlanta Forest have put up unauthorized

22     barricades, lit fires, there were buckets of human waste

23     which have feces and urine in it, tires and they have built

24     unauthorized treehouses as well, and when I say treehouses,

25     these are actual structures with floors and ceilings and

1    tarps.  So when the APD and GBI went in to clear the area so

2    construction can begin soon they found someone up in one of

3    the treehouses and historically when any workers or police

4    are on the grounds of the forest the Defend the Atlanta

5    Forest group will send out a message on social media or

6    through text and they will call for assistance.  When that

7    help call is answered usually folks will show up and throw

8    glass bottles, throw brick-sized rocks, light Molotov

9    cocktails, set things on fire, usually in a means to divert

10   the police or the people there in order to get their person

11   away or to basically scare people into not doing their job

12   because construction workers will come out, people from

13   AT&T, people who have no real interest in this other than to

14   do their jobs and they will be attacked and have their items

15   vandalized.

16        THE COURT:  Counsel, let me interrupt and you can

17   expect interruptions.  You said usually "they will do" and

18   you gave me a litany of things "they will do."

19        MR. JOHNSON:  Yes.

20        THE COURT:  Did they do similar things in the matter

21   that caused their arrest and now is before me?

22        MR. JOHNSON:  Yes.

23        THE COURT:  Okay.  Moving along then.  Go ahead.

24        MR. JOHNSON:  Yes.  So, while the personnel from the

25   GBI and APD were moving through the forest they saw a

4

1   treehouse that I was talking about before that had a wood

2   floor, tin roof, tarps, and there was someone in there and

3   that was one of the defendants before you today Serena

4   Hertel.  That is position number 10 on the calendar.

5   Defendant Hertel is from Los Angeles, California.  She

6   is a known member of this Defend the Atlanta Forest group.

7   This group as I have mentioned, Judge, is a well-funded,

8   well-organized group.  This isn't just a bunch of kids

9   playing in the woods.  This is a group that has illegally

10   occupied this area and caused vandalism and on this

11   particular day they yelled for the defendant to come down.

12   The defendant refused.  The defendant did not even answer

13   when they yelled up to her.  This went on for some time.

14   Special Agent Ryan Long from the GBI yelled up at least 20

15   times that she was trespassing on this property and was

16   under arrest and advised the defendant that if the defendant

17   did not come down and continue to obstruct the officers they

18   would have no choice but to fire pepper balls up into the

19   treehouse to get the defendant down.  The defendant still

20   did not answer, did not comply and at about 9:30 AM that

21   morning one round of pepper balls was fired into the

22   treehouse.  You could hear the defendant coughing and they

23   called up to her to come down, that they could give

24   assistance.  There was still no movement and in fact about

25   10:16 AM Special Agent Long from the GBI observed a video

5

1    posted to the Defend the Forest social media and it came

2    from defendant Hertel and it was a video from the treehouse

3    position that the defendant was in and the message said

4    forest defenders are in danger.  We need your physical

5    presence now.  Forest defenders need your disruptive

6    presence.  A few minutes after that Special Agent Long heard

7    on the radio that members of Defend the Forest went to

8    Intrenchment Creek Park which is on the east side of this

9    location and as we were talking about what they have done in

10   the past, they did on this occasion when defendant Hertel

11   sent the call for assistance out.  They started throwing

12   large brick-sized rocks at an APD patrol car and APD Officer

13   Morales.  They also threw glass bottles at firefighters

14   because fire station number 10 is right nearby there and

15   there were firefighters and EMTs and EMS from AMR who had

16   come out to try to help to see what was going on and it was

17   so bad that the police advised the firefighters and EMS to

18   leave the area for their own protection.  While this all

19   occurred they were throwing the rocks and bottles.  They

20   also lit several objects on fire and the APD officer's car

21   suffered visible damage because, again, I want you to

22   understand, Judge, these aren't just rocks that they are

23   throwing.  They are basically like bricks.  They caused

24   dents in the car and they are not just small things.

25        Investigator Sluss with the Atlanta Police Department

1        observed three people throwing these objects at the police

2        and at the firefighters and at the EMTs.  He identified

3        himself as a police officer and was able to arrest one of

4        them that he visibly observed throwing the brick rocks and

5        the glass bottles.  That was defendant Nicolas Olson who is

6        also on this calendar today in position 16.

7             He attempted to get the other two individuals who were

8        also throwing and essentially chased them into the woods.

9        The other two, one was able to get away.  One, he was able

10       to grab at the backpack and the defendant wiggled out of the

11       backpack and kept running.  They were able to identify the

12       backpack and who it belongs to.  It is actually position

13       number 6 Francis Carroll.  So Francis Carroll and Olson were

14       at least two of the people who were throwing rocks and

15       bottles at the law enforcement personnel on scene.  When

16       Investigator Sluss attempts to grab Carroll with the

17       backpack it caused Sluss to fall to the ground where he

18       sustained minor injuries.  Meanwhile they were still trying

19       to get defendant Hertel out of the treehouse when they heard

20       two explosions nearby and then another person came out of

21       the woods dressed in camouflage and lit some items on the

22       roadway on fire.  The fire department was requested to put

23       out the fire but they were not allowed to go in because of

24       the danger to them so APD officers went in instead and were

25       able to get the fire under control.

1       At this point the defendant Serena Hertel has now put a

2   gas mask on and has actually climbed up on the roof and tied

3   to the tree with a rope.  The GBI and APD personnel then

4   contacted arborist whose job it is to go into the trees and

5   they usually are there to cut a limb down or do what they

6   need to do.  Here they went up to try to get the treehouse

7   dismantled and to get the defendant down.  As they attempted

8   to climb, and they were quite high up, the defendant Hertel

9   brandished a knife and cut one of the ropes.  One of the

10  lines for the arborist in an attempt, from what the

11  witnesses observed, to have the arborist fall.  Luckily it

12  was not a lead rope line so the arborist was not injured,

13  however, there were about five to ten feet away from the

14  defendant when the defendant was brandishing this knife.

15  They yelled up to her to drop the knife and eventually --

16  this all took a very long time -- Hertel dropped the knife

17  and finally after this long standoff, came down.

18      The members of this Defend the Atlanta Forest are

19  parties to the same crime of domestic terrorism.  I imagine

20  the defense is going to say that this is an overreach but

21  the crime of domestic terrorism is exactly what we have

22  here.  If you use violence to basically get a policy

23  changed, that is domestic terrorism.

24      The State does not oppose any kind of protest or

25  picketing or however you want to do it as long as you are

1    not destroying property and hurting people and that is what

2    is the fear here.

3         When defendant Hertel was finally handcuffed and taken

4    she refused to comply with any actions.  She would not move,

5    wouldn't walk.  So the police picked her up, carried her to

6    an ATV where they were able to drive off the property and

7    place the defendant in a police car.  They searched the

8    treehouse and they found Hertel's driver's license which as

9    I said before is from California and they also found a

10   cooking stove, sleeping mats, sleeping bag, food, water,

11   camouflage, masks and other items.  While they continued

12   there patrol to look for other treehouses they found the

13   defendant Francis Carroll who I mentioned before occupying

14   another treehouse.  He was wearing a gas mask and a

15   camouflage jacket and they told Carroll this is trespassing

16   and Carroll had to leave.  Similar with Hertel, Carroll

17   refused to comply, refused to answer and they ultimately

18   fired a pepper ball up into the treehouse and Carroll

19   eventually agreed to come down.

20        Inside the treehouse that Carroll had been in was

21   gasoline, Orion road flares and several cell phones.  The

22   gas and road flares are important, Judge, because that is

23   the method they use to set fires and the special agent

24   involved here actually witnessed one of the Defend the

25   Forest members in a previous day use the road flare to set a

1    fire along a barricade.  When Carroll was brought to the

2    North gate of the entrance to be arrested he and Hertel were

3    placed in separate patrol cars.  Prior to them being placed

4    in the patrol cars the officers heard Hertel yell to Carroll

5    I love you.  I don't say that for any reason other than to

6    show that they know each other.  This isn't a bunch of

7    unknown people in the woods.  They care for each other.

8    They look out for each other.  They are all aiding,

9    encouraging and assisting in what is going on out in the

10    woods.  In the backpack that I mentioned before that they

11    located that was Carroll's they found in the backpack a cell

12    phone, a glass smoking pipe, two large concussive-type

13    fireworks and a lighter.

14        Nearby, Judge, is the Department of Juvenile Justice

15    and they could, kind of, see what was going on here and they

16    observed another treehouse which they pointed out to the

17    officers on scene.  In this treehouse was defendant Arieon

18    Robinson who is position, I believe, 19 on the calendar.

19    Arieon Robinson was wearing a mask and Ghillie suit pants

20    which are kind of like camouflage pants and he had a

21    respirator on as well.  He refused or Robinson refused to

22    come down or refused to comply even though the defendant was

23    given multiple opportunities.  Just like before, pepper

24    balls were deployed and eventually Robinson came down.

25        The last person on the calendar which is position

1    number 12 which is Leonardo Voiselle came out of the

2    woodlands also trespassing.  Voiselle had a backpack, was

3    wearing camouflage and inside the backpack were fireworks.

4         THE COURT:  Was the name Voiselle or Leonardo?

5         MR. JOHNSON:  On the calendar it is Voiselle Leonardo

6    but I believe his name is actually Leonardo Voiselle -- is

7    his actual name.

8         MR. KANE:  His name is Leonardo Voiselle.

9         THE COURT:  Okay.

10        MR. JOHNSON:  Yes, Judge.  Because Leonardo Voiselle

11   was in the location with fireworks and a backpack and had

12   answered this call that had been placed out by defendant

13   Hertel this defendant was assisting and therefore also

14   charged with these crimes and police also found pipe bombs,

15   trip wires and fortified structures that the Defend the

16   Atlanta Forest members had been inhabiting.

17        Later, Judge, defendant Ariel Ebaugh who is position

18   number 7 also had seen the call for assistance and defendant

19   Ebaugh arrived at the location, parked the car that Ebaugh

20   was in and then exited the car wearing camouflage and

21   carrying an AR-15 long rifle, a Glock 9 mm pistol.  The

22   AR-15 was loaded with 31 rounds.  The Glock had, I believe,

23   9 rounds and also a fixed boot knife was on her boot.  When

24   Ebaugh walked on to the property it was actually captured

25   via drone which had been in the air and you can see

1   defendant Ebaugh walk up, openly carrying the AR-15 rifle in

2   the low ready position and trespass onto the property.

3        Police yelled to her to immediately stop and put the

4   rifle down.  It took a moment.  The police were, quite

5   frankly, in fear that the defendant was about to raise up

6   the rifle and fire considering everything that had been

7   going on that day and it was on the property.  The defendant

8   did not.  The defendant lowered the rifle and placed it on

9   the ground and complied with the request of the officers at

10  that point.  Located in Ebaugh's car after Ebaugh was taken

11  under arrest were additional extra loaded firearm magazines,

12  camping gear and what is commonly known as a go bag.  A bag

13  full of clothes and other items that if you need to go

14  somewhere in a hurry.  That is why it is called a go bag.

15       All six were taken into custody on that date December

16  13th, 2022.  I should note, Judge, that there were other

17  people walking in the woods that day that were trespassing

18  but were not wearing camouflage, not setting off fireworks

19  or throwing rocks or throwing glass bottles who were not

20  arrested because they did not incite violence or cause

21  damage to property.

22       So those are the general facts, Judge.  Going into the

23  case itself or the defendants themselves, the first one on

24  the calendar, Judge, is position number 6 which is Francis

25  Carroll.  Francis Carroll is charged with interference with

1    government property, criminal trespass, aggravated assault,

2    obstruction and domestic terrorism.

3        Your Honor, Francis Carroll is originally from

4    Kennebunkport, Maine.  Information we have is that is where

5    he is from and where his family is from and he does not have

6    any prior arrests that we are aware of or any criminal

7    history other than what we have talked about here today.

8    Judge, he is 22 years old and we would oppose the granting

9    of a bond to Mr. Carroll.  I am not sure if you want to take

10   these up individually so I can stop there and then allow the

11   defense if you like, Judge --

12       THE COURT:  You have set a format that is easy to

13   follow.  You told me what you thought about Mr. Carroll.

14   Why don't you go on to another one and as briefly as you did

15   with Mr. Carroll we will try to move through the six.  I

16   will give the defense an opportunity to speak on behalf of

17   their clients.  I will do it any way you guys want to do it.

18       MR. KANE:  Judge, can I be heard just briefly?  This is

19   Daniel Kane.

20       THE COURT:  Yes.

21       MR. KANE:  We are going to follow your format.  It is

22   just I want you to know that we do not agree with the

23   State's representation of what happened.

24       THE COURT:  Wait.  I am not surprised but let me hear

25   -- I will give you that opportunity to espouse that in just

13

1    a moment.  I am just trying to get organized, all right?

2        MR. KANE:  Yes, sir.

3        THE COURT:  What I understand about Mr. Carroll, he is

4    22 years old.  He is from Maine.  Kennebunkport, is that in

5    Maine or Massachusetts?

6        MR. SCHIFFER:  Maine, Judge.  I think it is best that

7    we continue with the format without any other interruptions

8    from us until it is time for us to do the cases one at a

9    time.

10       THE COURT:  And Mr. Carroll has no criminal history.

11   State, what is your next defendant you want to talk about?

12       MR. JOHNSON:  Yes, Judge.  We can just go in order.

13   Position 7 is Ariel Ebaugh.

14       THE COURT:  Yes.

15       MR. JOHNSON:  Judge, Ariel Ebaugh you will recall is

16   the one that came on the property with the AR-15 long rifle,

17   a Glock 9 mm and a knife.

18       Ariel Ebaugh is 22 years old.  Also like Mr. Carroll

19   does not have a criminal history.  Ariel Ebaugh is charged

20   with domestic terrorism, simple assault, criminal trespass,

21   obstruction and two counts of possession of a firearm during

22   commission of a felony for the two guns, the rifle and the

23   pistol.

24       THE COURT:  Is Ariel Ebaugh a male or female?

25       MR. JOHNSON:  A female, Judge.  At least as far as the

1    history.

2         MS. KAUFMAN:  She is a female.

3         THE COURT:  It is not critical to my decision making.

4    I just want to make sure I keep the gender correctly.  Go

5    ahead, counsel.

6         MR. JOHNSON:  Judge, the next one would be the next

7    position on the calendar which is Serena Hertel.  That is

8    position number 10.

9         Serena Hertel is 25 years old and is charged in this

10   case with domestic terrorism, aggravated assault and

11   criminal trespass.  Defendant Hertel does have some prior

12   arrests.  There was a case in 2015 out of what it appears is

13   Garden City, Idaho for obstruction, loitering and alcohol to

14   minors.  From September 2021 this defendant was arrested in

15   Eureka, California in Humboldt County for similar to what is

16   going on here.  We were able to obtain the report and it was

17   a trespassing, obstruction and destruction of a fence.  It

18   was a logging area that there were protests going on and

19   defendant Hertel was there as well.  I believe that case was

20   dismissed based on what we talked about or talked with the

21   Humboldt County folks about the case.  Not that it did not

22   happen.  They said they just decided not to go forward with

23   the charges because I think the logging folks left the area,

24   the protesters.  The last arrest, Judge, was just recently

25   other than this one which was November 20th of 2022 here in

1       Fulton County for possession or purchase of illegal

2       narcotics, possessing drug-related objects, a Schedule I

3       substance and providing a false name.  That case is still

4       open last we had checked with Fulton County.

5           As I stated, defendant Hertel is from Los Angeles,

6       California and I believe that is the summary on Serena

7       Hertel.

8           Mr. Fowler from the Attorney General's office is going

9       to, kind of, pick it up from here, Judge.  He has the final

10      three defendants.  So I will turn it to Mr. Fowler.

11          THE COURT:  All right.

12          MR. FOWLER:  Good afternoon, Judge.  John Fowler from

13      the Attorney General's office.  Thank you, Mr. Johnson.

14          I am going to address Mr. Voiselle, Mr. Olson and Mr.

15      Robinson.  Before that I would like to give a little bit

16      more background on the group Defend the Atlanta Forest.

17          They have been occupying the forest for a little over a

18      year in DeKalb County.  It is an area of just over 300 acres

19      out there.  So it's not a small area.  It is largely densely

20      forested so it is not an area where you can mostly see what

21      is going on inside.  It is difficult to get inside in

22      certain places and so a lot of people ask why in the world

23      can't you just go in and take people out of there and just

24      remove them.  Well, the reason why is because it is

25      difficult to get in there in certain places and there are

1    easy hiding locations.  With those hiding locations the

2    reasons why police and everyone are concerned about going in

3    is because as Mr. Johnson stated they found pipe bombs, trip

4    wires.  There is police surveillance from a helicopter at

5    night of multiple individuals that are patrolling the area

6    with AR-15s in the area.  This group stems from the 2020

7    anti-police demonstrations following the murder of George

8    Floyd and the local shooting of Rayshard Brooks.

9        These individuals use those two instances as an

10   opportunity to push forward their antigovernment beliefs.

11   This is coming from the FBI, the GBI, Atlanta Police

12   Department and the Dekalb County Police Department, to push

13   forward their antigovernment beliefs.  There are individuals

14   that are coming from all around the country and if you take

15   a look at where these folks are from, Wisconsin, Nebraska.

16   One person Mr. Voiselle is local here in Macon and I will

17   turn to him in just a moment.  These people are coming from

18   all around the country to occupy this forest and what we are

19   seeing is we are seeing more and more incidents occur.  Just

20   last week we had the defacing of a builders apartment up in

21   New York where they were saying stop cop city which is what

22   they say when they are trying to stop what is going on here.

23   Not only that but this group has been tied to the

24   vandalization of the Ebenezer Baptist Church here in Atlanta

25   which is Senator Warnock's church.  They have been tied to

1       the fire set in the Promise Center in Atlanta and Fulton

2       County and they have been tied to numerous other incidents

3       that are going on and they have made it pretty clear at this

4       point that they're willing to engage in violence and use

5       fire to keep anybody out of the forest.  So that forms a

6       little bit more nature of these charges.  It is not just the

7       singular incident that happened on the 13th.  There's more

8       to it and there are a lot more people out there.

9            Turning to Mr. Voiselle, he is number 12 on the

10      calendar, he doesn't have any criminal history but he is the

11      one individual on this calendar that has not wiped his

12      social media.  He is the one individual that we can take a

13      look at his social media and we have collected it thus far

14      and what we know is we know he is tied to extremist groups.

15      He follows those extremist groups and he interacts with

16      those extremists groups on Twitter.  We know that.  We can

17      see it and we have copies of it.  Mr. Voiselle --

18           THE COURT:  Counsel, how old is Mr. Voiselle?

19           MR. FOWLER:  I don't know off the top of my head how

20      old Mr. Voiselle is but they are all young.  I know that.

21      No one here is old or middle aged.

22           MR. KANE:  Mr. Voiselle is 20 years old.

23           THE COURT:  Thank you, counsel.

24           MR. FOWLER:  Mr. Olsen is 16.  He is from Nebraska.

25           MR. KANE:  He is not 16.

```
1        MR. FOWLER:  I am sorry.  He is 16 on the calendar.  He
2    is from Nebraska.  Mr. Robinson is 19 on the calendar and
3    he's all the way from Wisconsin.
4        Working backward, Mr. Robinson is the individual that
5    was clearing the Ghillie suit.  If the Court is unaware of
6    what that is -- he was weary Ghillie pants I should say.
7    They are pants that are not just camouflage but they almost
8    have fake-like grass on them so that if a sniper or someone
9    with a rifle wanted to hide -- you may have seen them in the
10   movies.  What they do is they wear a whole suit that looks
11   like it has long grass on it so you can lie in long grass
12   and no one can see you.  That is what a Ghillie suit is.  He
13   also had a respirator in case somebody came after them.
14       So for those reasons with that background, what
15   Mr. Johnson has stated including the items that were found,
16   particularly the trip wires, pipe bombs, we are opposed to
17   bond on all of these individuals.
18       MR. SCHIFFER:  Judge, if that concludes the State's
19   presentation, if I could speak very briefly and then the
20   three of us each have two of the defendants a piece.  I have
21   Arieon Robinson and Francis Carroll.
22       THE COURT:  Hold on.  I am trying to make notes.  You
23   are going to speak on behalf of Robinson?
24       MR. SCHIFFER:  Robinson and Carroll.  Mr. Kane has
25   Mr. Voiselle and Mr. Olson and Ms. Kaufman has the remaining
```

1      Ms. Hertel and --

2          THE COURT:  I can't write as fast as you are going.

3      Counsel, you have Robinson and?

4          MR. SCHIFFER:  I have Robinson and Carroll, Judge.

5          THE COURT:  Just a second.  Don't go any faster.

6          MR. SCHIFFER:  Yes, sir.

7          THE COURT:  And the next attorney is going to represent

8      Voiselle and?

9          MR. SCHIFFER:  Olson, correct, Mr. Kane.

10         MR. KANE:  Yes, that is right.

11         THE COURT:  And lastly we have someone representing --

12         MS. KAUFMAN:  Your Honor, I will be representing Ms.

13     Hertel and Ms. Ebaugh and they are position 7 and 10.

14         THE COURT:  Okay.  Thank you for your patience.  Go

15     ahead and make your presentation.

16         MR. SCHIFFER:  Thank you, Judge.  My name is Joshua

17     Schiffer.  I am a lawyer here in the Atlanta area for 20

18     years.  I am proud to be joined in any political case with

19     such fine counsel as Ms. Kaufman and Mr. Kane.

20         I don't know whether to begin with rolling my eyes at

21     the libel and slander or play the background music of the

22     old Benny Hill show.

23         We have 300 acres that has been occupied by protesters

24     for a year.  As the State literally just put out in front of

25     you that they are not being -- there's hundreds of people

1    from around the nation that have come to support this civil

2    disobedience celebrating the First Amendment and what we

3    have here is the State Attorney General's office, not the

4    local district attorney, we have the GBI, not local law

5    enforcement using its concurrent jurisdiction which is why

6    the State needs a felony for domestic terrorism.  We are

7    going to ask the court to look at the domestic terrorism

8    statute.  Without a felony there is no domestic terrorism

9    and I am going to encourage the Court to delve specifically

10   into the felony warrants for aggravated assault and the

11   scraped knee of --

12       THE COURT:  Counsel, so we understand each other, my

13   role is not to address those challenges that you're making,

14   whether or not there is a felony or not.  That would be

15   properly brought by motion and it would be assigned to a

16   judge.  I am just a presiding judge today for the sole

17   purpose of deciding whether or not your clients should have

18   a bond.

19       MR. SCHIFFER:  Yes, Judge.  I will go directly on to

20   the Ayala factors.

21       THE COURT:  Just please understand that if I sidestep

22   your issue I am not suggesting you have no issue or you do

23   but it is not my role today.

24       MR. SCHIFFER:  I understand that, Your Honor.  Thank

25   you.

1       As the State said they object to all bonds on all these
2   individuals.  Most of the charges brought are criminal
3   trespass misdemeanors, minor, outside the obvious felonies
4   that they have included in order to gain concurrent
5   jurisdiction.

6       Regarding Ayala for my two clients the flight risk and
7   likelihood to intimidate witnesses, danger to commit
8   additional felonies, danger to the community, those are all
9   relatively straightforward to address.  As the State
10  acknowledged my two clients have no record at all.  They
11  have loving, caring families and support groups.  In fact,
12  we have family from Kennebunkport, Maine that is present in
13  this hearing.  I have had extensive contact with the support
14  group for my other client Ms. Robinson.  There is no
15  likelihood of intimidating any witnesses because the
16  witnesses in this case are all GBI agents and Atlanta police
17  and other first responders.  Those are the witnesses and I
18  don't feel that they are subject to much intimidation.
19  Flight risk is zero.

20      These are political prisoners that are protesting using
21  their First Amendment right to set forth what is clearly a
22  popular opinion that this property should not be developed
23  in the manner that local government has determined it should
24  be.  I am not here to weigh in on that.  I love my police
25  friends.  I have represented a bunch of them but I love the

1    Constitution more than anything else and freedom of speech
2    and freedom of assembly and freedom to peacefully protest is
3    really inherent in our role as good citizens and what we are
4    seeing here is a very contrived, manufactured attempt by the
5    Attorney General's office to overstep local law enforcement
6    and silence, shill and scare hundreds, thousands of citizens
7    across this nation because they have helicopters with
8    machine guns yet they are going to complain about someone
9    lawfully possessing a firearm and openly displaying it as
10   has been supported by our governor and everybody else in our
11   state government.  Now, were police present?  Yes.  Was
12   there an active threat?  No, not at all.  It was in a
13   low-ready position.  The same position that officers when
14   they approach at the many courthouses hold their firearms.
15   I judge citizens the same way that I judge law enforcement.
16   I think the court should as well.  But, Judge, there is no
17   flight risk.  They all have attorneys.  They've all
18   dedicated themselves to supporting this movement whatever
19   Defend the Forest is and we will discuss that at length
20   later.
21       There are allegations in the press releases that the
22   GBI has been putting out about how it has been determined to
23   be a terrorist organization by homeland security and they've
24   clearly over a year exercised great law enforcement assets
25   to ensure that the State's goal of developing this property

23

1    is met and that is a lawful State Interest.  I do not

2    disagree with that.  The State has a plan to build this and

3    these are citizens saying no, but to trump up and create a

4    bunch of charges, arrest them, sweep the forest, this was

5    nothing more than a manufactured criminal end to an

6    otherwise reasonable protest where these were criminal

7    trespasses.  These are people refusing to leave a place

8    because they know the moment they leave they lose their

9    fight and the State decided to end it by arresting them all

10   and now they are objecting to bond.  We just sat through

11   three hours of listening to the rest of the conditions of

12   this jail.  We are asking for a low and reasonable bond for

13   both of my clients of $1,000 on every charge.  They should

14   be released with no restrictions as to travel or who they

15   contact.  My two clients in particular pose no threat to

16   anybody and the State has struggled and I ask the Court

17   again just read the warrants to allocate that crimes have

18   really even been committed and I will pass this off now to

19   Ms. Kaufman.

20        THE COURT:  Counsel, before you pass the matter on,

21   because there is now a dispute of the facts.  You've

22   contended one set of facts.  The State has contended

23   another.  I am not surprised by that.  That is why we are

24   here.  Why there are trials.  The State has contended that

25   your clients who I have as Robinson and Carroll --- is that

1    accurate?

2         MR. SCHIFFER:  That is accurate, Your Honor.

3         THE COURT:  At least as to Carroll, participated in the

4    rock throwing, bottle throwing, starting fires, throwing

5    bricks.  Is that in dispute?

6         MR. SCHIFFER:  I believe that is not listed in any of

7    the warrants.

8         THE COURT:  I don't know about warrants because I do

9    not have access to that.  I am merely saying that is what

10   the State's attorney told me in his presentation.  You have

11   given me a different picture.

12        MR. SCHIFFER:  Yes.

13        THE COURT:  So in a matter of deciding a bond -- and

14   that is all we are deciding, not guilt or innocence.  I am

15   telling you what you already know but the State's attorney

16   has indicated that Mr. Carroll was living in a treehouse,

17   threw rocks and bottles at firefighters, started fires,

18   threw bricks.  Is that in dispute?

19        MR. SCHIFFER:  We definitely dispute that and there

20   wasn't enough specificity with my client in regards to their

21   --

22        THE COURT:  That is fine.  I just want to know what is

23   before me.

24        MR. JOHNSON:  Your Honor, I don't mean to interrupt but

25   just since we are right here on the issue I figure it would

1    be easier than going back.  The allegations that I set out

2    this morning that is actually what is charged in the

3    warrants.  Specifically the aggravated assault is for

4    throwing rocks and bottles at fire department and EMS

5    employees standing outside of a fire station and the

6    obstruction and the --

7        MR. SCHIFFER:  Would you read the details of the

8    officer case, please?  The details from the officer involved

9    warrant for Mr. Carroll, if you would read that.  The Court

10   does not have a copy of that warrant what the specific

11   language used by Chris Carr and the Attorney General's

12   office is.

13       MR. JOHNSON:  First off I guess I need to just put

14   something in here for a second, Judge.  This is a

15   multijurisdictional joint operation that includes the

16   District Attorney's Office, the Attorney General's office,

17   the GBI, the Dekalb County Police Department, the Atlanta

18   Police Department, and many other jurisdictions.  I am

19   perfectly willing to sit down as I did already with Ms.

20   Kaufman with Mr. Schiffer if he wants and talk a little bit

21   off line about this situation but Mr. Schiffer is just

22   throwing things out that quite quickly, Judge, are not true.

23   So I want it to be clear that he says on the one hand that

24   he is all for a lawful State interest which is to build on

25   the property but now we are confused about what the protest

1    is.  Is the protest writing a letter to your Congressman and
2    saying don't build or is the protest okay?  Because what I
3    am hearing is it is okay to throw bricks at cops.  It is
4    okay to set things on fire.  I guess my thing, Judge, is if
5    Mr. Schiffer wanted to build a shed on his yard and as a
6    neighbor I didn't care for that I don't think Mr. Schiffer
7    would like it if I went and put a bucket of urine on his
8    front lawn and set tires on fire because that is what's
9    going on here.
10        MS. KAUFMAN:  Your Honor --
11        THE COURT:  Everybody, hold on.  It is like I want to
12    herd the cats and do a small corral here.  My role is not to
13    hear motions to dismiss or motions to suppress.  I'm just
14    here to determine bond.  While everybody that I have heard
15    from so far has been very eloquent and I do not mean to
16    curtail, the emotions associated with your legal arguments
17    are outside of the scope of what I am doing.  I want to know
18    if they have criminal histories, why should I set a bond,
19    why should I not set a bond, the justification for the act
20    if at all as alleged are for another time and another place.
21    A jury perhaps.  A motion perhaps.  I am not here to hear
22    motions.  Just the motion for bond.  That's all I am here
23    for.  I admire and respect the eloquence, the advocacy, but
24    we are going too far a field.  I want to know from the
25    State's point of view why I should not set a bond or if I do

1    set a bond what is the State's view of what the bond should

2    be.  I want to know from defense counsel why I should set a

3    bond.  I don't need to know whether they are good people, no

4    people.  I need to know do they have criminal history.  Do

5    they come to court when they are supposed to.  Do they have

6    jobs.  Do they have a reason for being here.  Do I make my

7    point?  I'm trying to get everybody focused on why I am

8    here, not why you're here.  I am looking at you, Mr.

9    Schiffer.  You are here to advance a matter that is outside

10   the scope of why I am here.  I would love to be the judge in

11   your matters when the motions come on.  That is not up to

12   me.  I do not pick what I am selected to sit on.  It was my

13   good fortune to be selected to sit on bonds today.  I drew

14   the short straw.  I will hear the matter of bonds.  The

15   merits of your case is to be heard at another date, place,

16   another time, probably by another judge.

17        Having said that I have already heard from Mr. Schiffer

18   the arguments that his clients Robinson and Carroll, they

19   are not a flight risk and they have no criminal history.

20   Those are valid arguments at a bond hearing.  The merits of

21   why they were there or not there, that is not for me.  That

22   is for another judge, another place, another time.

23        If you have anything else, Mr. Schiffer, to convince me

24   why a bond, if any at all, should be set for your clients I

25   will hear from you, otherwise we will move on to the next

```
 1      two defendants.

 2          MR. SCHIFFER:  The only last issue is, Judge, the

 3      community has jobs available for all of these people that

 4      will also encourage them to continue participating in this

 5      process but they are excellent candidates for bond.

 6          THE COURT:  Your clients are Carroll and Robinson

 7      you're are speaking about?

 8          MR. SCHIFFER:  Yes, Judge, and I believe that carries

 9      for the others as well.

10          THE COURT:  We will get to the others.  Let me look at

11      my notes.  Your clients, one is 22.  Carroll is 22. How old

12      is Robinson?

13          MR. SCHIFFER:  Yes, Judge.  Robinson, I believe, is 19

14      years old from Wisconsin.

15          THE COURT:  You could've told me that and I didn't

16      write it down.  Mr. Schiffer, is there anything else you

17      want to say on behalf of your clients or can we move on?

18          MR. SCHIFFER:  No, Judge.  It is frustrating to hear

19      mischaracterizations and not be able to respond about things

20      like Ghillie suits and waste buckets which isn't plumbing,

21      so.  I worry that the State as much as they are concerned

22      with my verbiage I am equally concerned with theirs.

23          THE COURT:  You know, counsel, if it goes to trial that

24      is what we call cross-examination.

25          MR. SCHIFFER:  Yes, Judge.
```

1          THE COURT:  State's Attorney General, I interrupted you

2     to try to corral all of you to get back to the issues.

3     State's Attorney General, anything else you want to tell me?

4          MR. FOWLER:  No, Your Honor.  Anything else I would say

5     would be outside of the scope of what Court wishes to hear

6     today.  So I will just leave it at that.

7          THE COURT:  I do not want to limit what you want to

8     tell me.  I can't tell you to not tell me.

9          MR. FOWLER:  The only thing I would say is this, this

10    group does not abide by the traditional notions of politics

11    of the left and the right.  They embody extremist ideals

12    from the left and the right.  So this has nothing to do with

13    politics whatsoever.  That is all I would say.

14         THE COURT:  Lawyer Kane, do you want to address your

15    position regarding bond for your clients of Voiselle and

16    Olson?

17         MR. KANE:  Yes, I would, Your Honor.  I have listened

18    attentively to you for over three hours this morning.

19         I thank you for hearing us.  I will address the bond

20    issues but I do want to say a couple of things if you just

21    give me a moment.

22         The first is one of the comments that the prosecutor

23    said was, these parties have been in and around the forest

24    for over a year and I think that's enlightening to you

25    because there is no allegation until the GBI showed up of

1    any illegality other than a possible criminal trespass.

2        People have been living in and around or staying or

3    coming into the forest for over a year with no problem.  It

4    was on December 13th when the police showed up with

5    helicopters, tear gas, drones and plastic bullets and

6    shooting at these kids in a treehouse that there was an

7    issue.  So I do believe it's a manufactured prosecution and

8    I think your other insightful act of judicial wisdom was

9    asking why is the Attorney General here and it is because,

10    respectively, it's probably the AG that manufactured this

11    domestic terrorism case.

12        With that let me address my clients.  Leonardo

13    Voiselle, first of all, his mother and father are online and

14    they likewise have been sitting patiently.  Also online is

15    his grandfather Charlie Hall.  Also online is a family

16    friend Ernestina Kalavowski.  They are all members of this

17    community that support him.

18        THE COURT:  Mr. Kane?

19        MR. KANE  Yes, sir.

20        THE COURT:  I do have some basic information I want to

21    know.  How old is Mr. Olson?

22        MR. KANE:  No.  I was talking about Mr. Voiselle.  Now

23    you want to go to Mr. Olson?

24        THE COURT:  Either one.  How old is Mr. Voiselle?

25        MR. KANE:  MR. Voiselle is 20 years old.

1        THE COURT:  And he is from where?

2        MR. KANE:  He is from Macon, Georgia.

3        THE COURT:  Does he have a criminal history does

4    anybody know?

5        MR. KANE:  He has no criminal history.  He has never

6    been arrested.  In fact, he wasn't even in the woods.  That

7    showed how contrived this is.  No, sir, he has no criminal

8    history.

9        THE COURT:  Mr. Olson -- would you mind just jumping?

10   How old is Mr. Olson?

11       MR. KANE: Mr. Olson -- first of all Mr. Olson's mother

12   and father are online.

13       THE COURT:  They are sitting there.  I know.  I have

14   seen them.

15       MR. KANE:  Incidentally it is Aria Nicolas Olson.

16       THE COURT:  How old is Aria Nicolas Olson?  How old?

17       MR. KANE:  25 years old.

18       THE COURT:  Mr. Olson is from where?

19       MR. KANE:  He is from Elkhorn, Nebraska.

20       THE COURT:  Now go ahead and make your presentation.

21       MR. KANE:  Who do you want me to talk about Olson or

22   Voiselle?

23       THE COURT:  It is up to you.

24       MR. KANE:  We will go back to Voiselle.  20 years old,

25   no criminal history, graduated from high school, worked for

1    AT&T, was walking down the street when he was arrested on

2    the 13th.  He has his grandfather here, his family friend

3    here to support him.  Perfect candidate for bond.  Really an

4    OR bond is what I'd ask for Leonardo Voiselle.  His charge

5    is that he entered the property, which is a criminal

6    trespass which is he walked up to a policeman and then they

7    arrested him, walked down the street and then he is a

8    domestic terrorist because he walked down the street.  So I

9    would ask you to give him an OR bond on those.

10        Let me talk to you about Aria Nicolas Olson.  They are

11   25 years old.  He is a high school graduate.  He has had

12   several jobs.  Worked at a recording studio.  Also did

13   warehouse work for a BioLab.  His mom and dad are online.

14   They are very concerned and also Aria has health problems or

15   health issues.  He is in the Dekalb County medical and he

16   needs medicine every day and he is not getting it or she is

17   not getting it.  So, likewise, I would ask the Court to

18   grant an OR bond for Nicolas Aria Olson and I can answer any

19   questions you have for either party.

20        THE COURT:  Give me a second and let me look at my

21   notes.  Olson is a female?

22        MR. KANE:  Olson is transitioning from male to female.

23   She prefers to be called Aria.

24        THE COURT:  Olson, my notes indicated also participated

25   in rock throwing, bottle throwing, fire -- brick throwing.

1          MR. KANE:  So what the allegation is is that he threw a
2     rock at a -- it varies.  The government can't seem to get it
3     straight.  One time it is a police car.  One time it is an
4     EMS vehicle.  One time it is a fire engine.  So that is the
5     allegation and it is disputed.
6          THE COURT:  Is it disputed that it was thrown or is it
7     disputed of what was thrown?
8          MR. KANE:  That he threw a rock or a stone or a bottle
9     at anyone.
10          THE COURT:  It is disputed that he threw anything?
11          MR. KANE:  Yes.
12          THE COURT:  Okay.
13          MR. KANE:  And let me add, he has no failures to
14     appear, no probation violation and presumed innocent.
15          THE COURT:  Did he have a criminal history?.
16          MR. KANE:  None.  25 years old, nothing.
17          THE COURT:  Now, he is a resident of Nebraska as is
18     your other client -- no.  Your other client is for Macon,
19     Georgia.
20          MR. KANE:  Mr. Voiselle is for Macon, Georgia and his
21     mom and dad are online.  Both these parties' parents are
22     online.
23          THE COURT:  Mr. Kane, you are giving me answers to
24     questions I have not asked.  What I say is get on the train
25     and let the train take you where it needs to go because I

1    know where I want to go.

2         Your client from Nebraska, what assurance is there that

3    he would return to court if he were granted bond?

4         MR. KANE:  Well, his parents will make sure he comes to

5    court.  If the Court is concerned you can put a must make a

6    good bond through a bondsmen.  That would give an assurance.

7         THE COURT:  What is your definition of a good bond?

8         MR. KANE:  I think it is an OR case but I would say

9    $10,000.

10        THE COURT:  How do you feel about -- well, again, your

11   other client is from Georgia.  Anything else you want to

12   tell me, counsel?

13        MR. KANE:  I would like to tell you a lot but you don't

14   want to hear it right now about the merits of the

15   government's case.  So that's all I have for now.  Thank

16   you.

17        THE COURT:  The merits of the case would not help me at

18   all.

19        MR. KANE:  And even the representations of the

20   government but I'll keep my mouth shut.

21        THE COURT:  Let me rephrase.  Sometimes -- and I'm not

22   trying to be funny and I'm not trying to drag this out.

23   Sometimes when I listen to defendant's attorneys present

24   their position on the case it comes out that there is a

25   reason to grant a bond when absent giving me that reason

1        there would not be a reason to grant a bond.  I know that is

2        stilted but the point I'm making is I have had it happen in

3        a murder case where the State wants to cut off the person's

4        head but yet the defense counsel said alibi.  My client was

5        in Alabama.  So now we've got a dispute as to facts and thus

6        might justify a bond because the facts will come out at

7        trial.  Am I making my point?  If you feel there's something

8        that I need to know that will affect the Court's giving a

9        bond to your client now is your day in court.  Now is your

10       chance to tell me.  The merits of the case are not for me to

11       decide.  If you think there are some defenses without giving

12       away your case to the State but will help the Court decide

13       bond now is your time for me to know it.  Am I making myself

14       --

15            MR. KANE:  You are making yourself abundantly clear.

16       Yes, sir.

17            THE COURT:  I just don't need to know about the case.

18       I have already got a picture.  People living in treehouses

19       --

20            MR. KANE:  Treehouses for a year.

21            THE COURT:  Whatever.  I want to know why you think I

22       should give your client a bond.  He has no criminal history,

23       has no failure to appears.  These are points well made which

24       I consider.  If you have anything else tell me now.

25            MR. KANE:  Yes, sir.  Leonardo Voiselle has worked

1     every day since he was 15 years old.

2         THE COURT:  He has no criminal history.  He is 20 years

3     old and he lives in Macon.

4         MR. KANE:  Yes, sir.

5         THE COURT:  Anything else, counsel?

6         MR. KANE:  No, sir.

7         THE COURT:  Thank you.

8         MR. KANE:  Thank you, sir.

9         THE COURT:  I will hear now from the last two.

10    Ms. Kaufman, are you counsel for Hertel and Ebaugh?

11        MS. KAUFMAN:  Yes, sir.  Position 7 is Ariel Ebaugh.

12        THE COURT:  Tell me what you want me to know.  Let me

13    start off with this, how old is your client Hertel?

14        MS. KAUFMAN:  My client Hertel is 25 years old.

15        THE COURT:  It is a female?

16        MS. KAUFMAN:  Yes.

17        THE COURT:  Female and 25 years old.  From California,

18    did I understand?

19        MS. KAUFMAN:  Yes, Your Honor.  Her mother lives in

20    California.  Her father -- she grew up in Boise, Idaho and

21    her father is on the call along with many other supporters

22    of Ms. Hertel.

23        THE COURT:  My notes indicate that Ms. Hertel does have

24    a criminal history albeit not a violent criminal history but

25    criminal history.  Is that accurate?

1         MS. KAUFMAN:  Your Honor, my understanding is there was

2    a 2021 arrest in Eureka, California.  That case was

3    dismissed and there is a pending Fulton County case

4    involving marijuana and obstruction, apparently.

5         THE COURT:  A 2015 case for obstruction and loitering.

6    Minor issues, but nonetheless a criminal history.

7         MS. KAUFMAN:  Yes.  She has an open case and a 2015

8    case.  Should I go on or do you want to ask me more

9    questions?

10        THE COURT:  This is Ms. Hertel.  She is from

11   California.

12        Now the question I have asked before, if bond is

13   granted what assurances do we have that she would return for

14   the issues pending in this county?

15        MS. KAUFMAN:  Your Honor, obviously, and I guess the

16   other two attorneys did not mention this.  These are really

17   serious charges.  Ms. Hertel has a college degree.  She

18   works in environmental analysis.  She is somebody who really

19   does not want -- I mean she wants to fight the charges.  So

20   you can best believe that she's going to be coming back to

21   handle this if and when the State is able to get an

22   indictment.

23        Furthermore, her family members, she has several

24   professors that have actually provided me with letters of

25   recommendation in support of her, which I've never seen

38

1    before.  Professors have never done that for me.  So what I
2    want Your Honor to know is that there are tons of people --
3    Ms. Hertel has every intention of being here if the Court
4    wants her to be here whenever she needs to be here.  Her
5    intentions would be to live with her father in Boise, Idaho
6    if the Court would allow that.  She can also have a
7    residence.  I could get the Court an address in Georgia if
8    the Court would prefer that she stay here.
9        What I can tell Your Honor is that she is an incredibly
10   talented bright young lady who is clearly passionate about
11   things, however, she has been in jail now more than a week
12   and she fully understands that she cannot be living in the
13   trees or go back to the area that they were in.  So I just
14   want to make that very clear.  Any stay away order she will
15   abide by.
16       THE COURT:  Counsel, I am concerned again about the
17   suggestion by State's counsel that your client participated
18   in throwing rocks, bottles at firefighters, started fires,
19   throwing bricks.
20       MS. KAUFMAN:  Well, Your Honor, we absolutely dispute
21   those facts.  I look forward to having our day in court on
22   those issues.  She is presumed innocent and she denies doing
23   --
24       THE COURT:  I am not presuming her guilt.  I am just
25   saying the State has made a representation.  Okay, that is

39

1    fine.  What is your position on bond for Ms. Hertel?

2         MS. KAUFMAN:  For Ms. Hertel I would ask for $1,000

3    bond on each count for a total of 3,000.  I think she has 3

4    charges, I believe.  The State can confirm.

5         MR. SCHIFFER:  I believe three is correct on Hertel.

6    Aggravated assault, criminal trespass and domestic

7    terrorism.

8         THE COURT:  Ms. Kaufman, anything else you want to say

9    on behalf of your client?

10        MS. KAUFMAN:  On behalf of Ms. Hertel she is not a

11   significant risk to the community, of committing felonies,

12   of being a danger, of intimidating witnesses.  She is a

13   pacifist and she will absolutely come back here and she is

14   not a flight risk.

15        THE COURT:  Thank you, counsel.  Anybody else wish to

16   address the Court before I make a decision?

17        MS. KAUFMAN:  Your Honor, I still have one other client

18   that we did not speak about.  About Ariel Ebaugh which is

19   position 7.

20        THE COURT:  I stand corrected, counsel.  Go ahead.

21        MS. KAUFMAN:  She is 22 years old.  She is a resident

22   of Stockbridge, Georgia.  Both of her parents are on this

23   call.  She is a college graduate.  She is employed at Olive

24   Garden and she does DoorDash.

25        I know you had asked her gender.  She is a 90-pound

1    female.  She is alleged to have legally possessed weapons.

2    Those are two of the charges.  Possessing of a firearm

3    during a felony.  I guess the felony is the domestic

4    terrorism.

5         THE COURT:  She has a criminal history?

6         MS. KAUFMAN:  She has no criminal history.  Zero.

7         THE COURT:  What are you referencing then?

8         MS. KAUFMAN:  I am referencing the charges as they have

9    alleged them against her.  I am just saying that she is

10   alleged to have had firearms and obstruction.  There might

11   be five or six charges.  I did not write them down fast

12   enough.  Go ahead.

13        MR. SCHIFFER:  Domestic terrorism, simple assault,

14   criminal trespass, obstruction.  I believe misdemeanor

15   obstruction but it may be a felony, and two counts of

16   possession of a firearm during the commission of a felony

17   which I believe was the obstruction because criminal

18   trespass and the simple assault are misdemeanor and domestic

19   terrorism needs a predicate felony.

20        MS. KAUFMAN:  By the way, Your Honor, her parents are

21   on the call.  She's from a good Christian family in

22   Stockbridge.  Her parents will absolutely assure that she

23   gets here.  She has ties to the community.  She's not a risk

24   and the allegations in this case are that she walked into a

25   field possessing a firearm.  I would like to say to, Your

1    Honor, if somebody wanted to do something with it she could

2    have and there is no allegation that she did.  When told to

3    put it down, I believe, the State said within a moment she

4    put it down.

5    THE COURT:  I am going to stray a little bit from what

6    is before me.  I am sorry for all of you but I am about to

7    ask a question.  If someone has no intention to use a

8    firearm at a gathering why are they carrying a firearm?

9    MS. KAUFMAN:  Your Honor, I am not the right person to

10    ask because I'm not someone who carries or believes in

11    carrying firearms.  There's lots of other people from

12    Georgia that have different feelings on that and people do

13    it at the gas station -- people do it all of the time.  I

14    don't know why.

15    MR. SCHIFFER:  Judge, I will speak as someone in

16    Georgia that knows a lot about firearms and people with

17    firearms.  The display of firearms is in overtly political

18    act and part of celebrating our First Amendment right about

19    what rights you like or do not like.

20    The display of a firearm has been protected many many

21    times and it is at the heart of the firearm's litigation but

22    it is in overtly political statement to be in public openly

23    carrying a  firearm if you are allowed to do so, which in

24    Georgia is basically everybody that does not have a felony

25    or is otherwise precluded and is of the appropriate age.

1    THE COURT:  Counsel, you are right but to the degree I

2    disagree it is more than just First Amendment.  It is an

3    effort to intimidate.

4    MR. SCHIFFER:  I agree.  We could talk about that

5    endlessly elsewhere, Judge.

6    THE COURT:  Another time.  I appreciate your input.  Is

7    there anything else that needs to be said before I make a

8    decision?

9    MR. SCHIFFER:  Judge, I just wanted to make sure --

10   Judge, I realized that I kind of jumped through my two in an

11   effort to move along.  Both of my clients besides having no

12   record are attached to this community.  Are absolutely

13   willing, ready and able to come back.  They have substantive

14   education as well as people in the community that support

15   them including family online.

16   THE COURT:  Your clients are Robinson and Carroll?

17   MR. SCHIFFER:  Yes, Judge.

18   THE COURT:  Carroll is from Maine.

19   MR. SCHIFFER:  Yes, Judge, and his parents are here.

20   THE COURT:  Anybody else wish to address the Court?

21   MR. JOHNSON:  Judge, before you make your decision just

22   to let you know the State's position is if you are inclined

23   to grant a bond we are not against the folks who live out of

24   state going back to where they came and going back home

25   until such time as they need to come back for court or court

1      matters because any request if you do grant a bond would be

2      for them to stay away from the location and to have no

3      contact with the organization any further.  So those are

4      some of the things we would request if you are inclined to

5      give a bond.  Also so the Court is aware we've also in case

6      the Court should grant it have reached out to a monitoring

7      company called Talitrix which is similar to an ankle monitor

8      except it is a little more affordable and it also is a

9      smartwatch.  So it is a little less stigmatizing from

10     wearing an ankle monitor.

11          So those are some of the things that we would request

12     if the Court is inclined to grand a bond and we can

13     obviously talk in more detail about that depending on which

14     way the Court is headed.

15          THE COURT:  Anything else?

16          MR. JOHNSON:  No, Judge.

17          THE COURT:  The Court is of several different minds

18     about what to do with this.  It is not my purpose to

19     pontificate about First Amendment, guns.  As I have tried to

20     give everybody, my role is to focus on bond.  Is there a

21     justification for granting a bond or not granting a bond?

22          The things that I consider when granting a bond among

23     others are criminal history, age of the participants,

24     failure to appears, those kind of things as distinguished

25     from the facts of the case.  That is to be addressed at

1 trial.  I am not a fact finder.  On the one hand the facts

2 as shared with me would suggest the six-part persons ought

3 to remain in jail for various reasons.  Some are from out of

4 state.  Their desire to return are questionable.  Why do I

5 say that?  Years ago I had the PETA riots out of Emory.

6 They were from all over the country.  They would get in a

7 van and travel all over the country and in the name of

8 protecting animals they would throw rocks and bricks and

9 start fires much as the people in this situation.  They were

10 granted bond.  I don't know if any of them ever came back.

11 Those were misdemeanors.  On the other hand the facts that

12 took place are in dispute.  Defendants say we did not throw

13 rocks and bricks and start fires.  So the facts are in

14 dispute.  So the things I dwell on are criminal history and

15 the likelihood they will return.  In candor I really doubt

16 that anybody from out of state will return.  I have not just

17 fallen off the back of a turnip truck.  I've gone through

18 this for many years of people who have the opportunity to

19 not return, they don't return, but on the other hand I don't

20 think it's justifiable to keep these people in jail awaiting

21 indictment and trial.  So I will set a bond.

22  I will need a few minutes to go through my notes,

23 please, so I can figure out what kind of bond to give.

24  MR. SCHIFFER:  Thank you.  If I may make one brief

25 comment regarding what Your Honor just shared.

1          THE COURT:  Yes.

2          MR. SCHIFFER:  With the top charge being domestic

3     terrorism the punishment range is very substantial.  I

4     believe it even includes death.  I expect that all 50 states

5     --

6          THE COURT:  Nobody is going to --

7          MR. SCHIFFER:  I totally understand that, Judge.

8          THE COURT:  Go ahead.

9          MR. SCHIFFER:  But what I am saying is should the State

10    of Georgia request the extradition of people charged with

11    this gravity of a charge I imagine that they would be

12    returned to Georgia relatively quickly.  This isn't a slap

13    and tickle.  This is a very serious charge.

14         THE COURT:  I did among other things when I was in the

15    criminal divisions at the Attorney General's office, I

16    participated in extraditions.  So I am confident that the

17    Attorney General, if they think the charge is serious enough

18    they will pursue it.  I had to go to several states to

19    pursue extraditions.

20         Anyway, enough of me.  Again, anything else?  I need a

21    few minutes to go through my notes.  Just give you a few

22    minutes, please.

23                     (Pause in proceedings.)

24         THE COURT:  State's attorney?  Not the AG.

25         MR. JOHNSON:  Yes, Judge?

1          THE COURT:   Regarding Francis Carroll.

2          MR. JOHNSON:   Yes, sir.

3          THE COURT:   Counts 4 and 5 domestic terrorism.

4          MR. JOHNSON:   Yes.

5          THE COURT:   What is the State alleging as the acts of

6      domestic terrorism?

7          MR. JOHNSON:   For Francis Carroll it is a combination

8      of -- he is one that we have alleged actually threw rocks

9      and threw bottles.  Additionally by occupying the treehouse

10     with the gasoline and fireworks contained inside of it and

11     the backpack that he had that had some other items in it

12     that he is both a party to the crime and an actual actor in

13     the crime.

14          THE COURT:   Okay.

15          MR. SCHIFFER:   Judge, should Your Honor be interested I

16     can read the actual caption from warrant Number D0293186

17     which is the charge taken out by Special Agent Ryan Long

18     against Francis Carroll for 16-14-10 domestic terrorism if

19     you would like it verbatim.

20          THE COURT:   No.  I wouldn't.

21          MR. SCHIFFER:   It is pretty similar to the same one

22     that they lodged against everybody.

23          THE COURT:   No.  I have sufficient overview of what is

24     before the court.

25          MR. SCHIFFER:   Yes, Judge.

1          (Pause in proceedings.)

2          THE COURT:  Not in any particular order the Court

3     orders as follows; in the matter of a bond in State versus

4     Hertel the Court sets a bond of $8,000 cash, surety or

5     property; report to pretrial services within 48 hours of

6     release; do not return to -- I don't know what to call this

7     place.  What designation is it?  What do we call it?  The

8     proper name?

9          MS. KAUFMAN:  Cop city.

10         MR. JOHNSON:  That is what they like to call it.  We

11    call it 1327 Key Road in and around that area of the forest

12    and in the bond order in the conditions, Judge, we can put

13    the exact location.

14         THE COURT:  All right.  I want the exact location and

15    not some euphemism.  Do not return to 1327 Key Road or

16    whatever it is called.  What other conditions, State?

17    Because I am going to go through all six of these.  They may

18    have some of the same conditions.

19         MR. JOHNSON:  Yes, Your Honor.  We would ask that the

20    defendants have no contact with each other except,

21    obviously, through their defense counsel can talk to each

22    other but no contact with any of the codefendants in this

23    case.

24         THE COURT:  Defense, do you want to speak to that?  Is

25    there any reason why contact should be necessary?

1      MR. SCHIFFER:  Is this on one individual at a time or

2  is this for the group, Judge?

3      THE COURT:  I am asking the State to give me some

4  conditions of some bonds because I am going to set some

5  bonds and probably the conditions may be the same on all of

6  the bonds.  So I am trying to get from the State what

7  conditions would they like for me to add.  The State has

8  suggested insofar as Hertel is concerned, do not return and

9  no contact with the other defendants.  If any lawyer for the

10  defendants wish to address this I will hear from you now

11  about no contact.  Is there any reason why Ms. Hertel has to

12  have any contact with Carroll, Ebaugh etcetera, etcetera?

13      MS. KAUFMAN:  There is no reason, Your Honor.  And if

14  she needs to it can be through her attorney.

15      THE COURT:  That is the way it should be.

16      MS. KAUFMAN:  That is fine, Your Honor.

17      THE COURT:  Hearing no objection Ms. Hertel shall have

18  no contact directly or indirectly with any other defendant

19  or State's witness in the case.  You've already heard me.

20  You've called my attention, you've been here three or four

21  hours about how I feel about no contact.  I do not need to

22  go through it all again.  Make sure your clients understand

23  no emails, no messages through third person.  That is as to

24  defendant Hertel.

25      As to defendant Carroll -- with that bond what did I

1          just say?  Was $8,000 cash, surety or property.  Defendant

2          Carroll a bond of $13,500 cash, surety or property; report

3          to pretrial services within 48 hours of release; no contact

4          directly or indirectly with any other defendant or State's

5          witness; do not return to the property in issue.

6              Defendant Ebaugh a bond of $10,000 cash, surety or

7          property; do not return to the property at issue; no contact

8          with any other defendant directly or indirectly.

9              Defendant Voiselle a bond of $6,000 cash, surety or

10         property; report to pretrial services.  I don't think I said

11         that with Ebaugh.  Ebaugh is to report to pretrial services

12         within 48 hours of release.

13             Voiselle $6,000 bond; report to pretrial services

14         within 48 hours of release; no contact directly or

15         indirectly with any other defendant or State's witness; do

16         not return to the property in issue.

17             Defendant Olson a bond of $7,500 dollars cash, surety

18         or property; do not return to the property in issue; have no

19         contact directly or indirectly with any other defendant or

20         any State's witness; report to pretrial services if I did

21         not already say that.

22             Defendant Robinson a bond of $6,000 cash, surety or

23         property; report to pretrial services within 48 hours of

24         release; do not return to the property in issue; no contact

25         directly or indirectly with any other defendant or any

1    State's witness.

2         State, have I overlooked any conditions that you would

3    like to see implemented?

4         MR. JOHNSON:  Yes, Judge.  There are a few.  Just with

5    Robinson just so I have it right.  What was the number you

6    gave?

7         THE COURT:  $6,000 cash, surety or property.

8         MR. JOHNSON:  Yes, Judge.  There are several conditions

9    and they would apply to all the defendants.  So this would

10   be something for all defendants.  In addition to no contact

11   with each other, also must have no contact with the Defend

12   the Atlanta Forest organization either through social media,

13   in person.  Any type of platform we would say a condition

14   should be no contact.

15        THE COURT:  The Atlanta Forest organization?  Is that

16   what you call it?

17        MR. JOHNSON:  Defend the Atlanta Forest, yes.  It is

18   the group that this set of defendants belong --

19        THE COURT:  Do not give me an answer to a question I

20   have not asked.  I just want to know the name of the group.

21        MR. KANE:  Defend the Atlanta Forest.

22        THE COURT:  Defend Atlanta Forest.  That is the name of

23   it?

24        MR. KANE:  Defend the Atlanta Forest.

25        THE COURT:  Is that a real group?

1        MR. SCHIFFER:  We would love their definition of it and

2    we would love to know a lot more about it because that is

3    kind of like saying those people.

4        MR. JOHNSON:  Actually if you go on social media, Mr.

5    Schiffer, they have a website and you can learn all about

6    it.

7        MR. SCHIFFER:  I know but you don't have a membership

8    list or a list of people that you have shared with anybody

9    so it is hard to say stay away from those people without a

10   definition considering the violation of it could lead to

11   problems.

12       MR. JOHNSON:  I get it but I can't put everybody's name

13   on a list.  I understand.  I was very specific no contact

14   with Defend the Atlanta Forest through social media.  They

15   have a very robust social media presence.  It would not take

16   very long for us to probably see if they were posting.

17       THE COURT:  Stop, stop, stop.  No contact with the

18   group known as Defend the Atlanta Forest through social

19   media.  If it exists, fine.  If it doesn't exist, fine.

20       What other conditions, State?

21       MR. JOHNSON:  They must possess no firearms or weapons

22   of any kind, Judge.

23       THE COURT:  Some of them have been -- a charge with

24   possession of a firearm and some have not.

25       MS. KAUFMAN:  Just briefly, Your Honor, those that have

1     been charged with possessing a firearm have not even been

2     charged with using it or pointing it at anyone and so on

3     behalf of Ms. Ebaugh who I believe is the one charged with

4     possession of the weapon.  She is a 90-pound small woman and

5     I know that she would like to continue to be able to carry.

6         MR. SCHIFFER:  Judge, Georgia is going through a crime

7     issue that has been on the front page of everything.  So

8     restricting Second Amendment rights for someone who's not

9     been accused of using a firearm in an offensive manner, that

10    seems to run contrary to the promises of the Constitution.

11        MR. JOHNSON:  This is a bond situation so there is a

12    difference here.  This is a --

13        MR. SCHIFFER:  No.  They are presumed innocent though

14    and that's something that -- removing someone's Second

15    Amendment right as a condition of bond would be appropriate

16    should there be an allegation involving wrongful use of a

17    firearm but there's been no allegation other than open

18    display.

19        MR. JOHNSON:  She is charged with simple assault with a

20    weapon.

21        MR. SCHIFFER:  Was that included in the simple assault?

22    So a misdemeanor simple assault for displaying the weapon?

23        MR. JOHNSON:  It was the appropriate charge for what

24    she did.

25        MR. SCHIFFER:  So a misdemeanor should result in the

53

1  removal of a constitutional right?

2    MR. JOHNSON:  That is the Judge's call, Mr. Schiffer.

3  Per my request the Judge can grant it --

4    MR. SCHIFFER:  It is a request though.  The request is

5  to remove a constitutional right for an allegation of a

6  misdemeanor?

7    MR. JOHNSON:  No.  The request is to remove a firearm

8  from a potentially dangerous person so we don't have someone

9  else getting hurt.

10    Look, the whole reason for this whole thing is nobody

11  wants to see anybody get hurt and it is only a matter of

12  time if these types of acts continue that someone is going

13  to get hurt out there whether it is one of the people trying

14  to stop the forest from being plowed down or people going

15  there to work on it.

16    THE COURT:  I will tell you what, if you all want to

17  debate the merits of the Constitution I am going to take a

18  break.  I will let you all debate and when you all are

19  through I will come back.

20    Again, this is not the place to discuss these things.

21  Mr. Schiffer, I am not dissuaded from taking away a

22  constitutional right in a bond hearing because you can take

23  that up in a proper motion to dismiss or amend or whatever

24  you want to do.  This is just a bond hearing and where

25  someone who has been charged with a felony, not necessarily

1    possession of a -- restricting their right to a weapon
2    doesn't bother me.  Now you all can argue it on all you want
3    but not here in front of me.  Take it up with whoever is
4    assigned this case.  I am just hearing bonds.  Do we
5    understand each other?  Do you want to argue this more, if
6    so, I'm going to go have lunch.  When you are through
7    arguing I will come back and we will finish with the bond
8    hearing.  Hearing no objection we will move on.
9        State, aside from do not possess a weapon what other
10   conditions are you urging?
11       MR. JOHNSON:  We are requesting what I mentioned
12   earlier a monitoring system.  It is called Talitrix.
13       THE COURT:  I am not going to do that.  Go ahead.
14       MR. JOHNSON:  Okay.  Then we would request a curfew if
15   you are going to release them and that they only be allowed
16   to go out for work, school or doctor's visits and that kind
17   of thing.
18       THE COURT:  Not going to do that either.  What else?
19       MR. JOHNSON:  That they waive their 4th Amendment right
20   to search and seizure while on bond.
21       THE COURT:  I won't do that either.  What else?
22       MR. JOHNSON:  That they submit to random drug screens.
23       THE COURT:  Nobody has been charged with a drug
24   violation.  What else?
25       MR. JOHNSON:  One of the defendants has a Fulton open

1    case.

2         THE COURT:  But I am just dealing with DeKalb and I

3    don't see where anybody has been charged with a drug

4    offense.   What else?

5         MR. JOHNSON:  The defendants that are out of state that

6    as a part of their bond condition they waive extradition and

7    if they fight it then they would have to pay to come back

8    into the state.

9         THE COURT:  I am not opposed to that.  Does the defense

10   want to address that?

11        MR. KANE:  No objection on behalf of Olson.

12        MR. SCHIFFER:  No objection on mine either.  They

13   intend to fully comply and participate with this case.  I

14   think that if you're waiving extradition that should

15   potentially reduce the bond but since Your Honor set the

16   bond at the amount chosen and now they have given additional

17   assurances to make it easier I would ask the court to reduce

18   all the bonds measurably.

19        THE COURT:  It is so noted but the request is denied.

20        MR. SCHIFFER:  Thank you.

21        THE COURT:  All right.  The State where we were was do

22   not have any connection with the Atlanta Forest or whatever

23   it's called -- Defend the Forest, through social media.  I

24   have granted that.  The defendants are required to -- those

25   who live out of state are required to waive extradition.

1      I'm granting that.  Do not use a weapon.  I will deny that.

2          What other conditions?

3      MR. JOHNSON:  I guess the only other one and this is

4  something we do on most bond cases that they not break the

5  law.  The only reason we do that is because if it is not

6  specifically in the bond order sometimes that is not a basis

7  for revocation, so.

8      MR. KANE:  It is overreaching.

9      THE COURT:  I think breaking the law is -- you're not

10  supposed to do that anyway whether you are charged or not.

11  I have not had that situation.  I've had it in probation

12  revocations where somebody got arrested.  I am not going to

13  add that in.  Anything else?

14      MR. JOHNSON:  Judge, I believe that is all.  Mr. Fowler

15  is on the Zoom.  I just want to ask if he has anything that

16  I have missed.

17      MR. FOWLER:  I don't think so.  We had previously

18  discussed this and I think that everything that Mr. Johnson

19  has said is covered everything that the State from the

20  Attorney General's office has requested as well.  So I won't

21  recover everything.

22      THE COURT:  All right.

23      MR. JOHNSON:  That is all, Judge.

24      THE COURT:  I have already gone through the bonds for

25  all six persons, right?

1      MR. JOHNSON:  Yes, Judge.

2      THE COURT:  And that there are now three conditions.

3   No communications through social media from or to Defend the

4   Atlanta Forest.  I don't know how you are going to regulate

5   that, but still.  I would require that the defendants waive

6   the right to extradition.  There was one more and I didn't

7   write it down.  Was that it?

8      MR. JOHNSON:  Do not return to the location, Judge.

9      THE COURT:  Yes.  Do not return to the location in

10  issue.  Anything else?

11     MR. JOHNSON:  And no contact with any co-defendants in

12  the case.

13     THE COURT:  No contact directly or indirectly with any

14  other defendant.  Anything else?

15     MS. KAUFMAN:  But through their attorneys.

16     MR. SCHIFFER:  I just want to clarify the no further

17  contact.  The no further contact as Your Honor just put is

18  with any other co-defendant except through their attorneys

19  and no further contact with Defend the Atlanta Forest

20  through social media.  Is that accurate and correct?

21     THE COURT:  That is accurate.  I did not say through

22  attorneys because that is the ethics of the profession

23  anyway but you are correct.  Anything else, anybody?

24     MR. JOHNSON:  Nothing further.

25     THE COURT:  Anything else, Attorney General?

1      MR. FOWLER:  No, Judge.

2      THE COURT:  DeKalb County?

3      MR. JOHNSON:  No, Judge.  That is all.

4      THE COURT:  Any defense attorney?

5      MS. KAUFMAN:  Is the State going to be drafting the

6  bond order?

7      THE COURT:  They are supposed to.

8      MR. JOHNSON:  Yes.  As soon as we get off the Zoom call

9  we will draft all the bond orders and send them in the queue

10  to Judge Robins to be signed.

11      MS. KAUFMAN:  Thank you very much.

12      MR. SCHIFFER:  Judge, I just want to say thank you to

13  Your Honor and everybody in the court for entertaining this

14  zealous advocacy from all parties.  That is what makes our

15  system wonderful.

16      THE COURT:  I agree with you, counsel.  I am a believer

17  in advocacy.  You all have been very good at your jobs.  I

18  commend you for it.

19      Everybody have a good holiday.  Do not drink and drive.

20      MR. SCHIFFER:  Thank you, Judge.

21      THE COURT:  Court is in recess.

22                  (Proceedings concluded.)

23

24

25

1

2                         C E R T I F I C A T E

3    STATE OF GEORGIA

4    COUNTY OF DEKALB

5

6

7

8        I, LATASHA BETHEL, HEREBY CERTIFY THAT THE FOREGOING

9    TRANSCRIPT WAS TAKEN DOWN, AS STATED IN THE CAPTION, AND THE

10   COLLOQUIES, QUESTIONS AND ANSWERS WERE REDUCED TO PRINT BY ME

11   OR UNDER MY DIRECTION; THAT THE FOREGOING PAGES REPRESENT A

12   TRUE, COMPLETE RECORD OF THE SAID PROCEEDINGS; THAT IN

13   ACCORDANCE WITH O.C.G.A 9-11-28(C), I AM NOT A RELATIVE,

14   EMPLOYEE, ATTORNEY, OR COUNSEL OF ANY PARTY, NOR AM I

15   FINANCIALLY INTERESTED IN THE ACTION.

16       THE ABOVE CERTIFICATION IS EXPRESSLY WITHDRAWN AND DENIED

17   UPON ANY ATTEMPT TO ALTER SAID TRANSCRIPT FROM ITS ORIGINAL

18   FORM FROM WHENCE IT WAS TRANSMITTED AND DELIVERED TO THE CLERK

19   OF COURT.

20               THIS, THE 24TH DAY OF JULY, 2023.

21

22

23                        _Latasha Bethel_
                          _____
24                        LaTasha D. Bethel
                          Certified Court Reporter
25                        Certificate No. 2660

# EXHIBIT E

FILED 5/27/2023 11:04 AM CLERK OF SUPERIOR COURT DEKALB COUNTY GEORGIA

# IN THE SUPERIOR COURT OF DEKALB COUNTY STATE OF GEORGIA

**Ariel Ebaugh,**

*Petitioner,*

**v.**

**Braddye Smith,**
Supervisor,
DeKalb County Pretrial Services;

**Melody M. Maddox,**
Sheriff, DeKalb County

**&**

**The State of Georgia**

*Respondents.*

No. _____
23CV5117

### PETITION FOR A WRIT OF HABEAS CORPUS

Ariel Ebaugh, a person whose liberty is being restrained under pretext of a facially unconstitutional state statute, petitions for a writ of habeas corpus under Title 9, Chapter 14, Article I of the Official Code of Georgia, to restore to her the freedoms she is due under the Georgia Constitution of 1983.

☐

## Introduction

This petition asks the Court to ensure 23-year-old Petitioner Ariel Ebaugh's right to the freedom of speech promised to her in Art. I, § I, ¶ V of the Georgia Constitution of 1983, as well as the First and Fourteenth Amendments to the United States Constitution. That Georgia provision (¶ V) commands, *inter alia*, that "[n]o law shall be passed to curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish sentiments on all subjects but [of course] shall be responsible for the abuse of that liberty"—a right that if taken away, we may "dumb and

silent … be led, like sheep, to the Slaughter." By design, ¶ V contains "broad and comprehensive language" empowering Georgians' to express themselves with "complete freedom until it affects the rights of another," that is at least as broad as the parallel right in the Federal Constitution."

Although freedom of expression is not absolute, like the federal strict scrutiny standard, under Georgia law to pass constitutional muster, legislation which can adversely impact speech and association rights must be narrowly construed to ensure such core entitlements remain unhampered from any impermissible government intrusion. For example, under House Bill 1(OCGA §20-3-48) also known as the FORUM Act, several years ago the Georgia State Legislature expanded free speech protection for institutions of higher education requiring, among other things, academic communities to "maintain and publish policies addressing content-neutral time, place, and manner restrictions on expressive activities with the *least restrictive means, in accordance with relevant First Amendment jurisprudence,* necessary for providing use of facilities and resources under the control of the institution to all student groups and invited speakers." (emphasis provided).[1]

In recognizing the necessity of facilitating the widest range of expressive speech and conduct under OCGA § 20-3-48:

> *"Conduct or expressive activity shall not be considered a material or substantial disruption if it is protected under the Georgia Constitution or the First Amendment to the United States Constitution (id. At (b)(2)(B)…Protected expressive activity under this part consists of speech and other conduct protected by the First Amendment to the United States Constitution, including, but not limited to, lawful verbal, written, audio-visual, or electronic expression by which*

---

[1] Georgia State Law HB1 the *Forming Open and Robust University Minds Act* described by Governor Kemp on May 3, 2022 as a reaffirmation of "Freedom of expression is one of this great nation's fundamental liberties."

*individuals may communicate ideas to one another, including all forms of peaceful assembly, distributing literature, carrying signs, circulating petitions, demonstrations, protests, and speeches including those by guest speakers." Id. At (7)(e).*

This speech haven finds its genesis in a wide constitutional sweep endowed under the Georgia Bill of Rights.[2] So, too, the right to assemble and to petition enjoys the same broad protection in the State Constitution which proclaims "The people have the right to assemble peaceably for their common good and to apply by petition or remonstrance to those vested with the powers of government for redress of grievances."[3] Indeed, not long ago the General Assembly of Georgia "declare[d] that it is in the public interest to encourage participation by the citizens of Georgia in matters of public significance and public interest through the exercise of their constitutional rights of petition and freedom of speech [with]...rights of petition and freedom of speech...construed broadly." GA Code § 9-11-11.1 (a).

And yet Ms. Ebaugh was arrested for the offense of domestic terrorism under OCGA § 16–11–220(2)(B) for allegedly having been party to a crime with the intent to alter, change, or coerce, the policies of state government by intimidation or coercion. Setting aside that Ariel's only act was to appear in a public place while carrying (but not brandishing) a firearm—an act protected by state law—attempting by word or expressive action to alter, change, or coerce government policy is a quintessential act of free speech. And this Court should not sanction any restraints upon her liberty for allegedly engaging in it.

Ariel has no choice at this juncture but to seek redress through a writ of habeas corpus. The writ of habeas corpus has deep roots in American history and has been called "the most important human right in the

---

[2] *See* GA. CONST. art. 1, § 1, para. V.
[3] *Id*. At para. IX.

Constitution."[4] Today, habeas corpus procedures are generally set out in state and federal statutes. Georgia's habeas corpus procedures can be found in Title 9, Chapter 14 of its Official Code. Article II of that Chapter applies only to petitioners, unlike Ariel, who are under sentence by a state court of record. OCGA § 9–14–41. Ariel, however, may avail herself of Article I, whose remedies are available to "[a]ny person restrained of his liberty under any pretext whatsoever." OCGA § 9–14–1.

## Parties

(1)     Petitioner is Ariel Ebaugh, a proud 22-year-old daughter of Georgia whose liberty is being restrained by the conditions placed upon her by the DeKalb County Magistrate Court to secure her release on bond for the offense of domestic terrorism.[5]

(2)     Respondents are Braddye Smith, Supervisor of DeKalb County Pretrial Services, and Melody M. Maddox, Sheriff of DeKalb County Georgia, who in those capacities are responsible for ensuring Ms. Ebaugh's compliance with the conditions of her release on bond following her arrest for domestic terrorism, and the State of Georgia, whose authority Smith and Morgan are exercising.[6]

## Jurisdiction

(3)     Subject-matter jurisdiction is proper in this Court because it is the superior court of the circuit where Ms. Ebaugh's liberty is restrained.[7]

---

[4] *Ex parte Yerger*, 75 U.S. 85, 95 (1868) ("the best and only sufficient defense of personal freedom").

[5] *See* OCGA §§ 9–14–1(a) & 3(1).

[6] OCGA § 17–6–15(b)(1); *see* OCGA § 9–14–3(2).

[7] OCGA § 9–14–4.

(4)     Ms. Ebaugh has standing to invoke that jurisdiction because OCGA
         § 9–14–1(a) empowers her to inquire into the legality of the re-
         straint. Further, that the restraint on Ms. Ebaugh's liberty flows from
         an arrest for an alleged criminal offense does not in this case strip
         her of standing because she was properly released on bail. OCGA
         § 9–14–16(1); *see Britt v. Conway*, 281 Ga. 189, 190, 637 S.E.2d 43,
         44 (2006).

(5)     Equally important, Ms. Ebaugh has no recourse to pursue relief
         other than through the Great Writ. Normally, one would challenge
         the constitutionality of a criminal statute via general demurrer, plea
         in bar, or motion in arrest of judgment. Were such processes avail-
         able to Ms. Ebaugh, she would be bound to pursue them in lieu of ex-
         traordinary relief. *Kearse v. Paulk*, 264 Ga. 509, 509, 448 S.E.2d
         369, 370 (1994) (quoting *Jackson v. Lowry*, 170 Ga. 755, 756–57,
         154 S.E. 228, 228–29 (1930)). But the State has not indicted Ms.
         Ebaugh, nor is it apparent when or if within the applicable limita-
         tions period it will do so. Without an indictment, there is no criminal
         proceeding to challenge. *See* OCGA § 16–1–3(4). And the law disal-
         lows preindictment challenges to criminal prosecutions. *Davis v.
         State*, 307 Ga. 784, 786–88, 838 S.E.2d 233, 234–35 (2020). Hence,
         Ms. Ebaugh files this petition.

### Facts and Allegations Underlying Ariel's Arrest

(6)     A "millennial baby," Ariel Ebaugh was born in December 2000 to the
         marriage of her father Stewart, a U.S. Army career veteran, and lo-
         cal real estate broker, and her mother Carol, a lawyer by training (if
         not in practice), a homemaker, home-school organizer, and educa-
         tor.

(7)     Ariel grew up in a devoutly Evangelical Christian household, follow-
         ing the Southern Baptist or unaffiliated Baptist traditions, with

5

membership for most of the last twenty-five years in a well-known "mega-church" outside Atlanta. Starting at age five, Ariel attended home school in a classroom of one. Her mother was her only teacher. Her younger brother, Ian, joined her in time. The two later continued their education in small-group home-schooling cooperatives of like-situated Christian families and their offspring—all of whom eschewed the local public school system as too permissive and insufficiently Christian. The family still attends church services every Sunday, and Ariel persists in her faith, albeit with less enthusiasm for the weekly meetings and religious life of her childhood.

(8)   A Fall 2021 graduate of Georgia College and State University, Ariel has earned her degree in English literature—mostly poetry—and creative writing, with a GPA of 3.9. She also participated in the exchange program at Regent's Park College, Oxford University, England where she studied poetry. Having graduated early, both cum laude and with college honors, Ariel is currently employed in multiple jobs, working approximately 50 hours per week.[8]

(9)   After graduation from GCSU, Ariel returned to her parent's home in Stockbridge. While there, she learned about various factions' growing opposition to the new police facility, which county officials had

---

[8] Since June of 2022, Ariel has worked primarily nights as a delivery driver for the fast-food app, DoorDash, driving approximately twenty hours per week, earning about $200 weekly. Licensed since age seventeen, Ariel drives from about 5 p.m. until just after midnight, and her monthly net, less gas and expenses on her 2006 Hyundai, is just under $600. She also tends bar during day shifts at the local Olive Garden, working approximately twenty-five hours per week, with an hourly wage of $5.50 plus tips, which together amounts to about $75.00 per shift. Lastly, Ariel also tutors local high school seniors in Math, English and writing skills in preparation for college entrance exams or applications, for a total of about four hours per week at $20/hour; she presently has one student and hopes to phase out the Olive Garden job and develop more college-bound kids in need of academic help this year.

approved the previous fall. She heard about the clashes that spring, which had led to some property destruction and violence and to further protests to save the forest that had been slated for clearance.

(10)  While she did not join any particular eco-activist or anti-police group, she took a general interest in the protests, as a social and political activity and saw them as a way to register her voice and meet contemporaries.

(11)  Ariel met some organizers who were providing support to the tree-sitting protesters, in particular a 30-year old-woman who worked as a paramedic. Through her, Ariel began intensive training classes being offered in a "street medic" training course.[9]

(12)  Ariel also met a handful of other activists involved in the forest demonstrations. She asked how she could help, and the activists asked her to bring food to the forest "kitchen," which she shared with them on occasion. A few times, Ariel went to the forest to talk to and to listen to people play music there. And on one occasion, she handed out leaflets describing the controversy, which a demonstrator had given her, in nearby communities.

(13)  Although Ariel had over a relatively short period become friends with half-a-dozen activists, she at no time attended any meetings

---

[9] The free classes met in a city park every two weeks for skills-sharing and demonstrations of paramedic basics. Ariel found the subject fascinating, and enrolled in a further, more complex course in September of 2022, that ran fifty hours of training in three weekends under supervision of professional paramedics. At the classes among other training, she learned how to control or stop bleeding; to administer aid to someone choking; how to splint a broken bone or wrap a sprain; how to identify basic medical conditions, and what to know about them; how to use NARCAN to save someone from an opiate overdose; how an Epi-pen works, and when to use one; and implementing emergency wound management.

where objectives or strategy were discussed—let alone join any struc-tured or formalized group.

(14) Among Ariel's new friends was a young forest demonstrator who gave Ariel his phone number. On the day of her arrest, Ariel had heard news reports that police had "raided" the forest the day before and made arrests. She had heard that people were being tear-gassed out of their tree bunks and platforms.

(15) Ariel called the young demonstrator to find out if he was okay and what was going on. In a brief discussion, Ariel's friend asked her to cause a "distraction" so he could leave the forest to avoid a police en-counter.

(16) Eager to help the boy, Ariel drove to a parking area not far from the police line, took her otherwise-lawfully-possessed long rifle⌑ from her vehicle. With the rifle's safety on, Ariel walked toward the offic-ers, hoping to attract their attention. Ariel drew no nearer than 50 yards to police and never aimed the rifle at them. Getting no closer to them than approximately 50 yards, at no time did Ariel aim the weapon at the officers. And when an officer ordered her to get on the ground, Ariel complied immediately. She was arrested without inci-dent shortly thereafter.

### Ariel's Domestic Terrorism Charge

(17) Ariel's brief, non-violent encounter with police, prompted them to charge her, *inter alia*, with domestic terrorism, OCGA § 16–11–220, *et seq.*

(18) Relevantly, § 220(2)(B), coupled with § 221(a), punishes for a felony, anyone who commits "or attempt[s] to commit a felony violation of the laws of this state which, as part of a single unlawful act or a se-ries of unlawful acts which are interrelated by distinguishing

8

characteristics, is intended to ... disable or destroy ... a state or government facility, and is intended to ... [a]lter, change, or coerce the policy of the government of this state or any of its political subdivisions by intimidation or coercion."

(19)   Though passed in 2017, the statute nevertheless provides this Court with a case of first impression: Prior to the forest demonstrations, no one has been arrested and prosecuted for violating its sweeping overbroad and vague restrictions which infringe upon long-settled and fundamental rights under both the state and federal constitutions.[10]

### The Domestic Terrorism Statute is Unconstitutional

(20)   Although freedom of expression is not absolute, under federal and state law both, legislation that can adversely impact speech and association rights is subject to strict scrutiny. Such legislation cannot pass constitutional muster unless it is narrowly construed to ensure that such core entitlements remain unhampered from any impermissible government intrusion.

(a)   For example, several years ago, under House Bill 1 (OCGA § 20–3–48), also known as the FORUM Act, Georgia's General Assembly expanded free-speech protection for institutions of higher education, requiring, among other things, academic communities to "maintain and publish policies addressing content-neutral time, place, and manner restrictions

---

[10] *Cf.* O.C.G.A. § 20-3-48(7)(e)("Protected expressive activity under this part consists of speech and other conduct protected by the First Amendment to the United States Constitution, including, but not limited to, lawful verbal, written, audio- visual, or electronic expression by which individuals may communicate ideas to one another, including all forms of peaceful assembly, distributing literature, carrying signs, circulating petitions, demonstrations, protests, and speeches including those by guest speakers").

on expressive activities with the *least restrictive means, in accordance with relevant First Amendment jurisprudence*, necessary for providing use of facilities and resources under the control of the institution to all student groups and invited speakers."(emphasis provided).[11]

(b)  In recognizing the necessity of facilitating the widest range of expressive speech and conduct under OCGA § 20–3–48:

*Conduct or expressive activity shall not be considered a material or substantial disruption if it is protected under the Georgia Constitution or the First Amendment to the United States Constitution (id. at (b)(2)(B))(7)(e).*

(22)  This speech haven finds its genesis in a wide constitutional sweep endowed under the Georgia Bill of Rights."[12] So too does the right to assemble and to petition enjoys the same broad protection[13] "The people have the right to assemble peaceably for their common good and to apply by petition or remonstrance to those vested with the powers of government for redress of grievances."[14]

(23)  Indeed, not long ago the General Assembly "declare[d] that it is in the public interest to encourage participation by the citizens of Georgia in matters of public significance and public interest through the exercise of their constitutional rights of petition and freedom of speech [with] ... rights of petition and freedom of speech ... construed broadly." OCGA § 9–11–11.1 (a).

(23)  These constitutional shields are not of recent vintage, nor are they lightly taken. They have long protected unpopular, ground-breaking,

---

[11] Georgia State Law HB1 the *Forming Open and Robust University Minds Act* described by Governor Kemp on May 3,2022 as a reaffirmation of "Freedom of expression is one of this great nation's fundamental liberties."

[12] *See*, GA. CONST. art. 1, § 1, para. V.

[14] *Id*. at para. IX.

10

and even militant, voices and associations and know no limits of race, gender, identity, politics or generation. Throughout Georgia's history, citizens and visitors alike have never hesitated to assemble, to preach, to protest—to let their opinions and beliefs be known in an effort to participate meaningfully in the marketplace of ideas throughout the state. Venerable examples are myriad, including:

(a)     Margaret Mitchell;[15]

(b)     Emory Speer;[16]

(c)     Lee Roy Abernathy;[17]

(d)     Chief Tomo-Chi-Chi;[18]

(e)     May Dubignon Stiles Howard;[19]

---

[15] Author of *Gone With the Wind*, Margaret Mitchell was very much the written voice of women empowerment at the height of the Depression and not long after women had obtained the right to vote. Meredith Biesinger, Scarlett O'Hara, Southern Belle; Modern Woman, PRETTY SOUTHERN (June 9,2022), http://prettysouthern.com/2022/06/09/scarlett-ohara-southern-belle-modern-woman/.

[16] As a member of Congress, U.S. Attorney and federal judge, for decades Emory Speer was infamous among southern whites for his position protecting the rights of Black people in the Jim Crow South. GEORGIA ENCYCLOPEDIA (April 5, 2021), https://www.georgiaencyclopedia.org/articles/government-politics/emory-speer-1848-1918/.

[17] Famed for decades of lyrical gospel music urging justice, Lee Roy Abernathy composed political songs for Franklin D. Roosevelt's 1936 campaign and was himself a candidate for governor of Georgia in 1958. http://sghistory.com/index.php?n=L.LeeRoyAbernathy.

[18] Chief Tomochichi was a Yamacraw activist with the English colonists. In his activism, he mediated-with and attacked local tribes, to help establish the colony of Georgia.https://georgiahistory.com/education-outreach/online-exhibits/featured-historical-figures/james-edward-oglethorpe/oglethorpe-and-the-creeks/.

[19] May Dubignon Stiles Howard was an advocate for free dental care for children, education for children with special needs, and trained people how to participate in local government—all in a time when women had just obtained the right to vote. May Dubignon

(f)     Mary Clare de Graffenried;[20]

(g)     Dorian Rhea Debussy;[21]

(h)     Mary Harris Armor;[22]

(i)     Lewis Grizzard;[23]

(j)     William B. Hartsfield;[24]

(k)     Susan Myrick;[25]

---

Stiles Howard, GEORGIA WOMEN OF ACHIEVEMENT, https://www.georgiawomen.org/mary-dubignon-stiles-howard.

[20] A social investigator and community activist of the late nineteenth century, well before women had obtained the right to vote Mary Clare De Graffenried had published findings on poor working conditions of textile workers in Georgia and advocated unpopular solutions. LeeAnn Whites, *The De Graffenreid Controversy: Class, Race, and Gender in the New South*, 54 No.3J. S. Hist. 449 (1988), https://doi.org/10.2307/2208998

[21] Reared in Columbus Georgia, Dorian Rhea Debussy is an academic who teaches women's studies at Ohio State University, transgender activist and Director of External Affairs for Equitas Health, one of the largest LGBTQ and HIV/AIDS healthcare organizations in U.S. https://wgss.osu.edu/people/debussy.1

[22] Mary Harris Armor was an outspoken advocate for suffrage in the late nineteenth and early twentieth century, and held office within various organizations in Georgia. ENTERING THE FRAY: GENDER, POLITICS, AND CULTURE IN THE NEW SOUTH, 50 (2009).

[23] Accused of being a racist, Lewis Grizzard was a columnist in the Atlanta-Journal Constitution, known for columns supporting controversial issues such as abortion rights and gun control. Shane Harrison, Remembering AJC columnist and southern humorist Lexis Grizzard, ATLANTA JOURNAL- CONSTITUTION (Oct. 16, 2020), https://www.ajc.com/lifestyles/remembering-ajc-columnist-and-southern-humorist-lewis-grizzard/na4wUJcFB1I6RvpSGHrYFN/.

[24] While Mayor of Atlanta, William B. Hartsfield helped negotiate desegregation of Atlanta businesses and ensured criminal charges against Martin Luther King Jr. and others were dropped following a demonstration in 1960. https://kinginstitute.stanford.edu/encyclopedia/hartsfield-william-berry

[25] An outspoken journalist, educator, author and conservationist who was concerned with the accurate portrayal of customs and manners of the antebellum South, Susan "Sue" Dowdell Myrick was associate editor for Macon-based newspaper, The Telegraph,

(l)     Mildred Seydell;[26]

(m)    Celestine Sibley;[27] and

(n)     Martin Luther King;[28]

not to mention Ralph David Abernathy, Andrew Young, John Lewis, Xerona Clayton Brady,[29] Hank Aaron, Little Richard, James Brown, and Jimmy Carter. Truly, Georgia boasts a remarkable history of famed activists, orators, musicians, scientists, educators and politicians who found voice, comfort and community in robust speech and association.

(24)   Ariel Ebaugh too knows well her birthplace's proud history of dissent. For sharing in that tradition, she now stands accused of the

where she worked for fifty years. https://www.georgiaencyclopedia.org/articles/arts-culture/susan-myrick-1893-1978/

[26] A member of the National Women's Party and advocate for equal rights, Mildred Seydell was one of the first female journalists in Georgia and often wrote about women's rights in the early twentieth century. Gregory C. Lisby, Mildred Seydell, NEW GEORGIA ENCYCLOPEDIA (May 10, 2019), https://www.georgiaencyclopedia.org/articles/arts-culture/mildred-seydell-1889-1988/.

[27] As one of the first female editors of the Atlanta Constitution in the early 1940s, Celestine Sibley often exposed police and political corruption, and covered high-profile trials. Kim Purcell, Celestine Sibley: 1914-1999, New Georgia Encyclopedia (Oct. 6, 2019), https://www.georgiaencyclopedia.org/articles/arts-culture/celestine-sibley-1914-1999/.

[28] No further elucidation is provided as unnecessary for Dr. King, Ralph David Abernathy, Andrew Young, John Lewis, Hank Aaron, Little Richard, James Brown, and Jimmy Carter given their contemporary *sui generis* footprint in the recent history of Georgia and the world.

[29] A civil rights activist and journalist, Xernona Clayton Brady, who wrote for the Atlanta Voice in the 1960s, became the first black woman in the South to host a regularly-scheduled prime-time talk show, and was appointed by then Governor Jimmy Carter to the State Motion Picture and Television Commission.  She convinced a Grand Dragon of the KKK to renounce the Klan. Xernona Clayton, THE HISTORY MAKERS (Feb. 21 2014), https://www.thehistorymakers.org/biography/xernona-clayton-40.

constitutionally untested crime of Domestic Terrorism, facing up to 35 years in prison if charged and convicted.

(25) Fundamental rights such as speech and assembly are among those for which the Supreme Court of the United States has required strong protection from government encroachment. Enshrined directly or implicitly in the penumbras of the Constitution, these rights are "fundamental" because they are so essential for individual liberty and should thus be beyond political grasp.

(26) Laws encroaching on a fundamental right must generally pass strict scrutiny to be upheld as constitutional—the highest standard of review which a court will use to evaluate the constitutionality of governmental discrimination. To satisfy scrutiny, a legislature must have passed the law to further a "compelling governmental interest," and must have narrowly tailored the law to achieve that interest. *See, New Ga. Proj. v. Raffensperger* (In re Ga. Senate Bill 202), No. 1:21-cv-01728-JPB, 2022 U.S. Dist. LEXIS 148357, at *71 (N.D. Ga. Aug. 18, 2022) (citing R.A.V. v. City of St. Paul, 505 U.S. 377 (1992)("Core political speech occupies the highest, most protected position' in the hierarchy, while obscenity and fighting words receive the least protection."); *Leitgeb v. Sark Wire Corp*., No. 2:21-cv-259-RWS, 2022 U.S. Dist. LEXIS 238960, at *80 (N.D. Ga. Sept. 21, 2022)(*citing Texas v. Johnson, 491 U.S. 397* (1989)(A statute that regulates expressive conduct is subject "to the most exacting scrutiny."); *6420 Roswell Rd., Inc. v. City of Sandy Springs*, 484 F. Supp. 3d 1321, 1338 (N.D. Ga. 2020) (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)(First Amendment scrutiny must be applied to: statutes regulating conduct which has the incidental effect of burdening speech; and statutes which, although directed at activities with no expressive component, impose a disproportionate

burden upon those engaged in protected First Amendment activities.").[30] Georgia's Domestic Terrorism statute fails that test utterly.

---

[30] *See, also, United States v. Robel* 389 U.S. 258, 262, 268 (1967)(Indictment dismissed where the charge "sweeps indiscriminately across all types of association with Communist-action groups, without regard to the quality and degree of membership... [W]hen legitimate legislative concerns are expressed in a statute which imposes a substantial burden on protected First Amendment activities, Congress must achieve its goal by means which have a "less drastic" impact on the continued vitality of First Amendment freedoms.")(internal citations and quotation marks omitted); *Moore v. City of E. Cleveland*, 431 U.S. 494, 499 (1977) ("[W]hen the government intrudes [on a fundamental right], this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation."); *United States v. Grace*, 461 U.S. 171, 177(1983)("the government's ability to permissibly restrict expressive conduct is very limited: the government may enforce reasonable time, place, and manner regulations as long as the restrictions ... are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."); *Boos v. Barry*, 485 U.S. 312, 321 (1988)(holding that content-based speech restrictions must be "necessary to serve a compelling state interest and ... narrowly drawn to achieve that end")(internal citations and quotation marks omitted); *Ward v. Rock Against Racism*, 491 U.S. 781,791(1989)(internal citations and quotations omitted)(consistent with the First Amendment "the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions ... are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."); *June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2179 (2020)(Gorsuch, J., dissenting)("A court must determine whether protected speech is at issue, whether the restriction is content based or content neutral, whether the State's asserted interest is compelling or substantial, and whether the State might rely on less restrictive alternatives to achieve the same goals."); *Bourgeois v. Peters*, 387 F.3d 1303,1322 (11th Cir. 2004)(weighed against First Amendment freedoms of association, speech, and assembly, magnetometer searches of all participants at a demonstration in the name of public safety deemed unconstitutional as "magnetometer searches do not seem narrowly tailored at all to the City's professed interest in maintaining safety [and where] there are other ways of ensuring public safety at this event, and the availability of alternatives casts serious doubt on any narrow tailoring analysis.").

## Argument and Citation of Authority

Georgia and United States Supreme Court cases are by now familiar, some of them legendary. They concern themselves with different rules of construction and the parsing of statutes and the definition of specific words,

but, yet, they all come from the same place. In this country, and in this State,

probably unlike anywhere else in the world, by design, citizens' rights generally

predominate over government will or convenience. We must start then with Ariel Ebaugh's rights and determine if the State has interfered with those rights in

a constitutional manner.

To be sure, the government has the authority, some would argue the responsibility, to protect itself from those who would tear it down through force or violence. But, when in seeking to protect itself, the government gets into the business of criminalizing its citizens' speech, it is entering into a constitutionally fraught arena where it must act carefully and with precision.

The line between constitutionally protected political persuasion and felonious coercion is razor thin. Therefore, that line must be crystal clear.

The line drawn in 16-11-220 between protected speech and criminal conduct

is not clear; indeed, it is barely drawn at all. Instead, the Georgia Legislature

has shirked its responsibility by stating its pure intentions and leaving the line drawing to the prosecutor and ultimately the courts. This failure of precision gives far too little notice of proscribed conduct to the citizenry and

leaves far too much discretion in the hands of the prosecutor.

### 16-11-220 is Substantially Overbroad.

By seeking to enforce 16-11-220 against Ariel Ebaugh, the government is

attempting to level the force of the state against words and deeds protected by

the First Amendment. Georgia's Domestic Terrorism's terms have broad

16

application, tying criminal culpability to statements or acts that "intimidate or coerce" private citizens or government actors. The statute's scope is impermissibly broad; the outer limits of its reach are impossible to discern.

As a statute that criminalizes expressive conduct and speech, "a careful examination [of 16-11-220] is critical." *State v. Miller*, 260 Ga. 669, (1990). First, does the statute "reach a substantial amount of constitutionally protected conduct?" *Johnson v. State*, 264 Ga. 590, 593 (1994) (citing *Miller v. State*, 260 Ga. 669, (1990). Stated differently, does the statute "stifle expression or conduct otherwise protected?" *Id*, at 591. If so, is the statute narrowly tailored to protect a vital government interest? *Cunningham v. State*, 260 Ga. 827 (1991). Georgia's Constitution has been interpreted to provide broad protection to expression. *State v. Miller*, 260 Ga. 669 (1990). Communicative conduct may only be limited by the government if the regulation furthers a substantial governmental interest that is unrelated to the suppression of free expression; and where the incidental restriction on First Amendment freedom is no greater than necessary to further the governmental interest. *Id*. Likewise, the United States Supreme Court has many times declared a law unconstitutional on its face under the First Amendment overbreadth doctrine, even though it may have some legitimate uses. *See e.g.*, *United States v. Stevens*, 559 U.S. 460, 473 (2010); *Sabri v. United States*, 541 U.S. 600, 609-10 (2004); *NAACP v. Button*, 371 U.S. 415 (1963)(in order to preserve the First Amendment's requisite "breathing space to survive, government may regulate in the area only with narrow specificity").

If, as is commonly accepted, Justice Holmes was correct when he

stated in his famous *Gitlow* dissent "every idea is an incitement,"[31] then every
attempt to persuade is coercive. Coercion is a rhetorical device that fits comfortably within the pathos leg of the Aristotelian rhetorical triangle.[32] Pathos, the appeal to emotions of the audience, is sometimes passion, sometimes love, often fear. But, of course, not all appeals to the decision maker's fear can or should be criminalized. As with incitement, there is constitutionally protected coercion and coercion that falls outside the zone of protection.[33] The Georgia criminal law makes no attempt to distinguish between the two and therefore is substantially overbroad.

  Several examples illuminate the folly of seeking to criminalize all coercion whose aim is to alter government policy. When he penned our Declaration of Independence wherein he asserted a person's right to throw off the yoke of an oppressive government through violence, if necessary, was Thomas Jefferson a domestic terrorist? Threatening rebellion is coercive indeed. Or, what of the Salt March and Mahatma Gandhi's famous letter to Lord Viceroy Irwin? Was it not coercive to suggest that if the salt tax were not repealed the march would "shake the foundations of the British Empire"?

From Dr. King to Nelson Mandela to Bobby Sands to the unnamed student who stood against Chinese tanks in Tiananmen Square came marches, demonstrations, boycotts and fasts. All were attempts to coerce changes to

---

  [31] "Every idea is an incitement. It offers itself for belief, and, if believed, it is acted on unless some other belief outweighs it or some failure of energy stifles the movement at its birth. The only difference between the expression of an opinion and an incitement in the narrower sense is the speaker's enthusiasm for the result. Eloquence may set fire to reason." *Gitlow v. New York*, 268 U.S.652 at 673 (1925).

  [32] *Aristotle, The Rhetoric of Aristotle: A Translation*. Cambridge [Cambridge-shire]: The University Press (1909) (three elements of rhetoric are logos, ethos, and pathos).

  [33] The Supreme Court's seminal decision in *Brandenburg v. Ohio* is instructive on this point. In *Brandenburg* the Court struck down an Ohio statute, stating "the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444 at 447 (1969). The First Amendment requires no less of the Georgia Domestic Terrorism law.

established law and policy. Are they to be celebrated as courageous forms of protest or are they to be criminalized by an ill-conceived and poorly drawn Georgia statute?

Far less dramatic or historically noteworthy, but perhaps just as important, is the speech of ordinary citizens seeking redress from their government. Implicit in every entreaty made to an elected official to alter government policy is the negative threat. The simple petition to a local mayor to fill the potholes in the street carries with it; sometimes directly, sometimes not, the threat that if she does not fill the potholes, she will lose political support or may even face a challenger in the next election. The simple fact is, virtually all elected officials live in fear of being voted out of office and are duly motivated by that fear. That type of coercion is the lifeblood of political communication between our citizenry and their elected representatives. It cannot be constitutionally proscribed. Yet, other than codifying their pure intentions, the Georgia Legislature did nothing to distinguish constitutionally protected coercion from credible threats of significant, imminent harm. The failure to do so has yielded a statute that is substantially overbroad and infringes on rights protected by the First Amendment.

## 16-11-220 is Unconstitutionally Vague.

In addition to infringing recognized First Amendment protections in violation of the overbreadth doctrine, 16-11-220 also violates "a faithful expression
of ancient due process" principles, the void-for-vagueness doctrine. *Sessions v.
Dimaya*, 138 S. Ct. 1204, 1224 (2018) (Gorsuch, J., concurring).

Although the concepts underlying overbreadth and vagueness are often "logically related," *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983), the void-for-vagueness doctrine entails a separate inquiry deserving of

independent attention given the severe uncertainty and risk of arbitrary en-
forcement that 16-11-220 creates. The statute under which Ariel Ebaugh
was charged cannot withstand constitutional scrutiny where, in addition to
violating the First Amendment, it also offends basic principles of due pro-
cess guaranteed by the Fifth Amendment.

Georgia Code 16-11-220 violates the Fifth and Fourteenth Amend-
ment's prohibition of vague criminal laws. "No person shall be . . . deprived
of life, liberty, or property, without due process of law." U.S. Const. amend.
V, XIV.  A criminal statute is unconstitutionally vague in violation of due
process for either of two reasons: first, if "it fails to give ordinary people fair
notice" of what is proscribed; and, second, if it is "so standardless that it in-
vites arbitrary enforcement." *Johnson v. United States*, 135 S. Ct. 2551,
2556 (2015); *Johnson v. State*, 264 Ga. 590, 591 (1994).

16-11-220's terms violate the fair notice element of the void-for-
vagueness doctrine, whose "purpose is to enable the ordinary citizen to con-
form his or her conduct to the law." *City of Chicago v. Morales*, 527 U.S. 41,
58 (1999); *see also Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939) ("No
one may be required at peril of life, liberty or property to speculate as to the
meaning of penal statutes."). A criminal law provides inadequate notice
where the meaning of its terms depends on "wholly subjective judgments
without statutory definitions, narrowing context, or settled legal meanings."
*United States v. Williams*, 553 U.S. 285, 306 (2008); *Slakman v. Continen-
tal Cas. Co.*, 277 Ga. 189, 191 (2003)(in order to determine whether a stat-
ute is unconstitutionally vague, "we apply the fundamental rules of statu-
tory construction that require us to construe [the] statute according to its
terms, to give words their plain and ordinary meaning, and to avoid a con-
struction that makes some language mere surplusage").

Section 16-11-220's expansive terms are undefined creating ambiguity about what the law intends to criminalize. The statute's expansiveness and imprecision are particularly dangerous and cannot comply with due process. Taking the statutory terms at face value, it is unclear where the Georgia Legislature has drawn the line between confrontational speech protected by the First Amendment and criminal coercion. The United States Supreme Court instructs, difficulty in "determin[ing] whether the incriminating fact . . . has been proved" is not what renders a statute vague. Instead, vagueness results when it is impossible to determine "precisely what that [incriminating] fact is." *Williams,* 553 U.S. at 306. The endless array of prosecutable cases illustrates its expanse and ambiguity about what conduct is covered and what is not. The fatal flaw in 16-11-220 is that the line between persuasion protected by the First Amendment and a prosecutable felony depends on the subjective reaction of the audience and not the objective intent of the speaker. Whether one criminally intends to intimidate or coerce is incapable of objective meaning: what coerces one person may have no effect on, or may even discourage, another. *Coates v. Cincinnati*, 402 U.S. 611,614 (finding unconstitutionally vague an ordinance criminalizing conduct "annoying to persons passing by" because "[c]onduct that annoys some people does not annoy others"); *Baggett v. Bullitt*, 377 U.S. 360, 368 (1964)(invalidating on vagueness and overbreadth grounds an oath requiring teachers to forswear an "undefined variety" of behavior considered "subversive" to the government). Liability under 16-11-220 hinges on the subjective reactions of others and therefore fails to give the ordinary person notice of what the state permits and what it forbids.

The constitutional concern caused by the statute's subjectivity is compounded by the risk that charging decisions will be based on the political

needs of elected officials and the whims of law enforcement. Section 16-11-220's imprecision in defining the explicit *mens rea* standard for "intimidation or coercion" highlights the lack of notice and risks extending criminal liability to speech protected by the First Amendment. *United States v. Ragen*, 314 U.S. 513, 524 (1942) ("Because of the absence of a scienter requirement in the provision . . . the statute is little more than a trap for those who act in good faith."). Unlike other criminal statutes that the Supreme Court has upheld against vagueness challenges, 16-11-220 contains no "narrowing definitions" for the operative words "intimidation and coercion". *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 20–21 (2010) (noting that "Congress also took care to add narrowing definitions to the material-support statute over time [which] increased the clarity of the statute's terms"). On their face, "intimidation' and "coercion" are broad and ambiguous terms so we must look to the rest of the statute for context and meaning. Applying the familiar canon of statutory construction, *noscitur a sociis*, we search for words to limit the imprecision and expanse. Alas, here our search is in vain, for there are no definitions or qualifiers to be found.

"Vague laws invite arbitrary power." *Dimaya,* 138 S. Ct. at 1223 (Gorsuch, J., concurring). By predicating liability on such imprecise terms, section 16-11-220 authorizes arbitrary and discriminatory enforcement. Criminal laws must "establish minimal guidelines to govern law enforcement." *Kolender v. Lawson,* 461 U.S. 352,358 (1983). The indeterminate nature of what behavior might rise to the level of "intimidation or coercion" grants prosecutors unrestrained discretion, creating risk of unguided enforcement under the statute. There lies the denial of due process. *See Grayned v. City of Rockford*, 408 U.S. 104,108 (1972) ("a vague law impermissibly delegates

basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis").

The so-called savings clause, added to the statute in the 11th hour to sway some fence-sitting House Representatives, admonishing that the statute was not intended to trample on the First Amendment and assurances by the government of fair enforcement of 16-11-220, even if "well-intentioned", "do not neutralize the vice of a vague law." *Baggett,* 377 U.S. at 373. "It is the statute, not the accusation under it, that prescribes the rule to govern conduct and warns against transgression." *Lanzetta*, 306 U.S. at 453. Allowing prosecutors to "shap[e] a vague statute's contours through their enforcement decisions" would transfer to them a job that belongs to Congress. *Dimaya*, 138 S. Ct. at 1228 (Gorsuch, J., concurring). "[T]he [vagueness] doctrine is a corollary of the separation of powers—requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not ... It is for the people, through their elected representatives, to choose the rules that will govern their future conduct." *Dimaya*, 138 S. Ct. at 1212, 1227 (Gorsuch, J., concurring).

Section 16-11-224 is probably the most damning evidence that the Domestic Terrorism Law is overbroad and vague enough to be interpreted to infringe on constitutionally protected speech and assembly. Why else would the Legislature have added such an absurdly redundant provision? Of course. The Legislature did not intend for the statute to be applied in an unconstitutional manner, that goes without saying and usually does. But here, rather than pass a narrow, precise law to achieve its ends, the Georgia Legislature punted. It passed an ill-defined, expansive law with a statement of pure intent, and left it entirely to others to make the critical

constitutional judgment calls. This is precisely the impermissible delegation of authority and responsibility Justice Gorsuch wrote of in *Dimaya*.

Section 16-11-220's vagueness chills protected speech in violation of the First Amendment, compounding the statute's constitutional infirmities. A statute deserves even more exacting scrutiny when it interferes with First Amendment freedoms. While the vagueness doctrine is "an outgrowth not of the First Amendment, but of the Due Process Clause," *Williams*, 553 U.S. at 304, the Supreme Court applies "a more stringent vagueness test," requiring greater statutory precision, where "the law interferes with the right of free speech or of association." *Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 499(1982). The reason why the test is stricter in the First Amendment context is "to ensure that ambiguity does not chill protected speech." *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2309–10 (2012); *Hoffman Estates* 455 U.S. at 499 ("[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights."). 16-11-220 (4)—by its plain terms and scope—criminalizes protected speech. The very threat of prosecution under the Domestic Terrorism law deters people from exercising their free speech rights. Due to its ambiguity, the surest way to avoid prosecution under the statute is self-censorship. Those citizens who might otherwise seek to persuade the government to alter a policy will "'steer far wide of the unlawful zone." As a result, "the free dissemination of ideas may be the loser." *Baggett*, 377 U.S. at 372,379.

This country was born of disagreement – vociferous, boisterous, and often violent disagreement with government policy. It is in our national DNA. Our founders, particularly James Madison, understood that America is not a debating society; it is a street fight, and they made ample room in

the First Amendment for loud, contentious confrontation between the citizenry and their government. In 1789, it was a bodacious experiment; but more than anything else, it is what sets us apart from the rest of the world. Even a cursory review of our history shows that every major policy advancement came not from polite conversation but from years, sometimes decades, of citizens coercing their government to change course. Civil rights, women's rights, labor rights were not achieved in the salons of polite society; they were achieved through citizens confronting government policy and forcing change. Power does not yield by mere debate. Madison understood this and so does our Constitution.

<u>The Domestic Terrorism law's passage violated Georgia's Constitution</u>

Georgia' s Constitution states:

> No bill or resolution intended to have the effect of law which shall have been rejected by either house shall again be proposed during the same regular or special session under the same or any other title without the consent of two-thirds of the house by which the same was rejected.

GA Const. Art III, § 5 ¶ 12.

The Georgia Legislature violated this provision in passing the domestic terrorism law.

Georgia first enacted a domestic terrorism statute in 2002 following the 9/11

attacks (Ga. Code § 16-4-10). In 2017, Senate Bill (SB 1) was introduced in the

Georgia Senate, which sought to change the definition of domestic terrorism in

response to the 2015 Charleston, South Carolina massacre.[34] The bill was assigned

---

[34] The 2002 Domestic Terrorism law was limited to instances where 10 or people were injured or killed. Nine persons were killed in the 2015 Charlestown massacre and therefore it would not have qualified as domestic terrorism under the original statute.

to committee where it was reported favorably with, several amendments.[35]

Pursuant to Georgia legislative process, the Senate bill was "read" (i.e. considered by the body) for a second time and then a third. Opponents of the bill worried it was too broad and might be used to prosecute protesters.[36] Two floor amendments were offered, including new language expressing the Legislature's desire that the law not be used to prosecute free speech and assembly activities. The Senate adopted both amendments and passed the committee substitute as amended by a vote of 42 to 12.

The bill was then sent to the Georgia House of Representatives, where it was read a first time and assigned to committee. The House read the bill for a second time and then the committee amended the bill and reported a substitute. The House committee made some significant changes to the bill in the substitute, requiring that the underlying predicate act be a felony and adding other elements of the crime. The committee also removed language requiring the predicate act be "intended to advance, further, or effectuate any ideology or belief whether committed alone or as part of a command structure involving an identifiable set of other individuals."

The House read the bill a third time but failed to pass the substitute; the vote failed 85 to 83. The House then voted on a motion to reconsider, which passed 94 to 73. On reconsideration, SB 1 failed again, losing 84 to 83. House Rules permit bills to be reconsidered only one time, so SB 1 officially died.

---

[35] A detailed chronology of the passage of Georgia's current Domestic Terrorism statute can be found at John J. Crowley & Tatiana E. Posada, *HB 452- Domestic Terrorism*, 34 Ga. St. U. L. Rev. 17, 19-21 (2018).

[36] Michelle Baruchman, *Civil Rights Groups Oppose State Bills Affecting Ability to Protest*, Atl. J.-Const. (Mar. 15,2017).

The Senate then took an entirely different bill, House Bill (HB) 452, and inserted, word for word, the failed language from SB 1. HB 452 passed the Senate in a vote of 36 to 18. The House received the Senate substitute of HB 452, amended the domestic terrorism language as it had with SB 1, and passed the Senate substitute to HB 452, as amended by the House, in a vote of 96 to 77. The bill then was returned to the Senate, where it passed 35 to 16. The Governor signed the bill into law shortly thereafter.

Within the same legislative session, the original bill, SB 1, failed on the motion to reconsider in the House. Thereafter, the second iteration, HB 452, did not pass in the House by a two-thirds vote (it passed 96-77, i.e., 55%). The eventual passage of HB 452 violated Art II, sec 5 of the Georgia Constitution. For the same reason, the law's passage also violated Rule 144 of the Rules, Ethics, and Decorum of the Georgia House of Representatives (House Rules), that states, "No bill, resolution, or amendment shall be reconsidered more than once. Here the bill was reconsidered more than once" when its language was added to HB 452 by the Senate.

The language of the Georgia Constitution is not precatory, it is mandatory. Article III, sec 5 may well be technical and procedural, but it is nonetheless clear. There is no exception for 'really important' bills. Indeed, given the public notoriety of the proposed law, one would have thought the Legislature would have been particularly careful in its passage. Some may contend that HB 452 and SB1 are not the same bill and therefore the provision does not apply. However, the language of the Constitution appears to have anticipated the Legislature's 'work around' by forbidding second consideration of a bill "under the same or any other title." SB 1 and HB 452 contain the same words arranged into the same sentences and sections. It

will take a giant judicial wink to conclude that they are not the same bill with different titles.

Although rare, legislative procedural violations have been struck down by other state courts. *See Naifeh v. State ex rel. Okla. Tax Comm'n*, 400 P.3d 759 (Okla. 2017)(striking down law as unconstitutional for violating procedural requirement of state constitution); *Anderson v. Oakland County Clerk*, 419 Mich. 492 (1984)(striking down law for violating Michigan Constitution regarding amended bill's "original purpose provision"). *But see Missouri Coalition for Environment v. State of Missouri*, 593 S.W.3d 534 (2020).

This appears to be a question of first impression in Georgia and the courts are understandably reluctant to interfere with the inner workings of a coequal branch. However, this is not some House Rule under consideration; it is the Georgia Constitution. If the Legislature cannot be bothered to run its own affairs by the clear mandate of the Constitution, how can the citizenry be expected to respect the rule of law?

The Domestic Terrorism Statute as applied to Ariel Ebaugh

Ariel Ebaugh has been charged with one count of Domestic Terrorism, a felony carrying a prison sentence of no less than five years and up to 35 years, as defined in Ga. Code §16-11-220. She is also charged with two counts of Possession of a Firearm or Knife during the Commission of the felony offense of Domestic Terrorism, a violation of Ga. Code §16-11-106.

As best as can be determined from the sparse affidavits filed in support of Ms. Ebaugh's arrest warrant, she is being charged with domestic terrorism not based on any individualized act or intent but because she "affirmed their cooperation with Defend the Atlanta Forest (DTAF) by presenting herself onto the private property armed with a rifle and handgun

dressed in the common attire of camouflage." Stated plainly, without any charge of a specific intent or action on her part, the defendant was charged based on exercising her right to freely associate, her freedom to dress as she chose, and her right to possess and carry firearms protected by the 2nd Amendment and the Georgia Constitution.

Even cursory review of the statute shows that Ms. Ebaugh's charged conduct and speech did not violate Georgia's Domestic Terrorism law. At a minimum, Section 16-4-110 requires the following: 1) a felony violation or attempt to commit a felony violation of the laws of Georgia; 2) intent to disable or destroy publicly or privately owned facilities deemed 'critical infrastructure' resulting in major economic loss; and 3) intent to alter, change, or coerce the policies of the government by intimidation or coercion.

By showing up at an undeveloped construction site Ariel Ebaugh did not "intend to disable or destroy" critical infrastructure or a state or government facility, thereby causing "major economic loss". It stretches the words in the statute to absurdity to argue that a person can disable or destroy something that does not exist. Yet, that is exactly what the government is alleging in the charging documents. The Legislature could have explicitly included construction sites in the "critical infrastructure" definition; many other states have done so. (Arkansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, North Dakota, Tennessee, and Texas). It chose not to and it is not for the prosecutor to expand what the Legislature has enacted. Moreover, even if the so-called Cop City facility did exist, it would not meet the "critical infrastructure" definition because it is not a "energy, fuel, water, agriculture, health care, finance, or communication facility providing or distributing services for the benefit of the public". Again, had the legislature

intended to include a public safety training facility in the definition, it would have done so.

An unbuilt so-called Cop City is not a "State or government facility"; it is an idea, an aspiration. An unbuilt Cop City is not a "permanent or temporary facility or conveyance that is used or occupied by representatives of this state or any of its political subdivisions, by the legislature, by the judiciary, or by officials or employees of this state or any of its political subdivisions." Cop City may become a state facility if it is ever built and used for its intended purpose; but until built, it is not a facility of any sort, permanent or temporary.

Furthermore, what major economic loss has the government alleged? Had the Legislature intended to cover every broken window or slashed tire, it would have done so. Instead, the Legislature focused on economic disruption. Delaying the construction of Cop City may be disruptive to some people, but it will not cause major economic loss as required by the statute.

It is clear that a person cannot violate 16-11-220 without first committing or attempting to commit a felony as defined by Georgia law. It is equally clear that no underlying felony has or could be identified here. The plain text of the Georgia Domestic Terrorism law requires the commission of or attempt to commit a triggering felony. There is no other meaning to be ascribed to the opening lines of the statute: "Domestic terrorism means any felony violation of, or attempt to commit a felony violation of the laws of this state ..." Ga. Code §16-11-220 (2). If the words in the statute are not plain enough, its legislative history confirms that a triggering felony is necessary. The original Senate bill was specifically amended in the House to add the triggering felony requirement. See Crowley & Posada, at p. 22.

Prosecutors know how a triggering felony statute works. In charging Ariel Ebaugh with the Possession counts, another triggering felony statute, the underlying felony is clearly stated in the charging documents. Either the Dekalb County District Attorney does not believe the Domestic Terrorism law requires a triggering felony, an error of law fatal to the charge; or her office seeks to use the felonies of others as the predicate for Ms. Ebaugh's charges, an equally fatal mistake. There is no felony underlying the domestic terrorism charge and that charge must therefore fall. Without the underlying felony of domestic terrorism, the firearm possession charges must also fall.

The charging documents describe alleged felonious acts and intent claimed by DTAF. Although far from certain, perhaps those felonies committed by others and not even alleged to have been committed by the defendant are the undergirding of Ms. Ebaugh's charges. If so, these charges are a house of cards ready to tumble down in the first stiff constitutional wind. If the sins of DTAF are to be visited on the defendant let the government say so plainly so that they can be examined in the light of Ariel Ebaugh's "freedom to engage in association of beliefs and ideas" protected by the First Amendment. *NAACP v. ex rel. Patterson*, 357 U.S. 449, 460 (1958).

Likewise, the charging documents attempt to use constitutionally protected conduct and expression as evidence of criminal intent. Like everyone else, Ms. Ebaugh is entitled, within the bounds of "public health and decency", to wear what she chooses, yet their choice of camouflage is cited as evidence of her terrorist intent. More importantly, the government is constitutionally prohibited from interfering with the defendant's right to keep and bear arms, yet the charging documents ascribe criminal intent to her

possession of firearms. Georgia law has long protected the right to keep and bear arms. In 2022, the Georgia Legislature codified that protection in a comprehensive "permitless carry" statute that repealed longstanding license application requirements. Ga. Code §§ 16-11-125.1;15-11- 138. Under the new law, Georgia now generally permits any "lawful weapons carrier" to carry handguns openly or concealed in most public spaces without any background check or permit required. It is thus perfectly legal-though some may find it intimidating-to attend a protest armed. The government's attempt to assign criminal intent to Ariel Ebaugh's exercise of her constitutional right to carry cannot stand.

As applied to the conduct charged to Ariel Ebaugh in the affidavit supporting her arrest, the following questions remain unanswered:

1) what felony or attempted felony is she alleged to have committed?

2) what critical infrastructure or government facility did Ariel Ebaugh intend to damage or destroy?

3) what major economic damage is she alleged to have caused? and

4) how did Ariel Ebaugh engage in intimidation or coercion to alter a government policy?


WHEREFORE, counsel for Ms. Ebaugh respectfully submits that this Honorable Court grant her writ of habeas corpus and strike down Georgia's Domestic Terrorism statute as both procedurally and substantively unconstitutional under the state and federal constitutions.

This 26th day of May, 2023.

Respectfully Submitted,

32

/s/Stanley Cohen
Stanley Cohen, Esq.
Co-counsel for Ms. Ariel Ebaugh
Admitted Pro Hac Vice


/s/Jason B. Sheffield
Jason B. Sheffield, Esq.
Co-counsel for Ms. Ariel Ebaugh
Georgia Bar No. 639719


PETERS, RUBIN, SHEFFIELD, & HODGES P.A.
2786 N. Decatur Rd., Suite 245
Decatur, GA 30033
404-296-5300
jasonsheffieldattorney@gmail.com


## CERTIFICATE OF SERVICE

As permitted by OCGA § 9–14–45, *Capote v. Ray*, 276 Ga. 1, 3 n.8, 573 S.E.2d 25, 28 n.8, *opinion corrected and superseded*, 276 Ga. 1, 577 S.E.2d 755 (2002), I served a copy of this petition via first-class mail with adequate postage on the following parties:

**Braddye Smith,** Supervisor**,**
DeKalb County Pretrial Services,
DeKalb County Courthouse
Room 120, 1st Floor
556 N. McDonough Street
Decatur, Georgia 30030

**Melody M. Maddox,**
Sheriff, DeKalb County
4415 Memorial Drive

Decatur, GA 30032

**Mr. Lance Cross**, ADA, DeKalb County District Attorney's Office
via email at clcross@dekalbcountyga.gov.

This 26th day of May, 2023.

Respectfully Submitted,

/s/Jason B. Sheffield
Jason B. Sheffield, Esq.
Co-counsel for Ms. Ariel Ebaugh
Georgia Bar No. 639719

PETERS, RUBIN, SHEFFIELD, & HODGES P.A.
2786 N. Decatur Rd., Suite 245
Decatur, GA 30033
404-296-5300
jasonsheffieldattorney@gmail.com

# EXHIBIT

# F



**EXHIBIT**
F

## IN THE SUPERIOR COURT OF DEKALB COUNTY
## STATE OF GEORGIA

ARIEL EBAUGH,

      PETITIONER,

v.

BRADDYE SMITH,
SUPERVISOR,
DEKALB COUNTY PRETRIAL SERVICES;

MELODY M. MADDOX,
SHERIFF, DEKALB COUNTY

&

THE STATE OF GEORGIA

      RESPONDENTS.

CIVIL ACTION NO. 23CV5117

### RESPONDENTS BRADDYE SMITH AND SHERIFF MELODY M. MADDOX'S
### ANSWER AND AFFIRMATIVE DEFENSES TO HABEAS PETITION

COME NOW, Respondents Braddye Smith and Sheriff Melody M. Maddox, hereafter referred to as ("the Respondents"), by and through the undersigned counsel, and file this Answer to Petitioner's Petition for a Writ of Habeas Corpus (the "Habeas") in the above-styled action as follows:

### FIRST DEFENSE

The Habeas fails to state a claim against the Respondents upon which relief can be granted and should be dismissed.

### SECOND DEFENSE

Service of process is insufficient pursuant to O.C.G.A. § 9-14-8, because the Petitioner failed to serve by delivery a copy of the Habeas to the Respondents personally or to an agent authorized to accept service on the Respondents' behalf.

DI

## THIRD DEFENSE

The Habeas is not verified by oath of the Petitioner in accordance with O.C.G.A. § 9-14-4 and is subject to dismissal.

## FOURTH DEFENSE

Petitioner has or will have other adequate remedies at law, such that the Habeas is subject to dismissal.

## FIFTH DEFENSE

Without waiving any of the foregoing defenses, Respondents respond to the allegations set out in the individually numbered paragraphs as follows:

## INTRODUCTION AND PARAGRAPH PRECEDING INTRODUCTION

The paragraphs preceding the numbered paragraphs of the Habeas and the footnotes referenced therein contain legal conclusions and rhetoric that require no response. To the extent these paragraphs contain factual allegations against Respondents, said allegations are denied.

## PARTIES

1. Respondents are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 1, and therefore deny the same.

2. Respondents admit that Defendant Braddye Smith is a supervisor of the DeKalb County Pretrial Services, and that Melody M. Maddox is the Sheriff of DeKalb County, Georgia. Respondents state that the remaining allegations of Paragraph 2 call for a legal conclusion to which no response is required. To the extent a response is required, Respondents deny same.

## JURISDICTION

3. Respondents admit this Court has jurisdiction over the alleged claims. However, insofar as Paragraph 3 alleges or implies that the Petitioner states a cause of action against Respondents, Paragraph 3 is denied, as Respondents deny restraining Plaintiff's liberty.

4. Paragraph 4 asserts legal conclusions to which no response is required. To the extent a response is required, Respondents deny Paragraph 4.

5. Paragraph 5 asserts legal conclusions to which no response is required. To the extent a response is required, Respondents deny Paragraph 5.

## FACTS AND ALLEGATIONS UNDERLYING ARIEL'S ARREST

6. Respondents are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 6, and therefore deny the same.

7. Respondents are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 7, and therefore deny the same.

8. Respondents are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 8 and footnote 8, and therefore deny the same.

9. Respondents are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 9, and therefore deny the same.

10. Respondents are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 10, and therefore deny the same.

11. Respondents are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 11 and footnote 9, and therefore deny the same.

12. Respondents are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 12, and therefore deny the same.

13. Respondents are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 13, and therefore deny the same.

14. Respondents are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 14, and therefore deny the same.

15. Respondents are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 15, and therefore deny the same.

16. Respondents are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 16, and therefore deny the same.

## ARIEL'S DOMESTIC TERRORISM CHARGE

17. Respondents are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 17, and therefore deny the same.

18. Paragraph 18 states a legal conclusion to which no response is required. To the extent a response is required, Respondents deny same.

19. Paragraph 19 and footnote 10 assert legal conclusions to which no response is required. To the extent a response is required, Respondents deny same.

## THE DOMESTIC TERRORISM STATUTE IS UNCONSTITUTIONAL

20. Paragraph 20 and footnote 11 assert legal conclusions to which no response is required. To the extent a response is required, Respondents deny same.

21. Petition has no Paragraph 21 and therefore, no response is required.

22. Paragraph 22 asserts legal conclusions to which no response is required. To the extent a response is required, Respondents deny same.

23. Paragraph 23 states a legal conclusion to which no response is required. To the extent a response is required, Respondents deny same.

23. Respondents are without knowledge or information sufficient to form a belief as to the truth of the allegations in the second Paragraph 23 of the Habeas and the footnotes therein, and therefore deny the same.

24. Respondents are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 24, and therefore deny the same.

25. Paragraph 25 asserts legal conclusions to which no response is required. To the extent a response is required, Respondents deny same.

26. Paragraph 26 and footnote 30 assert legal conclusions to which no response is required. To the extent a response is required, Respondents deny same.

## ARGUMENT AND CITATION OF AUTHORITY

The un-numbered paragraphs included in the section titled "Argument and Citation of Authority" and the footnotes referenced therein contain legal conclusions and rhetoric to which no response is required. To the extent these paragraphs are intended to assert a cause of action against Respondents, they are denied.

27. Any allegations in Petitioner's Habeas that are not specifically admitted in this Answer are hereby denied.

**WHEREFORE**, Respondents Braddye Smith and Sheriff Melody M. Maddox respectfully pray as follows:

1) That Petitioner be denied any relief against Respondents and that the Habeas be dismissed with prejudice;

2) That Petitioner pay the costs of this action and, to the extent authorized by law, reimburse Respondents for their attorneys' fees and expenses of litigation; and

3) For such other and further relief as this Court deems just and proper.

Respectfully submitted this 27th day of June, 2023.

> Laura K. Johnson
> Deputy County Attorney
> Ga. Bar. No. 392090
>
> Nikisha L. McDonald
> Supervising Attorney
> Ga. Bar No. 489573
>
> */s/Omari J. Crawford*
> Assistant County Attorney
> Ga. Bar No. 179965
>
> *Counsel for Respondents Braddye Smith
> and Sheriff Melody M. Maddox*

**PLEASE ADDRESS ALL
COMMUNICATIONS TO:**

**Nikisha L. McDonald**
Supervising County Attorney
nmcdonald@dekalbcountyga.gov

**Omari J. Crawford**
Assistant County Attorney
ojcrawford@dekalbcountyga.gov

**DEKALB COUNTY LAW DEPARTMENT**
1300 Commerce Drive, 5th Floor
Decatur, Georgia 30030
Telephone: (404) 371-3011
Facsimile: (404) 371-3024

6

**IN THE SUPERIOR COURT OF DEKALB COUNTY**
**STATE OF GEORGIA**

ARIEL EBAUGH,

    PETITIONER,

v.

BRADDYE SMITH,
SUPERVISOR,
DEKALB COUNTY PRETRIAL SERVICES;

MELODY M. MADDOX,
SHERIFF, DEKALB COUNTY

&

THE STATE OF GEORGIA

    RESPONDENTS.

CIVIL ACTION NO. 23CV5117

---

**CERTIFICATE OF SERVICE**

I hereby certify that on this day, I electronically filed **RESPONDENTS BRADDYE SMITH AND SHERIFF MELODY M. MADDOX'S ANSWER AND AFFIRMATIVE DEFENSES TO HABEAS PETITION** with the Clerk of the Court using the Odyssey system which will electronically serve the following counsels of record:

Jason B. Sheffield, Esq.
**PETERS, RUBIN, SHEFFIELD, & HODGES P.A.**
2786 N. Decatur Rd.
Suite 245
Decatur, GA 30033

This the 27th day of June, 2023.

*/s/ Omari J. Crawford*
Assistant County Attorney
Ga. Bar No. 179965

IN THE SUPERIOR COURT OF DEKALB COUNTY
STATE OF GEOGIA

ARIEL EBAUGH,

      PETITIONER,                             CIVIL ACTION NO. 23CV5117

V.

BRADDYE SMITH,
SUPERVISOR,
DEKALB COUNTY PRETRIAL SERVICES;

MELODY M. MADDOX,
SHERIFF, DEKALB COUNTY

&

THE STATE OF GEORGIA

      RESPONDENTS.

## CERTIFICATE OF SERVICE

    I hereby certify that I electronically filed in the above-styled action the foregoing **ENTRY OF APPEARANCE** with the Clerk of Court using the Odyssey eFileGA system, which will automatically send e-mail notification of such filing to all parties of record.

    Respectfully submitted this 28th day of June, 2023.


                                */s/ Nikisha L. McDonald*
                                Nikisha L. McDonald
                                Supervising County Attorney
                                Georgia Bar No. 489573

PERSONS SERVED:

Jason B. Sheffield, Esq.
Peters, Rubin, Sheffield, & Hodges P.A.
2786 N. Decatur Rd. Suite 245
Decatur, GA 30033